**[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT.]**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| --------------------------------------------------------------------x | Case No. 09-40795 |
| : | Jointly Administered |
| In re : | |
| : | Chapter 11 |
| **FORUM HEALTH**, *et al.*, : | |
| : | Judge Kay Woods |
| : | |
| Debtors. : | **DISCLOSURE STATEMENT PURSUANT TO** |
| : | **SECTION 1125 OF THE BANKRUPTCY CODE** |
| : | **FOR THE JOINT PLAN OF** |
| : | **REORGANIZATION PROPOSED BY THE** |
| --------------------------------------------------------------------x | **CONSENT PARTIES** |

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox  (OH 0059649)

-AND-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Amy Edgy Ferber  (GA 013819)

Counsel for MBIA Insurance Corporation

FAEGRE & BENSON LLP
Suite 2200
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
Michael B. Fisco  (MN 175341)

Counsel for U.S. Bank National Association, as Master Trustee
and the Bond Trustees

WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700
Matthew Botica  (IL 260118)

Counsel for JPMorgan Chase Bank, N.A.

REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
Eric A. Schaffer  (PA 30797)

Counsel for Fifth Third Bank

Date Proposed Disclosure Statement Filed with the Bankruptcy Court:  May 14, 2010

CLI-1803443v1

**DISCLOSURE STATEMENT, DATED MAY     , 2010**
**SOLICITATION OF VOTES**
**WITH RESPECT TO THE**
**JOINT PLAN OF REORGANIZATION**
**PROPOSED BY THE CONSENT PARTIES**

———————————————

**MBIA Insurance Corporation ("MBIA" or the "Bond Insurer"), U.S. Bank National Association, as Master Trustee and as Bond Trustees ("US Bank"), JPMorgan Chase Bank, National Association (successor to JPMorgan Chase Bank) ("JPMorgan") and Fifth Third Bank ("Fifth Third") (together, the "Consent Parties") believe that the Joint Plan of Reorganization Proposed by the Consent Parties attached as Exhibit A (the "Plan") to this Disclosure Statement for the Plan (the "Disclosure Statement") is in the best interests of creditors and other stakeholders. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 10 of this Disclosure Statement. More detailed instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan. To be counted, your Ballot must be duly completed, executed and received by 5:00 p.m., Eastern time, on     , 2010 (the "Voting Deadline"), unless extended.**

———————————————

**The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. See Section II.H. There is no assurance that these conditions will be satisfied or waived.**

———————————————

No person is authorized by any of the Consent Parties in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Consent Parties. Although the Consent Parties will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof. The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein nor an endorsement of the merits of the Plan by the Bankruptcy Court.

———————————————

**All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit A and the Risk Factors described under Section XI, prior to submitting Ballots in response to this solicitation.**

———————————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the Confirmation Exhibits thereto and documents described therein as being Filed prior to approval of the Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the Consent Parties will File all Confirmation Exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (*www.kccllc.net/forum*) no later than ten days before the Confirmation Hearing.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested

matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

------------------------

### FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Consent Parties based on the Debtors' projections as provided to the Consent Parties about future events and financial trends affecting the financial condition of the Debtors' businesses, if any, and assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section XI. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Consent Parties do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein. Persons or entities trading in or otherwise procuring, selling or transferring securities of or Claims against the Debtors should evaluate this Disclosure Statement and the Plan in light of the purpose for which they were prepared.**

Section II.B contains important information regarding rights provided to certain holders of debt securities of the Debtors who will be able to elect, as part of voting on the Plan, to receive a Cash payment in lieu of holding their existing bonds (the "Alternative Cash Payment Option"). If you are such a Holder, you will not be entitled to elect the Alternative Cash Payment Option described in that section unless you submit a duly elected Ballot electing such option, as described in Section II.B hereof, to the Voting Agent prior to 5:00 p.m. Eastern time, on _____, 2010, and comply with the other instructions described in Sections II.B and II.G hereof and set forth on the Ballots.

------------------------

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT AND OVERVIEW OF THE PLAN ........................................ 1

II.    OVERVIEW OF THE PLAN ................................................................................................ 2

       A.    Introduction ............................................................................................................... 2

       B.    Summary of Classes and Treatment of Claims and Interests .................................... 3

             1.    Other Priority Claims (Class 1 Claims) ......................................................... 3

             2.    Other Secured Claims (Class 2 Claims) .......................................................... 3

             3.    Series 1997A Bond Claims (Class 3A Claims) ............................................... 3

             4.    Series 1997B Bond Claims (Class 3B Claims) ................................................ 4

             5.    Series 2002A Bond Claims (Class 3C Claims) ............................................... 4

             6.    Series 2002B Bond Claims (Class 3D Claims) ............................................... 5

             7.    Convenience Class Claims (Class 4 Claims) ................................................... 5

             8.    General Unsecured Claims (Class 5 Claims) ................................................... 5

             9.    Intercompany Claims (Class 6 Claims) ........................................................... 5

             10.   Subsidiary Debtor Member Interests (Class 7 Interests) ................................. 5

       C.    General Information Concerning Treatment of Claims and Interests ........................ 9

       D.    Special Provisions Relating to the Rights of Setoff of Creditors ............................. 9

       E.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims;
             Maximum Recovery .................................................................................................. 9

       F.    Sources of Payment of Certain Claims ..................................................................... 9

             1.    Electing Holders of Allowed Series 1997A Bond Claims and Allowed Series
                   2002A Bond Claims ........................................................................................ 9

             2.    Allowed General Unsecured Claims ............................................................. 10

       G.    Voting on and Confirmation of the Plan ................................................................ 10

             1.    Voting Procedures and Requirements ........................................................... 10

             2.    Confirmation Hearing ................................................................................... 11

             3.    Confirmation .................................................................................................. 11

             4.    Acceptance or Cramdown ............................................................................. 12

             5.    Feasibility ...................................................................................................... 13

             6.    Best Interests Test; Chapter 7 Liquidation Analysis ..................................... 13

             7.    Compliance with Applicable Provisions of the Bankruptcy Code ................. 14

             8.    Alternatives to Confirmation and Consummation of the Plan ....................... 14

       H.    Conditions Precedent to the Effective Date of the Plan .......................................... 14

             1.    Conditions to the Effective Date ................................................................... 14

             2.    Waiver of Conditions to Confirmation or Effective Date .............................. 15

             3.    Effect of Nonoccurrence of Conditions to the Effective Date ....................... 15

             4.    Request for Waiver of Stay of Confirmation Order ....................................... 15

             5.    Limited Consolidation for Voting, Confirmation and Distribution Purposes .. 15

             6.    Modification of the Plan ................................................................................ 16

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 4 of 169

# TABLE OF CONTENTS

|  |  | 7. | Revocation of the Plan | 16 |

| III. | | HISTORY OF THE DEBTORS | 16 |
| | A. | Historical Overview | 16 |
| | | 1. | Background | 16 |
| | | 2. | Forum's Hospitals | 17 |
| | | 3. | Forum's Other Businesses | 17 |
| | | 4. | Relationship of Forum Health to the Other Debtors | 19 |
| | B. | Subsidiary Debtor Membership Interests | 20 |

| IV. | | THE DEBTORS' PREPETITION INDEBTEDNESS | 20 |
| | A. | The Hospital Revenue Bonds | 20 |
| | B. | Segregated Funds | 20 |
| | | 1. | The Special Funds Account | 20 |
| | | 2. | The Debt Service Funds and Debt Service Reserve Funds | 21 |
| | C. | Other Prepetition Financing Agreements | 21 |
| | | 1. | The Base Lease | 21 |
| | | 2. | The Lease | 21 |
| | | 3. | The Master Trust Indenture | 21 |
| | | 4. | The Mortgages | 22 |
| | | 5. | The Insurance Policies and Insurance Agreement | 22 |
| | | 6. | The Standby Bond Purchase Agreement | 22 |
| | | 7. | The Reimbursement Agreement | 23 |
| | D. | The Debtors' Obligations on the Petition Date | 23 |
| | E. | Other Liabilities | 23 |

| V. | | EVENTS LEADING UP TO THE DEBTORS' CHAPTER 11 FILING | 24 |
| | A. | Operating Losses at the Debtors' Hospitals | 24 |
| | B. | The Debtors' Turnaround Plans | 25 |
| | C. | Decision to Commence the Chapter 11 Cases | 25 |

| VI. | | EVENTS DURING THE CHAPTER 11 CASES | 25 |
| | A. | Commencement of Chapter 11 Cases | 25 |
| | B. | First Day Relief | 26 |
| | C. | Appointment of Creditors' Committee | 26 |
| | D. | Retention of Advisors for the Debtors | 27 |
| | E. | The Consent Parties | 27 |
| | | 1. | MBIA | 27 |
| | | 2. | U.S. Bank | 27 |
| | | 3. | JPMorgan | 27 |
| | | 4. | Fifth Third | 27 |

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 5 of 169

F.    Use of Cash Collateral to Finance Continuing Operations ................................................ 27

G.    Claims Process and Bar Dates................................................................................................ 28

    1.    Schedules and Statements................................................................................ 28

    2.    Bar Date....................................................................................................... 28

    3.    Summary of Claims................................................................................... 29

    4.    Intercompany Claims................................................................................. 29

H.    Lift Stay Motions ................................................................................................... 29

I.    Postpetition Divestitures ........................................................................................ 30

    1.    Sale of WRCS's Interest in OSC-WRCS ................................................ 30

    2.    Sale of the Gypsy Lane Property .............................................................. 30

    3.    Sale of the CAPD Program ....................................................................... 30

J.    The Debtors' Management ..................................................................................... 31

K.    The Debtors' Pension Plan ..................................................................................... 31

L.    The First 1113 Motion and the 1113 Orders ......................................................... 32

M.    The Debtors' Operating Performance During the Pendency of the Chapter 11 Cases ................. 32

N.    Marketing of the Debtors' Assets .......................................................................... 33

O.    Exclusivity .............................................................................................................. 34

VII.    IMPLEMENTATION OF THE PLAN ............................................................................... 34

A.    Alternative Cash Payment Option.......................................................................... 34

    1.    Source of Funds ......................................................................................... 34

    2.    Cash Option Funds Account ...................................................................... 35

    3.    Fifth Third Cash Collateral Account.......................................................... 35

    4.    Cancellation and Surrender of Instruments, Securities and Other Documentation........ 35

B.    Continued Corporate Existence and Vesting of Assets .......................................... 36

C.    Restructuring Transactions ..................................................................................... 36

    1.    Restructuring Transactions Generally........................................................ 36

    2.    Obligations of Any Successor Corporation in a Restructuring Transaction ................. 36

    3.    Dissolution of Certain Debtors .................................................................. 37

D.    Corporate Governance and Directors or Trustees and Officers ............................. 37

    1.    Articles of Incorporation and Codes of Regulation of the Reorganized Debtors........... 37

    2.    Reorganized Boards................................................................................... 37

    3.    Corporate Action ....................................................................................... 37

E.    The Liquidating Trust Created Pursuant to the Plan .............................................. 38

    1.    Liquidating Trust Generally....................................................................... 38

    2.    Funding of and Transfer of Assets into the Liquidating Trust................... 39

    3.    Liquidating Trustee ................................................................................... 39

    4.    Liquidating Trust Agreement..................................................................... 39

CLI-1803443v1

5. Reports to be Filed by the Liquidating Trustee .................................................... 39

6. Fees and Expenses of the Liquidating Trust ..................................................... 40

7. Indemnification ........................................................................................ 40

8. Tax Treatment .......................................................................................... 40

9. Sales of Assets by Liquidating Trust ............................................................ 40

10. Creation and Maintenance of Trust Accounts ................................................ 41

F. Amended and Restated Master Trust Indenture .......................................................... 41

G. Amended Insurance Agreement ......................................................................... 42

H. Implementation of Settlements .......................................................................... 43

1. Union Settlement Agreements ..................................................................... 43

2. Pension Plan ............................................................................................ 43

I. Employment, Retirement and Other Related Agreements; Workers' Compensation Programs. .................................................................................... 43

1. Employment-Related Agreements ................................................................ 43

2. Compensation and Benefit Programs .......................................................... 43

3. Continuation of Workers' Compensation Programs ...................................... 44

J. Special Provisions Regarding Insured Claims .................................................... 44

1. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims .......................................................................................... 44

2. Assumption and Continuation of Insurance Contracts .................................. 44

3. Liquidation of Tort Claims ......................................................................... 44

K. Cash Management ............................................................................................ 44

L. No Change in Control ....................................................................................... 45

M. Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Avoidance Actions ........................................................................... 45

N. Release of Liens .............................................................................................. 45

O. Releases ......................................................................................................... 45

1. General Releases by Debtors and Reorganized Debtors ............................... 45

2. General Releases by Holders of Claims ....................................................... 45

P. Exculpation ..................................................................................................... 46

Q. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 46

R. Comprehensive Settlement of Claims and Controversies .................................... 46

VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 46

A. Executory Contracts and Unexpired Leases to Be Assumed ............................... 46

1. Assumption and Assignment Generally ....................................................... 46

2. Cure of Defaults ...................................................................................... 47

B. Rejection of Executory Contracts and Unexpired Leases .................................... 47

1. Rejection Generally .................................................................................. 47

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 7 of 169

# TABLE OF CONTENTS

2.      Bar Date for Rejection Damage Claims...................................................... 47

C.      Approval of Assumption, Assumption and Assignment or Rejection............................. 48

D.      Executory Contracts and Unexpired Leases Entered Into After the Petition Date..................... 48

E.      Certain Nonresidential Real Property Leases....................................................... 48

IX.     DISPUTED CLAIMS ...................................................................................... 48

A.      Treatment of Disputed Claims ...................................................................... 48

1.      Tort Claims .............................................................................................. 48

2.      Disputed Insured Claims .......................................................................... 48

3.      No Distributions Pending Allowance ......................................................... 48

B.      Prosecution of Objections to Claims ............................................................. 49

1.      Objections to Claims ................................................................................ 49

2.      Authority to Prosecute Objections ............................................................ 49

3.      Settlement or Compromise of Disputed Claims On or After the Effective Date ........... 49

C.      Authority to Amend Schedules ................................................................... 49

D.      Request for Extension of Claims Objection Bar Date ..................................... 49

E.      Distributions on Account of Disputed Class 4 Claims Once Allowed...................... 49

X.      DISTRIBUTIONS UNDER THE PLAN ............................................................ 50

A.      Payment of Administrative Superpriority Claims and/or Administrative Claims................ 50

1.      Administrative Claims in General ............................................................. 50

2.      Statutory Fees ........................................................................................ 50

3.      Ordinary Course Liabilities .................................................................... 50

4.      Claims Under the Cash Collateral Order .................................................. 50

5.      Special Provisions Regarding the Claims of the Master Trustee and Bond Trustees........ 50

B.      Payment of Priority Tax Claims ................................................................. 51

C.      Distributions for Claims Allowed as of the Effective Date.................................. 51

D.      Method of Distributions to Holders of Claims ............................................... 51

E.      Distributions on Account of Secured Bond Claims ......................................... 51

F.      Compensation and Reimbursement for Services Related to Distributions.................... 52

G.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.................... 52

1.      Delivery of Distributions ........................................................................ 52

2.      Undeliverable Distributions Held by Disbursing Agents................................ 53

H.      Distributions on Account of Allowed Claims in Class 1 and Class 2 ................... 53

I.      Distributions on Account of Allowed Claims in Class 3 .................................. 53

1.      Alternative Cash Payment Option ........................................................... 53

J.      Distributions on Account of Allowed Claims in Class 5 .................................. 54

1.      Selection of Distribution Dates for Class 5 Claims and Provision of Notice Thereof........ 54

2. Calculation of Amounts to Be Distributed to Holders of Class 5 Claims ...................... 54

3. Provisions Governing Disputed Unsecured Claims Reserve ........................... 54

K. Other Provisions Applicable to Distributions in All Classes ....................................... 55

1. Postpetition Interest ........................................................................ 55

2. Allocation of Distributions ........................................................... 55

L. Distribution Record Date ........................................................................ 55

M. Means of Cash Payments ........................................................................ 55

N. Withholding Requirements ...................................................................... 56

O. Setoffs ...................................................................................................... 56

XI. RISK FACTORS ....................................................................................................... 56

A. Certain Bankruptcy Considerations ......................................................... 56

1. Risk of Liquidation or Protracted Reorganization .......................... 56

2. Non-Confirmation of the Plan ......................................................... 57

3. Liquidating Trust ............................................................................. 57

4. Avoidance Actions ........................................................................... 57

B. Certain Alternative Cash Payment Option Considerations and Other Considerations for Holders of Bonds .................................................. 58

1. Risks Relating to the Alternative Cash Payment Option ................. 58

2. No Independent Valuation of Bonds ............................................... 58

3. Enforcement of Remedies; Risks of Bankruptcy ............................ 58

4. Risks Related to Reorganized Debtors' Financings ......................... 58

5. Certain Matters Relating to Enforceability of Security Interest in Gross Revenues ........................................................................ 59

6. Matters Relating to the Security for the Bonds ............................... 60

7. Market for Bonds ............................................................................. 61

8. Tax Exempt Status; Continuing Legal Requirements ..................... 61

9. The Bond Insurer ............................................................................. 63

10. Cash Available for the Alternative Cash Payment Option .............. 63

C. Other Risks to the Reorganization Proposed by the Plan .......................... 63

1. Risk that the CBA Modifications Are Not Implemented ................. 63

2. Risk that the Pension Plan is Not Terminated ................................ 63

D. Reorganized Debtors' Financial Condition ............................................... 64

1. The Reorganized Debtors' Operations Might Not Be Profitable Post-Emergence .......... 64

2. Restrictions Imposed by Amended and Restated Master Trust Indenture and Bond Indentures .................................................. 64

3. Liquidity ........................................................................................... 64

4. Outstanding Indebtedness ................................................................ 64

5. Projections ........................................................................................ 65

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 9 of 169

6. Reorganized Debtors' Business Plan ................................................................ 65

7. Investment Income ........................................................................................... 65

8. Business Uncertainties and Risk from Bankruptcy ........................................... 65

E. Nonprofit Health Care General Business Risks ............................................................ 66

1. Impact of Disruptions in the Credit Markets and General Economic Factors ............... 66

2. Indigent Care ................................................................................................... 66

3. Reliance on Medicare ....................................................................................... 66

4. State Budgets ................................................................................................... 66

5. Rate Pressure from Insurers and Major Purchasers ......................................... 67

6. Health Plans and Managed Care ....................................................................... 67

7. Business Relationships ..................................................................................... 67

8. Health Care Professionals and Other Employees ............................................. 68

9. Labor Costs and Disruption .............................................................................. 68

10. Medical Liability Litigation and Insurance ....................................................... 69

11. Technical and Clinical Developments ............................................................... 69

12. Competition Among Health Care Providers ...................................................... 69

13. Capital Needs versus Capital Capacity ............................................................. 69

14. Facility Damage .............................................................................................. 69

15. Hospital Pricing .............................................................................................. 69

F. Nonprofit Health Care Regulatory Risks ..................................................................... 70

1. General .............................................................................................................. 70

2. Federal Laws and Regulations .......................................................................... 70

3. Ohio Laws and Regulations .............................................................................. 76

4. Environmental Regulations .............................................................................. 78

5. Enforcement Actions ........................................................................................ 78

6. Possible Future Legislation .............................................................................. 80

G. Securities Laws Considerations Regarding Liquidating Trust Interests ....................... 81

1. Non-Transferability of Liquidating Trust Interests ........................................... 81

2. Uncertainty of Value of Liquidating Trust Interests ......................................... 81

XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE
PLAN ..................................................................................................................................... 81

A. General ......................................................................................................................... 81

B. Tax Treatment of Interest on the Bonds ...................................................................... 82

C. U.S. Federal Income Tax Consequences to Holders of Claims ...................................... 82

1. Holders of Bonds .............................................................................................. 82

2. Holders of Class 5 Claims ................................................................................. 83

D. Tax Treatment of the Liquidating Trust and Disputed Unsecured Claims Reserve ......... 84

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 10 of 169

**TABLE OF CONTENTS**

1. Establishment of the Liquidating Trust............................................................ 84

2. Taxation of Holders of Beneficial Interests in Liquidating Trust ................... 84

E. Certain Other Tax Considerations for Holders of Claims ................................ 85

1. Pre-Effective Date Interest........................................................................ 85

2. Post-Effective Date Cash Distributions .................................................... 85

3. Reinstatement of Claims ........................................................................... 85

4. Bad Debt and/or Worthless Securities Deduction..................................... 85

5. Market Discount ........................................................................................ 85

6. Installment Method .................................................................................... 86

7. Information Reporting and Backup Withholding ....................................... 86

F. Importance of Obtaining Professional Tax Assistance .................................... 86

XIII. ADDITIONAL INFORMATION ................................................................................ 86

XIV. RECOMMENDATION AND CONCLUSION ........................................................... 86

CLI-1803443v1

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 11 of 169

# TABLE OF EXHIBITS

**Exhibit A:**      Plan

**Exhibit B:**      Organizational Chart

**Exhibit C:**      Liquidation Analysis

**Exhibit D:**      Financial Projections

**Exhibit E:**      Feasibility Analysis

CLI-1803443v1

## I.    PRELIMINARY STATEMENT AND OVERVIEW OF THE PLAN

The Consent Parties are seeking approval of the Plan, a copy of which is attached as Exhibit A. This Disclosure Statement is submitted by the Consent Parties in connection with the solicitation of acceptances of the Plan. Capitalized terms used in this Disclosure Statement but not defined have the meanings given to them in the Plan.

The Debtors comprise a regional health care system ("Forum")[1] that was formed in 1997 and consists of three principal business units: Trumbull, WRCS – which includes Northside Medical Center ("Northside") – and Hillside. The Debtors are engaged in the provision of health care related services in the Trumbull, Mahoning and Columbiana counties in the greater Youngstown, Ohio area.

On March 16, 2009, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The United States Trustee appointed the Creditors' Committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a) of the Bankruptcy Code on March 23, 2009, and subsequently amended its membership on March 25, 2009. Concurrently with the Filing of this Disclosure Statement, the Consent Parties Filed the Plan, which sets forth, among other things, how the Claims against and Interests in the Debtors will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, significant events occurring in these Chapter 11 Cases and other related matters.

The Plan generally provides for the continued operation of the Debtors' businesses and a restructuring of their debt through (A) the restructuring of approximately $129,000,000.00 in aggregate principal amount of Secured Bond Claims and (B) the creation of a liquidating trust (the "Liquidating Trust") to, among other things, (1) collect, preserve and/or liquidate all assets in the Liquidating Trust, (2) pursue Avoidance Actions that are transferred to the Liquidating Trust and (3) make distributions pursuant to the Plan for the benefit of Allowed Class 5 General Unsecured Claims.

The Plan requires the simultaneous implementation of several distinct restructuring initiatives and the cooperation of, among others, the Debtors, the Consent Parties, the Unions, the Pension Benefit Guaranty Corporation (the "PBGC") and the Creditors' Committee. In order to successfully reorganize, the Debtors must, among other things: (A) address the excessive costs and funding requirements of the legacy pension accumulated over the past forty years and (B) restructure their wage and benefit programs to create an appropriate and sustainable labor and benefit cost structure. As a result, the Plan is premised upon two overarching settlements being reached prior to Confirmation: (A) a settlement, reasonably acceptable to the Consent Parties, among the Debtors and the PBGC with respect to (1) the termination of the Forum Health Pension Plan (the "Pension Plan") and (2) certain Claims held by the PBGC (together, the "PBGC Settlement"); and (B) a settlement among the Debtors and each of ASCFME, the ONA and SEIU (each a "Union", and together, the "Unions"), that implement the CBA Modifications, or, in the absence of such settlement, an order or orders from the Bankruptcy Court implementing the CBA Modifications, as set forth more fully below.

In particular, it is vital that modifications to the Collective Bargaining Agreements are reached that, in sum, shall (A) cause the Debtors' total labor costs not to exceed an average of 49% of the Debtors' net patient revenues over the life of the Debtors' business plan, approved by the Forum Health Board (as defined below) on or about April 27, 2010 (the "Business Plan"), (B) cause the Unions' work rules to conform to market standards and

---

[1]    Forum includes: Forum Health; its parent, non-debtor Forum Health Holding Company ("Forum Holding"); its debtor affiliates (a) Western Reserve Care System ("WRCS"), (b) Western Reserve Health Foundation ("WRHF"), (c) Trumbull Memorial Hospital ("Trumbull"), (d) Trumbull Memorial Hospital Foundation ("TMHF"), (e) Forum Health Services Co. ("FHS"), (f) Forum Health Rehabilitative Services Co. (d/b/a Hillside Rehabilitation Hospital) ("Hillside"), (g) Beeghly Oaks ("Beeghly"), (h) Dacas Nursing Systems, Inc. (d/b/a Forum Health at Home – Private Duty) ("Dacas"), (i) Dacas Nursing Support Systems, Inc. ("Dacas Nursing"), (j) Visiting Nurse Association and Hospice of Northeast Ohio ("VNA"), (k) Forum Health Pharmacy Services Co. ("FHPS"), (l) Forum Health Enterprises Co. ("FHE"), (m) Forum Health Ventures Co. ("FHV"), (n) Forum Health Outreach Laboratories, Inc. ("FHOL"), (o) Forum Health Diagnostics Co. ("FHD"), (p) PrideCare, Inc. ("PCI"), (q) Comprehensive Psychiatry Specialists, Inc. ("CPS"); and its non-debtor affiliates (r) Forum Health Insurance Ltd. ("FHIL") and (s) Forum Health Foundation ("FHF").

(C) extend the term of each Collective Bargaining Agreement through the life of the Debtors' Business Plan (collectively, the "CBA Modifications").  In the event that the Debtors and the Unions are unable to reach agreement on or before 14 days prior to the Disclosure Statement Hearing, with respect to the necessary CBA Modifications, the Debtors must File and serve (A) a reconsideration motion pursuant to Bankruptcy Rule 60 and section 105(a) of the Bankruptcy Code for reconsideration of (1) the Stipulated Order Resolving Debtors' Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113 (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto (Service Employees International Union) entered by the Bankruptcy Court on July 31, 2009 (Docket No. 410) and (2) the Stipulated Order Resolving Debtors' Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113 (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto (Ohio Nurses Association) entered by the Bankruptcy Court on July 31, 2009 (Docket No. 411) (the "Reconsideration Motion") and (B) a motion pursuant to section 1113 of the Bankruptcy Code seeking authority to impose the CBA Modifications (the "New 1113 Motion") or other similar relief (collectively, the "New 1113 Relief").  If such relief cannot be obtained, then the Debtors must implement the Northside Disposition Plan and, after such implementation is complete, (A) Debtor WRCS' Chapter 11 Case will be converted to a case under chapter 7 of the Bankruptcy Code and (B) Debtor WRCS will be removed from the Plan.

The Plan provides that all Classes of Allowed Claims will be treated as set forth in the Plan and as summarized on the classification and treatment chart in Section II.B.  Holders of Intercompany Claims will receive no distributions under the Plan, and all Claims and Interests will be deemed settled and compromised as of the Effective Date.

## II.    OVERVIEW OF THE PLAN

### A.    Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit A, and the Confirmation Exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Consent Parties will File all Confirmation Exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (*www.kccllc.net/forum*) no later than ten days before the Confirmation Hearing.

The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case.  Although referred to as a plan of reorganization or plan of liquidation, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan.  In these Chapter 11 Cases, the Plan contemplates a reorganization of each of the Reorganized Debtors and the merger or dissolution of Beeghly, CPS, Dacas, Dacas Nursing, FHPS, PCI and VNA (collectively, the "Dissolving Entities"), and therefore, is referred to as a "plan of reorganization."  The primary objectives of the Plan are to (1) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis in accordance with the priorities established by the Bankruptcy Code and (2) settle, compromise or otherwise dispose of certain claims and interests on terms that the Consent Parties believe to be fair and reasonable and in the best interests of the Debtors' respective Estates and creditors.  The Plan provides for, among other things:  (1) the reorganization of each of the Reorganized Debtors; (2) the merger or dissolution of the Dissolving Entities; (3) the restructuring of approximately $129,000,000.00 in aggregate principal amount of Secured Bond Claims; (4) the establishment of the Liquidating Trust to take possession of the Liquidating Trust Assets and then distribute the assets of the Liquidating Trust to the holders of Allowed Class 5 General Unsecured Claims; (5) the assumption of all unexpired Executory Contracts and Unexpired Leases to which any Debtor is a party that were not previously assumed and assigned or rejected or to be rejected pursuant to the Plan (subject to certain limited exceptions); and (6) certain other transactions to effect the Plan.

**By an order of the Bankruptcy Court dated                        , 2010, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of**

the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ."  11 U.S.C. § 1125(a)(1).

The Consent Parties believe that the Plan is in the best interests of creditors and other stakeholders.  All creditors entitled to vote are urged to vote in favor of the Plan by no later than the Voting Deadline.

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in Section II.G.  The occurrence of the Effective Date is subject to certain conditions, which are summarized in Section II.H.  There can be no assurance that these conditions will be satisfied.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan of reorganization are that the plan:  (1) is accepted by the requisite holders of claims and interests in impaired classes of the debtor; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for the debtor; and (3) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Allowed Claims in Classes 3A, 3B, 3C, 3D, 4 and 5 are entitled to vote to accept or reject the Plan.  See Section II.G for a discussion of the Bankruptcy Code requirements for Confirmation of the Plan.  As set forth in Section I above, the Plan is premised on two overarching settlements being achieved prior to Confirmation: the PBGC Settlement and the implementation of the CBA Modifications.

**B.  Summary of Classes and Treatment of Claims and Interests**

The Plan divides holders of Claims against and Interests in the Debtors into seven (7) separate Classes as follows:

**1.  Other Priority Claims (Class 1 Claims) are unimpaired.**  On the later of the Effective Date or on the allowance of such Other Priority Claim, each holder of an Allowed Other Priority Claim in Class 1 will receive Cash equal to the amount of such Allowed Claim, unless the holder of such Other Priority Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment.

**2.  Other Secured Claims (Class 2 Claims) are unimpaired**.  On the later of the Effective Date or on the allowance of such Other Secured Claim, each holder of an Allowed Other Secured Claim in Class 2 will receive such treatment that either:  (a) Reinstates the Other Secured Claim; (b) results in the surrender of the collateral of the holder of such Other Secured Claim and preserves all statutory rights of the holder of such Other Secured Claim to assert deficiency Claim(s); or (c) pays the holder of such Other Secured Claim in the ordinary course, unless the holder of an Other Secured Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment.

**3.  Series 1997A Bond Claims (Class 3A Claims) are impaired**.  On the Effective Date, unless otherwise agreed by the beneficial holder of a Series 1997A Bond Claim and the applicable Debtor or Reorganized Debtor, each beneficial holder of an Allowed Claim in Class 3A will receive treatment on account of such Allowed Series 1997A Bond Claim in the manner set forth in Option A or B below, at the election of the beneficial holder of the Series 1997A Bond Claim.  The beneficial holder of such Allowed Series 1997A Bond Claim will be deemed to have elected Option A unless such beneficial holder elects Option B on its Ballot.

*Option A*:  On the Effective Date, for the beneficial holders electing or deemed to elect Option A, (a) their Series 1997A Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 1997A Bonds, the Series 1997A Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 1A, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 1997A Bonds, the Series 1997A Bond Indenture, the Series 1997A Policy, the Base Lease, the Lease, the Assignments, Obligation No. 1A and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture and the Amended Insurance Agreement shall replace the Master Trust Indenture and the Insurance Agreement, respectively.

*Option B*:  On the Effective Date, the Reorganized Debtors will satisfy such beneficial holder's Allowed Series 1997A Bond Claim by making the Series 1997A Alternative Cash Payment.  Any beneficial holder of an Allowed Series 1997A Bond Claim that elects and receives the Series 1997A Alternative Cash Payment shall surrender such Electing Holder's Bonds, such Electing Holder's Series 1997A Bonds that have been satisfied by the Series 1997A Alternative Cash Payment shall be canceled and no longer outstanding under the Series 1997A Bond Indenture, and such Electing Holder shall no longer have the benefit of or rights under the Series 1997A Policy on account of the Series 1997A Bonds being canceled. To the extent the Series 1997A Cash Option Funds are insufficient to satisfy all of the elections made by the Electing Holders of the Allowed Series 1997A Bond Claims, the Series 1997A Cash Option Funds will be applied Pro Rata to such Claims.  The remainder of the Allowed Series 1997A Bond Claims of the Electing Holders will receive treatment in the manner set forth in Option A above.  To the extent the Series 1997A Cash Option Funds exceed the amounts needed to satisfy all of the elections made by the Electing Holders of the Allowed Series 1997A Bond Claims, the Series 1997A Cash Option Funds will be withdrawn from the Series 1997A Cash Option Funds Account and applied by the Obligated Group Debtors to redeem Bonds (which may or may not include the Series 1997A Bonds).  Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

Nothing in Section II.B.3 of the Plan or any other provision in the Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 1997A Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 1997A Bonds; *provided, however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

4.    **Series 1997B Bond Claims (Class 3B Claims) are impaired.**  On the Effective Date, (a) the Series 1997B Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 1997B Bonds, the Series 1997B Bond Indenture, the Standby Bond Purchase Agreement, the Series 1997B Policy, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 1B, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 1997B Bonds, the Series 1997B Bond Indenture, the Standby Bond Purchase Agreement, the Series 1997B Policy, the Base Lease, the Lease, the Assignments, Obligation No. 1B and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture and the Amended Insurance Agreement shall replace the Master Trust Indenture and the Insurance Agreement, respectively.

Nothing in Section II.B.4 of the Plan or any other provision in the Plan shall affect in any way the Series 1997B Policy, which shall remain in full force and effect, or shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 1997B Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 1997B Bonds; *provided*, *however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

5.    **Series 2002A Bond Claims (Class 3C Claims) are impaired**.  On the Effective Date, unless otherwise agreed by a beneficial holder of a Series 2002A Bond Claim and the applicable Debtor or Reorganized Debtor, each beneficial holder of an Allowed Claim in Class 3C will receive treatment on account of such Allowed Series 2002A Bond Claim in the manner set forth in Option A or B below, at the election of the beneficial holder of the Series 2002A Bond Claim.  The beneficial holder of such Allowed Series 2002A Bond Claim will be deemed to have elected Option A unless such Holder elects Option B on its Ballot.

*Option A*:  On the Effective Date, for the beneficial holders electing or deemed to elect Option A, (a) their Series 2002A Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 2002A Bonds, the Series 2002A Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 2A, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 2002A Bonds, the Series 2002A Bond Indenture, the Base Lease, the Lease, the Assignments, Obligation No. 2A and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture shall replace the Master Trust Indenture.

- 4 -

*Option B*:  On the Effective Date, the Reorganized Debtors will satisfy such beneficial holder's Allowed Series 2002A Bond Claim by making the Series 2002A Alternative Cash Payment.  Any beneficial holder of an Allowed Series 2002A Bond Claim that elects and receives the Series 2002A Alternative Cash Payment shall surrender the Electing Holder's Bonds, such Electing Holder's Series 2002A Bonds that have been satisfied by the Series 2002A Alternative Cash Payment shall be canceled and no longer outstanding under the Series 2002A Bond Indenture.  To the extent the Series 2002A Cash Option Funds are insufficient to satisfy all of the elections made by the Electing Holders of the Allowed Series 2002A Bond Claims, the Series 2002A Cash Option Funds will be applied Pro Rata to such Claims.  The remainder of the Allowed Series 2002A Cash Option Bond Claims of the Electing Holders will receive treatment in the manner set forth in Option A above.  To the extent the Series 2002A Cash Option Funds exceed the amounts needed to satisfy all of the elections made by the Electing Holders of the Allowed Series 2002A Bond Claims, the Series 2002A Cash Option Funds will be withdrawn from the Series 2002A Cash Option Funds Account and deposited in the Series 2002A Reserve Fund to be applied in accordance with the Series 2002A Bond Indenture.  Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

Nothing in Section II.B.5 of the Plan or any other provision in the Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 2002A Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 2002A Bonds; *provided*, *however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

**6.**      **Series 2002B Bond Claims (Class 3D Claims) are impaired**.  On the Effective Date, (a) the Series 2002B Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 2002B Bonds, the Series 2002B Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 2B, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 2002B Bonds, the Series 2002B Bond Indenture, the Base Lease, the Lease, the Assignments, Obligation No. 2B and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture shall replace the Master Trust Indenture.

Nothing in Section II.B.6 of the Plan or any other provision in the Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 2002B Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 2002B Bonds; *provided*, *however*, the Amended and Restated Master Trust Indenture and the Amended Reimbursement Agreement will replace the Master Trust Indenture and Reimbursement Agreement, respectively.

**7.**      **Convenience Class Claims (Class 4 Claims) are impaired**.  On the later of the Effective Date or the allowance of the Claim, each holder of an Allowed Convenience Class Claim will receive, in exchange for and in full satisfaction of such Convenience Class Claim, its Pro Rata interest in the Convenience Class Claims Pool.

**8.**      **General Unsecured Claims (Class 5 Claims) are impaired**.  On the Effective Date, in full satisfaction of its Allowed Claim, each holder of an Allowed Claim in Class 5 will receive its Pro Rata interest in the Liquidating Trust as set forth more fully in Section III.I of the Plan and Section V.F.3 of the Plan.

**9.**      **Intercompany Claims (Class 6 Claims) are unimpaired**.  On the Effective Date, prepetition Intercompany Claims in Class 6 that are not eliminated by operation of law in the Restructuring Transactions will be deemed settled and compromised in exchange for consideration and other benefits provided to the holders of prepetition Intercompany Claims, and such Claims are not entitled to any distributions under the Plan. Each holder of a Class 6 Claim will be deemed to have accepted the Plan.

**10.**     **Subsidiary Debtor Member Interests (Class 7 Interests) are unimpaired**.  On the Effective Date, the Subsidiary Debtor Member Interests of all Reorganized Debtors will be Reinstated, subject to the Restructuring Transactions.  Each holder of a Class 7 Interest will be deemed to have accepted the Plan.

CLI-1803443v1

The estimated percentage recovery for each Class under the Plan is provided in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Superpriority Claims, Administrative Claims and Priority Tax Claims, except as described in Section II.A of the Plan, have not been classified. For a discussion of certain additional matters related to Administrative Superpriority Claims, Administrative Claims and Priority Tax Claims, see Sections X.A and X.B. The Consent Parties' estimate of recoveries for holders of Claims under the Plan are based on their estimate of the Administrative Superpriority Claims, Administrative Claims and Priority Tax Claims, including those that were Filed as of the date of this Disclosure Statement; *however*, there can be no assurance that the Consent Parties' estimate of the likely aggregate allowed amount of such Administrative Superpriority Claims, Administrative Claims or Priority Tax Claims will prove to be accurate.

The estimated amounts of Claims shown in the table below are based upon the Debtors' (insofar as their views have been communicated to the Consent Parties) and the Consent Parties' preliminary review of certain (but not all) of the Claims Filed on or before August 3, 2009 and the Consent Parties' review of the Debtors' books and records and may differ from the analysis set forth herein substantially following the completion of a detailed analysis of all the Claims Filed. In addition, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim under this Disclosure Statement.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash, estimated Cash Option Funds, the value of the Convenience Class Claims Pool or the value of other assets of the Liquidating Trust to be distributed to holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class. Each of the estimated Cash, Cash Option Funds, the value of the Convenience Class Claims Pool or other Liquidation Trust Assets and the estimated aggregate amount of Allowed Claims has been made in ranges with both low and high estimates. In determining such amount, the Consent Parties have assumed that the Plan is consummated as described therein. These calculations do not include any value attributed to Avoidance Actions, including preference actions, by any of the Estates or the Liquidating Trustee. The Consent Parties have not commenced a review of potential Avoidance Actions and, therefore, this Disclosure Statement does not provide an estimated value for such actions.

For a discussion of various factors that could materially affect the amount of Cash and other assets of the Liquidating Trust to be distributed pursuant to the Plan, see Section XI and the Feasibility Analysis attached hereto as Exhibit E. In addition, the Consent Parties' estimates for recoveries by holders of Allowed Claims are based on the Consent Parties' current view of the likely amount of Allowed Administrative Claims incurred by the Debtors through Confirmation of the Plan. There can be no guaranty that the Consent Parties' estimates of Allowed Administrative Claims will prove to be accurate.

### SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED TOTAL AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 1 (Other Priority Claims) | Unimpaired; Not Entitled to Vote | $0 | 100%[2] |

---

[2] The estimated total amount of Claims and the estimated percentage recovery for holders of Claims in Class 1 is based upon the Consent Parties' review of the Debtors' Claims register. No independent analysis has been conducted by the Consent Parties.

CLI-1803443v1

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED TOTAL AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 2 (Other Secured Claims) | Unimpaired; Not Entitled to Vote | $0 | 100%[3] |
| Class 3A (Series 1997A Bond Claims) | Impaired; Entitled to Vote | $68,650,000.00[4] | 100%[5] |
| Class 3B (Series 1997B Bond Claims) | Impaired; Entitled to Vote | $26,313,000.00[6] | 100%[7] |
| Class 3C (Series 2002A Bond Claims) | Impaired; Entitled to Vote | $26,200,000.00[8] | 100%[9] |

---

[3]    The estimated total amount of Claims and the estimated percentage recovery for holders of Claims in Class 2 is based upon the Consent Parties' review of the Debtors' Claims register. Though certain Claims were filed as Secured Claims, upon information and belief, all were filed as unliquidated Claims. No independent analysis has been conducted by the Consent Parties.

[4]    Amount represents aggregate principal amount of such Claims. Pursuant to the Cash Collateral Order, the Debtors have paid postpetition interest, fees and costs to the Holders and the Consent Parties. Notwithstanding the foregoing, there are certain postpetition interest, fees and costs due to the Holders and the Consent Parties, which would increase the amount of the Claims in Class 3A.

[5]    The estimated total amount of Claims and the percentage recovery for holders of Claims in Class 3A is based upon the outstanding aggregate principal amounts of the Series 1997A Bonds.

[6]    Amount represents aggregate principal amount of such Claims. Pursuant to the Cash Collateral Order, the Debtors have paid postpetition interest, fees and costs to the Holders and the Consent Parties. Notwithstanding the foregoing, there are certain postpetition interest, fees and costs due to the Holders and the Consent Parties, which would increase the amount of the Claims in Class 3B.

[7]    The estimated percentage recovery for holders of Claims in Class 3B is based upon the outstanding aggregate principal amounts of the Series 1997B Bonds.

[8]    Amount represents aggregate principal amount of such Claims. Pursuant to the Cash Collateral Order, the Debtors have paid postpetition interest, fees and costs to the Holders and the Consent Parties. Notwithstanding the foregoing, there are certain postpetition interest, fees and costs due to the Holders and the Consent Parties, which would increase the amount of the Claims in Class 3C.

[9]    The estimated percentage recovery for holders of Claims in Class 3C is based upon the outstanding aggregate principal amounts of the Series 2002A Bonds.

CLI-1803443v1

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED TOTAL AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 3D (Series 2002B Bond Claims) | Impaired; Entitled to Vote | $7,755,000.00[10] | 100%[11] |
| Class 4 (Convenience Class Claims) | Impaired; Entitled to Vote | $180,999.97 | 82.87%[12] |
| Class 5 (General Unsecured Claims) | Impaired; Entitled to Vote | $234,000,000.00 | 0.03%[13] |
| Class 6 (Intercompany Claims) | Unimpaired; Deemed to Accept the Plan; Not Entitled to Vote | N/A | N/A[14] |
| Class 7 (Subsidiary Debtor Member Interests) | Unimpaired; Deemed to Accept the Plan; Not Entitled to Vote | N/A | N/A |

For purposes of computations of Claim amounts, administrative and other expenses and similar computational purposes, the Effective Date is assumed to occur on September 30, 2010. Though the Consent Parties anticipate that the Plan will be confirmed on or before September 30, 2010 and that, as a result, the Effective Date

---

[10] Amount represents aggregate principal amount of such Claims. Pursuant to the Cash Collateral Order, the Debtors have paid postpetition interest, fees and costs to the Holders and the Consent Parties. Notwithstanding the foregoing, there are certain postpetition interest, fees and costs due to the Holders and the Consent Parties, which would increase the amount of the Claims in Class 3D.

[11] The estimated percentage recovery for holders of Claims in Class 3D is based upon the outstanding principal amounts of the Series 2002B Bonds.

[12] The estimated percentage recovery for holders of Claims in Class 4 is based upon the Consent Parties' review of the Debtors' Claims register. No independent analysis has been conducted by the Consent Parties.

[13] The estimated percentage recovery for holders of Claims in Class 5 is based upon the Consent Parties' review of the Debtors' Claims register. The calculations for the estimated percentage recovery do not include any value attributed to Avoidance Actions, including preference actions. The Consent Parties have not commenced a review of potential Avoidance Actions and, therefore, are not in a position to provide an estimated value for such actions. As a result, the estimated percentage recovery for holders of Claims in Class 5 may increase if Avoidance Actions are successfully prosecuted. In addition, while the Consent Parties have performed an initial review of the Debtors' Schedules regarding the value of unencumbered real estate assets that may be transferred to the Liquidating Trust, such review found that certain of the Debtors' real property is either not listed on the Schedules or not valued on the Schedules. Thus, the estimated percentage recovery for holders of Claims in Class 5 may vary from the estimate provided herein.

[14] The estimated total amount of Claims and the percentage recovery for holders of Claims in Class 6 is based upon the Consent Parties' review of the Debtors' books and records and information provided by the Debtors' management. No independent analysis has been conducted by the Consent Parties.

CLI-1803443v1

will occur on or before September 30, 2010, there can be no assurance if or when the Effective Date will actually occur.

The classification and manner of satisfying all Claims and Interests under the Plan takes into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510 of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan. All subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

C.      **General Information Concerning Treatment of Claims and Interests**

Procedures for the distribution of Cash to the Electing Holders of Allowed Series 1997A Claims and to the Electing Holders of Allowed Series 2002A Claims pursuant to the Plan are described in Section V.C of the Plan and are set forth and described more fully in Section X.I below. Procedures for the distribution of Cash and other assets of the Liquidating Trust pursuant to the Plan are described in Section V of the Plan or will be set forth in the Liquidating Trust Agreement and are set forth and described more fully in Sections VII.E and X below. The determination of the relative distributions to be received under the Plan by the holders of Claims in certain Classes was based upon, among other factors, estimates of the amounts of Allowed Claims in such Classes and the relative priorities of such Allowed Claims. The distributions to be received by creditors in certain Classes could differ from these estimates if the estimates prove to be inaccurate.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization or liquidation in certain circumstances even if the plan is not accepted by all impaired classes of claims and interests. See Section II.G.4. The Consent Parties have reserved the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code. Although the Consent Parties believe that, if necessary, the Plan could be confirmed under the cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

D.      **Special Provisions Relating to the Rights of Setoff of Creditors**

Nothing in the Plan shall expand or enhance a creditor's right of setoff, which shall be determined as of the Petition Date. Nothing in the Plan is intended to, or shall be interpreted to, approve any creditor's effectuation of a postpetition setoff without the consent of the Debtors or Reorganized Debtors, unless prior Bankruptcy Court approval has been obtained.

E.      **Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

Holders of Allowed Secondary Liability Claims against any of the Debtors will be entitled to only one distribution from the Debtors in respect of the Liabilities related to such Allowed Secondary Liability Claim and such Claims against all of the Debtors will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim. Holders of Allowed Secondary Liability Claims against a Debtor may not receive more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

F.      **Sources of Payment of Certain Claims**

1.      **Electing Holders of Allowed Series 1997A Bond Claims and Allowed Series 2002A Bond Claims**

Payments made on account of Allowed Series 1997A Bond Claims in Class 3A (where Option B is elected) and Allowed Series 2002A Bond Claims in Class 3C (where Option B is elected) will be made from the Series 1997A Cash Option Funds and the Series 2002A Cash Option Funds, respectively. To the extent the applicable

- 9 -

Cash Option Funds are insufficient to satisfy all of the elections made by the Electing Holders of the Series 1997A Bond Claims and the Series 2002A Bond Claims, respectively, the applicable Cash Option Funds will be applied Pro Rata to such Claims. The remainder of the Allowed Series 1997A Bond Claims and the Allowed Series 2002A Bond Claims of the Electing Holders, as applicable, will receive treatment in the manner set forth in the treatment section outlined in Option A of each of Class 3A and 3C, respectively, as set forth more fully in Sections II.B.3 and II.B.5 of the Plan and Sections II.B.3 and II.B.5 above. In the event that Cash remains in the Series 1997A Cash Option Funds Account, the Cash in the Series 1997A Cash Option Subaccount shall be transferred by the Master Trustee to the Bond Trustees to redeem Bonds, in accordance with the terms of the Bond Indentures, at the direction of the Bond Insurer, including, without limitation, to redeem the Series 1997B Bonds. In the event that Cash remains in the Series 2002A Cash Option Funds Account, the Cash in the Series 2002A Cash Option Subaccount shall be transferred by the Master Trustee to the Series 2002A Reserve Fund to be applied in accordance with the Series 2002A Bond Indenture.

### 2. Allowed General Unsecured Claims

Payments on account of Allowed Class 4 Claims will be made by the Reorganized Debtors from the Convenience Class Claims Pool. Payments made on account of Allowed General Unsecured Claims in Class 5 will be made from the Liquidating Trust, as set forth more fully in Sections VII.E and X below.

### G. Voting on and Confirmation of the Plan

### 1. Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified other than by curing defaults and reinstating maturities. Classes of claims and equity interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan. In addition, classes of claims and equity interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan unless such class otherwise indicates acceptance. The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each class of Claims or Interests is impaired or unimpaired, in Section II.B above.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. **By order of the Bankruptcy Court, certain vote tabulation rules have been approved that temporarily allow or disallow certain Claims for voting purposes only. These tabulation rules are described in the solicitation materials provided with your Ballot.**

Voting on the Plan by each holder of an impaired Claim is important. If you hold Claims in more than one Class, if you hold multiple general unsecured Claims or under certain other circumstances, you may receive more than one Ballot. You should complete, sign and return each Ballot you receive.

Under the terms of the Plan, only Classes 3A, 3B, 3C, 3D, 4 and 5 are impaired and are entitled to vote on the Plan. If any of Classes 3A, 3B, 3C, 3D, 4 or 5 votes to reject the Plan, (a) the Consent Parties may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety. See Sections II.G.4 and II.H. Further, if any of Classes 3A, 3B, 3C, 3D, 4 or 5 votes to reject the Plan, the Consent Parties reserve the right, in their sole discretion, to seek to not confirm the Plan.

Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided.

To be counted, your Ballot or Ballots must be received by the Voting Deadline by Kurtzman Carson Consultants LLC ("KCC" or, the "Voting Agent").

CLI-1803443v1

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at (866) 967-0264.

**Votes cannot be transmitted orally or by facsimile, except in the case of a master Ballot submitted by the tabulation agent. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is <u>received</u> by the Voting Agent on or before the Voting Deadline.**

Holders of Claims entitled to vote may withdraw or modify their Ballots by delivering (or having their nominee deliver) to KCC, prior to the Voting Deadline, a subsequent properly completed and duly executed Ballot. After the Voting Deadline, withdrawals of or modifications to Ballots will not be permitted.

### 2. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Consent Parties have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for _____, 2010. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to the Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3. Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Consent Parties, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Consent Parties have complied with the applicable provisions of the Bankruptcy Code;

- the Consent Parties, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure has been made that is required by section 1125 of the Bankruptcy Code;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the successors to the Debtors have been made; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 23 of 169

retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan.

In addition, the Bankruptcy Court will not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section VIII.C of the Plan:

- The Confirmation Order will be reasonably acceptable in form and substance to the Consent Parties.

- The Plan shall not have been materially amended, altered or modified from the Plan as Filed on May 14, 2010, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

- All Confirmation Exhibits to the Plan are in form and substance reasonably satisfactory to the Consent Parties.

- The CBA Modifications shall be implemented after being either (a) agreed to by the Unions and, if necessary, ratified by their memberships and approved by order of the Bankruptcy Court, or (b) obtained through the New 1113 Relief by order of the Bankruptcy Court.

- In the event the Debtors and the Unions are unable to agree upon the CBA Modifications for Northside on or before 14 days prior to the Disclosure Statement hearing, the Debtors shall have sought the New 1113 Relief. If such relief cannot be obtained from the Bankruptcy Court, the Debtors shall implement the Northside Disposition Plan, and Debtor WRCS shall be administered outside the Plan.

- The Pension Plan shall have been terminated.

### 4. Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class. See Section II.G.6.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that, unless a dissenting class of unsecured claims or a class of interests with respect to a debtor receives full compensation for its allowed claims or allowed interests, no holder of allowed claims or interests with respect to such debtor in any junior class may receive or retain any property on account of such claims or interests. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of the amount of their allowed claims or allowed interests. The Consent Parties believe that, if necessary, the Plan may be crammed down over the dissent of certain Classes of Claims, in view of the treatment proposed for such Classes.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Consent Parties do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

Any Class of Claims or Interests that receives nothing under the Plan is deemed to be a dissenting Class. As a result, in addition to any Class that does not vote to accept the Plan, the Consent Parties will, to the extent required, seek to use the "cramdown" provisions described above in respect to such Claims and Interests that are not to receive any distributions pursuant to the Plan.

### 5. Feasibility

Based upon the Debtors' Business Plan, the Consent Parties believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation. In connection with Confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which section requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors (unless such liquidation or reorganization is proposed by the Plan).

To demonstrate the Plan's feasibility, the Consent Parties have prepared the projections based on the Debtors' Business Plan, as set forth in Exhibit D attached to this Disclosure Statement (the "Projections").

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB") OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE CONSENT PARTIES OR THEIR ADVISORS. THE PROJECTIONS RELY UPON THE DEBTORS' BUSINESS PLAN AS PREPARED BY THE DEBTORS, HURON CONSULTING SERVICES LLC AND THE DEBTORS' OTHER ADVISORS.

WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, WHILE CONSIDERED REASONABLE BY DEBTORS' MANAGEMENT BASED ON THEIR BUSINESS PLAN, MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE CONSENT PARTIES AND THE DEBTORS' MANAGEMENT. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE CONSENT PARTIES, THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS, OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS.

### 6. Best Interests Test; Chapter 7 Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor plus any Cash held by the Debtor.

The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 cases and all

- 13 -

unpaid Administrative Claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases.  Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The information contained in Exhibit C hereto (the "<u>Liquidation Analysis</u>") provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each of the Debtors' properties and interests in property.

After consideration of the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtors' creditors, including (a) the increased costs and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee, (b) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation, and from the rejection of unexpired leases and executory contracts in connection with the cessation of the operations of the Debtors, (c) the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (d) the adverse effects on the salability of portions of the business that could result from the possible departure of key employees and the loss of patients and vendors, (e) the costs related to the termination of the Debtors' employees and the concomitant increase in Claims, (f) the cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding and (g) the application of the rule of absolute priority to distributions in a chapter 7 liquidation, the Consent Parties have determined that Confirmation of the Plan will provide each holder of a Claim in an impaired Class entitled to vote with a greater recovery than such holder would have received under a chapter 7 liquidation of the Debtors.

### 7. Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Consent Parties have considered each of these issues in the development of the Plan, believe that the Plan complies with all provisions of the Bankruptcy Code and will File a brief in support of Confirmation of the Plan prior to the Confirmation Hearing.

### 8. Alternatives to Confirmation and Consummation of the Plan

The Consent Parties have evaluated alternatives to the Plan, including alternative structures and terms of reorganization of the Debtors.  While the Consent Parties have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or different plans of reorganization or liquidation.  Further, if no plan of reorganization or liquidation under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases.  In a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to creditors.  The net proceeds of the liquidation would be distributed in accordance with the priorities established by the Bankruptcy Code.  For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidations, see Section II.G.6.  The Consent Parties believe that Confirmation and consummation of the Plan is preferable to the available alternatives.

### H. Conditions Precedent to the Effective Date of the Plan

### 1. Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section VIII.C of the Plan:

- The Bankruptcy Court has entered the Confirmation Order.

- No stay of the Confirmation Order is in effect.

- The Liquidating Trust Agreement has been executed, the Liquidating Trust has been created and the Liquidating Trustee has been appointed and accepted such appointment.

- The Plan and all Confirmation Exhibits to the Plan have not been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification was made in accordance with Section X.A of the Plan.

### 2. Waiver of Conditions to Confirmation or Effective Date

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Consent Parties without an order of the Bankruptcy Court.

### 3. Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C of the Plan, then upon motion by the Consent Parties made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section VIII.D of the Plan: (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Article IV of the Plan, (iii) the releases described in Section III.O of the Plan and (iv) the Alternative Cash Payment Options; (b) nothing contained in the Plan will (i) constitute a waiver or release of any Claims by or against any Debtor or (ii) prejudice in any manner the rights of the Debtors, the Consent Parties or any other party in interest; and (c) the Liquidating Trust, if already created, will be promptly dissolved.

### 4. Request for Waiver of Stay of Confirmation Order

The Plan serves as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served on the parties listed in Section X.F of the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### 5. Limited Consolidation for Voting, Confirmation and Distribution Purposes

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the consolidation of the Debtors solely for the purpose of voting, Confirmation and distributions to be made under the Plan. Accordingly, for purposes of implementing the Plan, pursuant to such order: (a) all Assets and Liabilities of the Debtors shall be treated as if they are pooled; and (b) with respect to any guarantees by one Debtor of the obligations of any Debtor, and with respect to any joint or several liability of any Debtor, the holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors, in each case except to the extent otherwise provided in the Plan.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (a) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions; (b) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (i) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that have been or will be assumed or (ii) pursuant to the Plan; (c) Interests between and among the Debtors; (d) distributions from any insurance policies or proceeds of such policies; (e) preservation of the separate Estates for purposes of Confirmation to the extent provided in the Plan; and (f) the revesting of assets in the separate Reorganized Debtors pursuant to Section III.A of the Plan. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a

CLI-1803443v1

waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

The Plan will serve as a motion seeking entry of an order consolidating the Debtors solely for the purposes of voting, Confirmation and distributions to be made under the Plan, as described and to the limited extent set forth in Section VII.A of the Plan. Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section X.F of the Plan on or before seven days before either the Voting Deadline or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing. Notwithstanding this provision, nothing in the Plan will affect the obligation of each and every Debtor to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930.

In the event that the Bankruptcy Court does not approve the Consent Parties' election to treat the Estates as if they are consolidated solely for voting, Confirmation and distribution purposes, (a) the Plan will be treated as a separate plan of reorganization for each Debtor and (b) the Consent Parties will not be required to re-solicit votes with respect to the Plan.

### 6. Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the Consent Parties reserve the right to alter, amend or modify the Plan before the Effective Date.

### 7. Revocation of the Plan

The Consent Parties reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Consent Parties revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against any Debtor; (b) prejudice in any manner the rights of the Consent Parties (or any of them), any Debtor or any other party in interest; or (c) constitute an admission of any sort by the Consent Parties (or any of them), any Debtor or any other party in interest.

## III. HISTORY OF THE DEBTORS[15]

### A. Historical Overview

#### 1. Background

Forum was formed in 1997 as a result of the merger of Trumbull and WRCS. Forum combined the separate healthcare delivery systems based in Warren, Ohio at Trumbull and in Youngstown, Ohio at Northside and the now-closed Southside Medical Center. Today, the Debtors and their non-Debtor affiliates provide health care related services in the northeast Ohio counties of Mahoning, Trumbull and Columbiana (the "Primary Service Area") as well as in Ashtabula, Geauga and Portage counties in northeast Ohio and Mercer and Lawrence counties in Pennsylvania (the "Secondary Service Area" and, together with the Primary Service Area, the "Service Area").

The sole member of Forum Health is non-debtor Forum Holding. Forum Holding was formed on July 29, 1997 to provide for community representation consistent with the prior governance of Trumbull and WRCS.[16] Since the merger, Forum has been composed as follows: Forum Health is the parent and sole member of

---

[15]  Much of the information in the following sections regarding the history and background of the Debtors is drawn from various pleadings filed by the Debtors in these Chapter 11 Cases. The Consent Parties make no representation or warranties as to the accuracy of such information.

[16]  Prior to Forum's formulation in 1997, Trumbull and WRCS had independently established special planning committees comprised of board members, community leaders, medical staff members and senior management with the stated purpose of examining how they could best serve the residents of northeastern Ohio in the evolving healthcare market.

CLI-1803443v1

WRCS, Trumbull, FHS and of non-debtor FHF; WRCS is the sole member of WRHF; Trumbull is the sole member of TMHF; FHS is the sole member of Hillside, Dacas, Beeghly, FHPS, VNA, FHE, FHV and non-debtor FHIL; and FHV is the sole member of Dacas Nursing, FHOL, FHD, PCI and CPS. Attached hereto as Exhibit B is an organizational chart showing the ownership interests of the Debtors.

Forum's stated mission is to enhance the health status of the communities in the Service Area, combined with a system-wide emphasis on technology and quality. Forum declares that it strives to be the preferred healthcare system in the Service Area through a commitment to healing, access, technology and education.

As of the Petition Date, over 700 physicians were affiliated with Forum. According to certain pleadings filed by the Debtors, in 2008, the last full calendar year prior to the Petition Date, Forum recorded more than 539,000 outpatient visits, 29,534 home care visits and 26,834 inpatient discharges.

2.      **Forum's Hospitals**

As of the Petition Date, Forum operated three hospitals located in northeastern Ohio: Trumbull, Northside and Hillside. Brief descriptions of these facilities follow:

Trumbull Memorial Hospital. Trumbull was founded in 1907 and is a general acute care hospital located in Warren, Ohio. Upon information and belief, as of July 2009, Trumbull had 346 licensed beds and 286 operating beds. Trumbull offers inpatient, outpatient, emergency, diagnostic and therapeutic services, including oncology, cardiology, general surgery, mental health and rehabilitative services. According to certain pleadings filed by the Debtors, as of the Petition Date, 249 physicians had privileges at Trumbull. Trumbull also owns the Elm Road Medical Park ("ERMP") that is located on a 17.5 acre campus approximately four miles north of the main hospital campus in central Trumbull County. ERMP is a 185,000 square foot ambulatory medical park, which includes 24,500 square feet of unfinished shelled space. ERMP is home to Trumbull's Center for Radiology, Center for Rehabilitation and Center for Surgery.[17] ERMP is also the site of Trumbull's PET scanning service, which is the only PET scanner available to patients in Trumbull County. Trumbull is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

Northside Hospital. Northside was opened in 1929 and is a general acute care hospital located in Youngstown, Ohio. Upon information and belief, as of July 2009, Northside had 398 licensed beds and 226 operating beds. Northside offers inpatient, outpatient, emergency, diagnostic and therapeutic services, including cardiology, oncology, general and orthopedic surgery and maternity services. According to certain pleadings filed by the Debtors, as of the Petition Date, 452 physicians had privileges at Northside. Northside is also an active teaching hospital in conjunction with the Northeastern Ohio University College of Medicine. WRCS, Northside's owner and operator, is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

Hillside Rehabilitation Hospital. Hillside is an accredited rehabilitation hospital located on a 20-acre campus in Howland Township in Trumbull County, Ohio. Upon information and belief, as of July 2009, Hillside had 69 licensed beds and 65 operating beds. Hillside was originally constructed in 1929, with major additions in 1972 and 1991. Until 1998, Hillside was owned and operated by Trumbull County as a county hospital facility and was acquired by Forum Health on April 1, 1998. According to certain pleadings filed by the Debtors, as of the Petition Date, four doctors had full privileges, one doctor had associate privileges and 62 doctors had consulting privileges at Hillside. Hillside is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

3.      **Forum's Other Businesses**

Forum also operates a number of related debtor businesses, one non-debtor captive insurance company (FHIL) and one non-debtor foundation (FHF) that is no longer operational. FHIL is registered as a separate captive insurance company under Bermuda law. FHF is an Ohio nonprofit 501(c)(3) corporation. As of February 28, 2009, the Debtors reported that FHF held no unrestricted or restricted Cash or investments.

---

[17]     Trumbull's Center for Surgery is an outpatient facility that includes four operating rooms, an eye-laser treatment room, a dermatology-laser treatment room, a lab draw site and pre-testing and post-operative areas.

CLI-1803443v1

### a. General Administration

i. *Forum Holding*: Forum Holding is the ultimate parent corporation of each of the Debtors and has an 18-member board of trustees (the "<u>Forum Holding Board</u>") that appoints the Forum Health Board of Trustees (the "<u>Forum Health Board</u>"). Forum Holding is an Ohio nonprofit 501(c)(3) corporation, and it is not a chapter 11 debtor.

ii. *Forum Health*: Forum Health is the operating parent of Forum. According to certain pleadings filed by the Debtors, as of the Petition Date, Forum Health had approximately 240 full-time administrative employees located in various facilities throughout Forum. These employees provide overall system management, as well as finance, human resources, management, marketing, planning, information technology, materials management, corporate compliance, legal, risk management and managed care services for Forum. Costs for these services are allocated among the Forum entities based on utilization and need as determined by Forum Health. Forum Health is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

iii. *FHE*: FHE employs certain physicians who provide clinical, medical, teaching, administrative and educational services to Forum (particularly to Trumbull, Northside and Hillside) to meet the Ohio Corporate Practice of Medicine regulations. FHE is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

iv. *FHV*: FHV provides certain staffing, billing and transcription services for FHE and for certain physicians who are not employed by FHE. FHV is an Ohio corporation, and it is a chapter 11 debtor.

### b. Trumbull's Related Services and Entities

i. *FHOL*: FHOL, also known as Preferred Regional Labs, operates six outpatient lab drawing sites in Mahoning and Trumbull Counties, including one facility at Trumbull's Center for Surgery (as described in footnote 17 above) that offers patients a wide range of clinical laboratory services, including cytology and surgical pathology, along with routine tests, STAT testing and lab courier services. FHOL is an Ohio corporation, and it is a chapter 11 debtor.

ii. *TMHF*: TMHF is charged with the development and fundraising activities for Trumbull. In addition, TMHF holds and manages donated funds until such funds are used in accordance with donors' restrictions, if any. As of March 31, 2010, the Debtors reported that TMHF held unrestricted Cash and investments of approximately $9,300,000.00. TMHF is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

### c. Northside's Related Services and Entities

i. *FHD*: FHD operates two outpatient diagnostic radiology and imaging services centers (including x-ray and MRI) at Northside. FHD is an Ohio nonprofit 501(c)(3) corporation, but is not exempt from federal income taxes. It is a chapter 11 debtor.

ii. *WRHF*: WRHF is charged with the development and fundraising activities for WRCS. In addition, WRHF holds and manages donated funds until such funds are used in accordance with donors' restrictions, if any. As of March 31, 2010, the Debtors reported that WRHF held unrestricted Cash and investments of approximately $4,300,000.00. WRHF is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

### d. Other Non-Hospital and Outpatient Services

i. *FHS*: FHS operates the principal non-hospital and outpatient services for Forum. Major activities include the operation of a non-debtor Bermuda captive insurance company, FHIL, an occupational

medicine program, a diagnostic imaging company, physical therapy services and medical office management. FHS also owns and operates Austintown Medical Park located in northwestern Mahoning County ("Austintown Medical Park"). Austintown Medical Park houses an immediate care facility, an imaging center, outpatient rehabilitation services and certain local primary care and subspecialty physicians. FHS is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

ii. *FHOL*: As described in more detail in Section III.A.3.b.i above, FHOL, based in Austintown Medical Park, operates six outpatient lab drawing sites, including one facility at Trumbull's Center for Surgery (as described in footnote 17 above).

### e. Discontinued Operations

i. *FHF*: FHF is no longer operational. FHF is an Ohio nonprofit 501(c)(3) corporation, and it is not a chapter 11 debtor.

ii. *Beeghly*: Substantially all of the assets of Beeghly were sold effective November 16, 2007. Beeghly is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

iii. *Dacas*: Substantially all of the assets of Dacas were sold effective July 1, 2008. Dacas is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

iv. *VNA*: Substantially all of the assets of VNA were sold effective July 1, 2008. VNA is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

v. *FHPS*: The business of FHPS was closed effective April 1, 2007. FHPS is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

vi. *CPS*: Substantially all of the assets of CPS were sold effective February 29, 2008. CPS is an Ohio corporation, and it is a chapter 11 debtor.

vii. *PCI*: PCI ceased operations in 2006. Prior to ceasing operations, PCI acted as a third party administrator and a licensed insurance agency and provided participating provider organization (PPO) health insurance, utilization management services and health care benefit administration to the Debtors and their employees. PCI also acted as the claims administrator for all of the Debtors' self-insured health care plans. PCI is an Ohio corporation, and it is a chapter 11 debtor.

viii. *Dacas Nursing*: Dacas Nursing is no longer operational. Dacas Nursing is an Ohio nonprofit 501(c)(3) corporation, and it is a chapter 11 debtor.

### 4. Relationship of Forum Health to the Other Debtors

Although the Debtors' cases have been jointly administered pursuant to an order of the Bankruptcy Court, the Consent Parties are proposing the consolidation of the Debtors' respective estates solely for the purpose of voting, Confirmation and distributions to be made under the Plan. Thus, the Plan is really 18 distinct chapter 11 plans, one for each of the Debtors. However, because some of the procedural provisions of the Plan are the same for each Debtor, and to save the costs of the duplicative efforts that would be involved in drafting and soliciting approval of 18 separate chapter 11 plans and disclosure statements, the Consent Parties are submitting a single Plan and Disclosure Statement for all Debtors. Accordingly, the Plan generally applies to all of the Debtors, except where otherwise indicated.

As discussed below, on the Effective Date, the Reorganized Debtors will merge or dissolve the following entities through the Plan and will not set up new corporations to continue those Debtors' historic functions: Beeghly, CPS, Dacas, Dacas Nursing, FHPS, PCI and VNA.

CLI-1803443v1

### B. Subsidiary Debtor Membership Interests

The following Debtors are nonprofit corporations that have one or more voting members, but have no issued shares or equity interests: Forum Health; Beeghly; Dacas; Dacas Nursing; FHE; FHPS; Hillside; FHS; Trumbull; TMHF; VNA; WRCS; and WRHF.

## IV. THE DEBTORS' PREPETITION INDEBTEDNESS

### A. The Hospital Revenue Bonds

Prior to the Petition Date, the County of Mahoning, Ohio (the "<u>Issuer</u>"), issued a series of Hospital Revenue Bonds as follows:

| Name of Bond | Original Aggregate Principal Amount | Relevant Agreement | Aggregate Principal Amount Outstanding on Petition Date |
|---|---|---|---|
| Series 1997A Bonds | $91,610,000.00 | Series 1997A Bond Indenture | $71,420,000.00 |
| Series 1997B Bonds | $42,600,000.00 | Series 1997B Bond Indenture | $30,072,000.00 |
| Series 2002A Bonds | $40,000,000.00 | Series 2002A Bond Indenture | $26,200,000.00 |
| Series 2002B Bonds | $20,000,000.00 | Series 2002B Bond Indenture | $7,755,000.00 |

The Bonds were issued for the purpose of defeasing certain outstanding bonds issued on behalf of certain of the Debtors and of financing the costs of additional hospital facilities for certain of the Debtors. As of the Petition Date, approximately $139,200,000.00 in gross aggregate principal of the Bonds remained outstanding under the Bond Indentures.

Pursuant to the terms of the Bonds, certain funds were segregated to secure the payment and performance obligations of the Debtors under the Bonds, including the Special Fund Accounts (as defined below). In addition, in order to secure the payment of their obligations in connection with the Bonds, the Obligated Group Debtors entered into various Prepetition Financing Agreements, all of which are more fully described below.

### B. Segregated Funds

#### 1. The Special Funds Account

The Series 1997A Bonds and Series 2002A Bonds are secured by an absolute and irrevocable assignment by the Issuer of its right, title and interest in and to certain trust accounts created and defined pursuant to the terms of the Series 1997A and 2002A Bond Indenture (the "<u>1997A and 2002A Special Funds Accounts</u>"), the moneys on deposit therein and by a pledge and grant of a lien on certain other moneys on deposit in and to the credit of other funds and accounts created under the Series 1997A and 2002A Bond Indenture. The Series 1997A Bonds and Series 2002A Bonds are also secured by (a) an assignment of the Hospital Receipts (*i.e.*, all rentals and other moneys received by the Issuer or the Bond Trustee pursuant to the Lease Agreement including, without limitation, Basic Rent (as defined below) and moneys including, without limitation, investments credited to the 1997A and 2002A Special Funds Accounts under the Series 1997A and 2002A Bond Indenture and income from the investment thereof) and (b) the assignment by the Issuer to the Series 1997A and 2002A Bond Trustee of Obligation Nos. 1A and 2A (as defined below).

The Series 1997B Bonds and Series 2002B Bonds are secured by an absolute and irrevocable assignment by the Issuer of its right, title and interest in and to certain trust accounts created and defined pursuant to the terms of the Series 1997B and 2002B Bond Indenture (the "<u>1997B and 2002B Special Funds Account</u>" and, together with the 1997A and 2002A Special Funds Account, the "<u>Special Funds Accounts</u>"), the moneys on deposit therein and by a

pledge and grant of a lien on certain other moneys on deposit in and to the credit of other funds and accounts created under the Series 1997B and 2002B Bond Indenture. The Series 1997B Bonds and Series 2002B Bonds are also secured by (a) an assignment of Hospital Receipts (*i.e.*, all rentals and other moneys received by the Issuer or the Bond Trustee pursuant to the Lease Agreement including, without limitation, Basic Rent (as defined below) and moneys including, without limitation, investments credited to the 1997B and 2002B Special Funds Accounts under the Series 1997B and 2002B Bond Indenture and income from the investment thereof) and (b) the assignment by the Issuer to the Series 1997B and 2002B Bond Trustee of Obligation Nos. 1B and 2B (as defined below).

### 2. The Debt Service Funds and Debt Service Reserve Funds

For each series of outstanding Bonds, certain of the Special Funds Accounts are debt service funds (each a "DSF" and, together, the "DSFs") and DSRFs. The DSFs were created for the purpose of paying certain Bond Service Charges, including, but not limited to, the payment of principal of and premium and interest on the Bonds on or before each date when the Bond Service Charges are due and payable. An individual DSRF was created for the benefit of the Holders of certain of the Bonds in order to secure the related outstanding Bonds. In the event that moneys in a DSF are insufficient on any date on which Bond Service Charges on the related outstanding Bonds are due, the applicable Bond Trustees may withdraw from the related DSRF the moneys necessary to make up the deficiency and may transfer those moneys to such DSF as applicable.

### C. Other Prepetition Financing Agreements

### 1. The Base Lease

In order to provide for and permit the issuance of the Bonds, Debtors FHS, Beeghly, Trumbull and WRCS, as lessors, conveyed to Issuer a leasehold interest in certain of their respective properties under the Base Lease.

### 2. The Lease

The Issuer, as lessor, reconveyed to the Lessees, a leasehold interest in the properties covered by the Base Lease under the terms of the Lease.

The Lessees covenanted and agreed jointly and severally under the Lease to, among other things, (a) pay Basic Rent and (b) to pay other amounts payable under the Lease. The obligation of each Lessee to pay the Basic Rent and other amounts payable under the Lease is absolute and unconditional, with limited exceptions as provided in Section 3.4 of the Lease. Pursuant to the Bond Indentures and an Assignment to Bond Trustees, the Basic Rent payments have been assigned by the Issuer, and are to be made directly by the Lessees to the Bond Trustees for the benefit of the Holders of the Bonds.

The Obligated Group Debtors are currently indebted to the Issuer for the payment of Basic Rent in an amount equal to the Bond Service Charges under the Lease.

The Debtors are required to make interest payments in May and November and a principal payment in November of each year as due to the Holders of the Series 1997A Bonds. The Debtors are required to make monthly interest payments and principal payments in November of each year as due to the Holders of the Series 1997B Bonds. The Debtors are required to make interest payments in May and November of each year and principal payments in November of each year as due to the Holders of the Series 2002A Bonds. The Debtors are required to make monthly interest payments and a principal payment at maturity to the Holders of the Series 2002B Bonds.

### 3. The Master Trust Indenture

In order to evidence and to secure their obligations in connection with the issuance of the Bonds, the Obligated Group Debtors issued Obligation Nos. 1A, 1B, 2A and 2B under the Master Trust Indenture. Obligation Nos. 1A, 1B, 2A and 2B are joint and several obligations of the Obligated Group Debtors to, among other things, pay Basic Rent under the Lease in amounts and at times sufficient to pay Bond Service Charges on each series of the Bonds, respectively. Obligation Nos. 2C and 3 were also issued under the Master Trust Indenture to evidence the Obligated Group Debtors' obligations to Fifth Third and JPMorgan, respectively. As security for payment of the

CLI-1803443v1

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 33 of 169

Obligations, the Issuer assigned to the Master Trustee, for the benefit of the Holders of the Bonds, all of its rights under the Lease (other than certain Unassigned Rights (as defined under the Lease) including, without limitation, rights to indemnification and reimbursement for expenses and the right to Basic Rent assigned to the Bond Trustees) pursuant to the Assignment to Master Trustee.

To secure equally and ratably the payment of debt service charges on the Obligations issued under the Master Trust Indenture, and the performance by each Debtor of all of its covenants and agreements under the Master Trust Indenture, each Obligated Group Debtor pledged, assigned and granted to the Master Trustee, and the Master Trustee has, to the extent permitted by law, for the benefit of the Holders of the Bonds, an assignment of and security interest in the Gross Revenues (as defined in the Master Trust Indenture) of each of the Obligated Group Debtors (consisting generally of all accounts and assignable general intangibles owned or thereafter acquired by an Obligated Group Debtor and proceeds thereof, excluding, among other items, proceeds of borrowings held in trust by a trustee as security for a borrowing and grantor or donor-restricted funds).  In addition, the Obligated Group Debtors pledged, assigned and granted to the Master Trustee, for the benefit of the Holders of the Bonds, an assignment of and security interest in Equipment, Inventory and Investment Property, each as defined in the Master Trust Indenture.

In connection with the Obligated Group Debtors' pledge of deposit and securities accounts to the Master Trustee under the Master Trust Indenture, and to perfect the Master Trustee's security interest therein, the Obligated Group Debtors entered into:  (a) that certain Accounts Control Agreement, dated as of October 31, 2003, among Forum Health, for itself and the other Obligated Group Debtors, the Master Trustee and BNY Mellon Bank, N.A., as successor to Mellon Bank, N.A.; (b) that certain Master Blocked Account Agreement, dated as of December 8, 2006, as amended by that certain First Amendment to Master Blocked Account Agreement, dated as of July 15, 2008, among the Obligated Group Debtors, Fifth Third and the Master Trustee; and (c) that certain Control Agreement, dated as of December 8, 2006, as amended by that certain First Amendment to Control Agreement, dated as of July 15, 2008, among the Obligated Group Debtors, JPMorgan and the Master Trustee.

## 4. The Mortgages

To further secure the Obligations, certain of the Obligated Group Debtors executed and delivered to the Master Trustee, for the benefit of the Holders of the Bonds, separate Mortgages, to provide a mortgage lien upon, and security interest in, their principal facilities, including land, buildings, fixtures, tangible personal property and proceeds thereof (collectively, the "Mortgaged Premises").

## 5. The Insurance Policies and Insurance Agreement

In connection with the issuance of the Series 1997A Bonds and the Series 1997B Bonds, at the request of the Obligated Group Debtors, the Bond Insurer issued the Series 1997A Policy and the Series 1997B Policy.  In connection with the issuance of the Policies, the Bond Insurer and Debtors FHS, WRCS and Trumbull entered into that certain Insurance Agreement setting forth, among other things, certain covenants made by the Obligated Group Debtors.  Pursuant to the terms of the Policies, the Bond Insurer insures the timely payment of principal of and interest on all of the currently outstanding Series 1997A Bonds and all of the currently outstanding Series 1997B Bonds.

Pursuant to Section 7.12(d) of the Bond Indentures, the Bond Insurer, as the insurer of the Series 1997 Bonds, is deemed to be the Holder of the Series 1997A Bonds and the Series 1997B Bonds for purposes of giving or withholding any approval, consent, direction, notice or waiver that a Holder of the Series 1997 Bonds may have discretion to give or withhold under the Bond Indentures of each outstanding Series 1997 Bond.  Further, the consent of the Bond Insurer is required prior to the acceleration of the maturity of the principal of the Series 1997 Bonds.  The Bond Insurer insures in excess of a majority of the aggregate amount of the outstanding Bonds.  Therefore, pursuant to Section 7.03 and Section 7.05 of the Bond Indentures, the Bond Insurer has the right to control and direct the exercise of any remedies under the Bond Indentures.

## 6. The Standby Bond Purchase Agreement

Pursuant to that certain Standby Bond Purchase Agreement, JPMorgan agreed to purchase all of the Series 1997B Bonds upon tender by the Holders thereof (the "Eligible Bonds").  The Eligible Bonds were purchased by

JPMorgan on July 10, 2008 and currently constitute bank bonds ("Bank Bonds"). Pursuant to Section 2.06 of the Standby Bond Purchase Agreement, upon the purchase of the Bank Bonds, JPMorgan is entitled to all rights and privileges accorded to Holders of the Series 1997B Bonds, except to the extent such rights and privileges conflict with the Standby Bond Purchase Agreement and as limited by Section 2.10 of the Master Trust Indenture.

On July 10, 2008, the then-current holders of the Series 1997B Bonds tendered their Bonds to the Series 1997B and Series 2002B Bond Trustee. The remarketing agent was unable to remarket the Series 1997B Bonds to new holders and, pursuant to the Standby Bond Purchase Agreement, JPMorgan purchased all of the Series 1997B Bonds. Pursuant to the terms of the Standby Bond Purchase Agreement, the Obligated Group Debtors are required to redeem $3,759,000.00 of the Series 1997B Bonds on each semi-annual payment date of January 1 and July 1 commencing January 1, 2010. The timely payment of these mandatory redemptions is insured by the Series 1997B Policy.

**7.      The Reimbursement Agreement**

In connection with the issuance of the Series 2002B Bonds, Fifth Third and the Obligated Group Debtors entered into the Reimbursement Agreement, pursuant to which Fifth Third issued an Irrevocable Letter of Credit No. R130091 (formerly S100205) in the original amount of $20,246,576 (the "Fifth Third Letter of Credit") and provided credit support for the Series 2002B Bonds. In addition, Fifth Third and the Obligated Group Debtors entered into that certain Forbearance and Bank Services Agreement, dated as of July 27, 2006 (as amended from time to time, the "Fifth Third Forbearance Agreement"), pursuant to which Fifth Third agreed to provide certain treasury management services, including, without limitation, automated clearing house transactions and credit card services to the Debtors (the "Fifth Third Services"). In exchange for the continued provision of the Fifth Third Services and its forbearance and as security for Fifth Third's credit exposure to the members of the Obligated Group Debtors, pursuant to the Fifth Third Forbearance Agreement, on or about July 27, 2006, the Obligated Group Debtors deposited into a segregated, blocked, cash collateral account (No. 7521664636) maintained at Fifth Third (the "Fifth Third Cash Collateral Account") funds in the amount of $5,000,000.00 (such amount and any other amounts that, from time to time, may have been deposited into the Fifth Third Cash Collateral Account, the "Fifth Third Cash Collateral"). Thereafter, Fifth Third and the Obligated Group Debtors entered into the WCLC Reimbursement Agreement pursuant to which the Obligated Group Debtors deposited into a segregated, blocked, cash collateral account (No. 7521666086) maintained at Fifth Third funds in the amount of $4,114,000. On October 30, 2009, Fifth Third filed a motion for relief from the automatic stay to draw down on the workers' compensation letter of credit referenced in the WCLC Reimbursement Agreement. A consent order related to Fifth Third's motion for relief from stay was entered on November 13, 2009, and the letter of credit was drawn.

On April 1, 2009, the then-current Holders of the Series 2002B Bonds tendered their Bonds to the Series 1997B and 2002B Bond Trustee. The remarketing agent was unable to remarket the Series 2002B Bonds to new holders and, pursuant to the Fifth Third Letter of Credit, Fifth Third purchased all of the Series 2002B Bonds.

**D.      The Debtors' Obligations on the Petition Date**

Pursuant to the terms of the Prepetition Financing Agreements described above, the Consent Parties and the other Holders of the Bonds constitute the Debtors' prepetition secured lenders (the "Prepetition Secured Lenders").

As of the Petition Date, the Obligated Group Debtors were and continue to be jointly and severally indebted and liable to the Prepetition Secured Lenders in the gross aggregate principal amount of not less than $139,200,000.00 (collectively, with accrued interest, fees, charges and costs, the "Prepetition Obligations").

**E.      Other Liabilities**

The Debtors had a number of intercompany loans that are not set forth in detail herein, but were tracked by the Debtors' management in the Debtors' books and records and reviewed by the Consent Parties.

Based upon their review of the Debtors' books and records, the Consent Parties do not presently believe that the Debtors have significant contingent liabilities for environmental claims.

CLI-1803443v1

The Debtors also have pension liabilities. Based upon outside actuarial reports, as of March 1, 2010, the Debtors anticipated that their discounted pension liabilities were approximately $322,000,000.00. As of that date, the Debtors had pension assets of approximately $205,000,000.00, thus indicating that the existing defined benefit pension plan funding were underfunded by approximately $117,000,000.00. The PBGC has Filed a Claim estimating such underfunding in the approximate amount of $200,000,000.00, and the Debtors have informed the Consent Parties that they believe this amount is substantially overstated. According to the Debtors' 2008 audited financial statements, Pension Plan funding was a substantial cost for the Debtors prior to the Petition Date, with $6,000,000.00 funded in 2006 and $12,100,000.00 funded in 2007. Also according to the Debtors' 2008 audited financial statements, employer contributions were discontinued during 2009. Upon information and belief, the Debtors failed to make quarterly payments of $1,437,000 due on April 15, 2009, July 15, 2009, October 15, 2009, January 15, 2010 and April 15, 2010. For information regarding action taken relating to the Pension Plan during the Chapter 11 Cases, see Section VI.K.

## V. EVENTS LEADING UP TO THE DEBTORS' CHAPTER 11 FILING

Several factors severely impacted the Debtors' operations and financial performance and ultimately prompted the liquidity pressures that precipitated the need to file the Chapter 11 Cases. Among other things, the Debtors were faced with the following challenges: (A) an aging and shrinking population in the Service Area; (B) difficulty in recruiting new physicians to the Service Area; (C) a poor payor mix; (D) capital investment needs; (E) investment losses (totaling approximately $6,000,000.00 in fiscal year 2008); and (F) high labor costs. Though the factors set forth above were not anomalies affecting the Debtors in isolation, certain circumstances were unique to the Debtors and are discussed more fully below.

### A. Operating Losses at the Debtors' Hospitals

Following the merger that created Forum in 1997, Forum's management was unable to realize many of the anticipated benefits from the merger. Instead, the two main hospitals, Trumbull and Northside, were poorly configured for an integrated delivery of health care services, both geographically and in terms of service offerings. As a result, instead of synergies, the merger caused inefficiencies, needlessly duplicative expenses and continuing losses for the health care system.

In addition, Forum's historically onerous Collective Bargaining Agreements remained dramatically more costly than those of its peers. Typically, labor costs for non-profit hospitals average 45% of net patient revenues. In contrast, in fiscal year 2009, Northside's labor costs represented 56.1% of net patient revenues (54.6% in fiscal year 2008), Trumbull's labor costs represented 50.8% of net patient revenues (47.7% in fiscal year 2008) and Hillside's labor costs represented 67.3% of net patient revenues (64.0% in fiscal year 2008). In comparison, in 2008, Debtors' nearest competitor, Humility of Mary Health Partners, reported total labor costs of 47% of net patient revenues in 2008, only two percent above the national average.

Moreover, the Debtors' management was unsuccessful in completing planned improvements, including improvements for which much of the Prepetition Obligations were incurred. In 2002, the Debtors adopted a $60,000,000.00 Master Facility Plan (the "Master Facility Plan"), pursuant to which, among other things, the Debtors planned the construction of a heart hospital, the renovation of a surgical unit and a new children's patient floor at Northside. None of these projects was completed.

In January 2006, these factors and others culminated in the Debtors' falling out of compliance with their Bond covenants and defaulting on their obligations to the Consent Parties. After several months of initial negotiations, the Debtors and the Consent Parties entered into the first of ultimately seven forbearance agreements (collectively, the "Forbearance Agreements"),[18] during the terms of which it was anticipated that Debtors'

---

[18]     The Forbearance Agreements include, collectively: (1) the Fifth Third Forbearance Agreement; (2) that certain Forbearance Agreement, dated as of December 8, 2006, among the Bond Insurer, the Bond Trustees, the Master Trustee and the Obligated Group Debtors (the "Bond Insurer Forbearance Agreement"); (3) that certain Forbearance Letter, dated as of December 8, 2006, by and among certain of the Debtors, the 1997B and 2002B Bond Trustee and JPMorgan (the "JPMorgan Forbearance Letter Agreement"); (4) the Master Forbearance Agreement, dated as of March 31, 2007, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors (the "Master Forbearance Agreement"); (5) the First Amended Master

management would make decisions and take steps designed to reverse the system's decline and to align the Debtors' operations with the opportunities available in their marketplace and to align their expenses with their available revenues.

### B.     The Debtors' Turnaround Plans

During the forbearance period, Forum pursued a variety of strategies, both with and without the assistance of outside professionals. Some progress was made through 2006, reflected in 2007 results, as Forum implemented operating improvements recommended by its advisors. However, these improvements did not extend to some of the most significant challenges facing the system: declining demographics; burdensome labor agreements; significant pension obligations; and enhanced competition in the market. In 2007, Forum pursued a sales strategy, which resulted in the sale of some assets, but resulted in no consummated offers for the operating hospitals. In 2008, Forum released all of its advisors and turned to a "back to basics" approach to its problems. This strategy failed. As the gains from the 2006 initiatives evaporated, Northside continued to drain cash from the rest of the system and the credit markets collapsed, closing off any possibility of raising additional capital for debt refinancing.

### C.     Decision to Commence the Chapter 11 Cases

Despite the above-described Forbearance Agreements and the efforts of the Debtors to reduce costs and improve operations, the Debtors continued to experience spiraling operating losses. In the four years leading up to the Petition Date, the Debtors suffered almost $100,000,000.00 in losses.

Still in distress and faced with the possibility of completely running out of Cash by the end of 2009, the Debtors were left with no alternative but to seek chapter 11 protection. Notwithstanding the liquidity problems that the Debtors have encountered and continue to encounter, the Consent Parties believe that the Debtors' businesses remain viable, but only through a comprehensive restructuring of those businesses as set forth in the Debtors' Business Plan. The Consent Parties seek to achieve this result through the restructuring embodied in the Plan.

## VI.    EVENTS DURING THE CHAPTER 11 CASES

### A.     Commencement of Chapter 11 Cases

On March 16, 2009, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases are being jointly administered as *In re: Forum Health, et al*. (Case No. 09-40795). The Chapter 11 Cases were assigned to U.S. Bankruptcy Judge Kay Woods of the United States Bankruptcy Court for the Northern District of Ohio.

---

(continued…)

Forbearance Agreement, dated as of August 15, 2007, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors (the "First Amended MFA"); (6) the Second Amended Master Forbearance Agreement, dated as of October 16, 2007, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors (as amended by that certain letter agreement, dated January 23, 2008 (the "Letter Agreement"), that certain second letter agreement, dated February 29, 2008 (the "Second Letter Agreement"), and that certain third letter agreement, dated March 31, 2008 (the "Third Letter Agreement", and together the "Second Amended MFA"); and (7) the Third Amended Master Forbearance Agreement, dated as of May 23, 2008, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors (as amended by that certain letter agreement, dated November 17, 2008, the "Third Amended MFA").

CLI-1803443v1

### B.  First Day Relief

On the Petition Date, the Debtors filed various motions and other pleadings (collectively, the "First Day Pleadings"), the most significant of which are described below.  The First Day Pleadings were Filed to ensure an orderly transition into chapter 11.

The First Day Pleadings included:

- motions seeking to honor and pay certain prepetition obligations, including:  (1) certain employee wage and benefit obligations; (2) certain workers' compensation obligations; (3) certain licensing and regulatory agency fees; (4) certain patient refund obligations; and (5) certain Tax obligations, including trust fund Taxes;

- a motion relating to the continued use of the Debtors' existing cash management system, bank accounts, business forms and investment and deposit guidelines;

- motions relating to case administration, joint administration, the appointment of KCC as the Debtors' claims, noticing and balloting agent and motions relating to other administrative matters;

- a motion to establish procedures to determine adequate assurance for the provision of utility services; and

- a motion to obtain the use of cash collateral to fund the Debtors' continuing operations (as described in more detail in Section VI.F below).

The relief requested in the First Day Pleadings was granted with certain adjustments and/or modifications to accommodate the concerns of the Bankruptcy Court, the Consent Parties, the Creditors' Committee, the United States Trustee for the Northern District of Ohio (the "United States Trustee") and other parties.

### C.  Appointment of Creditors' Committee

The United States Trustee appointed the Creditors' Committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a) of the Bankruptcy Code on March 23, 2009, and subsequently amended its membership on March 25, 2009.  The current members of the Creditors' Committee are:

| | |
|---|---|
| Service Employees International Union, District 1199 c/o Rob Johnson 1395 Dublin Road Columbus, OH 43215 | Neo-Pet LLC c/o Carla Miraldi 34555 Chagrin Blvd. Suite 200 Cleveland, OH 44022 |
| Siemens Medical Solutions USA, Inc. c/o John J. Schwab 51 Valley Stream Parkway Malvern, PA 19355 | GE Healthcare c/o Douglas Dietzen Mail Stop WT 897 3200 N. Grandview Blvd. Waukesha, WI 53188-6696 |
| Owens & Minor Distribution, Inc. c/o Richard Thomas Bernhardt 9120 Lockwood Blvd. Mechanicsville, VA 23116-2015 | |

In connection with these Chapter 11 Cases, the Creditors' Committee retained Alston & Bird LLP as its legal counsel, and Grant Thornton LLP as its financial advisor.

CLI-1803443v1

### D. Retention of Advisors for the Debtors

Throughout the Chapter 11 Cases, the Debtors have sought authority to retain certain professionals in connection with their reorganization. The Debtors retained McDonald Hopkins LLC as their counsel, Nadler, Nadler & Burdman Co., L.P.A. as their co-counsel and Baker Hostetler LLP as their special counsel. The Debtors also retained Huron Consulting Services LLC ("Huron") as their financial advisors and one of its managing directors, Dalton Edgecomb, as the Debtors' Chief Restructuring Officer. In addition, the Debtors retained Houlihan Lokey Howard & Zukin Capital, Inc. ("HLHZ") as their investment banker and Ernst & Young LLP as their independent auditors and tax consultants.

### E. The Consent Parties

As previously defined, the Consent Parties are: MBIA, U.S. Bank, JPMorgan and Fifth Third.

#### 1. MBIA

MBIA is involved in these Chapter 11 Cases pursuant to the terms of certain financial guaranty insurance policies issued by MBIA (as described more fully in Section IV.C above). MBIA, as Bond Insurer, insures the timely payment of principal of and interest on all the currently outstanding Series 1997 Bonds. MBIA has engaged Jones Day as counsel and Togut, Segal & Segal LLP as co-counsel.

#### 2. U.S. Bank

U.S. Bank is involved in these Chapter 11 Cases in its role as the Master Trustee and as Bond Trustees with respect to the Master Trust Indenture and the Bond Indentures (as described more fully in Section IV.C above). U.S. Bank has engaged Faegre & Benson LLP as counsel.

#### 3. JPMorgan

JPMorgan is involved in these Chapter 11 Cases pursuant to the Standby Bond Purchase Agreement and its status as a Holder of Series 1997B Bonds (as described more fully in Section IV.C above). JPMorgan has engaged Winston & Strawn LLP as counsel.

#### 4. Fifth Third

Fifth Third is involved in these Chapter 11 Cases pursuant to the Reimbursement Agreement, the WCLC Reimbursement Agreement and the Fifth Third Services (as described more fully in Section IV.C above). Fifth Third has engaged Reed Smith LLP as counsel.

The Consent Parties collectively utilize Bridge Associates LLC as their financial advisor.

### F. Use of Cash Collateral to Finance Continuing Operations

On April 16, 2009, the Bankruptcy Court entered the Agreed Final Order Authorizing Debtors' Use of Cash Collateral, Pursuant to 11 U.S.C. §§ 101, 361 and 363, and Granting Replacement Liens, Adequate Protection and Administrative Expense Priority to the Master Trustee, Bond Trustees and Prepetition Secured Creditors (Docket No. 165) (as amended, the "Cash Collateral Order").

The Cash Collateral Order contained a reservation of rights for the Creditors' Committee to object to or challenge the validity, extent, perfection or priority of the liens and security interests asserted by the Consent Parties. Currently, the Creditors' Committee and the Consent Parties are negotiating a stipulation regarding these matters.

Four days after the entry of the Cash Collateral Order, the Debtors informed the Consent Parties that they were already in default under the terms of the order. As documented in a series of letters dated April 21, 2009, April 24, 2009, April 28, 2009, May 19, 2009, June 26, 2009, July 27, 2009, August 12, 2009, October 6, 2009 and October 21, 2009 (collectively, the "Default Letters"), during the year that they have been in bankruptcy, the Debtors have repeatedly been in default under various covenants that they negotiated in the Cash Collateral Order.

Although the Consent Parties entered into a series of conditional waivers of the Debtors' defaults, the Debtors persisted in their failure to comply with all of the conditions, and the waivers consequently did not become effective. For the defaults identified in the October 21, 2009 letter, the Consent Parties only agreed to forbear from exercising remedies. Since the last conditional waiver letter, which was sent on October 21, 2009, the Debtors have incurred new defaults under the terms of the Cash Collateral Order (which the Consent Parties have not waived and as to which they reserve all of their rights).

Pursuant to the last amendment to the Cash Collateral Order, the use of the Consent Parties' cash collateral under the Cash Collateral Order is scheduled to terminate on May 17, 2010 (the "Termination Date").

### G. Claims Process and Bar Dates

#### 1. Schedules and Statements

On May 1, 2009, the Debtors filed their Statements of Financial Affairs (Docket No. 215) and Summary of Schedules (Docket No. 214) (as subsequently amended on May 7, 2009, the "Schedules"), identifying the assets and liabilities of the Debtors' Estates.

#### 2. Bar Date

##### a. General Bar Date

In accordance with Bankruptcy Rule 3003(c)(3), by order dated June 23, 2009 (the "Bar Date Order"), the Bankruptcy Court established the following bar dates for the filing of proofs of Claim in the Chapter 11 Cases: (i) August 3, 2009 as the general bar date for all claims (the "General Bar Date"), except as noted below; (ii) September 14, 2009 as the bar date for Governmental Units (as defined in the Bar Date Order) holding Claims against the Debtors; (iii) the later of (A) the General Bar Date and (B) 30 days after the date that a notice of an amendment to the Schedules is served on a claimant as the bar date for Claims relating to such amendment to the Schedules; and (iv) the later of (A) 30 days from the date on which an order authorizing the rejection of a contract or lease is entered by the Bankruptcy Court and (B) the General Bar Date for any person or entity whose Claim arises out of the rejection of an executory contract or unexpired lease. The Debtors have certified that they served notice of the Bar Date and a proof of Claim form upon all creditors listed on the Schedules, the Consent Parties, the members of the Creditors' Committee and all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order. The Bankruptcy Court-approved notice of the Bar Date was also published on June 30, 2009 in (i) The Wall Street Journal, (ii) The Vindicator and (iii) The Tribune Chronicle.

The Plan does not modify any Bar Date Order already in place, including the Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

##### b. Bar Dates for Administrative Claims

Pursuant to the Plan, except as otherwise provided in Section II.A.1.f.i of the Plan or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (i) 90 days after the Effective Date, (ii) 30 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee

CLI-1803443v1

Claim no later than 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; *provided*, *however*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (i) 90 days after the Effective Date, (ii) 30 days after the Filing of the applicable request for payment of the Fee Claim or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

Holders of Administrative Claims arising from liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section IV.A of the Plan, will not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.c of the Plan. Any Administrative Claims that are Filed contrary to Section II.A.1.f.ii.B of the Plan will be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside the Chapter 11 Cases.

Holders of Allowed Administrative Superpriority Claims or Administrative Claims on account of the Cash Collateral Order will not be required to File or serve any request for payment or application for allowance of such Claims. Such Allowed Administrative Superpriority Claims or Allowed Administrative Claims shall be satisfied pursuant to Section II.A.1.d of the Plan.

### 3. Summary of Claims

As of March 31, 2010, over 930 proofs of Claim had been filed in these cases. To date, the Debtors have filed three omnibus objections seeking to disallow and expunge (a) amended and late-filed Claims, (b) duplicate Claims and (c) Claims filed without supporting documentation. To date, the Bankruptcy Court has entered three omnibus orders expunging approximately 198 Claims. The Consent Parties anticipate that the Debtors will continue the Claims reconciliation process and will continue to object to proofs of Claims when appropriate.[19]

### 4. Intercompany Claims

As explained in Section III above, several of the Debtors are members of several other Debtor entities. Prior to the Petition Date, Cash was transferred from certain Debtor entities to other Debtor entities, resulting in certain intercompany payables.

Pursuant to the Plan, on the Effective Date, prepetition Intercompany Claims in Class 6 that are not eliminated by operation of law in the Restructuring Transactions will be deemed settled and compromised in exchange for consideration and other benefits provided to the holders of prepetition Intercompany Claims, and such Claims are not entitled to any distributions under the Plan.

### H. Lift Stay Motions

Since the Petition Date, approximately 30 parties have filed motions seeking relief from or modification to the automatic stay in effect with respect to these Chapter 11 Cases. The vast majority of such motions related to medical malpractice lawsuits involving one or more of the Debtors currently pending in state court. The remainder

---

[19] Under the Plan, the Debtors will continue to have the ability to object to Claims including Claims asserting priority under section 503(b)(9) of the Bankruptcy Code, other than Allowed Claims, up to the latest of: (a) 150 days after the Effective Date, subject to extension by order of the Bankruptcy Court; (b) 90 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such a Claim.

CLI-1803443v1

of such motions sought relief from the automatic stay to: (1) continue an action in probate court to determine the appropriate party for the distribution of certain trust proceeds from a charitable foundation; (2) file and prosecute a motion in probate court to construe the terms of a donation by a declaration trust; and (3) set off funds held in a workers' compensation cash collateral account against the full amount of a draw against the workers' compensation letter of credit by the Ohio Bureau of Workers Compensation.

Certain of the lift stay motions related to medical malpractice Claims have already been resolved by stipulated orders entered by the Bankruptcy Court permitting the movants to (1) prosecute and liquidate their Claims, if any, against the Debtors and (2) collect any such liquidated Claims from the proceeds of applicable policy or policies of insurance. The Consent Parties anticipate that similar stipulated orders will likely be entered with respect to those lift stay motions that have not yet been resolved and as and if additional requests for stay relief are filed by holders of timely filed medical malpractice Claims.

The other three lift stay motions that were unrelated to medical malpractice lawsuits were each granted by the Bankruptcy Court.

## I.      Postpetition Divestitures

Since the Petition Date, the Debtors, in their reasonable business judgment, decided to sell certain of their assets. Despite investments in each of these properties, the Debtors were unable to operate them profitably, or had no further use for them. In particular, the Debtors sought, and the Bankruptcy Court approved, sales of (1) WRCS's interest in OSC-WRCS, LLC ("OSC-WRCS"), (2) certain real property located at 431 Gypsy Lane, Youngstown, Ohio 44504 (the "Gypsy Lane Property") and (3) the assets of a continuous ambulatory peritoneal dialysis program (the "CAPD Program").

### 1.      Sale of WRCS's Interest in OSC-WRCS

WRCS and Orthopedic Surgery Center of Youngstown, LLC ("OSC") were the sole members of OSC-WRCS. WRCS owned a total of 30 units of the limited liability membership interest in OSC-WRCS (together, the "Units"). On June 10, 2009, the Debtors filed a motion seeking approval to enter into a redemption agreement (the "Redemption Agreement") for the Units. Pursuant to the Redemption Agreement, OSC-WRCS redeemed the Units from WRCS for $300,000 (the "Redemption Price"). It was the unanimous recommendation of the management of WRCS, in consultation with the Debtors' professionals, that (a) the Redemption Price was the fair market value of the Units and (b) it was in the best interest of the Debtors, the Debtors' Estates, and the Debtors' creditors to enter into the Redemption Agreement. The Consent Parties were consulted and consented to the Debtors' entry into the Redemption Agreement. The Bankruptcy Court approved the Debtors' request to enter into the Redemption Agreement on June 19, 2009.

### 2.      Sale of the Gypsy Lane Property

WRCS was the title owner of the Gypsy Lane Property. The Gypsy Lane Property is located in a commercially zoned area, and situated thereon is a two-family brick structure originally built in 1947 where WRCS operated a Youth Services Behavioral Medicine (outpatient) Program (the "Youth Program"). The Youth Program was discontinued on or about December 31, 2007, and the facility has been vacant since that date.

Shortly after the Youth Program was discontinued, the Debtors listed the Gypsy Lane Property for sale for $69,000. On or about October 24, 2009, the Debtors received a written purchase offer for the property in the amount of $55,000 (the "Purchase Offer"). The Debtors believed that the Purchase Offer was fair and equitable. The Consent Parties were consulted and consented to the Debtors' request to accept the Purchase Offer. The Bankruptcy Court approved the Debtors' request to accept the Purchase Offer on January 12, 2010 (as subsequently amended on January 13, 2010).

### 3.      Sale of the CAPD Program

WRCS owned the assets of the CAPD Program. The CAPD Program was located at 3622 Belmont Avenue, Suite 21, Youngstown, Ohio 44505 (the "CAPD Facility") and provided dialysis and related services. In late 2009, several physicians employed by WRCS and providing services to the CAPD Program notified WRCS that

CLI-1803443v1

they were separating from their employment and would pursue affiliation with American Renal Associates, LLC ("ARA"). WRCS experienced difficulty in soliciting and engaging the qualified physician support necessary to continue the operation of the CAPD Program and determined that without physician support, the CAPD Program was of little value to the Debtors' Estates.

As a result, the Debtors entered into discussions with ARA regarding the sale of the assets of the CAPD Program to ARA. After negotiations, ARA agreed to purchase, through a newly-formed entity, certain of the assets used in the CAPD Program and located at the CAPD Facility for the approximate amount of $200,000. The Debtors believed that, under the circumstances, the structure and form of the sale was a reasonable distribution of the CAPD Program assets and would likely yield the maximum benefit for the Debtors' Estates. The Consent Parties were consulted and consented to the Debtors' sale of the assets of the CAPD Program. The Bankruptcy Court approved the Debtors' request to sell the assets of the CAPD Program on January 12, 2010.

J.        The Debtors' Management

At the commencement of these Chapter 11 Cases, the Debtors were led by their Chief Executive Officer, Walter J. Pishkur. After, among other things, the repeated failure of the Debtors to comply with the Cash Collateral Order (see Section VI.F above) and to communicate with their creditor constituencies, the Consent Parties lost confidence in the Debtors' senior management, and specifically in Mr. Pishkur. The Consent Parties publicly stated that they were prepared to file a motion seeking the appointment of a chapter 11 trustee. According to public statements released by the Debtors, after the Debtors expressed that they feared a lengthy, public battle over the Debtors' leadership would be disruptive to the Debtors' businesses and to their reorganization efforts, on September 21, 2009, Mr. Pishkur tendered, and the Debtors accepted, his letter of resignation.

After Mr. Pishkur's resignation, the Debtors turned their attention to restoring longer-term leadership focused on restructuring operations and emerging from chapter 11. Thus, immediately upon Mr. Pishkur's resignation, the Debtors worked to find an interim Chief Executive Officer to replace Mr. Pishkur. At the conclusion of the selection process, the Forum Health Board decided to employ Charles Neumann, of FTI Consulting, Inc. ("FTI"), as interim Chief Executive Officer. The Bankruptcy Court entered an order authorizing Mr. Neumann's retention on October 30, 2009. Mr. Neumann continues to serve as the interim Chief Executive Officer of the Debtors.

As Forum Health's current Chief Executive Officer and Chief Restructuring Officer are interim managers, Forum requires a qualified permanent executive to run its businesses after it emerges from chapter 11. The Plan contemplates that such permanent chief executive officer be acceptable to the Consent Parties.

K.        The Debtors' Pension Plan

The Debtors and their predecessors have maintained the Pension Plan since January 1, 1968. The Pension Plan is a qualified defined benefit pension plan covered under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Pension Plan is subject to the funding requirements of ERISA and the Internal Revenue Code of 1986, as amended (the "IRC") and is qualified under section 401(a) of the IRC. The Pension Plan covers approximately 7,132 present and former employees of the Debtors (the "Participants"). The majority of the Participants have retired and begun receiving benefits under the Pension Plan or have terminated their employment from the Debtors with the right to receive retirement benefits pursuant to the Pension Plan. The Pension Plan has previously been amended to freeze the additional accrual of benefits for all remaining employees of the Debtors other than eligible employees who had reached the age of 55 and had served with the Debtors for at least ten years as of December 31, 2001 (the "Grandfathered Participants"). As of July 2009, the Debtors reported there were approximately 124 Grandfathered Participants still accruing benefits.

The PBGC is a wholly owned United States government corporation that administers the defined benefit pension plan termination insurance program under ERISA. Pursuant to federal statute, the Debtors are jointly and severally liable to the PBGC on behalf of the Pension Plan for amounts that the Debtors are required to contribute to the Pension Plan, as well as for certain liability in the event of a plan termination. The Pension Plan is maintained by Forum Health and guaranteed in part by the PBGC.

Forum has not made any contributions to the Pension Plan subsequent to July 31, 2008. On March 15, 2009, the Debtors filed a notice of failure to make required contributions with the PBGC. On September 15, 2009, Forum filed for a distress termination of the Pension Plan with the PBGC. To date, the Pension Plan has not been terminated. It is a condition to Confirmation of the Plan that the Pension Plan be terminated.

On August 12, 2009, the PBGC filed contingent Claims against the Debtors on behalf of itself and the Pension Plan, which included: (1) unliquidated Claims for estimated unfunded benefit liabilities, totaling over $207,000,000.00; (2) unliquidated Claims for missed statutory insurance premiums; and (3) unliquidated Claims for missed minimum required contributions. The Claims were asserted as a mixture of priority and unsecured Claims. The Debtors have informed the Consent Parties that they believe that these Claims are overstated and assert, in certain instances, incorrect priorities.

L.    The First 1113 Motion and the 1113 Orders

As of the Petition Date, the Debtors were party to seven collective bargaining agreements (as defined in the Plan, the "Collective Bargaining Agreements") with the Unions covering approximately 2,800 employees. Since before the Petition Date, the Debtors were engaged in negotiations with the Unions over necessary modifications to the Collective Bargaining Agreements in order to cut operating losses at the hospitals. The Debtors, led by their former Chief Executive Officer, reached agreements with bargaining units at Trumbull and Hillside. However, when it appeared that the Debtors would not be able to reach agreements with the bargaining unit of SEIU operating at Northside ("SEIU Northside") or with the bargaining unit of ONA operating at Northside ("ONA Northside"), the Debtors filed their Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113 (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto (the "First 1113 Motion"). Prior to the Bankruptcy Court ruling on the First 1113 Motion, however, the Debtors entered into stipulated orders (the "1113 Orders") resolving the First 1113 Motion with respect to SEIU Northside and ONA Northside. Both the 1113 Orders provided, among other things, that the Debtors could terminate the Pension Plan without violating the terms of the relevant bargaining agreements. The business plan upon which such concessions were negotiated has since proven to be inaccurate and, unfortunately, the prior concessions have proven to be inadequate to establish the Debtors' long-term viability.

As demonstrated by the terms of the most recent Debtors' Business Plan, the modifications to the Collective Bargaining Agreements as negotiated by the Debtors and set forth in the 1113 Orders are insufficient for the Debtors to implement and sustain a feasible plan of reorganization pursuant to the terms of the Bankruptcy Code. Pursuant to the Debtors' Business Plan, even with the concessions agreed to in the 1113 Orders, the Collective Bargaining Agreements remain substantially above market and, upon information and belief, their labor costs keep rising. In addition, the so-called "snapback" provisions in the 1113 Orders provide for the reinstatement of the original terms of the relevant bargaining agreements within 12 to 24 months of the Effective Date, regardless of the performance and financial position of the Debtors at that time. As demonstrated by the terms of the Debtors' Business Plan, if the Collective Bargaining Agreements remain in their current composition, any plan of reorganization presented would prove infeasible, and the Debtors' reorganization efforts would fail.

Thus, over the past several months, the Debtors made proposals pursuant to section 1113 of the Bankruptcy Code to modify the Collective Bargaining Agreements. While the Consent Parties are hopeful that the Debtors and the Unions will settle their remaining matters, the Consent Parties anticipate that, absent settlements, the Debtors will file a motion or motions on or before 14 days prior to the Disclosure Statement hearing to implement the CBA Modifications.

M.    The Debtors' Operating Performance During the Pendency of the Chapter 11 Cases

During the course of these Chapter 11 Cases, the Debtors have filed monthly operating reports, identifying, among other things, their revenue and expenses with the Bankruptcy Court. These monthly operating reports are available through the Bankruptcy Court's electronic docketing system, as well as on the Document Website maintained by KCC at *www.kccllc.net/forum*.

According to the Debtors' monthly operating reports through the filing period of March 31, 2010 (collectively, the "March MORs"), the Debtors have reported an operating loss of approximately $6,000,000.00 on a

consolidated basis postpetition.[20] One facility – Northside – sustained an operating loss of approximately $8,164,000.00 postpetition, thus consuming the profits generated by all of the Debtors' other entities.[21] According to the March MORs, in 2010, the Debtors have generated an operating profit of approximately $80,000 on a consolidated basis.[22]

Upon information and belief, according to the Debtors' financial statements, the Debtors' March 2010 year-to-date budget projected a $2,900,000.00 profit compared to a reported profit of only $228,000, resulting in a variance of approximately negative $2,700,000.00 on a consolidated basis. According to the Debtors' March MORs, postpetition, the Debtors have sustained a net loss of $20,600,000.00 on a consolidated basis - $17,600,000.00 of which resulted solely from Northside.

Beginning in June 2010, the Debtors are expected to begin consuming Cash for the next six months. In June 2010, Debtor WRCS (Northside) is expected to require a loan from the other hospitals to keep operating.

## N.    Marketing of the Debtors' Assets

After the commencement of the Chapter 11 Cases and the retention of HLHZ as the Debtors' investment banker on July 13, 2009, HLHZ began the solicitation of offers for, and marketing of the assets of the Debtors (the "Hospital Assets"). Four months later, a potential purchaser (the "Potential Purchaser"), submitted a letter of intent (the "LOI") contemplating the purchase of the Hospital Assets.

After negotiating with the Debtors and the Unions for over six months regarding, among other things, the modification of the terms of the Collective Bargaining Agreements, the Debtors and the Potential Purchaser have yet to enter into a definitive purchase agreement. As set forth in the Debtors' March MORs, in the past year, the Debtors have sustained a net loss of $20,600,000.00 on a consolidated basis - $17,600,000.00 of which resulted from Northside alone.

---

[20]    See Monthly Operating Report for Forum Health for the Period Ended March 31, 2010 (Case No. 09-40795) (Docket No. 755); Trumbull Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40808 (Docket No. 20); WRCS Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40804 (Docket No. 19); Hillside Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40796 (Docket No. 19); FHOL Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40799 (Docket No. 18); Beeghly Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40807 (Docket No. 17); CPS Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40810 (Docket No. 17); Dacas Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40806 (Docket No. 17); FHD Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40797 (Docket No. 17); FHE Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40798 (Docket No. 17); FHS Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40803 (Docket No. 17); FHV Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40801 (Docket No. 17); VNA Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40812 (Docket No. 17); Dacas Nursing Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40805 (Docket No. 16); FHPS Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40802 (Docket No. 16); PCI Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40811 (Docket No. 16); TMHF Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40809 (Docket No. 16); WRHF Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40800 (Docket No. 16). Forum Health for the Period Ended March 31, 2010 (Docket No. 755).

[21]    See WRCS Debtor-in-Possession Monthly Operating Report for Filing Period March 31, 2010, Case No. 09-40804 (Docket No. 19).

[22]    Id.

- 33 -

For these reasons, the Consent Parties have filed the Plan at this time. The Consent Parties believe, in reliance upon the Debtors' Business Plan, that this Plan provides a long-term solution for the Debtors and their creditor constituencies and will lead to the successful reorganization of the Debtors.

### O.    Exclusivity

Pursuant to section 1121 of the Bankruptcy Code, a debtor has the exclusive right to (1) file a plan of reorganization during the first 120 days of its chapter 11 case and (2) solicit acceptances of the plan during the first 180 days of the case. These periods (the "Exclusive Periods") may be extended for "cause" up to a date that is 18 months after the Petition Date. On June 15, 2009, the Debtors filed a motion seeking extensions of the Exclusive Periods through November 11, 2009 and January 11, 2010, respectively (the "First Exclusivity Motion"). The Consent Parties filed an objection (the "First Exclusivity Objection") to the First Exclusivity Motion, such objection was settled and the First Exclusivity Motion was approved, in part, on July 15, 2009, to provide for an extension of the Exclusive Periods through September 15, 2009 and November 16, 2009, respectively. On September 10, 2009, the Debtors filed a second motion seeking extensions of the Exclusive Periods, through and including October 31, 2009 and December 31, 2009, respectively (the "Second Exclusivity Motion"). On September 14, 2009, the Consent Parties filed an objection (the "Second Exclusivity Objection") to the Second Exclusivity Motion. On September 15, 2009, the Bankruptcy Court held a hearing on the Second Exclusivity Motion and sustained the Second Exclusivity Objection. Subsequently, the Bankruptcy Court entered an order refusing to extend the Debtors' Exclusive Periods to file a plan of reorganization and to solicit acceptances of such plan.

Accordingly, the Exclusive Periods in these Chapter 11 Cases have expired, and the Consent Parties are authorized to file this Disclosure Statement and the Plan.

## VII.    IMPLEMENTATION OF THE PLAN

### A.    Alternative Cash Payment Option

#### 1.    Source of Funds

Any beneficial holder of the Series 1997A Bonds and the Series 2002A Bonds may elect, as part of voting on the Plan, to receive a Cash payment in lieu of continuing to hold their existing Bonds. A beneficial holder may elect to exchange its Bonds to the Obligated Group for a Cash payment on the Effective Date of the Plan. The Cash payment shall be at a discount to the par value of such Bonds held by such beneficial holder as described below. The Alternative Cash Payment Option will be funded from the following sources:

##### a.    FHIL Cash Infusion

On the Effective Date of the Plan, Reorganized Forum Health will issue the FHIL Note in exchange for the FHIL Cash Infusion. Immediately thereafter, on the Effective Date, Reorganized Forum Health shall transfer the FHIL Cash Infusion to the Master Trustee for the benefit of the Holders of the Bonds and used, in accordance with the True-Up Agreement, for debt service reduction, including the Alternative Cash Payment Option.

##### b.    Unrestricted Foundation Funds

On the Effective Date (i) WRHF will transfer all of its Unrestricted Assets to the Master Trustee, and (ii) TMHF will transfer all of its Unrestricted Assets to the Master Trustee. On the Effective Date, all such Unrestricted Assets shall be released to the Master Trustee for the benefit of the Holders of the Bonds and used, in accordance with the True-Up Agreement, for debt service reduction, including the Alternative Cash Payment Option.

##### c.    Indemnity Account and the Segregated Proceeds Account

On the Effective Date, any and all funds in the Indemnity Account and the Segregated Proceeds Account shall be released to the Master Trustee for the benefit of the Holders of the Bonds, and used, in accordance with the True-Up Agreement, for debt service reduction, including pursuant to the Alternative Cash Payment Option.

### d. Master DSRF and DSRFs

On the Effective Date, any and all funds in the Master DSRF shall be transferred by the Master Trustee in accordance with the True-Up Agreement as follows: (i) approximately $14,300,000.00 to the Series 1997A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 1997A Alternative Cash Payment for the Electing Holders; and (ii) approximately $206,000.00 to the Series 2002A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 2002A Alternative Cash Payment for the Electing Holders.

On the Effective Date, approximately $8,700,000.00 in the DSRF relating to the Series 1997A Bonds shall be released by the applicable Bond Trustee for the Series 1997A Bonds and transferred to the Master Trustee to be deposited in the Series 1997A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 1997A Alternative Cash Payment for the Electing Holders.

On the Effective Date, approximately $470,000.00 in the DSRF relating to the Series 2002A Bonds shall be released by the applicable Bond Trustee for the Series 2002A Bonds and transferred to the Master Trustee to be deposited in the Series 2002A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 2002A Alternative Cash Payment for the Electing Holders.

### 2. Cash Option Funds Account

Pursuant to the Amended and Restated Master Trust Indenture, the Master Trustee will create the Cash Option Funds Account. Within the Cash Option Funds Account the Master Trustee will create two subaccounts: (a) the Series 1997A Cash Option Subaccount and (b) the Series 2002A Cash Option Subaccount. Funds deposited in the Series 1997A Cash Option Subaccount will be applied by the Master Trustee to pay the Electing Holders of Series 1997A Bonds to satisfy their Series 1997A Bond Claims. Funds deposited in the Series 2002A Cash Option Subaccount will be applied by the Master Trustee to pay the Electing Holders of Series 2002A Bonds to satisfy their Series 2002A Bond Claims. Any funds remaining in the Series 1997A Cash Option Funds Account after satisfaction of all Series 1997A Secured Bond Claims of Electing Holders shall be transferred to the Bond Trustees to redeem Bonds in accordance with the terms of the Bond Indentures, at the direction of the Bond Insurer, including, without limitation, to redeem the Series 1997B Bonds. In the event that Cash remains in the Series 2002A Cash Option Funds Account, the Cash in the Series 2002A Cash Option Subaccount shall be transferred by the Master Trustee to the Series 2002A Reserve Fund to be applied in accordance with the Series 2002A Bond Indenture. Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

### 3. Fifth Third Cash Collateral Account

On the Effective Date, the approximately $5,000,000.00 in the Fifth Third Cash Collateral Account shall be released by Fifth Third and applied to redeem $5,000,000.00 of the Series 2002B Bonds.

### 4. Cancellation and Surrender of Instruments, Securities and Other Documentation

On the Effective Date and concurrently with the applicable distributions made pursuant to Article V of the Plan, any and all Bonds of the Electing Holders that receive the Alternative Cash Payment, but only to the extent that the Secured Bond Claims of such Electing Holders were satisfied by the Alternative Cash Payment, will be surrendered to the applicable Bond Trustee and canceled. Such Bonds shall be of no further force and effect without any further action on the part of any Debtor or Reorganized Debtor. To the extent that an Electing Holder's Secured Bond Claims were satisfied by an Alternative Cash Payment, such Electing Holder, the Bond Trustees and the Master Trustee will have no rights against the Issuer, the Debtors, the Reorganized Debtors or the Bond Insurer arising from or relating to their Secured Bond Claims and other documentation; *provided, however*, that no distribution under the Plan will be made to or on behalf of any Electing Holder until such Bonds are surrendered to and received by the Master Trustee, to the extent required in Section V.F.2 of the Plan. Section III.D.6 of the Plan does not affect or alter any legal, equitable or contractual rights of the Non-Electing Holders except as otherwise set forth in the Plan.

CLI-1803443v1

B.        **Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided in the Plan (including with respect to the Restructuring Transactions described in Section III.B of the Plan), on the Effective Date: (1) the Reorganized Debtors will continue to be incorporated and shall exist as separate nonprofit and for-profit corporate entities, as applicable, with all corporate powers in accordance with the laws of the state of Ohio and the applicable Reorganized Articles of Incorporation and Reorganized Codes of Regulation attached as Confirmation Exhibit III.C.1 to the Plan; (2) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, and if applicable, with the same charitable purpose as previously set forth in the applicable articles of incorporation, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances and other interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

C.        **Restructuring Transactions**

1.        **Restructuring Transactions Generally**

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors, in consultation with the Consent Parties, may determine to be necessary or appropriate to effect a corporate restructuring of their respective operations, activities or businesses, as applicable, or simplify the overall corporate structure of the Reorganized Debtors (including but not limited to the merger or dissolution of Beeghly, CPS, Dacas, Dacas Nursing, FHPS, PCI and VNA) to the extent not inconsistent with any other terms of the Plan. Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Consent Parties, in consultation with the Debtors and Reorganized Debtors, to be necessary or appropriate. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, right, Liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including without limitation giving such notice to the Attorney General of the State of Ohio regarding disposition of assets as may be required pursuant to section 1702.39(B)(1) of the Ohio Revised Code, and the making of any filings or recordings that may be required by applicable law in connection with such transactions. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the members, directors or trustees, as applicable, of any of the Debtors or the Reorganized Debtors.

2.        **Obligations of Any Successor Corporation in a Restructuring Transaction**

The Restructuring Transactions may result in substantially all of the respective Assets, properties, rights, Liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed

- 36 -

Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### 3. Dissolution of Certain Debtors

On the Effective Date, each Debtor that is not one of the Reorganized Debtors shall cease to exist as a separate entity without any other action being required to effect such dissolution as of the Effective Date and the Reorganized Debtors shall file appropriate certificates or documents either related to the merger of the entity into one of the Reorganized Debtors or the dissolution of such entity in accordance with applicable law.

### D. Corporate Governance and Directors or Trustees and Officers

### 1. Articles of Incorporation and Codes of Regulation of the Reorganized Debtors

As of the Effective Date, the Reorganized Articles of Incorporation and Reorganized Codes of Regulation (or comparable constituent documents) of the Reorganized Debtors will be substantially in the forms set forth in Confirmation Exhibit III.C.1 to the Plan. After the Effective Date, each Reorganized Debtor may amend and restate their respective articles of incorporation or codes of regulation (or comparable constituent documents) as permitted by applicable law, subject to the terms and conditions of the Plan and such constituent documents. On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such Reorganized Articles of Incorporation and Reorganized Codes of Regulation (or comparable constituent documents) with the Ohio Secretary of State and with such other governmental authorities as may be necessary to make such documents effective under, or as otherwise may be required by, applicable law.

### 2. Reorganized Boards

Subject to any requirement of Bankruptcy Court approval, pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date, the initial officers of the Reorganized Debtors will consist of the individuals identified on Confirmation Exhibit III.C.2 to the Plan. The initial Reorganized Parent Board will be comprised of nine independent members (to be identified on Confirmation Exhibit III.C.2 to the Plan as selected), as follows: (a) the then-serving Chief Executive Officer of Reorganized Forum Health; (b) two individuals designated by the Restructuring Committee; (c) one individual designated by the Creditors' Committee; and (d) five individuals designated by the Consent Parties. One of the independent members designated by the Consent Parties shall serve as chair of the Reorganized Parent Board.

The Reorganized Boards of the other Reorganized Debtors shall each consist of five independent members (to be identified on Confirmation Exhibit III.C.2 to the Plan as selected), as follows: (a) the then-serving Chief Executive Officer of Reorganized Forum Health; (b) the Reorganized Parent Board member designated by the Creditors' Committee; and (c) three Reorganized Parent Board members designated by the Consent Parties. One of the independent members designated by the Consent Parties shall serve as chair of each Reorganized Board.

The initial Reorganized Boards shall continue in effect until removed or replaced pursuant to applicable law or in accordance with the Reorganized Debtors' corporate governance policies. Thereafter, until such time as the Consent Parties are paid in full in Cash, if a member of any Reorganized Board who was initially appointed by the Consent Parties resigns, dies or becomes disabled such that he or she cannot perform his or her duties as a Reorganized Board member, the replacement of such members shall be determined by the other Reorganized Board members who were initially appointed by the Consent Parties. After such time as the Consent Parties are paid in full in Cash, the Reorganized Board shall determine, by majority vote of the then-serving members, all replacement Reorganized Board members as vacancies arise.

### 3. Corporate Action

The Restructuring Transactions; the adoption of new or amended and restated articles of incorporation and codes of regulation (or comparable constituent documents) for the Reorganized Debtors; the initial selection of directors, trustees and officers for the Reorganized Debtors; the establishment of the Liquidating Trust and the

- 37 -

appointment of the Liquidating Trustee; the distribution of Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, incentive compensation programs, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and the Reorganized Debtors, will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the members, directors or trustees, as applicable, of the Debtors or the Reorganized Debtors.

### E.   The Liquidating Trust Created Pursuant to the Plan

#### 1.   Liquidating Trust Generally

On or prior to the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement for the purpose of distributing assets contributed to the Liquidating Trust to holders of Allowed Class 5 Claims, pursuing any Avoidance Actions, making all distributions to holders of Allowed Class 5 Claims in accordance with the terms of the Plan and otherwise implementing the applicable terms of the Plan.  Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan), the Liquidating Trust (and the Liquidating Trustee) shall be empowered to:

- effect all actions and execute all agreements, instruments and other documents necessary to implement the Liquidating Trust provisions of the Plan;

- establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan or Liquidating Trust Agreement;

- accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the assets of the Liquidating Trust (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan;

- sell, liquidate, transfer, distribute or otherwise dispose of the assets of the Liquidating Trust (directly or through its professionals or a Third Party Disbursing Agent) or any part thereof or any interest therein upon such terms as the Liquidating Trustee determines to be necessary, appropriate or desirable;

- calculate and make distributions to holders of Allowed Class 5 Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan;

- comply with the Plan and exercise the Liquidating Trustee's rights and fulfill its obligations thereunder;

- review, reconcile or object to Class 5 Claims and resolve such objections as set forth in the Plan;

- pursue Avoidance Actions that are transferred to the Liquidating Trust to the extent that their pursuit would likely result in an economic benefit to creditors classified in Class 5;

- retain and compensate professionals to represent the Liquidating Trustee with respect to its responsibilities;

- file appropriate Tax returns and other reports on behalf of the Liquidating Trust and pay Taxes or other obligations owed by the Liquidating Trust;

CLI-1803443v1

- exercise such other powers as may be vested in the Liquidating Trustee under the Liquidating Trust Agreement or the Plan, or as deemed by the Liquidating Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidating Trust Agreement; and

- dissolve the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement.

Notwithstanding anything to the contrary in Section III.I of the Plan, the Liquidating Trust's primary purpose is liquidating the assets transferred to it by the Debtors, pursuing Avoidance Actions and making distributions of the assets of the Liquidating Trust to holders of Allowed Class 5 Claims.

### 2. Funding of and Transfer of Assets into the Liquidating Trust

On the Effective Date, the Liquidating Trust shall receive the Liquidating Trust Assets. The assets will be transferred to and vest in the Liquidating Trust on the Effective Date, free and clear of all liens.

The Liquidating Trustee shall have the authority to create sub-accounts or sub-trusts within the Liquidating Trust, and into which the Liquidating Trustee may deposit any non-Cash property, including real or personal property pending its liquidation. Such sub-accounts or sub-trusts may hold legal title to such property. Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts shall be deposited directly into the primary Trust Account.

The act of transferring assets and rights to the Liquidating Trust, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the applicable Debtor.

### 3. Liquidating Trustee

The initial Liquidating Trustee shall be selected by the Creditors' Committee, subject to the consent of the Debtors (with such consent not being unreasonably withheld).

The powers, rights and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section III.I of the Plan. Other rights and duties of the Liquidating Trustee and the beneficiaries of the Liquidating Trust shall be as set forth in the Liquidating Trust Agreement.

### 4. Liquidating Trust Agreement

The Liquidating Trust Agreement generally will provide for, among other things: (a) the payment of reasonable compensation to the Liquidating Trustee; (b) the payment of other expenses of the Liquidating Trust, including the cost of pursuing the claims assigned to the Liquidating Trust; (c) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (d) the investment of Cash by the Liquidating Trustee within certain limitations; (e) the preparation and filing of appropriate Tax returns and other reports on behalf of the Liquidating Trust and the payment of Taxes or other obligations owed by the Liquidating Trust; (f) the orderly liquidation of the Liquidating Trust's assets; and (g) the litigation, settlement, abandonment or dismissal of the Avoidance Actions or any other claims, rights or causes of action assigned to the Liquidating Trust.

### 5. Reports to be Filed by the Liquidating Trustee

The Liquidating Trustee, on behalf of the Liquidating Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidating Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

CLI-1803443v1

### 6. Fees and Expenses of the Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Liquidating Trust (including the reasonable and necessary fees and expenses of any professionals assisting the Liquidating Trustee in carrying out its duties under the Plan) will be funded by the assets in the Liquidating Trust in accordance with the Liquidating Trust Agreement without further order from the Bankruptcy Court.

### 7. Indemnification

The Liquidating Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidating Trustee and/or other parties. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the assets of the Liquidating Trust.

### 8. Tax Treatment

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated either as discrete trusts taxed pursuant to section 641 *et seq.* of the IRC or as disputed ownership funds described in Treasury Regulation § 1.468B-9. For federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the holders of Allowed Class 5 Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one or more Disputed Claims reserves. The holders of Allowed Class 5 Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the holders of Allowed Class 5 Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to such assets. The holders of Allowed Class 5 Claims will be required to use the values assigned to such assets by the Liquidating Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest. The Liquidating Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (a) require that the Liquidating Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the holders of Allowed Class 5 Claims the Liquidating Trust's net income and the net proceeds from the sale of Liquidating Trust assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Liquidating Trust assets. Liquidating Trust assets reserved for holders of Disputed Claims will be treated as one or more Disputed Claims reserves for tax purposes, which will be subject to an entity-level Tax on some or all of their net income or gain. No holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset.
The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as discrete trusts or disputed ownership funds, and will pay all Taxes owed from Liquidating Trust assets.

### 9. Sales of Assets by Liquidating Trust

In connection with the sale, liquidation, transfer, distribution or other disposition of the assets of the Liquidating Trust by the Liquidating Trustee, the Liquidating Trustee shall deposit any proceeds of the litigation or settlement of Avoidance Actions into the primary Trust Account. The Liquidating Trustee may conduct any sales or liquidations of non-Cash assets from the Liquidating Trust on any terms it deems reasonable, without further order of the Bankruptcy Court.

CLI-1803443v1

10.     **Creation and Maintenance of Trust Accounts**

a.     **Creation of Trust Accounts**

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trustee.  To effect distributions, the Liquidating Trustee may establish and maintain multiple Trust Accounts.

b.     **Additional Funding of Trust Accounts**

After the funding of the Trust Accounts on the Effective Date, each Trust Account will continue to be funded by the transfers provided under the Plan, including Cash distributions and proceeds from litigation.  Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Liquidating Trust Agreement.

c.     **Investment of Trust Accounts**

The Liquidating Trustee shall invest Cash in the Trust Accounts, subject to the limitations established by the Liquidating Trust Agreement; *provided, however*, that should the Liquidating Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may choose not to invest such Cash.  Distributions of Cash from accounts held by the Liquidating Trustee will include a Pro Rata share of any Cash Investment Yield, net of any Taxes payable with respect thereto.

d.     **Closure of Trust Accounts**

Upon obtaining an order of the Bankruptcy Court authorizing final distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Liquidating Trust Agreement, and the Trust Accounts will be closed.

F.     **Amended and Restated Master Trust Indenture**

On the Effective Date, the Reorganized Debtors Forum Health, FHS, Trumbull, WRCS, FHRS, Beeghly and Dacas (the "New Obligated Group" and each member thereof, a "New Obligated Group Member") and the Master Trustee will enter into the Amended and Restated Master Trust Indenture.  The Amended and Restated Master Trust Indenture shall amend, restate and replace the Master Trust Indenture.  The Obligations issued under the Master Trust Indenture shall remain outstanding under the Amended and Restated Master Trust Indenture and continue to secure the Bonds, subject to the terms of the Amended and Restated Master Trust Indenture.

Under the Amended and Restated Master Trust Indenture, each New Obligated Group Member will be jointly and severally liable for the performance of all of the obligations under the Amended and Restated Master Trust Indenture, as supplemented and amended, including without limitation all payment obligations with respect to all Obligations (as defined in the Amended and Restated Master Trust Indenture) from time to time outstanding under the Amended and Restated Master Trust Indenture, including Obligation Nos. 1A, 1B, 2A, 2B, 3 and 4.  In the future, other entities may become members of the New Obligated Group in accordance with the provisions of the Amended and Restated Master Trust Indenture.  No New Obligated Group Member may withdraw from the New Obligated Group and be released from its obligations under the Amended and Restated Master Trust Indenture.

Payment of Bond Service Charges on the Series 1997A Bonds, the Series 1997B Bonds, the Series 2002A Bonds and the Series 2002B Bonds will be secured by Obligation No. 1A, Obligation No. 1B, Obligation No. 2A and Obligation No. 2B, respectively, issued pursuant to the Amended and Restated Master Trust Indenture.  The New Obligated Group will issue Obligation No. 4 to the Bond Insurer to secure the New Obligated Group's obligations under the Amended Insurance Agreement.  Each Obligation is on a parity with the other Obligations issued and outstanding under the Amended and Restated Master Trust Indenture.  The Amended and Restated Master Trust Indenture does not permit the issuance of additional obligations ("Additional Obligations") on a parity with Obligation No. 1A, Obligation No. 1B, Obligation No. 2A, Obligation No. 2B, Obligation No. 3 and Obligation No. 4.

The Amended and Restated Master Trust Indenture contains covenants of the New Obligated Group. Those covenants include provisions with respect to the incurrence of indebtedness, debt service coverage, liens, rates, charges and certain other matters. See Confirmation Exhibit I.A.14 to the Plan. So long as any of the Bonds remain outstanding (and, therefore, Obligation No. 1A, Obligation No. 1B, Obligation No. 2A, Obligation No. 2B, Obligation No. 3 and Obligation No. 4 remain outstanding), each New Obligated Group Member will be required to comply with the terms and provisions of the Amended and Restated Master Trust Indenture.

To secure equally and ratably the payment of debt service charges on Obligations issued under the Amended and Restated Master Trust Indenture, and the performance by each New Obligated Group Member of all of their covenants and agreements under the Amended and Restated Master Trust Indenture, each New Obligated Group Member will continue to pledge, assign and grant to the Master Trustee, and the Master Trustee will have, to the extent permitted by law, an assignment of and security interest in the Gross Revenues (as defined in the Amended and Restated Master Trust Indenture) of each New Obligated Group Member (consisting generally of all accounts and assignable general intangibles now owned or hereafter acquired by a New Obligated Group Member and proceeds thereof, excluding, among other items, proceeds of borrowings held in trust by a trustee as security for a borrowing and grantor or donor-restricted funds).

The Amended and Restated Master Trust Indenture may be amended or supplemented from time to time in certain circumstances with the consent of the holders of a majority in aggregate principal amount of the Obligations then outstanding, with the consent of the Bond Insurer. Such consent could consist of consents from holders of Obligations (including Obligations subsequently issued), other than the holders of Obligation No. 1A, Obligation No. 1B, Obligation No. 2A and Obligation No. 2B. The Amended and Restated Master Trust Indenture may also be amended or supplemented without the consent of holders of Obligations in certain circumstances with the consent of the Bond Insurer and for specified purposes.

As discussed in Section IV.C.4 above, each Lessee has executed and delivered to the Master Trustee a separate Mortgage, to provide a mortgage lien upon, and security interest in the Mortgaged Premises (consisting of its principal facilities, including land, buildings, fixtures, tangible personal property and proceeds thereof) in order to further secure equally and ratably the obligations of the New Obligated Group Members under the Amended and Restated Master Trust Indenture, including the payment of debt service charges on Obligations issued and outstanding thereunder. Title insurance with respect to the creation and priority of the lien created on the Mortgaged Premises will be obtained for the benefit of the Master Trustee as to the respective Mortgaged Premises subject to each Mortgage.

The Amended and Restated Master Trust Indenture will also provide that, from and after the Effective Date, the New Obligated Group Members are to redeem the Bonds, without penalty or premium, with 80% of Excess Cash Flow within 60 days of the end of each semiannual interest payment date beginning November 15, 2010. The remaining 20% of Excess Cash Flow may be utilized by the New Obligated Group Members in accordance with the Debtors' Business Plan. The term "Excess Cash Flow" shall mean the sum of (1) EBIDA for the immediately prior two fiscal quarters less (a) scheduled Bond interest and principal payments, (b) scheduled capital lease interest and principal payments as of the Effective Date, (c) scheduled interest and principal payments on Other Long-Term Indebtedness (as defined under the Amended and Restated Master Trust Indenture) as of the Effective Date, (d) the Minimum Annual Capital Expenditures (as defined under the Amended and Restated Master Trust Indenture), (e) the Net Working Capital Allowance (as defined under the Amended and Restated Master Trust Indenture), (f) the Cash Adjustment (as defined under the Amended and Restated Master Trust Indenture), plus (2) amounts released from the Master Redemption Account (as defined under the Amended and Restated Master Trust Indenture) utilized to make Bond interest and principal payments.

G.    **Amended Insurance Agreement**

On the Effective Date, the New Obligated Group Members and the Bond Insurer will enter into the Amended Insurance Agreement. The Amended Insurance Agreement will replace the Insurance Agreement. The Amended Insurance Agreement contains covenants of the New Obligated Group Members that apply in addition to the covenants contained in the Amended and Restated Master Trust Indenture. Those covenants may be enforced only by the Bond Insurer and can be waived or amended at any time by the Bond Insurer. Those covenants include

CLI-1803443v1

provisions with respect to incurrence of indebtedness, debt service coverage, liens, rates, charges and certain other matters. See Confirmation Exhibit I.A.12 to the Plan.

The Amended Insurance Agreement will also require the New Obligated Group Members to reimburse the Bond Insurer for any payments the Bond Insurer makes to the Holders of the Series 1997 Bonds under the Policies. Pursuant to the terms of the Standby Bond Purchase Agreement, the Obligated Group Debtors are required to redeem $7,518,000 of the Series 1997B Bonds each year commencing January 1, 2010. The timely payment of these mandatory redemptions is insured by the Series 1997B Policy. Under the Plan, certain of those redemptions will be paid by the Bond Insurer. The Amended Insurance Agreement will require the New Obligated Group Members to repay the Bond Insurer for such payments at an annual rate to be determined by the Bond Insurer, plus interest, until the Bond Insurer is repaid in full. The obligations of the New Obligated Group Members under the Amended Insurance Agreement will be secured by Obligation No. 4 to be issued under the Amended and Restated Master Trust Indenture.

### H.    Implementation of Settlements

#### 1.    Union Settlement Agreements

The Plan contemplates the implementation of the Union Settlement Agreements and/or the New 1113 Relief and the transactions contemplated thereby.

On the Effective Date, the applicable Debtor will assume the New Collective Bargaining Agreements as set forth under Section IV.A of the Plan. Ordinary course obligations arising under the assumed agreements shall be unaltered by the Plan and shall be satisfied by the Reorganized Debtors in the ordinary course of business.

#### 2.    Pension Plan

The Plan assumes that the Pension Plan will be terminated. The Debtors' obligations under ERISA § 4006(a)(7), 29 U.S.C. § 1306(a)(7)(A) shall be satisfied by the Reorganized Debtors issuing the PBGC Note on the Effective Date. According to the Debtors' actuaries, the Pension Plan was underfunded by $105,000,000.00 on a financial reporting basis as of December 31, 2009. In or around September 2009, the Debtors sought a distress termination of the Pension Plan. Currently, the Consent Parties, in conjunction with the Debtors, are in negotiations with the PBGC to implement a distress termination of the Pension Plan, unless the PBGC institutes an involuntary termination proceeding.

### I.    Employment, Retirement and Other Related Agreements; Workers' Compensation Programs.

#### 1.    Employment-Related Agreements

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with, or programs for, their active employees, subject to the terms and conditions of any such agreement or program; and (b) enter into new employment, retirement, welfare, incentive, severance and other agreements or programs for active employees.

#### 2.    Compensation and Benefit Programs

Except as provided in Sections III.G.3, VIII.A.6 and IV.B.1 of the Plan, all savings plans, retirement plans (other than the Pension Plan), health care plans, performance based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability and other insurance plans are deemed assumed and assigned under Section IV.A of the Plan and Reinstated as of the Effective Date; *provided*, *however*, the Pension Plan, the Collective Bargaining Agreements and the New Collective Bargaining Agreements shall be treated in accordance with the terms of the Plan and as set forth herein.

CLI-1803443v1

### 3. Continuation of Workers' Compensation Programs

From and after the Effective Date, (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtor or Reorganized Debtors are responsible under Ohio's workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures, applicable plan documents and Ohio's workers' compensation law and (b) nothing in the Plan shall discharge, release or relieve the Debtors or Reorganized Debtors from any current or future liability under Ohio's workers' compensation law. The Debtors expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

### J. Special Provisions Regarding Insured Claims

#### 1. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but (other than with respect with any Secured Bond Claim) solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in Section III.J.1 of the Plan constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

#### 2. Assumption and Continuation of Insurance Contracts

From and after the Effective Date, each of the Insurance Contracts will be, as applicable, either deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section IV.A of the Plan or continued in accordance with its terms such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the parties to each Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred. Nothing in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred. In addition, notwithstanding anything to the contrary in the Plan, nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect. Any such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

#### 3. Liquidation of Tort Claims

All Tort Claims will be liquidated, determined or otherwise resolved under section 502(c) of the Bankruptcy Code and will be subject to the Claims allowance process set forth in the Plan.

### K. Cash Management

The Reorganized Debtors shall maintain the cash management system of the Reorganized Debtors in effect on the Effective Date and cause to be maintained in all material respects, and shall not transfer funds out of (except in the ordinary course of business) the cash management system, cash management accounts and investments accounts of the Reorganized Debtors. Each of the Reorganized Debtors further jointly and severally agrees that, until such time the Secured Bond Claims are paid in full in Cash, to the extent any new accounts (including, without limitation, any operating, Cash or investment accounts) are opened by, or for the benefit of, the Reorganized Debtors, the Reorganized Debtors shall execute and deliver a deposit account control agreement (in form and substance acceptable to the Master Trustee), or amend the existing account control agreements (if applicable) and deliver such amendment to the Master Trustee prior to or on the date such account is opened.

- 44 -

### L. No Change in Control

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to another Reorganized Debtor is not intended to, and will not, constitute a change in ownership or change in Control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease, contract or agreement in existence on the Effective Date to which a Debtor is a party.

### M. Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Avoidance Actions

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Liquidating Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Liquidating Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain the Avoidance Actions to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court. For the avoidance of doubt, the Avoidance Actions exclude any and all causes of action against the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors.

### N. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and except as specified in the treatment provided for Secured Claims and Secured Bond Claims in Article II of the Plan, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns. As of the Effective Date, except as specified in the treatment provided for Secured Claims and Secured Bond Claims in Article II of the Plan, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of Section III.N of the Plan.

### O. Releases

#### 1. General Releases by Debtors and Reorganized Debtors

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan; *provided*, *however*, that the foregoing will not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

#### 2. General Releases by Holders of Claims

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan, and to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits to the Plan or the Disclosure Statement that such

entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code).

### P. Exculpation

From and after the Effective Date, except with respect to obligations arising under the Plan, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, preparation, dissemination, implementation, Confirmation or approval of the Plan, the Confirmation Exhibits to the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### Q. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The President, Chief Executive Officer, Chief Financial Officer or any Chief Operating Officer of each Debtor or Reorganized Debtor, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax: (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) the making, execution and delivery of the FHIL Note and PBGC Note; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### R. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Articles II and III of the Plan, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Executory Contracts and Unexpired Leases to Be Assumed

#### 1. Assumption and Assignment Generally

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts or Unexpired Leases between the Debtors and any Person shall be deemed assumed by the Debtors or the Reorganized Debtors as of the Effective Date or after the Effective Date in accordance with Section IV.A of the Plan, except for any Executory Contract or Unexpired Lease: (a) that has been rejected pursuant to an order of the Bankruptcy Court; (b) as to which a motion for rejection of such Executory Contract or Unexpired Lease has been filed and served prior to the Confirmation Date; or (3) that is listed on Confirmation Exhibit IV.B.1 to the Plan (Prepetition Executory Contracts or Unexpired Leases Designated for Rejection), which may be amended, modified or supplemented prior to the Effective Date. All Executory Contracts or Unexpired Leases will be deemed assigned to

the applicable Reorganized Debtor, or if such Debtor is not a Reorganized Debtor, then to Reorganized Forum Health.

## 2. Cure of Defaults

To the extent that the Cure Amount Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Consent Parties, in consultation with the applicable Debtor or Reorganized Debtor: (a) by payment of the Cure Amount Claim in Cash within 30 days of the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If a party disputes: (a) the amount of any Cure Amount Claim; (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made (a) pursuant to the Plan if the dispute is resolved as part of the Confirmation Order or (b) within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption, if such dispute is not resolved as part of the Confirmation Order; *provided, however*, if a dispute resolving any Executory Contract or Unexpired Lease issue is decided against the Debtors or Reorganized Debtors by Final Order, the Consent Parties, in consultation with the Debtors or Reorganized Debtors, may amend Confirmation Exhibit IV.B.1 to the Plan to reject such Executory Contract or Unexpired Lease within 10 days of such Final Order, regardless of whether such Final Order is entered after the Effective Date.

## B. Rejection of Executory Contracts and Unexpired Leases

### 1. Rejection Generally

Each Executory Contract or Unexpired Lease listed on Confirmation Exhibit IV.B.1 to the Plan will be deemed rejected as of the Effective Date under section 365 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease listed on Confirmation Exhibit IV.B.1 to the Plan will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Confirmation Exhibit IV.B.1 to the Plan. The Consent Parties may amend, modify or supplement Confirmation Exhibit IV.B.1 to the Plan at any time prior to the later of the Effective Date, the periods set forth in Section IV.A.2 of the Plan or within 30 days of implementing the Northside Disposition Plan. In the event of such amendment, modification or supplement, such Executory Contract(s) or Unexpired Lease(s) will be deemed to be rejected by the Debtors or Reorganized Debtors as of the Effective Date. The Debtors or the Reorganized Debtors will provide notice of any amendments to Confirmation Exhibit IV.B.1 to the Plan to the other parties to the Executory Contracts or Unexpired Leases affected thereby. Section IV.B.1 of the Plan does not provide the Debtors or the Reorganized Debtors the authority to remove a party from Confirmation Exhibit IV.B.1 to the Plan, and any such deletion shall be void and of no effect. Listing a contract or lease on Confirmation Exhibit IV.B.1 to the Plan will not constitute an admission that such contract or lease (including any related agreements) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

### 2. Bar Date for Rejection Damage Claims

Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to Section IV.B.1 of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and the Consent Parties or, on and after the Effective Date, the Reorganized Debtors, the Consent Parties and the Liquidating Trustee, by no later than 30 days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or Unexpired Lease, (b) notice of the Confirmation Order or (c) notice of an amendment to Confirmation Exhibit IV.B.1 to the Plan, and upon allowance, shall be an Allowed General Unsecured Claim classified in Class 5. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors, the Estates or the Liquidating Trust.

CLI-1803443v1

C. **Approval of Assumption, Assumption and Assignment or Rejection**

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of: (1) the assumption and assignment of the Executory Contracts and Unexpired Leases pursuant to Section IV.A of the Plan; and (2) the rejection of the Executory Contracts and Unexpired Leases pursuant to Section IV.B of the Plan.

D. **Executory Contracts and Unexpired Leases Entered Into After the Petition Date**

Other than with respect to the Collective Bargaining Agreements, which are addressed in Section III.G.1 of the Plan, contracts, leases and other agreements entered into after the Petition Date by a Debtor and any Executory Contracts or Unexpired Leases assumed by a Debtor, will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

E. **Certain Nonresidential Real Property Leases**

Upon information and belief, the Debtors' deadline for the assumption of nonresidential real property leases expired on October 12, 2009, pursuant to section 365(d)(4) of the Bankruptcy Code. The Consent Parties are under the belief that certain of the nonresidential real property leases were not assumed by October 12, 2009 and that the Debtors, upon the written consent of the lessor, entered into new leases with the non-Debtor party of such leases. For the avoidance of doubt, the Consent Parties, in consultation with the Debtors and the Reorganized Debtors, reserve the right to treat such leases in the same manner as other unexpired leases set forth in Article IV of the Plan.

IX. **DISPUTED CLAIMS**

A. **Treatment of Disputed Claims**

1. **Tort Claims**

Each Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim. The amount of a Tort Claim that is not otherwise settled and resolved by a Stipulation of Amount and Nature of Claim shall be determined and liquidated, in the discretion of the Debtors or Reorganized Debtors in either (a) the administrative or judicial tribunal of appropriate jurisdiction or (b) the United States District Court for the Northern District of Ohio. The Debtors or Reorganized Debtors shall provide written notice of its selection of the appropriate forum promptly after the Effective Date. Such judicial tribunal shall determine the amount of the Tort Claim, but shall not enter or enforce a judgment against the Debtors, their Estates or the Liquidating Trust, as all distributions on account of Tort Claims resolved in accordance with Section VI.A.1 of the Plan shall be subject to and made in accordance with the Plan. All claims, demands, rights, defenses and causes of action that the Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

2. **Disputed Insured Claims**

The resolution of Disputed Insured Claims, including Tort Claims, pursuant to Section VI.A of the Plan shall be subject to the provisions of Section III.J of the Plan.

3. **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever.

CLI-1803443v1

B.    **Prosecution of Objections to Claims**

   1.    **Objections to Claims**

All objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date. If an objection has not been Filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

   2.    **Authority to Prosecute Objections**

After the Confirmation Date, but prior to the Effective Date, the Debtors or any other party in interest will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

On or after the Effective Date, the Reorganized Debtors will have the sole authority, except as set forth in the Plan, to File, settle, compromise, withdraw or litigate to judgment objections to Claims. The Liquidating Trustee shall have the authority to review, reconcile or object to Class 5 Claims and resolve such objections as set forth in Section III.I of the Plan.

   3.    **Settlement or Compromise of Disputed Claims On or After the Effective Date**

On or after the Effective Date, only the Reorganized Debtors, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim, without approval of the Bankruptcy Court; *provided*, *however*, that the Reorganized Debtors shall give the Liquidating Trustee notice of all such settlements or compromises of any Class 4 or Class 5 Claim. The Liquidating Trustee may File an objection to a stipulation, compromise or other agreement filed by the Debtors or Reorganized Debtors within 14 days of receiving written notice of such stipulation or other agreement. In the event the Liquidating Trustee Files an objection, Bankruptcy Court approval will be required for such stipulation or settlement agreement, unless the Liquidating Trustee withdraws the objection.

C.    **Authority to Amend Schedules**

The Debtors or Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim except the Secured Bond Claims, and to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor will provide (1) the holder of such Claim and (2) the Creditors' Committee or the Liquidating Trustee, as applicable, with notice of such amendment, and such parties will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the applicable Reorganized Debtor or Liquidating Trustee may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court.

D.    **Request for Extension of Claims Objection Bar Date**

Upon motion to the Bankruptcy Court, the Reorganized Debtors or the Liquidating Trustee may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

E.    **Distributions on Account of Disputed Class 4 Claims Once Allowed**

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

CLI-1803443v1

# X.  DISTRIBUTIONS UNDER THE PLAN

## A.  Payment of Administrative Superpriority Claims and/or Administrative Claims

### 1.  Administrative Claims in General

Except as otherwise specified in Section II.A of the Plan, and subject to the Bar Date provisions in the Plan, unless otherwise agreed by the holder of an Administrative Superpriority Claim or Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Superpriority Claim or Allowed Administrative Claim will receive, in full satisfaction of its Administrative Superpriority Claim or Administrative Claim, Cash equal to the amount of such Allowed Administrative Superpriority Claim or Allowed Administrative Claim on the later of (a) the Effective Date, (b) the date on which such Administrative Superpriority Claim or Administrative Claim becomes an Allowed Administrative Superpriority Claim or Allowed Administrative Claim or (c) the date that such Administrative Superpriority Claim or Administrative Claim will become due pursuant to its terms.

### 2.  Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Allowed Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

### 3.  Ordinary Course Liabilities

Allowed Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section IV.A of the Plan, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

### 4.  Claims Under the Cash Collateral Order

Holders of Cash Collateral Claims that are Administrative Superpriority Claims or Administrative Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Unless otherwise agreed by a holder of a Cash Collateral Claim, on or before the Effective Date, the Cash Collateral Claims that are Allowed Administrative Superpriority Claims or Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Superpriority Claims or Allowed Administrative Claims.

### 5.  Special Provisions Regarding the Claims of the Master Trustee and Bond Trustees

In full satisfaction of the Trustee Fee Claims, on the Effective Date, the Trustee Fee Claims shall be allowed as Administrative Claims against the Debtors pursuant to section 503(b) of the Bankruptcy Code and shall be paid by the Reorganized Debtors without the need for the Master Trustee or the Bond Trustees to File applications for allowance with the Bankruptcy Court.  To receive payment pursuant to Section II.A.1.e of the Plan, the Master Trustee and Bond Trustees shall provide reasonable and customary detail or invoices in support of such Claims to counsel to the Reorganized Debtors no later than 30 days after the Effective Date.  The Reorganized Debtors shall have the right to object to such Claims based on a "reasonableness" standard within 20 days after receipt of supporting documentation.  The Reorganized Debtors shall pay the undisputed amount of any such Claims no later than 30 days after the receipt of supporting documentation from the Master Trustee or the Bond Trustees.  In the event that the Reorganized Debtors and applicable Master Trustee or Bond Trustees are unable to resolve a

- 50 -

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 62 of 169

dispute with respect to a Trustee Fee Claim, the Master Trustee or the Bond Trustees may submit any such dispute to the Bankruptcy Court for resolution. The Reorganized Debtors shall pay the remaining amount of the Trustee Fee Claims no later than 10 days after the resolution of any objections to such Claims by agreement of the parties or Final Order of the Bankruptcy Court. Charging Liens held by the Master Trustee and/or the Bond Trustees against distributions to Holders on account of the Trustee Fee Claims will be deemed released upon payment of the Trustee Fee Claims in accordance with the terms of the applicable Bond Indenture, Master Trust Indenture and this Plan. Except as provided herein, distributions received by Holders on account of Cash Collateral Claims or Allowed Secured Bond Claims pursuant to the Plan will not be reduced on account of the payment of the Trustee Fee Claims.

### B.    Payment of Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, at the option of the Reorganized Debtors, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim, on the later of (1) the Effective Date, (2) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, (3) on terms that conform to the requirements of section 1129(a)(9)(C) of the Bankruptcy Code or (4) upon such other terms determined by the Bankruptcy Court to provide the holder of such Claims deferred Cash payments having a value in Cash on the Effective Date equal to such Allowed Priority Tax Claims.

Notwithstanding the provisions of Section II.A.2.a of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 5 (General Unsecured Claims), as applicable, if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors or their respective property (other than as a holder of a Class 5 Claim).

### C.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article V of the Plan, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article II of the Plan that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section IV.A of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section IV.B.2 of the Plan (regarding payment of Claims related to the rejection of an Executory Contract or Unexpired Lease, Section V.E of the Plan (regarding undeliverable distributions) or Section V.F.2 of the Plan (regarding the surrender of instruments), as applicable, are satisfied. Distributions on account of Claims that become Allowed, respectively, after the Effective Date will be made pursuant to Section VI.C of the Plan.

### D.    Method of Distributions to Holders of Claims

Except for distributions to Electing Holders of Allowed Secured Bond Claims electing the Alternative Cash Payment Option, which shall be made to the Master Trustee for the benefit of such Electing Holders, the Reorganized Debtors or the Liquidating Trustee, or Third Party Disbursing Agents as the Reorganized Debtors or the Liquidating Trustee may employ in their sole discretion, will make all distributions of Cash and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan. The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

### E.    Distributions on Account of Secured Bond Claims

Distributions to Electing Holders on account of Allowed Secured Bond Claims electing the Alternative Cash Payment Option shall be made by the Master Trustee. The Master Trustee in its capacity as Third Party Disbursing Agent, shall administer the distributions to Electing Holders in accordance with the Plan and the

CLI-1803443v1

applicable Amended and Restated Master Trust Indenture or the applicable Bond Indentures and be compensated in accordance with Section II.A of the Plan.

### F.  Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. Except as otherwise provided in the Plan, these payments shall be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims receiving distributions from a Third Party Disbursing Agent. For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed. To the extent that there are any disputes that the Reorganized Debtors or the Liquidating Trustee are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors or the Liquidating Trustee may submit such dispute to the Bankruptcy Court for resolution.

### G.  Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.  Delivery of Distributions

Except as provided in Section V.F.2 of the Plan, distributions to holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Claims and Noticing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Claims and Noticing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

Except as provided in Section V.F.2 of the Plan, and subject to the requirements of Section V.F.2 of the Plan, distributions to Electing Holders will be made by the Master Trustee as of the Distribution Record Date.

Except as provided in Section V.F.2 of the Plan, on the Effective Date (or as soon as practicable thereafter in accordance with Section V.F.2 of the Plan), the Master Trustee will make all distributions of Cash under the Alternative Cash Payment Option to the Electing Holders in accordance with the Plan and the Amended and Restated Master Trust Indenture. For the purposes of distribution under Section V.E.1.b of the Plan, the Master Trustee shall be considered a Third Party Disbursing Agent.

The Master Trustee shall only be required to act and make distributions in accordance with the terms of the Plan. The Master Trustee shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

Notwithstanding any of the foregoing, nothing herein shall be deemed to impair, waive or extinguish any rights of the Master Trustee or the Bond Trustees, as applicable, with respect to a Charging Lien; *provided*, *however*, that any such Charging Lien will be released upon payment of the Master Trustee's or the Bond Trustees' reasonable fees and expenses in accordance with the terms of the applicable Amended and Restated Master Trust Indenture, Bond Indentures or the Plan.

CLI-1803443v1

### 2. Undeliverable Distributions Held by Disbursing Agents

#### a. Holding of Undeliverable Distributions

Subject to Section V.E.2.c of the Plan, distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the Disbursing Agent, pursuant to Section V.E.2.a of the Plan, until such time as a distribution becomes deliverable. A Disbursing Agent holding undeliverable Cash will invest such Cash in a manner consistent with the Liquidating Trust Agreement or the Reorganized Debtors' corporate governance policies, as applicable.

#### b. After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agent will make all distributions that became deliverable to holders of Allowed Claims during the preceding calendar quarter; *provided*, *however*, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each periodic Distribution Date, such that only Allowed Claims as of the record date will participate in such periodic distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, to the extent it determines a distribution on any periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a periodic Distribution Date.

#### c. Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim or Allowed Interest that does not assert its right to an undeliverable distribution prior to the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against a Disbursing Agent and their respective property or accounts. In such cases, unclaimed distributions held by a Disbursing Agent will be returned to Reorganized Forum Health or the Liquidating Trust, as applicable. Any unclaimed distributions or any distributions that are returned as undeliverable, will become property of Reorganized Forum Health or the Liquidating Trust, as applicable, free of any restrictions thereon. Nothing contained in the Plan will require a Debtor, a Reorganized Debtor, the Liquidating Trustee or a Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### H. Distributions on Account of Allowed Claims in Class 1 and Class 2

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan will be made within 30 days of such Claim becoming an Allowed Claim.

### I. Distributions on Account of Allowed Claims in Class 3

#### 1. Alternative Cash Payment Option

Payments made to an Electing Holder will be made no later than 40 days after the Effective Date.

If and to the extent a beneficial holder elects the Alternative Cash Payment Option, such Electing Holder shall authorize and instruct its broker/custodial bank to initiate a Deposit/Withdrawal at Custodian to surrender its Bond(s) within 30 days of the Effective Date.

Any Electing Holder of a Bond that fails to surrender or is deemed not to have surrendered the applicable Bond within 30 days after the Effective Date will be deemed to have elected Option A. In the event that Cash remains in the Series 1997A Cash Option Funds Account, the Cash in the Series 1997A Cash Option Subaccount shall be transferred by the Master Trustee to the Bond Trustees to redeem Bonds, in accordance with the terms of the Bond Indentures, at the direction of the Bond Insurer, including, without limitation, to redeem the Series 1997B Bonds. In the event that Cash remains in the Series 2002A Cash Option Funds Account, the Cash in the Series 2002A Cash Option Subaccount shall be transferred by the Master Trustee to the Series 2002A Reserve Fund to be used in accordance with the terms of the Series 2002A Bond Indenture.

CLI-1803443v1

### J. Distributions on Account of Allowed Claims in Class 5

#### 1. Selection of Distribution Dates for Class 5 Claims and Provision of Notice Thereof

Except where the Plan requires the making of a distribution on account of a particular Allowed Claim within a particular time, the Liquidating Trustee shall have the authority to select Distribution Dates that, in the judgment of the Liquidating Trustee, provide holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred by the distribution process; *provided*, *however*, that the first Distribution Date after the Effective Date must occur prior to 180 days after the Effective Date and a Distribution Date must occur at least once every twelve months thereafter, if any amounts are available for distribution on such date. Upon the selection of a Distribution Date by the Liquidating Trustee, the Liquidating Trustee may File a notice of such Distribution Date with the Bankruptcy Court that provides information regarding the distribution to be made.

#### 2. Calculation of Amounts to Be Distributed to Holders of Class 5 Claims

Prior to any distribution to holders of Allowed Class 5 Claims, the Liquidating Trustee shall estimate the amount of Cash on hand that will remain after payment of all Liquidating Trust Expenses. Such estimations shall utilize assumptions that the Liquidating Trustee will be unsuccessful in litigation with claimants with respect to any issue that is being reasonably contested. Such estimations shall also assume that any unresolved Avoidance Actions shall result in no recovery for the Liquidating Trust and that remaining non-Cash assets shall produce no recovery for the Liquidating Trust. Only if, after applying such assumptions, the estimated Cash is greater than zero shall the Liquidating Trustee be permitted to make any distributions to holders of Allowed Class 5 Claims.

On each Distribution Date, each holder of an Allowed Claim in Class 5 will receive a distribution of any Cash that has been determined to be available for distribution in accordance with Section V.F.3 of the Plan (as described in Section X.I above) such that each holder of an Allowed Claim in such Class 5 has received, in the aggregate, its Pro Rata share of the amounts of Cash that are made available for distribution to such Claim holders. All distributions shall be made pursuant to the terms and conditions of the Plan and the Liquidating Trust Agreement, and shall be subject to the Debtors', the Reorganized Debtors' or the Liquidating Trustee's rights of setoff or deduction.

On each Distribution Date prior to the Final Distribution Date, the Liquidating Trustee shall not distribute Cash to the holder of an Allowed Class 5 Claim if the amount of Cash to be distributed on account of such Claim is less than $25 in the aggregate. Any Cash not distributed pursuant to such limitation will be returned to the applicable Trust Account until the next Distribution Date. On the Final Distribution Date, if the aggregate amount of distributions to be made to such claimant is $25 or greater, such distribution shall be made. Otherwise, the amount shall be redistributed to other holders of Allowed Claims in such Class and such holder of an Allowed Claim will be forever barred from asserting its Claim for such distribution against the Liquidating Trust or its property.

#### 3. Provisions Governing Disputed Unsecured Claims Reserve

On the Effective Date or otherwise prior to the initial distributions under Section V.F.3 of the Plan, the Disputed Unsecured Claims Reserve will be established by the Liquidating Trustee for the benefit of holders of Allowed Claims in Class 5 and Disputed Claims that become Allowed Claims in Class 5. For the purpose of calculating the Assets to be contributed to the Disputed Unsecured Claims Reserve, all Disputed Claims will be treated (solely for purposes of establishing the Disputed Unsecured Claims Reserve) as Allowed Claims in the Face Amount of such Claims as of the Effective Date. In addition, Disputed Claims rendered duplicative as a result of the limited consolidation of the Consolidated Debtors pursuant to Article VII of the Plan will only be counted once for purposes of establishing the Disputed Unsecured Claims Reserve. As Disputed Claims are resolved, the Liquidating Trustee or Third Party Disbursing Agent shall make adjustments to the reserves for Disputed Claims, but the Debtors, Reorganized Debtors or the Liquidating Trustee shall not be required to increase such reserves from and after the Effective Date. The Liquidating Trustee may File a motion seeking an order of the Bankruptcy Court approving additional procedures for the establishment of the Disputed Unsecured Claims Reserve.

The distributions received by the Liquidating Trustee or Third Party Disbursing Agent on account of the Disputed Unsecured Claims Reserve from the Liquidating Trust, along with any Cash Investment Yield held in the

- 54 -

Disputed Unsecured Claims Reserve, will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5 and Disputed Claims that become Allowed Claims in Class 5, (b) be accounted for separately and (c) not constitute property of the Reorganized Debtors. The Disbursing Agent will invest any Cash held in the Disputed Unsecured Claims Reserve in a manner consistent with the Liquidating Trust Agreement.

Each holder of an Allowed Claim in Class 5 and each holder of a Disputed Claim that ultimately becomes an Allowed Claim in Class 5 will have recourse only against the Disputed Unsecured Claims Reserve Assets and not to any other assets held by the Reorganized Debtors or the Liquidating Trust, their property or any assets previously distributed on account of any Allowed Claim or Allowed Interest.

The rights of holders of Allowed Claims to receive distributions from the Disputed Unsecured Claims Reserve in accordance with the Plan will be non-transferable, except with respect to a transfer by will, the laws of descent and distribution or operation of law.

### K.    Other Provisions Applicable to Distributions in All Classes

#### 1.    Postpetition Interest

No interest shall have accrued on any Claim that is not an Allowed Secured Claim or Allowed Secured Bond Claim on and after the Petition Date, nor will interest accrue on or after the Effective Date.

#### 2.    Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under this Plan.

### L.    Distribution Record Date

As of the close of business on the Distribution Record Date, the transfer registers for the Electing Holders' Bonds will be closed. The Master Trustee, the Bond Trustees or the Reorganized Debtors will have no obligation to recognize the transfer or sale of any of the Bonds held by the Electing Holders that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those beneficial holders who are beneficial holders of such Secured Bond Claims as of the close of business on the Distribution Record Date.

Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. No transfers Filed with the Bankruptcy Court after the Distribution Record Date shall be recognized by the Liquidating Trustee or the Reorganized Debtors.

### M.    Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Reorganized Debtors, the Liquidating Trustee, the Master Trustee or a Disbursing Agent, as applicable, or at the option of the Reorganized Debtors, the Liquidating Trustee, Master Trustee or a Disbursing Agent, as applicable, by wire transfer, electronic funds or ACH from a domestic bank; *provided*, *however*, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors, the Liquidating Trustee, the Master Trustee or a Disbursing Agent, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

CLI-1803443v1

### N. Withholding Requirements

In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications. To the extent any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's distribution will be deemed undeliverable and subject to the provisions of Section V.E.2 of the Plan.

Notwithstanding any other provision of the Plan, each entity receiving a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding and other Tax obligations.

The Debtors or the Reorganized Debtors reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

### O. Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Liquidating Trustee of any claims, rights and causes of action that the Debtors or the Reorganized Debtors or Liquidating Trustee may possess against a Claim holder, which are expressly preserved under Section III.M of the Plan.

## XI. RISK FACTORS

The implementation of the Plan and the Alternative Cash Payment Option are subject to a number of material risks, including those enumerated below. Prior to voting on the Plan, each party entitled to vote should carefully consider these risks, as well as all of the information contained in this Disclosure Statement, including the exhibits hereto. If these risks materialize in whole or in part, the Debtors and the Reorganized Debtors may not be able to conduct their businesses as currently planned, and their financial condition and operating results could be negatively impacted. In addition to the risks set forth below, risks and uncertainties not presently known to the Consent Parties, or risks that the Consent Parties currently consider immaterial, may also impair the operations or results of the Debtors and the Reorganized Debtors. For purposes of this section of the Disclosure Statement only, the term "Reorganized Debtors" will be used to refer to the Debtors, the Reorganized Debtors and the New Obligated Group Members.

### A. Certain Bankruptcy Considerations

#### 1. Risk of Liquidation or Protracted Reorganization

Beginning in June 2010, the Debtors are expected to begin consuming Cash for the next six months. In June 2010, Debtor WRCS (Northside) is expected to require a loan from the other hospitals to keep operating.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidation cases, or that any alternative plan of reorganization would

CLI-1803443v1

be on terms as favorable to holders of Claims and Interests as the terms of the Plan. If a liquidation or protracted reorganization were to occur, the distributions to holders of Allowed Claims and Allowed Interests could be drastically reduced. The Consent Parties believe that, in a liquidation under chapter 7, holders of Allowed Claims and Allowed Interests would receive substantially less because of the inability in a liquidation to realize the greater going-concern value of the Debtors' assets. In addition, administrative expenses of a chapter 7 trustee and the trustee's attorneys, accountants and other professionals would cause a substantial erosion of the value of any converted estate. Furthermore, substantial additional Claims would arise by reason of the liquidation and from the rejection of unexpired leases and other executory contracts.

### 2.    Non-Confirmation of the Plan

Even if all impaired Classes accept or could be deemed to accept the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (a) that Confirmation not be followed by a need for further reorganization or liquidation (*i.e.*, that the Plan is "feasible"); (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan, the Debtors and the Consent Parties otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Consent Parties believe that the Plan will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including, among other things, the cramdown requirements under section 1129(b) of the Bankruptcy Code, the Consent Parties have reserved the right to amend the Plan in such a manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code. See Section II.G for additional information regarding the requirements for Confirmation.

### 3.    Liquidating Trust

The ultimate amount of Cash available to satisfy the Allowed Class 5 General Unsecured Claims depends, in part, on the manner in which the Liquidating Trustee operates the Liquidating Trust and the expenses the Liquidating Trustee incurs. The expenses of the Liquidating Trustee will be given priority over distributions to Allowed Class 5 General Unsecured Claims. As a result, if the Liquidating Trustee incurs professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Class 5 General Unsecured Claims will decrease.

The ultimate amount of Cash available for distribution to holders of Allowed Class 5 General Unsecured Claims also will be affected by the performance and relative success of the Liquidating Trustee in pursuing preference, fraudulent conveyance, setoff and other claims against potential parties under the Bankruptcy Code. The less successful the Liquidating Trustee is in pursuing such matters, the less Cash there will be available for distribution to satisfy Allowed Class 5 General Unsecured Claims. The Consent Parties have not assumed any recovery on account of such potential Avoidance Actions in estimating the recoveries to Allowed Class 5 General Unsecured Claims under the Plan.

### 4.    Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code, even after Confirmation of the Plan, the Liquidating Trustee will retain and may enforce any claims, demands, rights and causes of action that the Estates may have against any person or entity, including claims for preference, fraudulent conveyance and setoff. In pursuing any such claims, the Liquidating Trustee will act in the best interest of the holders of all Allowed Class 5 Claims. Accordingly, a holder of a Claim may be subject to one or more such claims brought by the Liquidating Trustee, even if such holder has voted in favor of the Plan.

CLI-1803443v1

### B. Certain Alternative Cash Payment Option Considerations and Other Considerations for Holders of Bonds

#### 1. Risks Relating to the Alternative Cash Payment Option

While there are risks to continuing to hold the Bonds, some of which are described in this Section XI, it is also possible that, subject to applicable law and the terms of the Bonds, after the Effective Date, the Reorganized Debtors may elect to redeem Bonds or purchase Bonds in the open market, in privately negotiated transactions, through subsequent tender or exchange offers or otherwise. Any such redemptions or purchases may be made on the same terms or on terms which are more or less favorable to Holders than the Alternative Cash Payment Option. The Reorganized Debtors might also fully repay any Bonds not surrendered under the Alternative Cash Payment Option in accordance with their terms. If the Reorganized Debtors decide to redeem or purchase Bonds that are not tendered in the Alternative Cash Payment Option, those Holders who decided not to participate in the Alternative Cash Payment Option could be better off than those who participated in the Alternative Cash Payment Option. There can be no assurances that the Reorganized Debtors will redeem or purchase any Bonds after the Effective Date other than in accordance with currently scheduled amortizations.

#### 2. No Independent Valuation of Bonds

Neither the Debtors nor the Consent Parties have obtained or requested a fairness opinion from any banking or other firm as to the fairness of the purchase price of the Bonds in the Alternative Cash Payment Option. If a Holder elects to surrender its Bonds pursuant to the Alternative Cash Payment Option, such Holder may or may not receive as much value as if such Holder chose to keep them.

#### 3. Enforcement of Remedies; Risks of Bankruptcy

The obligations of the Reorganized Debtors under the Amended and Restated Master Trust Indenture and the Obligations are general obligations of the Reorganized Debtors and are not secured by any liens on real estate, equipment or other assets or any pledge of the revenues of the current Obligated Group Debtors or any future Reorganized Debtors, other than the security interest granted to the Master Trustee in the Gross Revenues (as defined in the Amended and Restated Master Trust Indenture) of the Reorganized Debtors and the Mortgages relating to a portion of the Mortgaged Premises. Enforcement of the remedies set forth in the Amended and Restated Master Trust Indenture, the Bond Indentures, the Lease and the Mortgage, may be limited or delayed in the event of application of federal bankruptcy laws or other laws affecting creditors' rights and may be substantially delayed and subject to judicial discretion in the event of litigation or the required use of statutory remedial procedures.

#### 4. Risks Related to Reorganized Debtors' Financings

The obligations of the Reorganized Debtors under the Obligations and the Amended and Restated Master Trust Indenture are limited to the same extent as the obligations of debtors typically affected by bankruptcy, insolvency and the application of general principles of creditors' rights and as additionally described below.

The joint and several obligations described herein of the Reorganized Debtors to make payments of debt service on the Obligations issued pursuant to and under the Amended and Restated Master Trust Indenture may not be enforceable to the extent (a) enforceability may be limited by applicable bankruptcy, moratorium, reorganization, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights and by general equitable principles or (b) such payments (i) are requested to be made with respect to payments on any obligation (other than the Obligations) that is issued for a purpose that is not consistent with the charitable purposes of the Reorganized Debtors from which such payment is requested or that is issued for the benefit of any entity other than a tax-exempt organization; (ii) are requested to be made from any money or assets that are donor restricted or which are subject to a direct or express trust which does not permit the use of such money or assets for such payment; (iii) would result in the cessation or discontinuation of any material portion of the health-care or related services previously provided by the Reorganized Debtor from which such payment is requested; or (iv) are requested to be made pursuant to any loan violating applicable usury laws. The extent to which the money or assets of any present or future Reorganized Debtor falls within the categories referred to above cannot be determined and could be substantial. The foregoing

CLI-1803443v1

notwithstanding, the accounts of the Reorganized Debtors are and will continue to be combined for financial reporting purposes and will be used in determining whether various covenants and tests contained in the Amended and Restated Master Trust Indenture (including tests relating to the issuance of Additional Indebtedness) are satisfied.

A Reorganized Debtor may not be required to make any payment of any Obligation, or portion thereof, or the recipient of such payment may be compelled to return such payment, the proceeds of which were not lent or otherwise disbursed to such Reorganized Debtor to the extent that such payment would conflict with, or would be prohibited or avoidable under, applicable laws.

The application of the law relating to the enforceability of guaranties or obligations of a Reorganized Debtor to make debt service payments on behalf of another Reorganized Debtor are not amenable to an unqualified declaration of whether a transfer would be prohibited or subject to avoidance.

As a general matter, in addition to a transfer of property made with the actual intent to hinder, defraud or delay creditors, a transfer of an interest in property by an entity may be avoided if the transfer is made for less than "reasonably equivalent value" or "fair consideration" and the transferor (a) is insolvent (*e.g.*, is unable to pay its debts as they become due), (b) is rendered insolvent by the transaction, (c) is undercapitalized (*i.e.*, operating or about to operate without property constituting reasonably sufficient capital given its business operations) or (d) intended or expected to incur debts that it could not pay as they became due.

The lack of certainty in the treatment of transfers is attributable to several factors. First, there is no true uniform law governing fraudulent transfers. Such transfers may be avoided under the Bankruptcy Code, state law variants of the Uniform Fraudulent Transfer Act and its predecessor, the Uniform Fraudulent Conveyance Act, or other non-uniform statutes or common law principles. Second, and more importantly, the standards for determining the reasonable equivalence of value, or the fairness of consideration, and the measure for determining insolvency are subjective standards resolved in the exercise of judicial discretion after engaging in a fact intensive analysis. This subjectivity has resulted in a conflicting body of case law and a lack of certainty as to whether a given transfer would be subject to avoidance.

In addition, the Bankruptcy Code provides a means to avoid transfers of a debtor's interests in property made on account of an antecedent debt within 90 days of the debtor filing for relief under the Bankruptcy Code, or one year if the transferee is an "insider," if, as a result of that transfer, the transferee receives more than it would have received in a liquidation of the debtor under chapter 7 of the Bankruptcy Code. Whether the creation of a lien, or a payment, made by a Reorganized Debtor would be determined to be avoidable would be dependent on the particular circumstances surrounding the transfer.

There exists, in addition to the foregoing, common law authority and authority under various state statutes pursuant to which courts may terminate the existence of a nonprofit corporation or undertake supervision of its affairs on various grounds, including a finding that a corporation has insufficient assets to carry out its stated charitable purposes or has taken some action that renders it unable to carry out its purposes. Such court action may arise on the court's own motion or pursuant to a petition of the attorney general of a particular state or other persons who have interests different from those of the general public, pursuant to the common law and statutory power to enforce charitable trusts and to see to the application of their funds to their intended charitable uses.

5.        **Certain Matters Relating to Enforceability of Security Interest in Gross Revenues**

The enforceability, priority and perfection of the security interest in Gross Revenues (as defined in the Amended and Restated Master Trust Indenture) created under the Amended and Restated Master Trust Indenture and the ability to receive and realize on the same may be limited by a number of factors, including, without limitation:  (a) provisions prohibiting the direct payment of amounts due to health care providers from Medicaid and Medicare programs to persons other than such providers; (b) the absence of an express provision permitting assignment of receivables due under the contracts between the Reorganized Debtors and third-party payors, and present or future legal prohibitions against assignment; (c) certain judicial decisions which cast doubt upon the right of the Master Trustee, in the event of the bankruptcy of a Reorganized Debtor, to collect and retain accounts receivable from Medicare, Medicaid, General Assistance and other governmental programs; (d) statutory liens; (e) rights arising in favor of the United States of America or any agency thereof; (f) constructive trusts or equitable

CLI-1803443v1

or other rights impressed or conferred thereon by a federal or state court in the exercise of its equitable jurisdiction; (g) federal and state laws governing fraudulent transfers as discussed above; (h) federal bankruptcy laws that may affect the enforceability of the Amended and Restated Master Trust Indenture or the security interest in the Gross Revenues; (i) rights of third parties in Gross Revenues converted to Cash and not in the possession of the Master Trustee; and (j) claims that might arise if appropriate financing or continuation statements or amendments of financing statements are not filed in accordance with the Uniform Commercial Code of the applicable state, as from time to time in effect.

Accounts receivable of the Reorganized Debtors that constitute Gross Revenues and are pledged as security under the Amended and Restated Master Trust Indenture may be sold if such sale is in accordance with the provisions of the Amended and Restated Master Trust Indenture. Any lien continued under the Amended and Restated Master Trust Indenture on such accounts receivable would terminate and be immediately released upon any such sale with respect to any such accounts receivable so sold, but such lien would attach to the proceeds of the sale.

## 6. Matters Relating to the Security for the Bonds

Certain amendments to the Amended and Restated Master Trust Indenture may be made with the consent of the Holders of not less than a majority of the principal amount of all outstanding Obligations. Such amendments may adversely affect the security of the Holders, and, in the event additional obligations are issued in the future, such percentage may be composed wholly or partially of the holders of obligations other than the Obligations. In addition, certain of the rights and remedies afforded to the holders of obligations by the Amended and Restated Master Trust Indenture, including without limitation the right to demand acceleration of obligations (including the Obligations), may be controlled by the holders of not less than 25% in aggregate principal amount of the obligations outstanding under the Amended and Restated Master Trust Indenture.

Pursuant to the terms of the Amended and Restated Master Trust Indenture, the Reorganized Debtors may incur additional indebtedness with the consent of the Bond Insurer (including indebtedness secured by additional obligations) that is entitled to the benefits of security that does not extend to any other indebtedness (including the Obligations). Such security may include liens on the Reorganized Debtors' property (including health care facilities) or any depreciation reserve, debt service or interest reserve or similar fund established for such additional indebtedness.

Although the Reorganized Debtors' interest in the Mortgaged Premises is mortgaged to secure the Obligations issued under the Amended and Restated Master Trust Indenture, the Mortgaged Premises are not general purpose buildings and may not be suitable for industrial or commercial use. Consequently, it could be difficult to find a buyer or lessee for the Mortgaged Premises if it were necessary to proceed against such property, whether pursuant to a judgment, if any, against the Reorganized Debtors or otherwise. Further, no appraisal has been made of the value of the Mortgaged Premises and their value may be significantly less than the principal amount of the obligations outstanding under the Amended and Restated Master Trust Indenture, including the Obligations. As a result, upon any default, the Bond Trustees may not realize the amount necessary to pay the Bonds in full from the sale or lease of the Mortgaged Premises.

The interest subject to the Mortgages, portions thereof or some or all of the Mortgaged Premises may be released from the lien and security interest of the Mortgages in certain circumstances and subject to certain conditions and limitations set forth in the Amended and Restated Master Trust Indenture and in the Mortgages.

Each Mortgage also provides that the Reorganized Debtors and the Master Trustee may amend such Mortgage to remove from the lien of the Mortgage any property that has become, or within the next succeeding 12 calendar months is reasonably expected to become, inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease, removal or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining property which is subject to such Mortgage in compliance with the provisions of the Amended and Restated Master Trust Indenture addressing the sale, lease or disposition of property. Any such amendment could be materially adverse to the interests of the holders of the Obligations, including the Obligations pledged as security for the Bonds.

Certain amendments to the Bond Indentures and the Lease may be made with the consent of the Holders of not less than a majority of the outstanding aggregate principal amount of the certificates outstanding under the Bond

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 72 of 169

Indentures.  Such majority could consist of holders of additional bonds issued under the Bond Indentures in the future.  Such amendments may adversely affect the security of the Holders.

**7.**     **Market for Bonds**

No assurance can be given that a secondary market for the Bonds will exist.  Consequently, Holders may not be able to resell the Bonds should they need or wish to do so.

**8.**     **Tax Exempt Status; Continuing Legal Requirements**

The tax exempt status of interest on the Bonds depends, among other things, upon maintenance by the Reorganized Debtors who operate facilities financed or refinanced with the proceeds of the Bonds of their status as organizations exempt from tax under section 501(a) of the IRC because they are organizations described in section 501(c)(3) of the IRC.  The maintenance of such status is contingent on compliance with general rules based on the IRC, regulations, and judicial decisions regarding the organization and operation of tax exempt hospitals and health systems.  The Internal Revenue Service's (the "IRS") interpretation of and position on these rules as they affect the organization and operation of health care organizations (for example, with respect to providing charity care, joint ventures, physician and executive compensation, physician recruitment and retention, etc.) are constantly evolving.  The IRS reserves the right to, and in fact occasionally does, alter or reverse its positions concerning tax-exemption issues, even concerning long-held positions upon which tax-exempt health care organizations have relied.

In addition, the IRS has asserted that tax-exempt hospitals that are in violation of Medicare and Medicaid regulations regarding inducement for referrals may also be subject to revocation of their tax-exempt status.  Because a wide variety of hospital-physician transactions potentially violate these broadly stated prohibitions on inducement for referrals, the IRS has broadened the range of activities that may directly affect tax exemption, without defining specifically how those rules will be applied.  As a result, tax-exempt hospitals, particularly those that have extensive transactions with physicians, are currently subject to an increased degree of scrutiny and perhaps enforcement by the IRS.  The IRS's policy position is not necessarily indicative of a judicial determination of the applicable issues.

Section 4958 of the IRC imposes excise taxes on "excess benefit transactions" between "disqualified persons" and tax-exempt organizations such as the Reorganized Debtors.  Transactions that violate the excess benefit transaction rules will also likely violate the portion of section 501(c)(3) of the IRC which prohibits inurement of net earnings of a section 501(c)(3) organization to private persons in position to exercise substantial influence over the financial affairs of the organization (the private inurement rules).  According to the legislative history accompanying section 4958, the excess benefit taxes are, in general, intended to be the sole remedy for violation of the excess benefit transaction rules.  However, the legislative history and regulations associated with section 4958 also indicate that the excise taxes may be imposed either in lieu of or in addition to revocation of exemption due to the violation of the private inurement rules.  As a result, when an excess benefit transaction occurs, the regulations under section 501(c)(3) set forth a five-factor analysis which the IRS will use to determine whether, and under what conditions, the occurrence of an excess benefit transaction will lead to revocation of tax-exempt status.  Although the IRS has only infrequently revoked the tax exemption of nonprofit health care organizations in the past, the risk of revocation remains, and there can be no assurance that the IRS will not direct enforcement activities against any of the Reorganized Debtors based upon alleged violations of the excess benefit and private inurement rules.  The legislation is potentially favorable to taxpayers because it provides the IRS with a punitive option short of revocation of exempt status to deal with incidents of private inurement.  However, the standards for tax exemption have not been changed, including the requirement that no part of the net earnings of an exempt entity inure to the benefit of any private individual.  Consequently, although the IRS has only infrequently revoked the tax exemption of nonprofit health care corporations in the past, the risk of revocation remains and there can be no assurance that the IRS will not direct enforcement activities against any of the Reorganized Debtors.

The Tax Exempt and Governmental Entities Division of the IRS is responsible for the Team Examination Program (referred to as "TEP") of the IRS which conducts audits of exempt organizations using teams of revenue agents.  The TEP audit teams consider a wide range of possible issues, including the community benefit standard, private inurement and private benefit, partnerships and joint ventures, retirement plans and employee benefits, employment taxes, tax-exempt bond financing, political contributions and unrelated business income.

- 61 -

CLI-1803443v1

One or more of the Reorganized Debtors could be audited by the IRS. Because of the complexity of the tax laws and the presence of issues about which reasonable persons can differ, a TEP audit could result in additional taxes, interest and penalties. A TEP audit could ultimately affect the tax-exempt status of any of the Reorganized Debtors.

As a result of the increased scrutiny of community benefit activity by the IRS, tax-exempt hospitals may be required to increase resources spent on qualifying activities. On February 12, 2009, the IRS released its final report containing the results of a two-year study focusing on community benefit reporting practices and executive compensation practices of tax-exempt hospitals. The results are based on a survey the IRS sent to 500 hospitals in May 2006, and builds on the analysis of results first released by the IRS in its interim report in July 2007. The final report, however, does not reach specific conclusions concerning whether the existing community benefit standard is appropriate and whether tax-exempt hospital executives are being compensated appropriately.

Loss of tax-exempt status by any of the Reorganized Debtors could result in loss of the exclusion from gross income of the interest on the Bonds that, in turn, could result in a default under the Bond Indentures, potentially triggering an acceleration of the Bonds. Any such event would have material adverse consequences on the future financial condition and results of operations of the affected Reorganized Debtors and, potentially, the Reorganized Debtors as a whole. Additionally, the loss of federal tax-exempt status by an Reorganized Debtor could adversely affect its access to future tax-exempt financing.

Failure to comply with certain legal requirements may cause the interest on the Bonds to become included in gross income of the recipients thereof for federal income tax purposes. The Bond Indentures do not provide for the payment of any additional interest or penalty in the event the interest on the Bonds is determined to be includible in gross income for federal income tax purposes.

Tax-exempt organizations also may be challenged indirectly by private parties through complaints filed with the IRS. The tax bar under the False Claims Act prohibits private parties from suing directly to enforce the federal tax laws. Nevertheless, beginning in mid-2004, plaintiffs' attorneys filed suit in various state and federal courts challenging the tax-exempt status of dozens of health care organizations, leading to significant defense costs for some organizations and settlements. See "Risk Factors – Nonprofit Health Care Regulatory Risks – Enforcement Actions – Litigation Relating to Billing and Collection Practices." There can be no assurances that similar actions will not be brought in the future, coupled with other claims, or what effect such actions may have on the Reorganized Debtors. Moreover, section 7623 of the IRC provides for a reward of up to 30% of the tax recovery (including taxes, penalties and interest) for private parties who provide the IRS with evidence of potential violations of federal tax law and file a claim for a reward based on that information. These same reward provisions apply to information regarding taxable entities but also tax-exempt organizations whose exemption may be challenged by the IRS or whose activities may be taxable in part as not substantially related to the furtherance of its exempt purposes. There is no public disclosure bar precluding tax law whistleblower claims; however, the IRS has discretion to reduce the maximum reward to 10% of the tax recovery. As directed by Congress in the Tax Relief and Health Care Act of 2006, the IRS has also established a Whistleblower Office to receive and follow-up on complaints of alleged tax law violations in large cases, including recoveries in excess of $2,000,000.00 from any entity. The IRS is also authorized by regulation to share confidential tax return information with whistleblowers and their attorneys so that they may assist in the investigation.

The IRS, in an ongoing program of auditing tax-exempt obligations to determine whether, in the view of the IRS, interest on such tax-exempt obligations is includible in the gross income of the owners thereof for federal income tax purposes, has recently reviewed a number of bond issues and concluded that such bond issues did not comply with applicable provisions of the IRC and related regulations. The IRS has typically entered into closing agreements with issuers and beneficiaries of such bond issues under which payments have been made to the IRS. No assurance can be given that the IRS will not examine a Holder, a Reorganized Debtor or the Bonds. If an audit is commenced, under current procedures, the IRS may treat the issuers as taxpayers and the Holders may have no right to participate in such procedure. If the Bonds are examined, it may have an adverse impact on their marketability and price (regardless of the ultimate outcome of the audit) and could also result in substantial payments by the Reorganized Debtors to resolve issues raised by the IRS.

### 9.    The Bond Insurer

In the event that the Reorganized Debtors fail to make a payment of principal or interest on Obligation Nos. 1A or 1B, any Holder shall have recourse against the Bond Insurer for such payments.  There can be no assurance that the Bond Insurer will have sufficient assets or revenues to enable it to make timely payments on the Series 1997A Bonds or the Series 1997B Bonds.  Moreover, the Policies do not insure the principal of or interest on such Bonds coming due by reason of acceleration or optional redemption.  In the event that the Bond Insurer is unable to make payments of principal and interest on the Series 1997A Bonds or the Series 1997B Bonds as such payments become due, such Bonds will be payable solely from moneys received by the Bond Trustee pursuant to Obligation No. 1A or 1B, respectively.

Under no circumstances, including the situation in which interest on the Series 1997A Bonds or the Series 1997B Bonds becomes subject to federal taxation for any reason, can the maturities of the Series 1997A Bonds or the Series 1997B Bonds be accelerated except with the consent of the Bond Insurer, unless the Bond Insurer has defaulted on its obligations under the related Policy or renounced its obligations thereunder.

So long as the Series 1997A Bonds or the Series 1997B Bonds are outstanding and the Bond Insurer is not in default under the Policies, the Bond Insurer shall be deemed the Holder of such Bonds for purposes of all actions under the Bond Indentures which require or permit the consent, direction or request of the Holders of the Series 1997A Bonds or the Series 1997B Bonds.  Most actions under the Bond Indentures that require or permit the consent, direction or request of the Holders of the Series 1997A Bonds or the Series 1997B Bonds only require or permit the consent, direction or request of the Bond Insurer in place of the actual registered Holder.  For example, so long as the Bond Insurer performs its obligations under such Policy, it may direct, and must consent to, any remedies that the related Bond Trustee exercises under the related Bond Indenture.

### 10.    Cash Available for the Alternative Cash Payment Option

To the extent the Cash Option Funds exceed the amounts needed to satisfy all of the elections made by the Electing Holders, the Cash Option Funds will be withdrawn from the Cash Option Funds Account and applied by the Reorganized Debtors to redeem Bonds (which may or may not include the Series 1997A Bonds and the Series 2002A Bonds).  As a result, the Series 1997A Bonds and the Series 2002A Bonds will no longer be entitled to the benefit of any security interest in such Cash.  Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

### C.    Other Risks to the Reorganization Proposed by the Plan

### 1.    Risk that the CBA Modifications Are Not Implemented

The implementation of the Debtors' Business Plan will depend in large part on the implementation of the CBA Modifications.  If the Debtors are not able to reach the Union Settlement Agreement on or before 14 days prior to the Disclosure Statement hearing, the Debtors will File the New 1113 Motion.  If the Debtors are unable to implement the Union Settlement Agreement or obtain the New 1113 Relief, there is no assurance that the Debtors will be able to reduce this significant part of their cost structure and avoid new potential collective bargaining issues and possible strikes.  Nor is there any assurance that the Plan would be confirmed.

### 2.    Risk that the Pension Plan is Not Terminated

The implementation of the Debtors' Business Plan assumes the termination of the Pension Plan.  If the Pension Plan is not terminated, there is no assurance that the Reorganized Debtors will be able to reduce this significant part of their cost structure.  Nor is there any assurance that the Plan would be confirmed.

CLI-1803443v1

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 75 of 169

D.    **Reorganized Debtors' Financial Condition**

    1.    **The Reorganized Debtors' Operations Might Not Be Profitable Post-Emergence**

    Upon information and belief, the Debtors' financial statements reflect that they have sustained losses of approximately $100,000,000.00 in the four years before the Petition Date.  Notwithstanding restructuring actions undertaken by the Debtors in an effort to improve their profitability, these actions have been insufficient to offset the downward profit pressures, in large part due to the factors discussed in Sections III and V above.  Although the implementation of the Plan, any success of the Alternative Cash Payment Option, the implementation of the CBA Modifications and the termination of the Pension Plan will have a significant effect on the Reorganized Debtors' business, the Reorganized Debtors' operations might not be profitable post-emergence, nor is there any assurance that the Debtors will achieve their Business Plan.

    2.    **Restrictions Imposed by Amended and Restated Master Trust Indenture and Bond Indentures**

    The Amended and Restated Master Trust Indenture will contain various covenants that will limit the Reorganized Debtors' ability to engage in specified types of transactions.  These covenants limit the Reorganized Debtors' ability to, among other things:

- incur additional indebtedness;

- make certain investments;

- sell, transfer or otherwise convey certain assets;

- create liens;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets;

- enter into a new or different line of business; and

- enter into certain transactions with affiliates.

    A breach of any of these covenants could result in a default under the Amended and Restated Master Trust Indenture.  In addition, any debt agreements entered into in the future may further limit the Reorganized Debtors' ability to enter into certain types of transactions.

    3.    **Liquidity**

    Given the current business environment, the Reorganized Debtor's liquidity needs could be significantly higher than currently anticipated.  Their ability to maintain adequate liquidity will depend on successfully operating their businesses, continuing to curtail operating expenses and capital spending, and, potentially, completing various asset sales.  Forecasted liquidity needs are highly sensitive to changes in each of these and other factors.

    Even if the Reorganized Debtors successfully implement their business restructuring strategy and successfully operate their businesses, the Reorganized Debtors may be required to execute asset sales or other capital generating actions and cut back or eliminate other programs that are important to the future success of the Reorganized Debtors' businesses.

    4.    **Outstanding Indebtedness**

    Even if the Alternative Cash Payment Option is fully subscribed and the other steps of business restructuring strategy are implemented, the Reorganized Debtors' indebtedness and other obligations will continue to be significant.  If the current economic environment does not improve, the Reorganized Debtors may not be able to generate sufficient cash flow from operations to satisfy their obligations as they come due.  For example, the amount of indebtedness and other obligations could:

CLI-1803443v1

- require the Reorganized Debtors to dedicate a significant portion of cash flow from operations to the payment of principal and interest on indebtedness and other obligations, which will reduce the funds available for other purposes necessary to run their businesses;

- make it more difficult for the Reorganized Debtors to satisfy their obligations;

- limit the Reorganized Debtors' ability to withstand competitive pressures;

- limit the Reorganized Debtors' ability to fund working capital, capital expenditures and other general corporate needs;

- make the Reorganized Debtors more vulnerable to any continuing downturn in general economic conditions and adverse developments in their industry and businesses; and

- reduce the Reorganized Debtors' flexibility in responding to changing business and economic conditions.

### 5.   Projections

The Projections attached to this Disclosure Statement as Exhibit D are inherently uncertain and are dependent upon the successful implementation of the Debtors' Business Plan and the reliability of the assumptions contained in the Debtors' Business Plan. The Projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Consent Parties or the Reorganized Debtors and some of which may not materialize. The Projections have not been audited, reviewed or subjected to any procedures designed to provide any level of assurance by the Consent Parties or their advisors. The Projections rely upon the Debtors' Business Plan as prepared by the Debtors, Huron Consulting Services LLC and the Debtors' other advisors. The Projections assume that the Debtors will obtain the CBA Modifications.

Unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections may vary from the projected results. These variations may be material and adverse.

### 6.   Reorganized Debtors' Business Plan

The Reorganized Debtors may make changes to their businesses, operations and current Business Plan that may have a material impact on the Reorganized Debtors' future results of operations.

### 7.   Investment Income

During certain fiscal years, the Debtors experienced losses on their investments. No assurance can be given that the investments of the Reorganized Debtors will produce positive returns or that losses on investments will not occur in the future.

### 8.   Business Uncertainties and Risk from Bankruptcy

The Reorganized Debtors' businesses depend upon physicians and potential patients believing that the Reorganized Debtors will be able to provide quality health care services. A negative perception of the Reorganized Debtors' ability to continue to provide quality health care services may be a result of the Debtors' current filing for bankruptcy. If physicians and potential patients are uncertain as to the Reorganized Debtors' ability to continue to exist or to provide the same breadth and quality of services, the Reorganized Debtors may be unable to attract patients. The Reorganized Debtors' future results of operations will also depend in part upon their ability to retain existing highly skilled and qualified employees and physicians and to attract new employees and physicians. Failure to continue to attract and retain such individuals could materially adversely affect the Reorganized Debtors' ability to compete.

CLI-1803443v1

Uncertainties about the future prospects and viability of the Reorganized Debtors' businesses and the possibility of seeking further relief under the Bankruptcy Code is impacting and is likely to continue to impact the Reorganized Debtors' ability to attract and retain patients, physicians, key management and technical and other personnel, and is creating a distraction for existing employees. A failure to retain and attract patients, physicians and employees could have a material adverse impact on the financial condition of the Reorganized Debtors.

### E.    Nonprofit Health Care General Business Risks

#### 1.    Impact of Disruptions in the Credit Markets and General Economic Factors

The impact of the current national economic crisis, including without limitation, its impact on the availability of credit, personal, corporate and governmental revenues and the market for and interest payable on the Reorganized Debtors' variable rate indebtedness, may adversely affect revenues and expenses and, consequently, the ability of the Reorganized Debtors to make payments under the Lease, the Obligations and the PBGC Note.

The domestic and international financial crisis that began in 2008 has had, and is expected to continue to have, negative repercussions upon the national and global economies, including a scarcity of credit, lack of confidence in the financial sector, extreme volatility in the financial markets, increase in interest rates, reduced business activity, increased consumer bankruptcies and increased business failures and bankruptcies. In response, President Barack Obama, on February 17, 2009, signed the American Recovery and Reinvestment Act of 2009 (the "Recovery Act"), which provides approximately $787 billion in federal spending and tax initiatives. Congress, the Federal Reserve Board and other agencies of the federal government and foreign governments have taken various actions that are designed to enhance liquidity, improve the performance and efficiency of credit markets and generally stabilize securities markets and stimulate spending. There can be no assurance these actions will be effective.

While the effect of the Recovery Act cannot be predicted at this time, the current economic environment has had and could have a further material adverse effect on the financial condition of many hospitals, including the Reorganized Debtors.

#### 2.    Indigent Care

Tax-exempt hospitals often treat large numbers of indigent patients who are unable to pay in full for their medical care. General economic conditions that affect the number of employed individuals who have health coverage affects the ability of patients to pay for health care. Similarly, changes in government policy, which may result in coverage exclusions under local, county, state and federal health care programs may increase the frequency and severity of indigent treatment by such hospitals and other providers. It is also possible that future legislation could require that tax-exempt hospitals maintain minimum levels of indigent care as a condition of federal income tax exemption from certain state and local taxes.

#### 3.    Reliance on Medicare

Inpatient hospitals rely to a high degree on payment from the federal Medicare and Medicaid programs. Future changes in the underlying law and regulations, as well as in payment policy and timing, create uncertainty and could have a material adverse impact on hospitals' payment streams from Medicare and Medicaid. With health care and hospital spending reported to be increasing faster than the rate of general inflation, Congress and/or the Centers for Medicare & Medicaid Services ("CMS") may take action in the future to decrease or restrain Medicare and Medicaid outlays for hospitals. In addition, state Medicaid and other state health care programs often pay hospitals at levels that may be below the actual cost of the care provided. Furthermore, as Medicaid is partially funded by states, significant deterioration in the financial condition of the State of Ohio could result in lower funding levels and/or payment delays.

#### 4.    State Budgets

Many states, including the State of Ohio, face severe financial challenges, including the erosion of general fund tax revenues. These factors have resulted in a shortfall between revenue and spending demands. The financial

CLI-1803443v1

challenges facing states may negatively affect hospitals in a number of ways, including, but not limited to, a greater number of indigent patients who are unable to pay for their care and a greater number of individuals who qualify for Medicaid and/or reductions in Medicaid reimbursement rates.

### 5.    Rate Pressure from Insurers and Major Purchasers

Certain hospital markets, including many communities in Ohio, are strongly impacted by large health insurers and, in some cases, by major purchasers of health services. In those areas, health insurers may have significant influence over hospital rates, utilization and competition. Rate pressure imposed by health insurers or other major purchasers may have a material adverse impact on hospitals, particularly if major purchasers put increasing pressure on payors to restrict rate increases. Business failures by health insurers also could have a material adverse impact on contracted hospitals in the form of nonpayment or shortfalls or delays in payment, and/or continuing obligations to care for managed care patients without receiving payment.

As a result of increased public scrutiny, it is also possible that the pricing strategies of hospitals may be perceived negatively by consumers, and hospitals may be forced to reduce fees for their services. Decreased utilization could result, and hospitals' revenues may be negatively impacted. In addition, consumers and groups lobbying on behalf of consumers are increasing pressure for hospitals and other health care providers to be transparent and provide information about cost and quality of services that may affect future consumer choices about where to receive health care services.

### 6.    Health Plans and Managed Care

Most private health insurance coverage is provided by various types of "managed care" plans, including health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs"), that generally use discounts and other economic incentives to reduce or limit the cost and utilization of health care services. Medicare and Medicaid also purchase hospital care using managed care options. Payments to hospitals from managed care plans typically are lower than those received from traditional indemnity or commercial insurers.

HMOs and PPOs are expected to place increasing pressure on the Reorganized Debtors' revenues in the future. HMO and PPO provider contracts generally obligate a health care provider to provide services to HMO and PPO participants at a discount from established charges. Currently, many HMOs and PPOs pay providers on a negotiated fee-for-service basis or, for institutional care, on a fixed rate per day of care, which, in each case, usually is discounted from the typical charges for that service or care. The discounts offered to HMOs and PPOs may result in payment to a provider that is less than its actual cost. Additionally, the volume of patients directed to a provider may vary significantly from projections, and/or changes in the utilization may be dramatic and unexpected, thus jeopardizing the provider's ability to manage this component of revenue and cost.

Often, HMO contracts are enforceable for a stated term, regardless of hospital losses and may require hospitals to care for enrollees for a certain time period, regardless of whether the HMO is able to pay the hospital. Hospitals also from time to time have disputes with managed care payors concerning payment and contract interpretation issues. Failure to maintain contracts could have the effect of reducing the market share and net patient services revenues of the Reorganized Debtors. Conversely, participation may result in lower net income if the Reorganized Debtors are unable to adequately contain their costs. Thus, managed care poses a significant business risk that hospitals face.

The alternative delivery systems market is becoming increasingly competitive, and many of the alternative delivery systems with which the Reorganized Debtors have contracted may not survive, which may result in the Reorganized Debtors being responsible for providing services for which the Reorganized Debtors may not ultimately be compensated.

### 7.    Business Relationships

*Integrated Physician Groups.* As integrated health care providers, the Debtors employ large numbers of physicians and have relationships with certain other physician groups.

- 67 -

Integrated delivery systems carry with them the potential for legal or regulatory risks in varying degrees. The ability of hospitals or health systems to conduct integrated physician operations may be altered or eliminated in the future by legal or regulatory interpretation or changes, or by health care fraud enforcement. In addition, participating physicians may seek their independence for a variety of reasons, thus putting the hospital or health system's investment at risk, and potentially reducing its managed care leverage and/or overall utilization.

*Physician Medical Staff.* The primary relationship between a hospital and physicians who practice in it is through the hospital's organized medical staff. Medical staff bylaws, rules and policies establish the criteria and procedures by which a physician may have his or her privileges or membership curtailed, denied or revoked. Physicians who are denied medical staff membership or certain clinical privileges or who have such membership or privileges curtailed or revoked often file legal actions against hospitals and medical staffs. Such actions may include a wide variety of claims, including antitrust claims, some of which could result in substantial uninsured damages to a hospital. Furthermore, from time to time, actions or decisions of hospital management may cause unrest among certain physician groups or members of the medical staff, which could result in legal or other actions, such as resignation from the medical staff. In addition, failure of the hospital governing body to oversee adequately the conduct of its medical staff may result in hospital liability to third parties.

*Physician Supply.* Sufficient community-based physician supply is important to hospitals and health systems. The shortage of physicians could become a significant issue for health providers to face in the coming years. In addition, CMS annually reviews overall physician reimbursement formulas. Changes to physician compensation formulas could lead to physicians locating their practices in communities with lower Medicare populations. The Reorganized Debtors may be required to invest additional resources for recruiting and retaining physicians.

## 8. Health Care Professionals and Other Employees

*Employee/Labor Relations and Collective Bargaining.* The ability of the Reorganized Debtors to employ and retain qualified employees, including any senior management and their ability to maintain good relations with such employees and the unions they may be represented by, affect the quality of services to patients and the financial condition of the Reorganized Debtors. Hospitals are large employers with a wide diversity of employees. A significant number of the Reorganized Debtors' employees are currently represented by the Unions.

*Wage and Hour Class Actions and Litigation.* Federal law and many states impose standards related to worker classification, eligibility and payment for overtime, liability for providing rest periods and similar requirements. Large employers with complex workforces, such as hospitals, are susceptible to actual and alleged violations of these standards. In recent years there has been a proliferation of lawsuits over these "wage and hour" issues, often in the form of large, sometimes multi-state, class actions. For large employers such as hospitals and health systems, such class actions can involve multi-million dollar claims, judgments and/or settlements. A major class action decided or settled adversely to any Reorganized Debtor could have a material adverse impact on its financial condition and result of operations.

*Staffing Shortages.* In past years, the health care industry experienced a scarcity of nursing personnel, respiratory therapists, radiation technicians, pharmacists and other trained health care technicians. A significant factor underlying this trend included a decrease in the number of persons entering such professions. As a result of the recent growth in the unemployment rate, however, these shortages have lessened. It is possible that such shortages will reappear if the economic conditions improve and demand for professional and technical staff increases. Competition for employees, coupled with increased recruiting and retention costs, could increase the Reorganized Debtors' operating costs, possibly significantly, and growth could be constrained. Such a trend could have a material adverse impact on the financial conditions and results of operations of the Reorganized Debtors.

## 9. Labor Costs and Disruption

Hospitals are labor intensive. Labor costs, including salary, benefits and other liabilities associated with the workforce, have a significant impact on hospital operations and financial condition. A significant number of the Reorganized Debtors' employees are organized in collective bargaining units, and may be involved in work actions of various kinds, including work stoppages and strikes. Overall costs of the hospital workforce are high, and turnover is often also high. Pressure to recruit, train and retain qualified employees is expected to accelerate. These

CLI-1803443v1

factors may materially increase the Reorganized Debtors' costs of operation. Workforce disruption may negatively impact the Reorganized Debtors' revenues and reputation.

### 10. Medical Liability Litigation and Insurance

Medical liability litigation is subject to public policy determinations and legal and procedural rules that may be altered from time to time, with the result that the frequency and cost of such litigation, and resultant liabilities, may increase in the future. A hospital may also be adversely affected by negative financial and liability impacts on its physicians. Costs of insurance, including self-insurance, may increase dramatically, or the availability of commercial insurance may be jeopardized.

### 11. Technical and Clinical Developments

New clinical techniques and technology, as well as new pharmaceutical and genetic developments and products, may alter the course of medical diagnosis and treatment in ways that are currently unanticipated and that may dramatically change medical and hospital care. These new technologies and developments could result in higher hospital costs, reductions in patient populations and/or new sources of competition for the Reorganized Debtors.

In addition, medical research and resulting discoveries have grown exponentially in the last decade. These new discoveries may add greatly to the Reorganized Debtors' costs of providing services with no or little offsetting increase in federal reimbursement and may also render obsolete certain of the health services provided by the Reorganized Debtors. New drugs and devices may increase the Reorganized Debtors' expenses because, for the most part, the costs of new drugs and devices are not typically accounted for in Medicaid payments received by hospitals for inpatient care and are often not covered for outpatient services.

### 12. Competition Among Health Care Providers

Increased competition from a wide variety of sources, including specialty hospitals, other hospitals and health care systems, inpatient and outpatient health care facilities, long-term care and skilled nursing services facilities, clinics, physicians and others, may adversely affect the utilization and/or revenues of the Reorganized Debtors. Existing and potential competitors may not be subject to various restrictions applicable to hospitals, and competition, in the future, may arise from new sources not currently anticipated or prevalent.

Additionally, scientific and technological advances, new procedures, drugs and appliances, preventive medicine and outpatient health care delivery may reduce utilization and revenues of the Reorganized Debtors in the future or otherwise lead the way to new avenues of competition. In some cases, investments by the Reorganized Debtors in facilities and equipment for capital-intensive services may be lost as a result of rapid changes in diagnosis, treatment or clinical practice brought about by new technology or new pharmacology.

### 13. Capital Needs versus Capital Capacity

Hospital operations are capital intensive. Regulation, technology and physician/patient expectations require constant and often significant capital investment. Total capital needs may be greater than the availability of funds to provide capital investment.

### 14. Facility Damage

Hospitals are highly dependent on the condition and functionality of their physical facilities. Damage from natural causes, fire, deliberate acts of destruction, or various facilities system failures may have a material adverse impact on the financial condition of the Reorganized Debtors.

### 15. Hospital Pricing

Inflation in hospital costs may evoke action by legislatures, payors or consumers. It is possible that legislative action at the state or national level may be taken with regard to the pricing of health care services.

- 69 -

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 81 of 169

F.  **Nonprofit Health Care Regulatory Risks**

1.  **General**

As nonprofit tax-exempt organizations, the Reorganized Debtors are subject to federal, state and local laws, regulations, rulings and court decisions relating to their organization and operation, including their operation for charitable purposes.  At the same time, the Reorganized Debtors conduct large-scale complex business transactions and are major employers in their respective geographic areas.  There can often be a tension between the rules designed to regulate a wide range of charitable organizations and the day-to-day operations of a complex health care organization.

Recently, an increasing number of the operations or practices of health care providers have been challenged or questioned to determine if they are in compliance with the regulatory requirements for nonprofit tax-exempt organizations.  These challenges, in some cases, are broader than concerns about compliance with federal and state statutes and regulations, such as Medicare and Medicaid compliance, and instead in many cases are examinations of core business practices of the health care organizations.  Areas that have come under examination have included pricing practices, billing and collection practices, charitable care, executive compensation, exemption of property from real property taxation and others.  These challenges and questions have come from a variety of sources, including state attorneys general, the IRS, labor unions, Congress, state legislatures, other federal and state agencies and patients, and in a variety of forums, including hearings, audits and litigation.

2.  **Federal Laws and Regulations**

a.  **Health Care Reform**

The federal fiscal year 2010 budget (the "2010 Budget") establishes a reserve fund of more than $630 billion over ten years to finance fundamental reform of America's health care system in an effort to reduce costs and expand health care coverage.  On July 8, 2009, the White House announced that it had reached agreement with leading hospital groups, including the American Hospital Association, to cut federal payments under Medicare and Medicaid by $155 billion over ten years as part of a plan to offset a portion of the cost of national health insurance and health care reform.  Much of these savings are derived from across-the-board cuts in Medicare hospital payments, with at least $50 billion in the cuts linked directly to increases in the number of uninsured who would be provided coverage under the Health Care Reform Law discussed below.

The Health Care Reform Law, which is designed to overhaul the United States health care system, regulates all aspects and players in the health care arena, including individuals, employers and health insurers.  The key provisions of the Health Care Reform Law include:  (i) dramatically increasing health care coverage of individuals through expansion of Medicaid eligibility and the creation of cooperative insurance purchasing pools: (ii) modifying how hospitals, physicians and other health care providers are paid; and (iii) evaluating hospitals, physicians and other health care providers on a variety of quality and efficacy standards to support pay-for-performance systems.

On March 23, 2010, President Obama signed the Patient Protection and Affordable Care Act into law.  On March 30, 2010, President Obama signed the Health Care and Education Reconciliation Act of 2010 into law, amending the Patient Protection and Affordable Care Act of 2010 (collectively referred to as the "Health Care Reform Law").  The Health Care Reform Law does include a number of changes applicable to hospitals exempt under section 501(c)(3) of the IRC.  In this regard, the Health Care Reform Law (i) imposes new eligibility requirements for 501(c)(3) hospitals, coupled with an excise tax for failures to meet certain of those requirements; (ii) requires mandatory IRS review of the hospitals' entitlement to exemption; (iii) sets forth new reporting requirements, including information related to community health needs assessments and audited financial statements; and (iv) imposes further reporting requirements on the Secretary of the Treasury regarding charity care levels.

In particular, the Health Care Reform Law enacted new section 501(r) of the IRC which imposes new requirements regarding community needs assessments, financial assistance policy requirements, charges limitation requirements, and billing and collection requirements on "hospital organizations."  Under new IRC section 501(r),

CLI-1803443v1

"hospital organizations" (defined to include organizations operating facilities determined to be hospitals under state law) must meet these requirements separately as to each hospital facility operated in order to continue to be organizations described in section 501(c)(3) of the IRC. While the effective dates for these new provisions vary, they are generally effective for tax years beginning after March 22, 2010, and failure to comply with the new requirements may lead to an increased risk that the IRS will seek to revoke the tax-exempt status of one or more members of the Reorganized Debtors.

One of the important factors looked to by the IRS to determine whether or not a health care organization is tax exempt is whether or not the organization has a community board. Materials used by the IRS to train agents who examine tax exempt health care organizations provide that, in general, in order to show that a health care organization has a community board, the health care organization should show that its board broadly represents the community and that the majority of its members are independent of the organization; that the board has adopted and operates under a conflicts of interest policy; and that all components of the organization conduct periodic activity reviews to ensure the organization operates in a charitable manner. A number of these factors, including what constitutes "independence" and what constitutes the "community" are not clearly defined under existing law and may be impacted by new section 501(r). Therefore, it is possible that the IRS would assert that the Reorganized Boards are not community boards because they fail to have a sufficient number of "independent" board members, that the members do not broadly represent the "community," or for other reasons. While having a community board is not an absolute precondition for a health care organization to be an organization described in section 501(c)(3) of the IRC, it is a very important factor in many cases, and failure of the Reorganized Boards to be community boards could lead to an IRS attempt to revoke tax exempt status of one or more of the Reorganized Debtors.

As discussed above, the TEP conducts audits of exempt organizations using teams of revenue agents. The TEP audit teams consider a wide range of possible issues, including the community benefit standard, private inurement and private benefit, partnerships and joint ventures, retirement plans and employee benefits, employment taxes, tax-exempt bond financing, political contributions and unrelated business income.

One or more of the Reorganized Debtors could be audited by the IRS. Because of the complexity of the tax laws and the presence of issues about which reasonable persons can differ, a CEP audit could result in additional taxes, interest and penalties. A CEP audit could ultimately affect the tax-exempt status of any of the Reorganized Debtors.

Loss of tax-exempt status by any of the Reorganized Debtors could result in loss of the exclusion from gross income of the interest on the Bonds that, in turn, could result in a default under the Bond Indentures, potentially triggering an acceleration of the Bonds. Any such event would have material adverse consequences on the future financial condition and results of operations of the affected Reorganized Debtors and, potentially, the Reorganized Debtors as a whole. Additionally, the loss of federal tax-exempt status by a Reorganized Group Debtor could adversely affect its access to future tax-exempt financing.

Failure to comply with certain legal requirements may cause the interest on the Bonds to become included in gross income of the recipients thereof for federal income tax purposes. The Bond Indentures do not provide for the payment of any additional interest or penalty in the event the interest on the Bonds is determined to be includible in gross income for federal income tax purposes.

The IRS is engaged in an ongoing program of auditing tax-exempt obligations to determine whether, in the view of the IRS, interest on such tax-exempt obligations is includible in the gross income of the owners thereof for federal income tax purposes and has recently reviewed a number of bond issues and concluded that such bond issues did not comply with applicable provisions of the Code and related regulations. The IRS has typically entered into closing agreements with issuers and beneficiaries of such bond issues under which payments have been made to the IRS. No assurance can be given that the IRS will not examine a Holder, a Reorganized Debtor or the Bonds. If an audit is commenced, under current procedures, the IRS may treat the issuers as taxpayers, and the Holders may have no right to participate in such procedure. If the Bonds are examined, it may have an adverse impact on their marketability and price (regardless of the ultimate outcome of the audit) and could also result in substantial payments by the Reorganized Debtors to resolve issues raised by the IRS. On May 10, 2010, the IRS announced that it plans to double the number of bond audits it closes in fiscal year 2010 over fiscal year 2009.

CLI-1803443v1

### b. Medicare and Medicaid Programs

Health care providers have been and will continue to be significantly impacted by changes in the last several years in federal health care laws and regulations, particularly those pertaining to Medicare and Medicaid. The purpose of much of the recent statutory and regulatory activity has been to reduce the rate of increase in health care costs, particularly costs paid under the Medicare and Medicaid programs. Diverse and complex mechanisms to limit the amount of money paid to health care providers under both the Medicare and Medicaid programs have been enacted, and have caused severe reductions in reimbursement from the Medicare program. It is likely that legislative modifications to refine the Medicare and Medicaid programs will continue.

In addition, past federal budgets have contained cuts to the Medicare and Medicaid program budgets. While it is uncertain whether future federal budgets will propose cuts to these programs, any reduction in the level of Medicare and/or Medicaid spending or a reduction in the rate of increase of Medicare and/or Medicaid spending would have an adverse impact on the revenues of the Reorganized Debtors derived from the Medicare and Medicaid programs.

*Hospital Inpatient Reimbursement.* Hospitals are generally paid for inpatient services provided to Medicare beneficiaries based on established categories of treatments or conditions known as diagnosis related groups ("DRGs"). DRGs are a system of classifying inpatient hospital services based on a person's medical diagnosis, any secondary diagnoses, surgical procedures, age, sex and presence of any complications. Payments are made to hospitals based on the DRG assignment for each patient's diagnosis. Hospital reimbursement will be set at specific rates established by Medicare for that particular patient's DRG, regardless of the actual costs incurred by the hospital for such treatment. The actual cost of care, including capital costs, may be more or less than the DRG rate. DRG rates are subject to adjustment by CMS and are subject to federal budget considerations. There is no guarantee that DRG rates, as they change from time to time, will cover the Reorganized Debtors' actual costs of providing services to Medicare patients.

*Other Medicare Service Payments.* Medicare payment for skilled nursing services, psychiatric services, inpatient rehabilitation services, general outpatient services and home health services are based on regulatory formulas or pre-determined rates. There is no guarantee that these rates, as they may change from time to time, will be adequate to cover the Reorganized Debtors' actual cost of providing these services to Medicare patients. In addition, there is no assurance that the Reorganized Debtors will be fully reimbursed for all services that each bills through consolidated billing.

*Reimbursement of Hospital Capital Costs.* Hospital capital costs apportioned to Medicare patient use (including depreciation and interest) are paid by Medicare exclusively on the basis of a standard federal rate (based upon average national costs of capital), subject to limited adjustments specific to a hospital. There can be no assurance that future capital-related payments will be sufficient to cover the actual capital-related costs of the Reorganized Debtors' facilities applicable to Medicare patient stays or will provide flexibility for the Reorganized Debtors to meet changing capital needs.

*Medicare Audits and Withholds.* Hospitals participating in Medicare and Medicaid are subject to audits and retroactive audit adjustments with respect to reimbursement claimed under those programs. Any future adjustments could be material. Both Medicare and Medicaid regulations also provide for withholding payments in certain circumstances. Any such withholding with respect to any Reorganized Debtor could have a material adverse effect on the financial condition and results of operations of the Reorganized Debtors. In addition, contracts between hospitals and third-party payors often have contractual audit, setoff and withhold language that may cause substantial, retroactive adjustments. Such contractual adjustments also could have a material adverse effect on the financial condition and results of operations of the Reorganized Debtors.

Under both Medicare and Medicaid programs, certain health care providers, including hospitals, are required to report certain financial information on a periodic basis and with respect to certain types of classifications of information, penalties are imposed for inaccurate reports. As these requirements are numerous, technical and complex, there can be no assurance that the Reorganized Debtors will avoid incurring such penalties in the future. These penalties may be material and adverse and could include criminal or civil liability for making false claims and/or exclusion from participation in the federal health care programs. Under certain circumstances, payments made may be determined to have been made as a consequence of improper claims subject to the federal False

CLI-1803443v1

Claims Act or other federal statutes, subjecting the provider to civil, administrative, or criminal sanctions. The Department of Justice has initiated a number of national investigations involving proceedings under the federal False Claims Act relating to alleged improper billing practices by hospitals. These actions have resulted in substantial settlement amounts being paid in certain cases.

Medicare audits or cost report settlements for the Medicare program could materially adversely affect the financial condition or results of operations of the Reorganized Debtors and, in light of the complexity of the regulations relating to the Medicare program and the threat of ongoing investigations, there can be no assurance that significant difficulties will not develop in the future.

*Medicaid Programs.* Medicaid is a program for medical assistance, funded jointly by the federal government and the states, for certain needy individuals and their dependants. Under Medicaid, the federal government provides limited funding to states that have medical assistance programs that meet federal standards. Attempts to balance or reduce federal and state budgets will likely negatively impact Medicaid spending. Payments made to health care providers under the Medicaid program are subject to change as a result of federal or state legislative and administrative actions, including changes in the methods for calculating payments, the amount of payments that will be made for covered services and the types of services that will be covered under the program. Such changes have occurred in the past and may be expected to occur in the future, particularly in response to federal and state budgetary constraints. Any future reduction in the level of Medicaid spending by the federal government is likely to have an adverse impact on the revenues of the Reorganized Debtors derived from the Medicaid program. While President Obama's proposed FY 2010 Budget includes $630 billion over ten years to fund health care reform, as noted above, a portion of such amount is derived from cuts in Medicaid and there is no assurance that Medicaid reimbursement rates and funding levels will not be adversely affected in the future.

Reimbursement for care provided to Ohio Medicaid patients is subject to appropriation by the Ohio legislature of sufficient funds to pay incurred patient obligations. As currently proposed, budget cuts in Ohio are likely to both reduce the level of benefits available and amounts to be paid for services provided to Medicaid recipients. At this time, however, exact changes to the program are unknown. Accordingly, it is uncertain how the Reorganized Debtors might be affected.

Since Medicaid is a significant payor for the Reorganized Debtors, changes in the qualification criteria, covered benefits and reimbursement amounts could have a material effect on the Reorganized Debtors' net revenue and operating margin. Additionally, the effect of the implementation of a Medicaid managed care program cannot be predicted. With increased benefit limitations and more restrictive payments for services, reductions in reimbursement could be materially greater than current estimates and could result in more uninsured patients. Accordingly, there is no assurance that Medicaid payments are, or will continue to be, adequate.

### c. American Recovery and Reinvestment Act of 2009

The Recovery Act was signed into law in February 2009. The Recovery Act includes certain provisions that are intended to provide financial relief to health care providers. The Recovery Act is intended to increase amounts paid by the federal government to the states to fund Medicaid through December 31, 2010. Title XIII of the Recovery Act, otherwise known as the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), provides for an investment of almost $20 billion in public monies for the development of a nationwide health information technology ("HIT") infrastructure. The HIT infrastructure is intended to improve health care quality, reduce health care costs and facilitate access to necessary information. The HITECH Act provides financial incentives (through the Medicaid and Medicare programs), loans and grants to encourage practitioners and providers to adopt and use qualified electronic health records. Eventually, Medicare payments are reduced for providers and practitioners who do not use electronic health records.

The HITECH Act has also significantly increased fines and the scope of remedies for violations of The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (described below) and breaches of the security of electronic health records and, if certain procedures and technologies are not in place, requires disclosure to affected individuals, news media and HHS in the event security of protected information is breached. Criminal penalties are enforceable against persons who obtain or disclose protected health information without authorization. In addition, a state's attorney general can bring civil actions against a person on behalf of residents adversely affected by violations of either HIPAA or the HITECH Act. An attorney general can either seek to enjoin further

violations or obtain money damages on behalf of the residents harmed. HHS is beginning to perform periodic audits of health care providers to ensure that required policies under the HITECH Act are in place. Individuals harmed by violations of HIPAA and the HITECH Act will be able to recover a percentage of monetary penalties or a monetary settlement based upon methods to be established by HHS for this private recovery in the next three years.

The effect of the Recovery Act, including the HITECH Act, on the Reorganized Debtors cannot be determined at this time.

### d. Federal Privacy Laws

HIPAA adds additional criminal sanctions for health care fraud and applies to all health care benefit programs, whether public or private. HIPAA also provides for punishment of a health care provider for knowingly and willingly embezzling, stealing, converting or intentionally misapplying any moneys, funds or other assets of a health care benefit program. A health care provider convicted of health care fraud could be subject to mandatory exclusion from Medicare.

HIPAA addresses the confidentiality of individuals' health information. Disclosure of certain broadly defined protected health information is prohibited unless expressly permitted under the provisions of the HIPAA statute and regulations or authorized by the patient. HIPAA's confidentiality provisions extend not only to patient medical records, but also to a wide variety of health care clinical and financial settings where patient privacy restrictions often impose new communication, operational, accounting and billing restrictions. These add costs and create potentially unanticipated sources of legal liability.

HIPAA imposes civil monetary penalties for violations and criminal penalties for knowingly obtaining or using individually identifiable health information. The penalties range from $100 to a maximum of $250,000 per violation and/or imprisonment depending on the violation's degree of intent and the extent of the harm resulting from the violation.

### e. Anti-Fraud and Abuse Laws

The federal Anti-Kickback Statute makes it a felony to knowingly and willfully offer, pay, solicit or receive remuneration, directly or indirectly, in order to induce business that is reimbursable under any federal health care program. The Anti-Kickback Statute applies to many common health care transactions between entities and persons with which a hospital does business, including hospital-physician joint ventures, medical director agreements, physician recruitment agreements, physician office leases and other transactions. The Anti-Kickback Statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain or pay money for the referral of services or to induce further referrals. Violation of the Anti-Kickback Statute may result in imprisonment for up to five years and/or fines of up to $25,000 for each act. In addition, the Office of Inspector General ("OIG") has the authority to impose civil assessments and fines and to exclude hospitals engaged in prohibited activities from the Medicare, Medicaid, TRICARE (a health care program providing benefits to dependents of active duty and retired members of the United States military services) and other federal health care programs, for a period of not less than five years.

The Health Care Reform Law amended a number of provisions of the Anti-Kickback Statute. One such amendment provides that an Anti-Kickback Statute violation may be established without showing that an individual knew of the statute's proscriptions or acted with specific intent to violate the Anti-Kickback Statute. The new standard could significantly expand criminal and civil fraud exposure for transactions and arrangements where there is no intent to violate the Anti-Kickback Statute. The Health Care Reform Law further amended the Anti-Kickback Statute to explicitly provide that a violation of the statute constitutes a false or fraudulent claim under the federal False Claims Act.

Increased emphasis is being placed on federal investigations and prosecutions of Medicare and Medicaid "fraud and abuse" cases and increases in personnel investigating and prosecuting such cases have been reported, which will most likely result in a higher level of scrutiny of hospitals and health care providers, including the Reorganized Debtors.

Because of the breadth of these laws and the narrowness of the safe harbor regulations, there can be no assurances that the Reorganized Debtors will not be found to have violated the Anti-Kickback Statute. Any claim, investigation or enforcement action regarding the Anti-Kickback Statute, if determined adversely to the Reorganized Debtors could have a material adverse effect on the Reorganized Debtors' financial condition.

### f. Stark Law

Another federal law (known as the "Stark Law") prohibits, subject to limited exceptions, a physician who has a financial relationship, or whose immediate family has a financial relationship, with entities (including hospitals) providing "designated health services" from referring Medicare patients to such entities for the furnishing of such designated health services. The Stark Law also prohibits the entity receiving the referral from filing a claim or billing for the services arising out of the prohibited referral. The prohibition applies regardless of the reasons for the financial relationship and the referral; that is, no finding of intent to violate the Stark Law is required. Sanctions for violation of the Stark Law include denial of payment for the services provided in violation of the prohibition, refunds of amounts improperly collected, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, exclusion from participation in the federal health care programs and a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law's prohibition. The types of financial arrangements between a physician and an entity that trigger the self-referral prohibitions of the Stark Law are broad and include ownership and investment interests and compensation arrangements.

Although the Stark Law only applies to Medicare claims, federal law also precludes payment of federal matching funds to a state Medicaid program to the extent used to pay for designated health services provided as a result of a referral that would be prohibited for Medicare purposes. In addition, a number of states (including Ohio) have passed similar statutes pursuant to which similar types of prohibitions are made applicable to all other health plans or third party payors, including Medicaid and private payors. Likewise, courts have held that Medicaid claims also constitute claims submitted to the federal government for purposes of the False Claims Act.

There can be no assurance that the Reorganized Debtors will not be found to have violated the Stark Law. Sanctions under the Stark Law, including exclusion from the Medicare and Medicaid programs, could have a material adverse effect on the financial condition and results of operations of the Reorganized Debtors, as would any significant penalties, demands for refunds or denials of payment.

### g. False Claims Laws

There are principally three federal statutes addressing the issue of "false claims." First, the civil False Claims Act imposes civil liability (including substantial monetary penalties and damages) on any person or corporation that (i) knowingly presents or causes to be presented a false or fraudulent claim for payment to the United States government; (ii) knowingly makes, uses, or causes to be made or used a false record or statement to obtain payment; or (iii) engages in a conspiracy to defraud the federal government by getting a false or fraudulent claim allowed or paid. A showing of specific intent to defraud the federal government is not required to establish the requisite knowledge. This statute authorizes private persons to file *qui tam* actions on behalf of the United States. Potential recovery under the False Claims Act includes repayment of three times the amount billed, plus civil penalties of $5,500.00 to $11,000.00 per claim. A relator bringing suit on behalf of the government may recover 15-25% of the settlement or judgment if the government intervenes and up to 30% if the government does not intervene. If the disclosure is based primarily on public information, the recovery would be up to 10%.

The Fraud and Enforcement and Recovery Act ("FERA"), signed into law on May 20, 2009, has the potential to expand exposure under the civil False Claims Act for a wide range of business transactions involving federal government funds. Pursuant to FERA amendments, the civil False Claims Act may impose liability for false claims with more remote connections to the federal government.

The Health Care Reform Law, among other changes to the civil False Claims Act, substantially modified the "public disclosure bar" as a jurisdictional defense to *qui tam* suits. Prior to the Health Care Reform Law, the public disclosure bar required dismissal of a *qui tam* suit where the allegations were publicly disclosed in a criminal, civil, or administrative proceeding; a congressional, administrative, or U.S. Government Accountability Office report, hearing, audit, or investigation; or news media unless the private plaintiff was the "original source" exception in other cases.

CLI-1803443v1

In addition to the civil False Claims Act, the Civil Monetary Penalties Law authorizes the imposition of substantial civil money penalties against an entity that engages in activities including, but not limited to, (i) knowingly presenting or causing to be presented, a claim for services not provided as claimed or which is otherwise false or fraudulent in any way, (ii) knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient, (iii) offering or giving remuneration to any beneficiary of a federal health care program likely to influence the receipt of reimbursable items or services, (iv) arranging for reimbursable services with an entity which is excluded from participation from a federal health care program, (v) knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary, (vi) using a payment intended for a federal health care program beneficiary for another use and (vii) knowingly making or causing to be made a false statement, omission or misrepresentation of material fact in any application, bid or contract to participate in a federal health care program. The Secretary of Health and Human Services, acting through the OIG, also has both mandatory and permissive authority to exclude individuals and entities from participation in federal health care programs pursuant to this statute.

Further, it is a criminal federal health care fraud offense to: (i) knowingly and willfully execute or attempt to execute any scheme to defraud any health care benefit program; or (ii) obtain, by means of false or fraudulent pretenses, representations or promises, any money or property owned or controlled by any health care benefit program. Penalties for a violation of this federal law include fines and/or imprisonment and a forfeiture of any property derived from proceeds traceable to the offense.

The Deficit Reduction Acts of 2005 and 2006 (collectively, the "DRA") provide financial incentives to states that pass similar false claims statutes. It is significant to note that a number of states, including Ohio, have passed similar statutes expanding the prohibition against the submission of false claims to nonfederal third party payors.

Any claims, investigations or enforcement actions regarding the False Claims Act Statute, if determined adversely to the Reorganized Debtors, taken as a whole and taking into account current reserves, could have a material adverse effect on the financial condition of Reorganized Debtors.

### h.      Physician Recruitment

As tax-exempt organizations, the Reorganized Debtors are limited with respect to their ability to use incentives to recruit and retain physicians. The IRS scrutinizes a wide variety of contractual relationships commonly used by hospitals. This scrutiny could result in the revocation of an Reorganized Debtor's tax-exempt status or an assessment of a significant tax liability. These limits could also adversely affect the Reorganized Debtors' ability to attract and retain sufficient physicians.

### i.      Emergency Medical Treatment and Labor Act

The Emergency Medical Treatment and Active Labor Act ("EMTALA") is a federal civil statute that requires hospitals to treat or conduct a medical screening for emergency conditions and to stabilize a patient's emergency medical condition before releasing, discharging or transferring the patient. A hospital that violates EMTALA is subject to civil penalties of up to $50,000 per offense and exclusion from the Medicare and Medicaid programs. In addition, the hospital may be liable for any claim by any individual who has suffered from harm as a result of a violation.

### 3.      Ohio Laws and Regulations

Ohio has established statutory and regulatory requirements for health care facilities. Failure to comply with laws and rules governing licensure and standards of care could result in the revocation of a hospital's license and operating privileges, including licensure of inpatient facilities and outpatient programs, including hospitals, home health agencies, skilled nursing facilities, hospice programs and basic care facilities.

### a.      Ohio Certificate of Need Program

Ohio's certificate of need ("CON") laws are only applicable to nursing facilities. As a result, the Reorganized Debtors could face increased competition from other providers, which could decrease revenues to the

Reorganized Debtors. Any such increased competition could have a material adverse impact on the financial condition of the Reorganized Debtors.

### b.    Accreditations and Licensure

The Reorganized Debtors are subject to periodic review by The Joint Commission and various federal, state and local agencies. Failure to receive accreditation or licensure could have a material adverse impact on the Reorganized Debtors. Renewal and continuance of certain of these licenses, certifications and accreditations are based on inspections, surveys, audits, investigations or other reviews, some of which may require or include affirmative action or response by the Reorganized Debtors. Difficulty renewing or continuing currently held licenses, certifications or accreditations could result in the loss of utilization or revenues, or the Reorganized Debtors' ability to operate all or a portion of its facilities and, consequently, could adversely affect the Reorganized Debtors' ability to make principal, interest and premium, if any, payments with respect to the Leases and the Obligations. No assurance can be given as to the effect on future operations of existing laws, regulations and standards for certification or accreditation or of any future changes in such laws, regulations and standards.

### c.    Ohio HCAP Program

Ohio currently has in place a program known as the "Hospital Care Assurance Program" ("HCAP") that imposes an assessment on hospitals to create a pool of funds for redistribution to hospitals based upon an indigent care factor. Under the HCAP, the Ohio Department of Job and Family Services ("ODJFS") helps hospitals pay for uncompensated costs of treating indigent people. The ODJFS does so by levying a provider tax against hospitals to generate a basic funding source that is joined with matching federal Medicaid funds. The pooled funds are then redistributed to hospitals based on the relative level of each hospital's indigent care services. The Balance Budget Act of 1997 (the "BBA") imposed reductions on the level of matching federal funds available with respect to the HCAP and similar programs in other states. The pool of funds available to hospitals under the HCAP is therefore expected to decrease in the future. In the year ended December 31, 2009, the Reorganized Debtors received HCAP fund net distributions of approximately $2,150,000.00. There is no guarantee that, in the future, the Reorganized Debtors will continue to receive distributions at this level or that the Reorganized Debtors will receive any aggregate net amount from HCAP.

*The Healthcare Simplification Act.* On March 25, 2008, the Governor of Ohio signed House Bill 125, commonly referred to as The Healthcare Simplification Act (the "HSA"), into law. The HSA makes many revisions to Ohio law that may impact hospitals. Specifically the HSA imposes new regulations on health care contracts between health plans and providers. Some of these regulations include establishing a moratorium on the use of "most favored nation" clauses in certain health care contracts, subjecting certain contractual disputes to binding arbitration and restricting the use of rental networks. Additionally, the HSA requires the Ohio Department of Insurance to establish standard credentialing forms for providers. Due to the recent passage of the HSA, its impact on the Reorganized Debtors cannot be ascertained at this point. It is possible that the regulations contained in the HSA could impose, among other things, material adverse operational, financial and legal burdens, costs and risks upon the Reorganized Debtors.

### d.    Professional Liability Claims and General Liability Insurance

In recent years, the number of professional and general liability suits and the dollar amounts of damage recoveries have increased in health care nationwide, resulting in substantial increases in malpractice insurance premiums, higher deductibles and generally less coverage. Professional liability and other actions alleging wrongful conduct and seeking punitive damages are often filed against health care providers. Insurance may not provide coverage for judgments for punitive damages.

In 2003, Ohio enacted legislation to limit amounts of money injured patients may recover in medical malpractice lawsuits. Although this legislation is intended to stabilize the liability insurance market, this effect will only occur over time, if at all. The central benefit of the Ohio reforms is a complex cap on non-economic damages in medical malpractice cases. The basic cap is the larger of $250,000 or three times economic damages, subject to a maximum of $350,000 per plaintiff and a maximum of $500,000 per occurrence. These maximum amounts increase to $500,000.00 per plaintiff and $1,000,000.00 per occurrence if the plaintiff has suffered permanent and substantial

CLI-1803443v1

physical deformity, loss of use of a limb, loss of a bodily organ system or permanent physical functional injury that prevents him from being able to independently care for himself and perform life sustaining activities. The cap does not limit the non-economic damages that family members can recover in a wrongful death case, but it does limit the right of a decedent's estate to recover for damages like conscious pain and suffering that the decedent experienced prior to death.

In addition, in 2005, Senate Bill 80 became law in Ohio. This law extended many of the 2003 Ohio medical malpractice reforms to other areas of tort law, and, among other things, established a cap on non-economic damages in non-catastrophic cases and imposed a cap on punitive damages.

The Ohio Supreme Court recently affirmed the constitutionality of several provisions of the 2005 tort reform act in *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468 (Ohio 2007). Decided on December 27, 2007, the Ohio Supreme Court upheld the constitutionality of the caps on non-economic damages and punitive damages and further found that neither cap violated the separation of powers or single subject rule. The Ohio Supreme Court did not rule, however, on a challenge to the collateral source provision, as the court concluded that the plaintiff did not have standing to challenge that provision.

Litigation also arises from the corporate and business activities of hospitals, from a hospital's status as an employer or as a result of medical staff or provider network peer review or the denial of medical staff or provider network privileges. As with professional liability, certain of these risks may not be covered by insurance. For example, some antitrust claims or business disputes are not covered by insurance and may, in whole or in part, become a direct liability of a Reorganized Debtor if determined or settled adversely.

There is no assurance that the Reorganized Debtors will be able to maintain coverage amounts currently in place in the future, that the coverage will be sufficient to cover malpractice judgments rendered against a Reorganized Debtor or that such coverage will be available at a reasonable cost in the future.

### 4.      Environmental Regulations

The Reorganized Debtors are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations. These include, but are not limited to: air and water quality control requirements; waste management requirements; specific regulatory requirements applicable to asbestos and radioactive substances; requirements for providing notice to employees and members of the public about hazardous materials handled by or located at the hospital; and requirements for training employees in the proper handling and management of hazardous materials and wastes.

Each Reorganized Debtor may be subject to requirements related to investigating and remedying hazardous substances located on their property, including such substances that may have migrated off of their property. Typical hospital operations include the handling, use, storage, transportation, disposal and/or discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants and contaminants. As such, hospital operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such environmental laws and regulations. Such risks may result in damage to individuals, property or the environment; may interrupt operations and/or increase their cost; may result in legal liability, damages, injunctions or fines; may result in investigations, administrative proceedings, civil litigation, criminal prosecution, penalties or other governmental agency actions; and may not be covered by insurance. There is no assurance that the Reorganized Debtors will not encounter such problems in the future, and such problems may result in material adverse consequences to the operations or financial condition of the Reorganized Debtors.

### 5.      Enforcement Actions

Enforcement activity against health care providers has increased, and enforcement authorities may aggressively pursue perceived violations of health care laws. In the current regulatory climate, it is anticipated that many hospitals and physician groups may be subject to an audit, investigation or other enforcement action regarding the health care fraud laws mentioned above. The cost of defending such an action, the time and management attention consumed and the facts of a case may dictate settlement. Therefore, regardless of the merits of a particular case, a hospital could experience materially adverse settlement costs, as well as materially adverse costs associated

- 78 -

with implementation of any settlement agreement. Prolonged and publicized investigations could also be damaging to the reputation and business of a hospital, regardless of outcome.

Certain acts or transactions may result in violation or alleged violation of a number of the federal health care fraud laws described above and therefore penalties or settlement amounts often are compounded. Generally, these risks are not covered by insurance.

### a. Joint Ventures

The OIG has expressed its concern in various advisory bulletins that many types of joint venture arrangements involving hospitals may implicate the Anti-Kickback Statute, since the parties to joint ventures are typically in a position to refer patients of federal health care programs.

In addition, under the federal tax laws governing section 501(c)(3) organizations, a tax-exempt hospital's participation in a joint venture with for-profit entities must further the hospital's exempt purposes, and the joint venture arrangement must permit the hospital to act exclusively in the furtherance of its exempt purposes, with only incidental benefit to any for-profit partners. If the joint venture does not satisfy these criteria, the hospital's tax-exemption may be revoked, the hospital's income from the joint venture may be subject to tax or the parties may be subject to some other sanction.

Finally, many hospital joint ventures with physicians may also implicate the Stark Law. The Health Care Reform Law, among other changes to Stark, would generally restrict physician ownership of hospitals to the levels in effect at a specific date in 2010, and would limit further expansion of such facilities. It is unclear what effect, if any, these changes will have on the Reorganized Group Debtors.

Any evaluation of compliance with the Anti-Kickback Statute or tax laws governing section 501(c)(3) organizations depends on the totality of the facts and circumstances; while the Stark Law requires strict compliance with an exception if the prohibition is triggered. Any determination that a Reorganized Debtor is not in compliance with these laws and related regulations could have a material adverse effect on the future financial condition of the Reorganized Debtors.

### b. Litigation Relating to Billing and Collection Practices

Lawsuits have been filed in both federal and state courts alleging, among other things, that hospitals have failed to fulfill their obligations to provide charity care to uninsured patients and have overcharged uninsured patients. The cases are proceeding in various courts around the country with inconsistent results. While it is not possible to make general predictions, some hospitals and health systems have incurred substantial costs in defending such lawsuits, and in some cases have entered into substantial settlements.

### c. Challenges to Real Property Tax Exemptions

Recently, the real property tax exemptions afforded to certain nonprofit health care providers by state and local taxing authorities have been challenged on the grounds that the health care providers were not engaged in sufficient charitable activities. These challenges have been based on a variety of grounds, including allegations of aggressive billing and collection practices and excessive financial margins.

### d. Enforcement Affecting Clinical Research

In addition to increasing enforcement of laws governing payment and reimbursement, the federal government has also heightened enforcement of laws and regulations governing the conduct of clinical trials at hospitals. HHS elevated and strengthened its Office of Human Research Protections, one of the agencies with responsibilities for monitoring federally funded research. In addition, the National Institutes of Health significantly increased the number of facility inspections that these agencies perform. The Food and Drug Administration ("FDA") also has authority over the conduct of clinical trials performed in hospitals when these trials are conducted on behalf of sponsors seeking FDA approval to market the drug or device that is the subject of the research. The FDA's inspection of facilities has increased significantly in recent years. These agencies' enforcement powers range

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 91 of 169

from substantial fines and penalties to exclusions of researchers and suspension or termination of entire research programs.

### e. Antitrust

While enforcement of the antitrust laws against hospitals has been less intense in recent years, antitrust liability may arise in a wide variety of circumstances, including medical staff privilege disputes, payor contracting, physician relations, joint ventures, merger, affiliation and acquisition activities, certain pricing or salary setting activities, as well as other areas of activity. The application of the federal and state antitrust laws to health care is evolving, and therefore not always clear. Currently, the most common areas of potential liability are joint action among providers with respect to payor contracting and medical staff credentialing disputes.

Violation of the antitrust laws could result in criminal and/or civil enforcement proceedings by federal and state agencies, as well as actions by private litigants. In certain areas, private litigants may be entitled to treble damages, and in others, governmental entities may be able to assess substantial monetary fines.

### 6. Possible Future Legislation

Legislation is periodically introduced in the U.S. Congress and in the legislature of the State of Ohio that could result in limitations on hospital revenues, reimbursement, costs or charges or that could require an increase in the quantity of indigent care required to maintain charitable status. The effects on the Reorganized Debtors of such legislation, if enacted, cannot accurately be determined at this time.

In addition to legislative proposals previously discussed herein, other legislative proposals that could have an adverse effect on the Reorganized Debtors include: (a) any changes in the taxation of nonprofit corporations or in the scope of their exemption from income or property taxes; (b) limitations on the amount or availability of tax-exempt financing for corporations described in section 501(c)(3) of the IRC; and (c) regulatory limitations affecting the Reorganized Debtors' ability to undertake capital projects or develop new services.

Legislative bodies have considered legislation concerning the charity care standards that nonprofit, charitable hospitals must meet to maintain their federal income tax exempt status under the IRC and legislation mandating nonprofit, charitable hospitals to have an open-door policy toward Medicare and Medicaid patients as well as offer, in a non-discriminatory manner, qualified charity care and community benefits. Excise tax penalties on nonprofit, charitable hospitals that violate these charity care and community benefit requirements could be imposed, or their tax-exempt status under the IRC could be revoked. The scope and effect of legislation, if any, that may be adopted at the federal or state levels with respect to charity care of nonprofit hospitals cannot be predicted. Any such legislation or similar legislation, if enacted, may have the effect of subjecting a portion of the income of a Reorganized Debtor to federal or state income taxes or to other tax penalties and adversely affect the ability of the Reorganized Debtors individually and of the Reorganized Debtors, taken as a whole, to generate net revenues sufficient to meet their obligations and to pay the debt service on the Bonds and their other obligations.

### a. Other Congressional Hearings/Legislation

Congress has frequently focused on tax-exempt hospitals, the community-benefit standard for tax-exempt hospitals and the charity care provided by tax-exempt hospitals. Congress has debated adding a 5 percent minimum mandated charity care requirement for maintaining tax exemption of nonprofit hospitals. In September 2008, Senator Grassley launched a detailed inquiry into two nonprofit hospitals' activities following media reports that called into question their tax-exempt purposes. This inquiry could be expanded to other hospitals or could result in legislation.

While the Health Care Reform Law contains many features from previous exemption reform proposals, it does not mandate specific levels of charity care for nonprofit hospitals. The Health Care Reform Law does, however, include a set of sweeping changes applicable to charitable hospitals exempt under section 501(c)(3) of the IRC. The Health Care Reform Law (i) imposes new eligibility requirements for 501(c)(3) hospitals, coupled with an excise tax for failures to meet certain of those requirements; (ii) requires mandatory IRS review of the hospitals' entitlement to exemption; (iii) sets forth new reporting requirements, including information related to community

health needs assessments and audited financial statements; and (iv) imposes further reporting requirements on the Secretary of the Treasury regarding charity care levels.

## G. Securities Laws Considerations Regarding Liquidating Trust Interests

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (1) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent that the rights to distributions from the Liquidating Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

### 1. Non-Transferability of Liquidating Trust Interests

Holders of Claims receiving the rights to distributions from the Liquidating Trust should be aware that such interests are not transferable. Therefore, there will not be any trading market for such interests, nor will such interests be listed on any public exchange or other market. The lack of liquidity of such interests may have a negative impact on their value.

### 2. Uncertainty of Value of Liquidating Trust Interests

In addition to the prohibition on the transfer of the rights to distributions from the Liquidating Trust, the value of such interests will depend on various significant risks and uncertainties, including, without limitation, (a) the success of the Liquidating Trust in securing judgments and settlements on a favorable basis with respect to claims that the trust is pursuing, (b) the effect of substantial delays in liquidating the assets not sold and liquidating the remaining claims and other contingent assets and liabilities and (c) the effects of any changes in Tax and other government rules and regulations applicable to the Liquidating Trust. These risks are in part beyond the control of the Liquidating Trustee. The amount of any recovery realized by the Liquidating Trust and its beneficiaries will vary depending upon the extent to which these risks materialize. In addition, the resolution of the claims held by the Liquidating Trust may require a substantial amount of time to be resolved and liquidated. The associated delays could reduce the value of any recovery.

## XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

### A. General

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM UNDER THE IRC, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND (3) A HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

CLI-1803443v1

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM COUNSEL TO THE PLAN PROPONENTS CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS.  AMONG OTHER THINGS, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS WHERE APPLICABLE.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES OR THE TAX CONSEQUENCES OF EVENTS BEFORE THE PETITION DATE, INCLUDING THE DEBTORS' ENTRY INTO THE MFA AND OTHER FORBEARANCE AGREEMENTS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

### B.    Tax Treatment of Interest on the Bonds

Under the Plan, all Series 1997A Bonds and Series 2002A Bonds for which the Holder does not exercise the Alternative Cash Payment Option and all Series 1997B Bonds and Series 2002B Bonds will remain outstanding. The Plan should not result in the loss of any exclusion from gross income for purposes of U.S. federal income taxation to which interest on the Bonds would otherwise be entitled.

### C.    U.S. Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences of the Plan to a holder of a Claim will depend, in part, on whether the Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

### 1.    Holders of Bonds

Under the Plan, all Series 1997A Bonds and Series 2002A Bonds for which the Holder does not exercise the Alternative Cash Payment Option and all Series 1997B Bonds and Series 2002B Bonds will remain outstanding and be governed by the Amended and Restated Master Trust Indenture, which will replace the Master Trust Indenture.  The Amended and Restated Master Trust Indenture alters a number of the indenture covenants.

Under Treasury Regulation § 1.1001-3, significant modifications to the terms of a debt instrument result in a deemed exchange of a modified debt instrument for the unmodified debt instrument.  Such exchanges are generally taxable to the holders of the debt instruments.  The addition of collateral securing a recourse obligation gives rise to a deemed exchange only if the addition results in a substantial enhancement of the obligor's capacity to meet its payment obligations under the debt instrument, which capacity was primarily speculative before the modification and is adequate after it.  The Debtors may take the position that the increase in collateral effected by the Amended and Restated Master Trust Indenture does not substantially enhance the Debtors' payment capacity and will not give rise to a deemed exchange of modified Bonds for unmodified Bonds.

Under the regulations, the addition, deletion or alteration of "customary accounting or financial covenants" is not a significant modification.  Although no authority has addressed changes of the type and scope made by the

- 82 -

Amended and Restated Master Trust Indenture, the Debtors may take the position that the changes will not give rise to a deemed exchange, in which event the Holders will not realize any gain or loss with respect to their Bonds.

If the IRS determines that a deemed exchange occurred, the exchange is likely to be a recapitalization in which the Holders realize but do not recognize gain or loss with respect to their Bonds. To be a recapitalization, the modified and unmodified Bonds must both be "securities" for U.S. federal income tax purposes. There is no precise definition of the term "security" for such purposes. Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security. Nevertheless, courts generally have held that corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security. The Bonds should be tax securities and any deemed exchange should be a recapitalization.

If the modifications made by the Amended and Restated Master Trust Indenture give rise to a deemed exchange and the exchange qualifies as a recapitalization, a Holder's tax basis in its modified Bonds (apart from any portion allocated to interest) would equal the Holder's basis in its unmodified Bonds and the holding period for the modified Bonds (apart from any portion allocated to interest) would include the holding period of the unmodified Bonds. The Holder's tax basis in any modified Bonds allocated to interest would equal the fair market value of the modified Bonds on the Effective Date, and the holding period of any such Bonds would begin on the day after the Effective Date.

If the modifications made by the Amended and Restated Master Trust Indenture give rise to a deemed exchange and the exchange does not qualify as a recapitalization, any gain or loss recognized by the Holder would be capital or ordinary, depending on the status of the Bond in the Holder's hands, including whether the Bond constitutes a market discount bond in the Holder's hands. Generally, any gain or loss recognized by a Holder would be a long-term capital gain or loss if the Bond is a capital asset in the hands of the Holder and the Holder has held the Bond for more than one year, unless the Holder had previously claimed a bad debt or worthless securities deduction or the Holder had accrued market discount with respect to the Bond. See "Certain Other Tax Considerations for Holders of Claims — Market Discount" below for a discussion of the character of any gain recognized from a Bond with accrued market discount.

A Holder of a Series 1997A Bond or Series 2002A Bond who elects the Alternative Cash Payment Option would recognize gain or loss in an amount equal to the difference between the amount of Cash received by the Holder in satisfaction of its Bond and the Holder's adjusted tax basis in the Bond. To the extent any portion of the Cash received by the Holder is allocable to interest on the Bond, such portion should be tax-exempt interest. See "Certain Other Tax Considerations for Holders of Claims — Pre-Effective Date Interest" below for a discussion of the allocation of recoveries first to principal and then to interest.

### 2. Holders of Class 5 Claims

A holder of an Allowed Class 5 Claim would recognize gain or loss in an amount equal to the difference between the fair market value of the interest in the Liquidating Trust received by the holder in satisfaction of the Claim and the holder's adjusted tax basis in the Claim. To the extent any portion of a holder's recovery is allocable to interest on the Claim, such portion would be treated as interest income to such holder. See "Certain Other Tax Considerations for Holders of Claims — Pre-Effective Date Interest" below for a discussion of the allocation of recoveries first to principal and then to interest.

The tax basis for the interest in the Liquidating Trust received by a holder of an Allowed General Unsecured Claim would equal its fair market value on the date of distribution to the holder. The holding period for such interest would begin on the day following the day of receipt.

Generally, any gain or loss recognized by a holder of an Allowed General Unsecured Claim would be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Certain Other Tax Considerations for Holders of Claims — Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### D. Tax Treatment of the Liquidating Trust and Disputed Unsecured Claims Reserve

The Liquidating Trust is intended to be treated in part as a "grantor trust" under Treasury Regulation § 301.7701-4(d) and section 671 of IRC. Assuming that this treatment is correct, the Liquidating Trust will generally not be treated as a separate taxable entity. Instead, the holders of beneficial interests in the Liquidating Trust will be treated as the owners of the Liquidating Trust's assets (net of any Debtor liabilities assumed by the Liquidating Trust). The portion of the Liquidating Trust assets reserved for holders of Disputed General Unsecured Claims that become Allowed Claims is intended to be treated as either a trust taxed pursuant to sections 641 *et seq.* of the IRC or a disputed ownership fund described in Treasury Regulation § 1.468B-9. Income or gain attributable to assets allocated to the Disputed Unsecured Claims Reserve will generally be subject to an entity-level tax. In general, no holder of a Claim will be treated as the owner of a Liquidating Trust asset until such Claim becomes an Allowed Claim.

The remainder of this discussion assumes that the Liquidating Trust will be treated as described in the previous paragraph. If the IRS succeeds in requiring a different characterization of the Liquidating Trust, the trust could be subject to tax on all of its income and gains, and the amounts received by the holders of beneficial interests in the trust with respect to their Claims could be reduced as a result.

#### 1. Establishment of the Liquidating Trust

The transfer of Debtor assets (subject to any Debtor liabilities) to the Liquidating Trust on the Effective Date should be treated in part as a transfer of the Debtor assets to the holders of Allowed Claims in Class 5 (subject to the liabilities), followed by the holders' contribution of those assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust (and the trust's assumption of the liabilities). After the deemed contribution, each holder of an Allowed Claim in Class 5 should be treated as owning its Pro Rata share of the Liquidating Trust's assets (net of any liabilities the Liquidating Trust has assumed from the Debtors).

#### 2. Taxation of Holders of Beneficial Interests in Liquidating Trust

Each holder of a beneficial interest in the Liquidating Trust will be required to include in income the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust, including any interest earned on Cash held by the trust.

If the Liquidating Trust sells or otherwise disposes of an asset in a transaction in which gain or loss is recognized, each holder of a beneficial interest in the Liquidating Trust will be required to include in income gain or loss equal to the difference between (a) the holder's pro rata share of the Cash or property received in exchange for the asset sold or otherwise disposed of and (b) the holder's adjusted basis in the holder's Pro Rata share of the asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Holders of beneficial interests in the Liquidating Trust will be required to report any income or gain recognized on the sale or other disposition of a Liquidating Trust asset whether or not the Liquidating Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the Liquidating Trust.

If the Liquidating Trust obtains a recovery (net of deductible expenses) with respect to an Avoidance Action and if the net recovery exceeds the fair market value of the Avoidance Action on the Effective Date, the excess will constitute taxable income to the holders of beneficial interests in the Liquidating Trust. If the Liquidating Trust obtains a net recovery that is less than the Avoidance Action's fair market value on the Effective Date, the difference should constitute a taxable loss to holders of beneficial interests in the Liquidating Trust. That loss may or may not be available to offset other income of those holders, depending on each holder's particular circumstances. The Debtors anticipate that the Avoidance Actions will be assigned nominal or no value on the Effective Date and that any net recovery would be income to the holders of beneficial interests in the Liquidating Trust.

CLI-1803443v1

### E. Certain Other Tax Considerations for Holders of Claims

#### 1. Pre-Effective Date Interest

In general, a Claim holder that was not previously required to include in taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the unpaid principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will apply to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to prepetition interest. Each holder of a Claim on which interest accrued prior to the Petition Date is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

#### 2. Post-Effective Date Cash Distributions

Holders of Allowed Claims may receive distributions of Cash subsequent to the Effective Date. The imputed interest provisions of the IRC may apply to treat a portion of any Post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution. Such interest will not be tax-exempt interest.

In addition, because additional distributions may be made to holders of Claims after the initial distribution, any loss and a portion of any gain realized by a holder may be deferred until the holder has received its final distribution. All holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

#### 3. Reinstatement of Claims

Holders of Claims that will be Reinstated under the Plan generally should not recognize gain, loss or other taxable income upon the Reinstatement. Taxable income, however, may be recognized by those holders if they are considered to receive interest (other than tax-exempt interest), damages or other income in connection with the Reinstatement or if the Reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

#### 4. Bad Debt and/or Worthless Securities Deduction

A holder who, under the Plan, receives on account of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of the IRC. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

#### 5. Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

- 85 -

### 6. Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the IRC.

### 7. Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain reportable payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### F. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XIII. ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Confirmation Exhibits to the Plan will be Filed with the Bankruptcy Court and available for review, free of charge, at *www.kccllc.net/forum* no later than ten days prior to the Confirmation Hearing on the Plan. Copies of all Confirmation Exhibits to the Plan also may be obtained, free of charge, from KCC by contacting them via (A) regular mail, delivery or courier at KCC, Attn: Forum Health, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; or (B) toll-free telephone for U.S. callers at (866) 967-0264. All parties entitled to vote on the Plan are encouraged to obtain and review all Confirmation Exhibits to the Plan prior to casting their vote.

## XIV. RECOMMENDATION AND CONCLUSION

The Consent Parties believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Consent Parties urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

**[Remainder of Page Intentionally Left Blank.]**

- 86 -

Dated:  May 14, 2010                                    Respectfully submitted:


  /s/ Heather Lennox                                      /s/ Matthew Botica
Heather Lennox  (OH 0059649)                   Matthew Botica  (IL 260118)
JONES DAY                                       WINSTON & STRAWN LLP
North Point                                     35 W. Wacker Drive
901 Lakeside Avenue                             Chicago, IL  60601
Cleveland, OH  44114-1190                       Telephone:  (312) 558-5600
Telephone:  (216) 586-3939                      Facsimile:   (312) 558-5700
Facsimile:   (216) 579-0212

                                                Counsel for JP Morgan Chase Bank, N.A.
-AND-

Amy Edgy Ferber  (GA 013819)                     /s/ Eric A. Schaffer
JONES DAY                                       Eric A. Schaffer  (PA 30797)
1420 Peachtree Street, N.E.                     REED SMITH LLP
Suite 800                                       Reed Smith Centre
Atlanta, Georgia  30309-3053                    225 Fifth Avenue
Telephone:  (404) 581-3939                      Pittsburgh, PA  15222
Facsimile:   (404) 581-8330                     Telephone:  (412) 288-3131
                                                Facsimile:   (412) 288-3063

Counsel for MBIA Insurance Corporation
                                                Counsel for Fifth Third Bank


  /s/ Michael B. Fisco
Michael B. Fisco  (MN175341)
FAEGRE & BENSON LLP
Suite 2200
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone:  (612) 766-7000
Facsimile:   (612) 766-1600


Counsel for U.S. Bank National Association, as Master
Trustee and the Bond Trustees

- 87 -

CLI-1803443v1

**EXHIBIT A**

**JOINT PLAN OF REORGANIZATION**
**PROPOSED BY THE CONSENT PARTIES**

CLI-1803443v1

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

--------------------------------------------------------------------x

|   |   |
|---|---|
| In re | : Case No. 09-40795 |
|  | : Jointly Administered |
| **FORUM HEALTH,** *et al.,* | : |
|  | : Chapter 11 |
|  | : |
|  | : Judge Kay Woods |
| Debtors. | : |
|  | : **JOINT PLAN OF REORGANIZATION** |
|  | : **PROPOSED BY THE CONSENT PARTIES** |

--------------------------------------------------------------------x    _____

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (OH 0059649)

-AND-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Amy Edgy Ferber (GA 013819)

Counsel for MBIA Insurance Corporation

FAEGRE & BENSON LLP
Suite 2200
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
Michael B. Fisco (MN 175341)

Counsel for U.S. Bank National Association, as Master
Trustee and the Bond Trustees

May 14, 2010

WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Matthew Botica (IL 260118)

Counsel for JPMorgan Chase Bank, N.A.

REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Eric A. Schaffer (PA 30797)

Counsel for Fifth Third Bank

CLI-1803450v1

# TABLE OF CONTENTS

**Article I.** DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME.......... 1

  A. Defined Terms ................................................................................................................ 1

  B. Rules of Interpretation and Computation of Time ......................................................... 20

    1. Rules of Interpretation ............................................................................................. 20

    2. Computation of Time ............................................................................................... 20

**Article II.** CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS; CRAMDOWN ................................................................................................................... 21

  A. Unclassified Claims ...................................................................................................... 21

    1. Payment of Administrative Superpriority Claims and/or Administrative Claims.......... 21

    2. Payment of Priority Tax Claims .............................................................................. 23

  B. Classified Claims .......................................................................................................... 23

    1. Other Priority Claims Against the Consolidated Debtors (Class 1 Claims).................... 23

    2. Other Secured Claims Against the Consolidated Debtors (Class 2 Claims).................. 24

    3. Series 1997A Bond Claims (Class 3A Claims). ....................................................... 24

    4. Series 1997B Bond Claims (Class 3B Claims) ......................................................... 25

    5. Series 2002A Bond Claims (Class 3C Claims) ........................................................ 25

    6. Series 2002B Bond Claims (Class 3D Claims) ........................................................ 26

    7. Convenience Class Claims Against the Consolidated Debtors (Class 4 Claims) ........... 26

    8. General Unsecured Claims Against the Consolidated Debtors (Class 5 Claims) ........... 26

    9. Intercompany Claims (Class 6 Claims) ................................................................... 26

    10. Subsidiary Debtor Member Interests (Class 7 Interests)......................................... 26

  C. Impact of Classification of Claims on Subordination Rights ......................................... 26

  D. Special Provisions Relating to the Rights of Setoff of Creditors .................................. 27

  E. Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery...................................................................................................... 27

  F. Cramdown..................................................................................................................... 27

**Article III.** MEANS FOR IMPLEMENTATION OF THE PLAN ................................................. 27

  A. Continued Corporate Existence and Vesting of Assets ................................................. 27

  B. Restructuring Transactions ........................................................................................... 28

    1. Restructuring Transactions Generally...................................................................... 28

    2. Obligations of Any Successor Corporation in a Restructuring Transaction ................. 28

    3. Dissolution of Certain Debtors ................................................................................ 28

  C. Corporate Governance and Directors or Trustees and Officers ..................................... 28

    1. Articles of Incorporation and Codes of Regulation of the Reorganized Debtors........... 28

    2. Reorganized Boards................................................................................................ 29

# TABLE OF CONTENTS
(continued)

3. Corporate Action ................................................................................................ 29

D. Alternative Cash Payment Option ........................................................................ 29

    1. FHIL Cash Infusion ........................................................................................... 29

    2. Use of Unrestricted Foundation Funds .............................................................. 30

    3. Indemnity Account and the Segregated Proceeds Account ............................... 30

    4. Master DSRF and DSRFs .................................................................................. 30

    5. Fifth Third Cash Collateral Account .................................................................. 30

    6. Cancellation and Surrender of Instruments, Securities and Other Documentation ........ 30

E. Amended and Restated Master Trust Indenture ..................................................... 31

F. Amended Insurance Agreement .............................................................................. 31

G. Implementation of Settlements .............................................................................. 31

    1. Union Settlement Agreements ............................................................................ 31

    2. Assumption of New Collective Bargaining Agreements .................................... 31

    3. Pension Plan ........................................................................................................ 31

H. Employment, Retirement and Other Related Agreements; Workers' Compensation Programs. ........ 31

    1. Employment-Related Agreements ...................................................................... 31

    2. Compensation and Benefit Programs .................................................................. 32

    3. Continuation of Workers' Compensation Programs ........................................... 32

I. Liquidating Trust .................................................................................................... 32

    1. Liquidating Trust Generally ................................................................................ 32

    2. Funding of and Transfer of Assets into the Liquidating Trust ........................... 33

    3. Liquidating Trustee ............................................................................................. 33

    4. Liquidating Trust Agreement .............................................................................. 33

    5. Reports to be Filed by the Liquidating Trustee .................................................. 33

    6. Fees and Expenses of the Liquidating Trust ...................................................... 33

    7. Indemnification ................................................................................................... 34

    8. Tax Treatment ..................................................................................................... 34

    9. Sales of Assets by Liquidating Trust .................................................................. 34

    10. Creation and Maintenance of Trust Accounts .................................................... 35

J. Special Provisions Regarding Insured Claims ....................................................... 35

    1. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims ......... 35

    2. Assumption and Continuation of Insurance Contracts ....................................... 35

    3. Liquidation of Tort Claims ................................................................................. 36

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 103 of 169

| | | | |
|---|---|---|---|
| K. | | Cash Management | 36 |
| L. | | No Change in Control | 36 |
| M. | | Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Avoidance Actions | 36 |
| N. | | Release of Liens | 36 |
| O. | | Releases | 37 |
| | 1. | General Releases by Debtors and Reorganized Debtors | 37 |
| | 2. | General Releases by Holders of Claims | 37 |
| P. | | Exculpation | 37 |
| Q. | | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 37 |
| R. | | Comprehensive Settlement of Claims and Controversies | 37 |
| **Article IV.** | | **EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | 38 |
| A. | | Executory Contracts and Unexpired Leases to Be Assumed | 38 |
| | 1. | Assumption and Assignment Generally | 38 |
| | 2. | Cure of Defaults | 38 |
| B. | | Rejection of Executory Contracts and Unexpired Leases | 38 |
| | 1. | Rejection Generally | 38 |
| | 2. | Bar Date for Rejection Damage Claims | 39 |
| C. | | Approval of Assumption, Assumption and Assignment or Rejection | 39 |
| D. | | Executory Contracts and Unexpired Leases Entered Into After the Petition Date | 39 |
| E. | | Certain Nonresidential Real Property Leases | 39 |
| **Article V.** | | **PROVISIONS GOVERNING DISTRIBUTIONS** | 39 |
| A. | | Distributions for Claims Allowed as of the Effective Date | 39 |
| B. | | Method of Distributions to Holders of Claims | 40 |
| C. | | Distributions on Account of Secured Bond Claims | 40 |
| D. | | Compensation and Reimbursement for Services Related to Distributions | 40 |
| E. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 40 |
| | 1. | Delivery of Distributions | 40 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 41 |
| F. | | Timing and Calculation of Amounts to be Distributed | 42 |
| | 1. | Distributions on Account of Allowed Claims in Class 1 and Class 2 | 42 |
| | 2. | Distributions on Account of Allowed Claims in Class 3 | 42 |
| | 3. | Distributions on Account of Allowed Claims in Class 5 | 42 |
| G. | | Other Provisions Applicable to Distributions in All Classes | 44 |
| | 1. | Postpetition Interest | 44 |

| | | | |
|---|---|---|---|
| | 2. | Allocation of Distributions ........................................................................ | 44 |
| H. | | Distribution Record Date ...................................................................................... | 44 |
| I. | | Means of Cash Payments ....................................................................................... | 44 |
| J. | | Withholding Requirements ..................................................................................... | 44 |
| K. | | Setoffs .................................................................................................................... | 45 |
| **Article VI.** | | PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................. | 45 |
| A. | | Treatment of Disputed Claims ............................................................................... | 45 |
| | 1. | Tort Claims .................................................................................................. | 45 |
| | 2. | Disputed Insured Claims ............................................................................. | 45 |
| | 3. | No Distributions Pending Allowance .......................................................... | 45 |
| B. | | Prosecution of Objections to Claims ..................................................................... | 46 |
| | 1. | Objections to Claims ................................................................................... | 46 |
| | 2. | Authority to Prosecute Objections .............................................................. | 46 |
| | 3. | Authority to Amend Schedules .................................................................... | 46 |
| | 4. | Request for Extension of Claims Objection Bar Date ................................. | 46 |
| C. | | Distributions on Account of Disputed Claims Once Allowed ................................ | 47 |
| **Article VII.** | | CONSOLIDATION OF CERTAIN DEBTORS FOR PLAN PURPOSES ONLY ..... | 47 |
| A. | | Limited Consolidation for Voting, Confirmation and Distribution Purposes .............. | 47 |
| B. | | Order Granting Consolidation for Voting, Confirmation and Distribution Purposes.... | 47 |
| **Article VIII.** | | CONFIRMATION OF THE PLAN ............................................................................ | 47 |
| A. | | Conditions Precedent to Confirmation ................................................................... | 47 |
| B. | | Conditions Precedent to the Effective Date ........................................................... | 48 |
| C. | | Waiver of Conditions to Confirmation or Effective Date ...................................... | 48 |
| D. | | Effect of Nonoccurrence of Conditions to the Effective Date ............................... | 48 |
| E. | | Effect of Confirmation of the Plan ........................................................................ | 49 |
| | 1. | Discharge of Claims .................................................................................... | 49 |
| | 2. | Injunction .................................................................................................... | 49 |
| F. | | Request for Waiver of Stay of Confirmation Order ............................................... | 50 |
| **Article IX.** | | RETENTION OF JURISDICTION ......................................................................... | 50 |
| **Article X.** | | MISCELLANEOUS PROVISIONS ....................................................................... | 51 |
| A. | | Modification of the Plan ......................................................................................... | 51 |
| B. | | Revocation of the Plan ........................................................................................... | 51 |
| C. | | Severability of Plan Provisions .............................................................................. | 52 |
| D. | | Dissolution of Creditors' Committee ..................................................................... | 52 |
| E. | | Successors and Assigns .......................................................................................... | 52 |

F.    Service of Documents ............................................................................................. 52

    1.    The Debtors and Reorganized Debtors ............................................................ 52

    2.    The Consent Parties ........................................................................................ 52

    3.    The Creditors' Committee .............................................................................. 54

    4.    The United States Trustee ............................................................................... 54

    5.    The Unions ..................................................................................................... 54

    6.    The Liquidating Trustee .................................................................................. 55

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 106 of 169

# TABLE OF EXHIBITS[1]

| EXHIBIT | DESCRIPTION |
|---|---|
| I.A.12 | Amended Insurance Agreement |
| I.A.13 | Amended Reimbursement Agreement |
| I.A.14 | Amended and Restated Master Trust Indenture |
| I.A.67 | Debtors in the Chapter 11 Cases |
| I.A.91 | FHIL Note |
| I.A.121 | Liquidating Trust Agreement |
| I.A.122 | Unencumbered Real Estate Assets |
| I.A.157 | PBGC Note |
| III.C.1 | Reorganized Articles of Incorporation and Codes of Regulation |
| III.C.2 | Reorganized Board Members |
| IV.B.1 | Prepetition Executory Contracts or Unexpired Leases Designated for Rejection |

---

[1]   To be Filed no later than 10 days before the Confirmation Hearing.  Copies of all Exhibits to the Plan also may be obtained, free of charge from the Claims and Noticing Agent by calling (866) 967-0264 (toll-free).  The Consent Parties reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 107 of 169

## INTRODUCTION

The Consent Parties (as such term is defined below) propose the following joint plan of reorganization for the above-captioned debtors and debtors in possession (collectively, as further defined below, the "Debtors") for the resolution of the outstanding Claims against the Debtors. The Consent Parties are the proponents of the Plan (as such term is defined below) within the meaning of section 1129 of the Bankruptcy Code (as such term is defined below). Reference is made to the Consent Parties' Disclosure Statement (as such term is defined below), distributed contemporaneously with the Plan, for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and properties, and for a summary and analysis of the Plan. Other agreements and documents supplement the Plan and have been or will be filed with the Bankruptcy Court (as such term is defined below). These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and are, or will be, available for review. **[N.B. — If Northside Disposition Plan is implemented, Debtor WRCS will be administered outside the Plan.]**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### A.    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules (as each such term is defined below), will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    "1113 Orders" means, collectively, the ONA Order and the SEIU Order.

2.    "Administrative Claim" means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 333, 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) Cash Collateral Claims; (c) compensation for legal, financial advisory, accounting, patient care ombudsman and other services and reimbursement of expenses awarded or allowed under sections 330(a), 331 or 333 of the Bankruptcy Code, including Fee Claims; (d) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; (e) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' businesses and (f) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

3.    "Administrative Superpriority Claim" means the allowed superpriority Administrative Claim granted to the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors under section 507(b) of the Bankruptcy Code under the Cash Collateral Order, which shall have priority in these Chapter 11 Cases and, to the extent permitted by law, in any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Chapter 11 Cases over all Administrative Claims, Priority Claims and General Unsecured Claims against the Debtors and their Estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726(b), 1113 and 1114 of the Bankruptcy Code, except as may be limited under the Cash Collateral Order.

4.    "AFSCME" means, collectively, Ohio Council 8 of the American Federation of State, County and Municipal Employees, AFL-CIO and its Local Number 2026, Local Number 2288 and Local Number 2804.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 108 of 169

5.      "AFSCME Settlement Agreement" means, collectively:  (a) that certain agreement between Forum Health and AFSCME entered into on May 22, 2009**[; and (b) any agreement implementing the CBA Modifications, dated [DATE]]**.

6.      "Agreement" means that certain Agreement dated November 16, 2007, by and between Fifth Third, Bond Insurer, JPMorgan and U.S. Bank, as Master Trustee.

7.      "Allowed … Claim" or "Allowed … Interest" means an Allowed Claim or Allowed Interest, as the case may be, in the particular Class or category specified.

8.      "Allowed Claim" when used:

        a.      a Claim that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated and (ii) is not a Disputed Claim;

        b.      a Claim (i) for which a proof of Claim or request for payment of Administrative Claim (or similar request) has been Filed by the applicable Bar Date or otherwise has been deemed timely Filed under applicable law and (ii) that is not a Disputed Claim;

        c.      a Claim that is expressly allowed:  (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or the Liquidating Trust and the Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

        d.      a Claim that the Debtors or the Liquidating Trustee determine prior to the Claims Objection Bar Date (i) will not be subject to an objection or to an amendment to the Schedules and (ii) will be satisfied in accordance with the terms of the Plan.

9.      "Allowed Interest" means any Interest expressly deemed allowed by the Plan.

10.     "Alternative Cash Payment" means, collectively:  (a) the Series 1997A Alternative Cash Payment and (b) the Series 2002A Alternative Cash Payment.

11.     "Alternative Cash Payment Option" means, collectively:  (a) the Series 1997A Alternative Cash Payment Option; and (b) the Series 2002A Alternative Cash Payment Option.

12.     "Amended Insurance Agreement" means the Insurance Agreement, as amended and restated on the Effective Date, substantially in the form of Confirmation Exhibit I.A.12.

13.     "Amended Reimbursement Agreement" means the Reimbursement Agreement, as amended and restated on the Effective Date, substantially in the form of Confirmation Exhibit I.A.13.

14.     "Amended and Restated Master Trust Indenture" means the Master Trust Indenture, as amended and restated on the Effective Date, substantially in the form of Confirmation Exhibit I.A.14.

15.     "Assets" means all of a Debtor's property, rights and interests that are property of a Debtor's Estate pursuant to section 541 of the Bankruptcy Code.

16.     "Assignments" means, collectively, the Assignment to Bond Trustees and Assignment to Master Trustee.

17.     "Assignment to Bond Trustees" means the Assignment to Bond Trustee dated as of December 1, 1997, between Issuer and the Bond Trustees whereby the Issuer assigned, among other things, the Basic Rent payments to the Bond Trustees for the benefit of the Holders of the Bonds and the Bond Trustees, together with all amendments thereto and extensions thereof.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 109 of 169

18.     "Assignment to Master Trustee" means the Assignment of Rights Under Base Lease and Lease to the Master Trustee dated as of December 1, 1997, between Issuer and the Master Trustee whereby the Issuer assigned its rights under the Base Lease and the Lease (other than certain Unassigned Rights (as defined under the Lease) including, without limitation, the rights to indemnification and reimbursement for expenses and the right to Basic Rent assigned to the Bond Trustees) to the Master Trustee for the benefit of the Holders of the Obligations and the Master Trustee, together with all amendments thereto and extensions thereof.

19.     "Avoidance Actions" means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 547, 548, 549 and 550 of the Bankruptcy Code and other similar state law claims and causes of action, but excluding any and all causes of action against the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors.

20.     "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates, among other things, either acceptance or rejection of the Plan.

21.     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

22.     "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Ohio.

23.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

24.     "Bar Date" means a bar date established by the Bar Date Order or other applicable order of the Bankruptcy Court, which was August 3, 2009 for most General Unsecured Claims.

25.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 11 Cases, including the Order Approving Debtors' Motion Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Notice Thereof, entered on June 23, 2009 (Docket No. 301), as the same may be amended, modified or supplemented.

26.     "Base Lease" means the Base Lease dated as of December 1, 1997 (as amended or supplemented), between Issuer and Debtors FHS, Beeghly, Trumbull and WRCS, whereby such Debtors, as lessors, conveyed to the Issuer a leasehold interest in certain of their respective properties, together with all amendments thereto and extensions thereof.

27.     "Basic Rent" means the basic rent that the Lessees covenanted and agreed jointly and severally to pay under the Lease in an amount equal to the Bond Service Charges.

28.     "Beeghly" means Beeghly Oaks, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

29.     "Bonds" means, collectively:  (a) the Series 1997A Bonds; (b) the Series 1997B Bonds; (c) the Series 2002A Bonds; and (d) the Series 2002B Bonds.

30.     "Bond Indentures" means, collectively:  (a) the Series 1997A Bond Indenture; (b) the Series 1997B Bond Indenture; (c) the Series 2002A Bond Indenture; and (d) the Series 2002B Bond Indenture.

31.     "Bond Insurer" means MBIA.

32.     "Bond Service Charges" means, for any period or date, principal of and interest and any premium on the Bonds accruing for that period or due and payable on that date.

33.     "Bond Trustees" means U.S. Bank, as successor-in-interest to National City Bank, as bond trustee for the Series 1997A Bonds, the Series 1997B Bonds, the Series 2002A Bonds and the Series 2002B Bonds.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 110 of 169

34. "Bond Trustees Fee Claim" means, individually and collectively, a Claim against the Debtors arising from and after the Petition Date pursuant to the Bond Indentures relating to any compensation, disbursements, fees and expenses, including any Claim under the Bond Indentures relating to reasonable fees and expenses of counsel or other representatives of the Bond Trustees, which Claims shall be satisfied and discharged in accordance with Section II.A.1.e.

35. "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

36. "Cash" means legal tender of the United States of America and equivalents thereof.

37. "Cash Collateral Claims" means all Administrative Claims, including the Administrative Superpriority Claims of the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors evidenced by or granted under the Cash Collateral Order.

38. "Cash Collateral Order" means that certain Agreed Final Order Authorizing Debtors' Use of Cash Collateral, Pursuant to 11 U.S.C. §§ 101, 361 and 363, and Granting Replacement Liens, Adequate Protection and Administrative Expense Priority to the Master Trustee, Bond Trustees and Prepetition Secured Creditors that was entered by the Bankruptcy Court on April 16, 2009 (Docket No. 165), as modified by the stipulation and agreed orders entered by the Bankruptcy Court on October 22, 2009 (Docket No. 526), December 4, 2009 (Docket No. 583), December 7, 2010 (Docket No. 584), December 16, 2009 (Docket No. 601), January 13, 2010 (Docket No. 627), February 22, 2010 (Docket No. 671), April 1, 2010 (Docket No. 728), April 22, 2010 (Docket No. 762), April 30, 2010 (Docket No. 766) and May 10, 2010 (Docket No. 774), and as the same may be further amended, modified or supplemented.

39. "Cash Investment Yield" means the net yield earned by the applicable Disbursing Agent from the investment of Cash held pending distribution pursuant to the Plan (including any Cash received by the Disbursing Agent on account), which investment will be in a manner consistent with the Liquidating Trust Agreement and the Reorganized Debtors' corporate governance policies.

40. "Cash Option Funds" means the Series 1997A Cash Option Funds and the Series 2002A Cash Option Funds to be held by the Master Trustee in the Cash Option Funds Account.

41. "Cash Option Funds Account" means the account to be created under the Amended and Restated Master Trust Indenture to be used to hold the Cash Option Funds for, and to make the payments on account of, the Alternative Cash Payment Option.

42. "CBA Modifications" means for each of AFSCME, ONA and SEIU, those certain modifications of the Collective Bargaining Agreements with AFSCME, ONA and SEIU, as applicable, that shall together, at a minimum, (a) cause the total labor costs of the Reorganized Debtors not to exceed an average of 49% of the net patient revenue through 2015, (b) cause the work rules to conform to market standards and (c) extend the term of each Collective Bargaining Agreement through 2015.

43. "Charging Lien" means any lien or other priority in payment to which the applicable Master Trustee or Bond Trustees are entitled under the Master Trust Indenture or the applicable Bond Indenture against distributions to be made to applicable bondholders under the Master Trust Indenture or applicable Bond Indenture.

44. "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court that are being jointly administered under Case No. 09-40795.

45. "Chief Executive Officer" means the interim chief executive officer of the Debtors, Charles Neumann, and, thereafter, a permanent chief executive officer selected by the Reorganized Parent Board.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 111 of 169

46. "Chief Operating Officers" means together, the Chief Operating Officer of Trumbull, the Chief Operating Officer of WRCS and the Chief Operating Officer of FHRS in office on the Effective Date and, thereafter, those chief operating officers selected by the Reorganized Parent Board.

47. "Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

48. "Claims and Noticing Agent" means Kurtzman Carson Consultants LLC.

49. "Claims Objection Bar Date" means, for all Claims, including Claims asserting priority under section 503(b)(9) of the Bankruptcy Code, other than Allowed Claims, the latest of: (a) 150 days after the Effective Date, subject to extension by order of the Bankruptcy Court; (b) 90 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such a Claim.

50. "Class" means a class of Claims, as described in Article II.

51. "Collective Bargaining Agreements" means, collectively, and together with all exhibits, supplements, schedules, appendices, modifications, amendments and ancillary documents thereto: (a) the "Agreement between Western Reserve Care System a subsidiary of Forum Health and the Ohio Nurses Association," dated July 20, 2008 to July 19, 2011, as amended, modified and supplemented; (b) the "Agreement between AFSCME, Ohio Council 8 United Nurses of America Local 2026 and Trumbull Memorial Hospital a wholly Owned Subsidiary of Forum Health," dated October 1, 2004 to September 30, 2007, as amended, modified and supplemented; (c) the "Agreement between Forum Health Trumbull Memorial Hospital and Ohio Council 8, and Local 2804 of the American Federation of State, County and Municipal Employees, AFL-CIO," dated May 1, 2008 to March 31, 2010, as amended, modified and supplemented; (d) the "Agreement Between Forum/Hillside Hospital and Local Union No. 2288 and Ohio Council 8 American Federation of State, County and Municipal Employees, AFL-CIO," dated April 1, 2008 to March 31, 2009, as amended, modified and supplemented; (e) the "Agreement Between Forum Health and District 1199, Service Employees International Union," dated October 1, 2008 to March 31, 2012, as amended, modified and supplemented; (f) the "Labor Agreement between Service Employees International Union, District 1199, AFL-CIO/CLC and Forum Health Outreach Laboratories (FHOL)," dated November 1, 2008 to October 31, 2011, as amended, modified and supplemented; and (g) the "Agreement between Forum Health Hillside Rehabilitation Hospital and the Ohio Nurses Association," dated July 20, 2008 to July 19, 2011, as amended, modified and supplemented.

52. "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

53. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket within the meaning of Bankruptcy Rules 5003 and 9021.

54. "Confirmation Exhibits" means, collectively, the documents identified on the "Table of Exhibits," which documents will be Filed no later than 10 days before the Confirmation Hearing, to the extent not Filed earlier.

55. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

56. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

57. "Consent Parties" means, collectively: (a) Bond Insurer; (b) U.S. Bank, as Master Trustee and Bond Trustees; (c) JPMorgan; and (d) Fifth Third.

58. "Consolidated Debtors" means, collectively, all of the Debtors other than the Foundations that will be consolidated for the limited purposes of voting, Confirmation and distributions to be made under the Plan, as set forth in more detail in Article VII.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 112 of 169

59.    "Control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

60.    "Convenience Class Claim" means a General Unsecured Claim against any of the Consolidated Debtors that otherwise would be classified in Class 5, but is equal to or less than $2,000; *provided, however*, that, where any portion(s) of a single Claim has been transferred to a transferee, the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Class Claim.

61.    "Convenience Class Claims Pool" means $150,000.

62.    "Creditors' Committee" means the statutory official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such appointment has been subsequently modified.

63.    "CPS" means Comprehensive Psychiatry Specialists, Inc., an Ohio for-profit corporation and a Debtor in these Chapter 11 Cases.

64.    "Cure Amount Claim" means a Claim based upon a Debtor's monetary defaults under an Executory Contract or Unexpired Lease that is to be paid in connection with the assumption of such contract or lease under section 365 of the Bankruptcy Code by one of the Debtors in connection with this Plan.

65.    "Dacas" means Dacas Nursing Systems, Inc. (d/b/a Forum Health at Home-Private Duty), an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

66.    "Dacas Nursing" means Dacas Nursing Support Systems, Inc., an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

67.    "Debtors" means, collectively, the above-captioned debtors and debtors in possession identified on Confirmation Exhibit I.A.67.

68.    "Disbursing Agent" means a Debtor, Reorganized Debtor or the Liquidating Trustee, or any Third Party Disbursing Agent employed by a Debtor, Reorganized Debtor or Liquidating Trustee, in its capacity as disbursing agent pursuant to Article V.

69.    "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to this Plan and has been prepared and distributed by the Consent Parties, as Plan proponents, pursuant to section 1125(g) of the Bankruptcy Code, as the same may be amended, modified or supplemented.

70.    "Disputed Claim" means, for any Claim:

a.    if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, (i) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated or (ii) a Claim that is not listed on a Debtor's Schedules;

b.    prior to and on the Claims Objection Bar Date, if a proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, all Claims that have not been expressly Allowed (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors and Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

c.    after the Claims Objection Bar Date, if a proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, such Claims for which the Debtors have Filed an objection in the Bankruptcy Court, and such objection has not been resolved in its entirety by a Final Order

or withdrawn (and for which there is no agreement with the Claim holder to treat the Claim as a Disputed Claim for a period of time after the Claim Objection Bar Date).

Notwithstanding the above, if a Claim is an Allowed Claim under the definition set forth herein, it shall not also be considered to be a Disputed Claim.

71.     "Disputed Insured Claim" means an Insured Claim that is also a Disputed Claim.

72.     "Disputed Unsecured Claims Reserve" means the reserve of Liquidating Trust Assets to be maintained as part of the Liquidating Trust, which reserve (a) will maintain such assets in trust for (i) Pro Rata distributions to holders of Disputed Claims that become Allowed Claims in Class 5 and (ii) periodic Pro Rata distributions to holders of Allowed Claims in Class 5, pursuant to the terms of the Plan, and (b) will not constitute property of the Reorganized Debtors.

73.     "Distribution Date" means a date selected by the Reorganized Debtors, the Liquidating Trustee and the Master Trustee, or the applicable Bond Trustee, in accordance with the terms of the Plan and the Liquidating Trust Agreement or other applicable documents to make distributions on account of Allowed Claims.

74.     "Distribution Record Date" means the close of business on the Confirmation Date.

75.     "Document Website" means the internet site address *www.kccllc.net/forum* at which all of the Confirmation Exhibits and Schedules to the Plan and the Disclosure Statement will be available to any party in interest and the public.

76.     "DSRFs" means those certain debt service reserve funds that were created pursuant to the Bond Indentures and the Third Amended MFA for the benefit of the Holders of the Bonds for the purposes of, among others:  (a) paying the Bond Service Charges when due and payable; and (b) securing the related outstanding Bonds.

77.     "DTC" means The Depository Trust Company.

78.     "Effective Date" means a day, as determined by the Consent Parties, in consultation with the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section VIII.B have been met or waived in accordance with Section VIII.C.

79.     "Electing Holders" means, collectively, the beneficial holders of the Series 1997A Bond Claims and the Series 2002A Bond Claims that elect on a Ballot to take the Alternative Cash Payment Option.

80.     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461.

81.     "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case, pursuant to section 541 of the Bankruptcy Code.

82.     "Executory Contract or Unexpired Lease" means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code and includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

83.     "Face Amount" means either:  (a) the full stated amount claimed by the holder of such Claim in any proof of claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the Debtors' Schedules, *provided that* such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the applicable Debtor and Reorganized Debtor in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code or (iii) proposed by the Debtors or the Reorganized Debtors if (A) no proof of claim has been Filed by the Bar Date or has otherwise been deemed timely

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 114 of 169

Filed under applicable law and such amount is not listed in the Debtors' Schedules or is listed in the Debtors' Schedules as disputed, contingent or unliquidated or (B) the proof of claim specifies an unliquidated amount (in whole or in part).

84.     "Federal Judgment Rate" means the federal post-judgment interest rate, as established by 28 U.S.C. § 1961(a), of .70% on the Petition Date.

85.     "Fee Claim" means a Claim under sections 328, 330(a), 331, 333, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases.

86.     "Fee Order" means the Order Upon the Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(A) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 164), entered by the Bankruptcy Court on April 15, 2009.

87.     "FHD" means Forum Health Diagnostics Co., an Ohio for-profit corporation and a Debtor in these Chapter 11 Cases.

88.     "FHE" means Forum Health Enterprises Co., an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

89.     "FHIL" means Forum Health Insurance Limited, a non-debtor off-shore Bermuda captive insurance company that is wholly owned by FHS.

90.     "FHIL Cash Infusion" means that certain Cash contribution evidenced by the FHIL Note.

91.     "FHIL Note" means that certain unsecured subordinated intercompany note to be issued by Reorganized Forum Health in favor of FHIL on the Effective Date, and that is substantially in the form of Confirmation Exhibit I.A.91.

92.     "FHOL" means Forum Health Outreach Laboratories, Inc., an Ohio for-profit corporation and a Debtor in these Chapter 11 Cases.

93.     "FHPS" means Forum Health Pharmacy Services Co., an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

94.     "FHRS" means Forum Health Rehabilitative Services Co. (d/b/a as Hillside Rehabilitation Hospital), an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

95.     "FHS" means Forum Health Services Co., an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

96.     "FHV" means Forum Health Ventures Co., an Ohio for-profit corporation and a Debtor in these Chapter 11 Cases.

97.     "Fifth Third" means Fifth Third Bank.

98.     "Fifth Third Cash Collateral Account" means the segregated, blocked, cash collateral account (No. 7521664636) at Fifth Third as required under the Fifth Third Forbearance Agreement, dated on or about July 27, 2006, between Fifth Third and the Obligated Group Debtors.

99.     "File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

100.    "Final Distribution Date" for a particular Class of Claims means the Distribution Date upon which a final distribution to holders of Allowed Claims in the Class are to be made.

101.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in these Chapter 11 Cases, or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or petition for certiorari and/or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

102.    "Forum Health" means Forum Health, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

103.    "Foundations" means, collectively, Debtors WRHF and TMHF.

104.    "Foundation Funds" means any and all assets of the Foundations that are not subject to donor restriction.

105.    "General Unsecured Claim" means any Claim that is not an Administrative Superpriority Claim, Administrative Claim, Secured Claim, Cure Amount Claim, Priority Claim, Priority Tax Claim or Intercompany Claim.

106.    "Holders" means, collectively, those parties that hold or that are deemed to hold Bonds under the: (a) Series 1997A Bond Indenture; (b) Series 1997B Bond Indenture; (c) Series 2002A Bond Indenture; and (d) Series 2002B Bond Indenture, and each individually is a "Holder."

107.    "Indemnity Account" means that certain account in the Control of the Master Trustee into which certain funds equal to $200,000 have been deposited, pursuant to the Cash Collateral Order, as security for any reimbursement, indemnification or similar continuing obligations of the Obligated Group Debtors in favor of the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors.

108.    "Insurance Agreement" means that certain Insurance Agreement, entered into by and among the Bond Insurer and Obligated Group Debtors Forum Health, WRCS, FHS, the Foundations, FHRS, Beeghly, Dacas and Trumbull, dated as of December 1, 1997, as amended by the First Amendment, dated as of February 17, 2006, together with all further amendments, modifications or supplements thereto.

109.    "Insurance Contract" means any policy of third party liability insurance under which any of the Debtors could have asserted or did assert, or may in the future assert, a right to coverage for any claim, together with any other contracts that pertain or relate to such policy, but excluding the Policies, Insurance Agreement and Amended Insurance Agreement.

110.    "Insured Claim" means that portion of any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date:  (a) as to which any Insurer is obligated pursuant to the terms, conditions, limitations and exclusions of its Insurance Contract(s), to pay any judgment, settlement or contractual obligation with respect to the Debtors; or (b) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Contract(s).

111.    "Insurer" means any company or other entity that issued, or is responsible for, a policy of third-party liability insurance under which any of the Debtors could have asserted or did assert, or may in the future assert, a right to coverage for any claim under an Insurance Contract, but excluding the Bond Insurer.

112.    "Intercompany Claim" means any Claim by any Debtor against another Debtor.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 116 of 169

113.    "Interest" means the rights and interest of the holder of any instrument evidencing an ownership interest in a Debtor.

114.    "Issuer" means County of Mahoning, Ohio.

115.    "JPMorgan" means JPMorgan Chase Bank, National Association (successor to JPMorgan Chase Bank).

116.    "Lease" means the Lease, dated as of December 1, 1997, as may be subsequently amended, modified or supplemented, among the Lessees and the Issuer whereby the Issuer reconveyed to FHS, Beeghly, Trumbull and WRCS a leasehold interest in the properties covered by the Base Lease and any additional property acquired or constructed with the proceeds of the Bonds.

117.    "Lessees" means, collectively, FHS, Beeghly, Trumbull and WRCS, under the Lease.

118.    "Letter Agreement" means that certain Letter Agreement dated January 23, 2009, among the Obligated Group Debtors, the Bond Insurer, JPMorgan, Fifth Third, the Bond Trustees and the Master Trustee.

119.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

120.    "Liquidating Trust" means the trust established pursuant to Section III.I to liquidate certain of the Liquidating Trust Assets, to prosecute certain Avoidance Actions and other causes of action of the Estates not released pursuant to the Plan and as identified in the Liquidating Trust Agreement and to make distributions to holders of Allowed Class 5 Claims.

121.    "Liquidating Trust Agreement" means the trust agreement governing the Liquidating Trust, to be dated on or prior to the Effective Date, which shall be in form and substance reasonably acceptable to the Creditors' Committee, and which will be substantially in the form of Confirmation Exhibit I.A.121.

122.    "Liquidating Trust Assets" means, collectively, (a) $150,000, (b) certain unencumbered real estate assets of the Debtors as set forth more fully on Confirmation Exhibit I.A.122 attached hereto and (c) except as otherwise provided in the Plan, the Avoidance Actions (which shall be preserved for the benefit of the Liquidating Trust).

123.    "Liquidating Trust Expenses" means any and all reasonable fees, costs and expenses incurred by the Liquidating Trust or the Liquidating Trustee (or any agent, Person, entity or professional engaged by the Liquidating Trust or the Liquidating Trustee) in connection with any of their duties under the Plan and the Liquidating Trust Agreement, including any reasonable administrative fees, attorneys' fees and expenses, insurance fees, Taxes and escrow expenses.

124.    "Liquidating Trustee" means the trustee of the Liquidating Trust as selected by the Creditors' Committee and reasonably acceptable to the Debtors pursuant to Section III.I.1 and identified in the Liquidating Trust Agreement (or any successor trustee in his or her capacity as the trustee of the Liquidating Trust).

125.    "Master DSRF" means, collectively, that certain master DSRF and that certain Sales Proceeds Account created pursuant to the Third Amended MFA for the benefit of the Master Trustee and the Holders of the Bonds and to be applied in accordance with the terms of the Master Trust Indenture and the True-Up Agreement.

126.    "Master Trust Indenture" means that certain Master Trust Indenture, dated as of December 1, 1997, between the Obligated Group Debtors and the Master Trustee, as it may have been amended, modified or

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 117 of 169

supplemented prior to the Petition Date, together with all amendments thereto and extensions thereof and all security agreements and instruments related thereto.

127. "Master Trustee" means U.S. Bank, as successor-in-interest to National City Bank, as master trustee under the Master Trust Indenture.

128. "Master Trustee Fee Claim" means a Claim against the Debtors arising from and after the Petition Date, pursuant to the Master Trust Indenture, relating to any compensation, disbursements, fees and expenses, including any Claim under such Master Trust Indenture relating to reasonable fees and/or expenses of counsel of the Master Trustee, which Claims shall be satisfied and discharged in accordance with Section II.A.1.e.

129. "MBIA" means MBIA Insurance Corporation.

130. "MFA" means that certain Master Forbearance Agreement, dated as of March 31, 2007, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors, as amended on August 15, 2007; October 16, 2007; and May 23, 2008, together with all amendments thereto and extensions thereof and all security agreements and instruments related thereto.

131. "Mortgaged Premises" means, collectively, the Obligated Group Debtors' principal facilities, including land, buildings, fixtures, tangible personal property and proceeds thereof.

132. "Mortgages" means, collectively, the following:

     a. Open-End Leasehold Mortgage, Security Agreement and Financing Statement dated as of November 1, 2002, from Beeghly to the Master Trustee;

     b. Open-End Leasehold Mortgage, Security Agreement and Financing Statement dated as of November 1, 2002, from FHS to the Master Trustee;

     c. Open-End Mortgage, Security Agreement and Financing Statement dated as of November 1, 2002, from Trumbull to the Master Trustee; and

     d. Open-End Mortgage, Security Agreement and Financing Statement dated as of November 1, 2002, from WRCS to the Master Trustee;

which provide a mortgage lien upon, and security interest in the Mortgaged Premises for the benefit of the Holders of the Obligations and the Master Trustee, together with all amendments thereto and extensions thereof.

133. "New 1113 Motion" means that certain motion seeking to reject and/or modify the Collective Bargaining Agreements to implement the CBA Modifications.

134. "New 1113 Relief" means, collectively, relief pursuant to the Reconsideration Motion and the New 1113 Motion.

135. "New Collective Bargaining Agreements" means: (a) those new collective bargaining agreements with AFSCME, ONA and/or SEIU containing the CBA Modifications; or (b) the modification of any existing Collective Bargaining Agreements to implement the CBA Modifications.

136. "New Obligated Group" means, collectively, Reorganized Debtors Forum Health, FHS, Trumbull, WRCS, FHRS, Beeghly and Dacas.

137. "Non-Electing Holders" means, collectively, the beneficial holders of the Series 1997A Bond Claims and Series 2002A Bond Claims that elect not to take the Alternative Cash Payment Option on a Ballot.

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 118 of 169

138.    "Northside Medical Center" means the hospital facility located at 500 Gypsy Lane, Youngstown, Ohio 44501, which is owned and operated by WRCS.

139.    "Northside Disposition Plan" means that certain plan regarding Northside Medical Center that was developed and agreed to pursuant to paragraph 3 of the Cash Collateral Order.

140.    "Notice Parties" means:  (a) prior to the Effective Date, the Debtors, the Creditors' Committee, the United States Trustee, counsel for U.S. Bank, counsel for the Bond Insurer, counsel for JPMorgan, counsel for Fifth Third, counsel for ASCFME, counsel for ONA, counsel for SEIU and the Office of the Attorney General for the State of Ohio; and (b) on or after the Effective Date, the Reorganized Debtors, counsel for U.S. Bank, counsel for the Bond Insurer, counsel for JPMorgan, counsel for Fifth Third, the United States Trustee and counsel to the Liquidating Trustee.

141.    "Obligated Group Debtors" means, collectively, Debtors Forum Health, FHS, Trumbull, WRCS, FHRS, TMHF, WRHF, Beeghly and Dacas.

142.    "Obligation No. 1A" means that certain obligation issued by the Obligated Group Debtors under the Master Trust Indenture to secure the Obligated Group Debtors' payment and performance of Basic Rent under the Lease related to the Series 1997A Bonds.

143.    "Obligation No. 1B" means that certain obligation issued by the Obligated Group Debtors under the Master Trust Indenture to secure the Obligated Group Debtors' payment and performance of Basic Rent under the Lease related to the Series 1997B Bonds.

144.    "Obligation No. 2A" means that certain obligation issued by the Obligated Group Debtors under the Master Trust Indenture to secure the Obligated Group Debtors' payment and performance of Basic Rent under the Lease related to the Series 2002A Bonds.

145.    "Obligation No. 2B" means that certain obligation issued by the Obligated Group Debtors under the Master Trust Indenture to secure the Obligated Group Debtors' payment and performance of Basic Rent under the Lease related to the Series 2002B Bonds.

146.    "Obligation No. 2C" means that certain obligation issued by the Obligated Group Debtors to JPMorgan under the Master Trust Indenture to secure the Obligated Group Debtors' obligations to JPMorgan under the Standby Bond Purchase Agreement.

147.    "Obligation No. 3" means that certain obligation issued by the Obligated Group Debtors to Fifth Third under the Master Trust Indenture to secure the Obligated Group Debtors' obligations to Fifth Third under the Reimbursement Agreement.

148.    "Obligation No. 4" means that certain obligation to be issued by the New Obligated Group to the Bond Insurer to secure the New Obligated Group's obligations under the Amended Insurance Agreement.

149.    "Obligations" means, collectively, Obligation No. 1A, Obligation No. 1B, Obligation No. 2A, Obligation No. 2B, Obligation No. 2C, Obligation No. 3 and Obligation No. 4.

150.    "ONA" means the Ohio Nurses Association and, with respect to WRCS, its affiliate the Youngstown General Duty Nurses Association.

151.    "ONA Order" means that certain Stipulated Order Resolving Debtors' Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113 (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto (Ohio Nurses Association) entered by the Bankruptcy Court on July 31, 2009 (Docket No. 411).

152.    "ONA Settlement Agreement" means that certain agreement between Forum Health and ONA approved by the ONA Order**[; and (b) any agreement implementing the CBA Modifications, dated [DATE]]**.

153.    "Ordinary Course Professionals Order" means the Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Businesses (Docket No. 270), entered by the Bankruptcy Court on June 9, 2009.

154.    "Other Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

155.    "Other Secured Claim" means any secured Claim against any of the Debtors not constituting a Secured Bond Claim.

156.    "PBGC" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States that administers the defined benefit pension plan termination insurance program under Title IV of ERISA.

157.    "PBGC Note" means that certain unsecured note to be issued by the Reorganized Debtors in favor of the PBGC on the Effective Date, substantially in the form as Confirmation Exhibit I.A.157.

158.    "PCI" means PrideCare, Inc., an Ohio for-profit Corporation and a Debtor in these Chapter 11 Cases.

159.    "Pension Plan" means the Forum Health Pension Plan.

160.    "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

161.    "Petition Date" means March 16, 2009, the date on which the Debtors Filed their petitions for relief and commenced the Chapter 11 Cases.

162.    "Plan" means this joint plan of reorganization of the Consent Parties, and all Confirmation Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

163.    "Policies" means, collectively, the Series 1997A Policy and the Series 1997B Policy.

164.    "Postpetition Interest" means:  (a) for a Secured Bond Claim, the contractual rate of interest set forth in the applicable Bond Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Secured Claim and the applicable Debtor giving rise to such holder's Secured Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Secured Claim and the applicable Debtor; or (d) if none of the foregoing apply, the Federal Judgment Rate.

165.    "Prepetition Secured Creditors" means, collectively:  (a) the Bond Insurer; (b) JPMorgan; (c) Fifth Third; and (d) the other Holders of the Bonds.

166.    "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim, an Administrative Superpriority Claim or a Priority Tax Claim.

167.    "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

168.    "Pro Rata" means, except with respect to the Electing Holders, when used with reference to a distribution of property to holders of Allowed Claims in a particular Class or other specified group of Claims pursuant to Article II, proportionately so that with respect to a particular Allowed Claim in such Class or in such

group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims, as the case may be, in such Class or group of Claims.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Pro Rata distribution of property to holders of Allowed Claims in such Class.

With respect to the Electing Holders, "Pro Rata" means, to the extent the Cash Option Funds are less than the amounts needed to satisfy all of the elections made by the Electing Holders of Allowed Bond Claims of a series pursuant to the applicable Alternative Cash Payment, the ratio of (a) the amount of Cash available to be distributed to such Electing Holders to (b) the product of (i) the principal amount of Bonds surrendered by the Electing Holders of that same series and (ii) the Cash payment rate available to such Electing Holders, subject to rounding to authorized denominations as defined in the Bond Indentures.

169.    "Professional" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 333, 363 or 1103 of the Bankruptcy Code, or any professional or other entity seeking compensation or reimbursement of expenses in connection with these Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

170.    "Reconsideration Motion" means that certain motion seeking reconsideration of the 1113 Orders, pursuant to Bankruptcy Rule 60 and section 105(a) of the Bankruptcy Code, or other similar relief.

171.    "Record Date" means the date of the order approving the Disclosure Statement.

172.    "Reimbursement Agreement" means that certain Reimbursement Agreement by and among Fifth Third and the Obligated Group Debtors, dated as of November 1, 2002 (as amended or supplemented), under which Fifth Third issued a letter of credit to secure the payment of principal, interest and purchase price of the Series 2002B Bonds.

173.    "Reinstated" or "Reinstatement" means rendering a Claim unimpaired within the meaning of section 1124 of the Bankruptcy Code.  Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that a Claim will be Reinstated, such Claim will be Reinstated in accordance with one of the following:

a.    Leaves unaltered the legal, equitable and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

b.    Notwithstanding any contractual provision(s) or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

i.    cures any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured;

ii.    reinstates the maturity of such Claim as such maturity existed before such default;

iii.    compensates the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision(s) or such applicable law;

iv.    if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 121 of 169

subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such Claim or Interest for any actual pecuniary loss incurred by such holder as a result of such failure; and

v.        does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

174.      "Released Parties" means, collectively and individually, the Creditors' Committee and their members (solely in their capacity as such), the Master Trustee, the Bond Trustees, the Consent Parties and the Representatives of each of the foregoing.

175.      "Reorganized . . . " means, when used in reference to a particular Debtor, such Debtor on or after the Effective Date.

176.      "Reorganized Articles of Incorporation" means the articles of incorporation or similar corporate organization document of each Reorganized Debtor as amended and restated, substantially in the form of Confirmation Exhibit III.C.1.

177.      "Reorganized Boards" means, collectively, the reorganized boards of trustees of the Reorganized Debtors.

178.      "Reorganized Codes of Regulation" means the codes of regulation or similar corporate organization documents, to the extent applicable, of each Reorganized Debtor, as amended and restated, substantially in the form of Confirmation Exhibit III.C.1.

179.      "Reorganized Debtors" means collectively, the Debtors, except Beeghly, CPS, Dacas, Dacas Nursing, FHPS, PCI and VNA, on and after the Effective Date.

180.      "Reorganized Parent Board" means the Reorganized Board for Reorganized Forum Health.

181.      "Representatives" means, with respect to any entity, such entity's successor, predecessor, officer, director, trustee, partner, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other Professional of such entity, and committee of which such entity is a member, in each case in such capacity, serving on or after October 30, 2009.

182.      "Restricted Assets" means, collectively, all Cash and Cash equivalents or other assets of the Foundations which, as of the Effective Date and pursuant to Ohio or any other applicable law, are subject to specific donor restrictions as to charitable use or purpose (other than the general charitable purposes of the relevant Foundation), which restrictions have not expired or been effectively waived, by the donor or by operation of law, as of the Effective Date.

183.      "Restructuring Committee" means that certain restructuring committee created pursuant to the Forbearance Letter, dated October 6, 2009, by and between the Consent Parties and the Debtors and consisting of the Chief Restructuring Officer of the Debtors, the interim Chief Executive Officer of the Debtors and the Chief Operating Officers of Trumbull, WRCS and FHRS.

184.      "Restructuring Transactions" means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Section III.B.

185.      "Sales Proceeds Account" means that certain sales proceeds reserve account created pursuant to the terms of the MFA for the benefit of the Master Trustee and the Holders of the Bonds and to be applied in accordance with the terms of the MFA and the True-Up Agreement.

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 122 of 169

186.    "Schedules" means the schedules of Assets and Liabilities and the Statements of Financial Affairs Filed by a Debtor on May 1, 2009, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

187.    "Secondary Liability Claim" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on:  (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

188.    "Secured Bond Claims" means, collectively:  (a) the Series 1997A Bond Claims; (b) the Series 1997B Bond Claims; (c) the Series 2002A Bond Claims; and (d) the Series 2002B Bond Claims.  The Secured Bond Claims are hereby allowed in the approximate aggregate principal amount of $128,328,000.00, plus accrued but unpaid prepetition and postpetition fees, costs, charges and interest.

189.    "Secured Claim" means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) of the Bankruptcy Code and, if applicable, section 1129(b) of the Bankruptcy Code.

190.    "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

191.    "Segregated Proceeds Account" means that certain account in Control of the Master Trustee into which the net proceeds of any settlement related to, or sale transaction for, any of the Debtors' assets that do not constitute collateral securing the Bonds or to which the Debtors, the Consent Parties and the Creditors' Committee have not agreed as to whether such assets constitute collateral securing the Bonds.

192.    "SEIU" means the Service Employees International Union, District 1199.

193.    "SEIU Order" means the Stipulated Order Resolving Debtors' Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113 (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto (Service Employees International Union) entered by the Bankruptcy Court on July 31, 2009 (Docket No. 410).

194.    "SEIU Settlement Agreement" means, collectively:  (a) that certain agreement between Forum Health and SEIU approved by the SEIU Order**[; and (b) any agreement implementing the CBA Modifications, dated [DATE]]**.

195.    "Series 1997A Alternative Cash Payment" means the payment to an Electing Holder from the Series 1997A Cash Option Subaccount under the Series 1997A Alternative Cash Payment Option.

196.    "Series 1997A Alternative Cash Payment Option" means the option whereby beneficial holders of the Series 1997A Bonds may elect on the Ballot to (a) surrender all of their Series 1997A Bonds to the Obligated Group Debtors and (b) release all of their rights and interests with respect to the surrendered Series 1997A Bonds under the Series 1997A Bond Indenture, the Base Lease, the Lease, the Master Trust Indenture, Obligation No. 1A, the Assignments, the Series 1997A Policy and any agreement or instrument related thereto in exchange for its vote for a Cash payment equal to 70% of the principal amount of their surrendered Series 1997A Bonds plus all accrued and unpaid interest on such surrendered Series 1997A Bonds.

197.     "Series 1997A Bonds" means the $91,610,000 original aggregate principal amount of County of Mahoning, Ohio, Fixed Rate Hospital Revenue Bonds, Series 1997A (Forum Health Obligated Group).

198.     "Series 1997A Bond Claims" means any Claim against a Debtor under or evidenced by the Series 1997A Bonds, the Series 1997A Policy, Obligation No. 1A, the Third Amended MFA and any agreement entered into by the Debtors or the Holders of such Claims related to the same, or any other related document.

199.     "Series 1997A Bond Indenture" means the Bond Indenture, dated as of December 1, 1997, between the Issuer and U.S. Bank, as successor-in-interest to National City Bank, as bond trustee, together with all amendments, modifications and supplements thereto and all security agreements and instruments related thereto.

200.     "Series 1997A Cash Option Funds" means the funds held by the Master Trustee in the Series 1997A Cash Option Subaccount to be distributed to the Electing Holders of the Allowed Series 1997A Bond Claims, which consists of certain amounts received from the Master DSRF, the Series 1997A Reserve Fund, the Foundations, FHIL, the Indemnity Account and the Segregated Proceeds Account.

201.     "Series 1997A Cash Option Subaccount" means that certain subaccount within the Cash Option Funds Account created under the Amended and Restated Master Trust Indenture for the Electing Holders of the Series 1997A Bonds.

202.     "Series 1997A Policy" means the financial guaranty insurance policy, dated December 30, 1997, issued by the Bond Insurer that insures the timely payment of the principal of and the interest on the Series 1997A Bonds (Policy Number 25486), together with all endorsements thereto.

203.     "Series 1997A Reserve Fund" means that certain DSRF created under the Series 1997A Bond Indenture.

204.     "Series 1997B Bonds" means the $42,600,000 original aggregate principal amount of County of Mahoning, Ohio, Variable Rate Hospital Revenue Bonds, Series 1997B (Forum Health Obligated Group).

205.     "Series 1997B Bond Claims" means any Claim against a Debtor under or evidenced by the Series 1997B Bonds, the Series 1997B Policy, Obligation No. 1B, the Third Amended MFA and any agreement entered into by the Debtors or the Holders of such Claims related to the same, or any other related document.

206.     "Series 1997B Bond Indenture" means the Bond Indenture, dated as of December 1, 1997, between the Issuer and U.S. Bank, as successor-in-interest to National City Bank, as bond trustee, together with all amendments, modifications and supplements thereto and all security agreements and instruments related thereto.

207.     "Series 1997B Policy" means the financial guaranty insurance policy, dated December 30, 1997, issued by the Bond Insurer that insures the timely payment of the principal of and the interest on the Series 1997B Bonds (Policy Number 25487), together with all endorsements thereto.

208.     "Series 1997B Reserve Fund" means that certain DSRF created under the Series 1997B Indenture.

209.     "Series 2002A Alternative Cash Payment" means the payment to an Electing Holder from the Series 2002A Cash Option Subaccount under the Series 2002A Alternative Cash Payment Option.

210.     "Series 2002A Alternative Cash Payment Option" means the option whereby the beneficial holders of the Series 2002A Bonds may elect on the Ballot to (a) surrender all of their Series 2002A Bonds to the Obligated Group Debtors and (b) release all of their rights and interests with respect to the surrendered Series 2002A Bonds under the Series 2002A Bond Indenture, the Base Lease, the Lease, the Master Trust Indenture, Obligation No. 2A, the Assignments and any agreement or instrument related thereto in exchange for its vote for a Cash payment equal to 55% of the principal amount of their surrendered Series 2002A Bonds plus all accrued and unpaid interest on such surrendered Series 2002A Bonds.

211.     "Series 2002A Bonds" means the $40,000,000 original aggregate principal amount of County of Mahoning, Ohio, Fixed Rate Hospital Revenue Bonds, Series 2002A (Forum Health Obligated Group).

212.     "Series 2002A Bond Claims" means any Claim against a Debtor under or evidenced by the Series 2002A Bonds, Obligation No. 2A, the Third Amended MFA and any agreement entered into by the Debtors or the Holders of such Claims related to the same, or any other related document.

213.     "Series 2002A Bond Indenture" means the Series 1997A Bond Indenture, as supplemented and amended by the First Supplemental Series 1997A Bond Indenture, dated as of November 1, 2002, between the Issuer and U.S. Bank, as successor-in-interest to National City Bank, as bond trustee, together with all amendments, modifications and supplements thereto and all security agreements and instruments related thereto.

214.     "Series 2002A Cash Option Funds" means the funds held by the Master Trustee in the Series 2002A Cash Option Subaccount to be distributed to the Electing Holders of the Allowed Series 2002A Bond Claims, which consists of certain amounts received from the Master DSRF, the Series 2002A Reserve Fund, the Foundations, FHIL, the Indemnity Account and the Segregated Proceeds Account.

215.     "Series 2002A Cash Option Subaccount" means that certain subaccount within the Cash Option Funds Account created under the Amended and Restated Master Trust Indenture for the Electing Holders of the Series 2002A Bonds

216.     "Series 2002A Reserve Fund" means that certain DSRF created under the Series 2002A Bond Indenture.

217.     "Series 2002B Bonds" means the $20,000,000 original aggregate principal amount of County of Mahoning, Ohio, Variable Rate Hospital Revenue Bonds, Series 2002B (Forum Health Obligated Group).

218.     "Series 2002B Bond Claims" means any Claim against a Debtor under or evidenced by the Series 2002B Bonds, Obligation No. 2B, the Third Amended MFA and any agreement entered into by the Debtors or the Holders of such Claims related to the same, or any other related document.

219.     "Series 2002B Bond Indenture" means the Series 1997B Bond Indenture, as supplemented and amended by the First Supplemental Series 2002B Bond Indenture, dated as of October 1, 2002, and the Second Supplemental Series 2002B Bond Indenture, dated March 1, 2003, between the Issuer and U.S. Bank, as successor-in-interest to National City Bank, as bond trustee, together with all amendments, modifications and supplements thereto and all security agreements and instruments related thereto.

220.     "Standby Bond Purchase Agreement" means that certain agreement, dated March 10, 2003 (as amended or supplemented), by and among Forum Health, FHS, Trumbull and WRCS, the Bond Trustee for the Series 1997B Bonds and JPMorgan, pursuant to which JPMorgan agreed, subject to certain terms and conditions, to purchase the unremarketable Series 1997B Bonds upon tender by the Holders thereof.

221.     "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between a Debtor or Reorganized Debtor and a holder of a Claim, that, prior to the Effective Date, is approved by the Bankruptcy Court, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or other orders of the Bankruptcy Court.  Any such stipulation or other agreement between a Reorganized Debtor and a holder of a Claim executed after the Effective Date is not subject to approval of the Bankruptcy Court; *provided*, *however*, that if the Liquidating Trustee Files an objection, as permitted by Section VI.B.2, to such stipulation or other agreement within 14 days of receiving written notice of such stipulation or other agreement, Bankruptcy Court approval will be required.

222.     "Subsidiary Debtor" means any Debtor other than Forum Health.

223.     "Subsidiary Debtor Member Interests" means, as to a particular Subsidiary Debtor, any Interests in such Debtor.

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 125 of 169

224. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental, excise or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

225. "Third Amended MFA" means that certain Third Amended Master Forbearance Agreement, dated May 23, 2008, among the Bond Insurer, the Master Trustee, the Bond Trustees, Fifth Third, JPMorgan and the Obligated Group Debtors (as amended by that certain letter agreement, dated November 17, 2008).

226. "Third Party Disbursing Agent" means an entity (including but not limited to the Master Trustee and Bond Trustees) designated by a Debtor, Reorganized Debtor, the Consent Parties or Liquidating Trustee to act as a Disbursing Agent pursuant to Article V.

227. "TMHF" means Trumbull Memorial Hospital Foundation, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

228. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability, medical malpractice or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

229. "True-Up" means that certain agreement by and among the Obligated Group Debtors and the Consent Parties and as set forth in the True-Up Agreement, the Agreement and the Letter Agreement, that proceeds from all other collateral thereafter received by the Master Trustee for the benefit of the Holders of the Series 2002B Bonds would be allocated in a manner to ensure that the Holders of the Series 1997A Bonds and the Series 1997B Bonds receive the full amount equal to such Bonds' ratable portion of the amount distributed to the Holders of the Series 2002A Bonds and the Series 2002B Bonds on account of the 2002A Defeasance and 2002B Redemption (as such terms are defined in the True-Up Agreement).

230. "True-Up Agreement" means that certain agreement by and among the Obligated Group Debtors, the Bond Insurer, JPMorgan, Fifth Third, the Bond Trustees and the Master Trustee and as set forth in Section 5.3.2 of the MFA, as amended by the True-Up Letter Agreement, together with all amendments thereto and extensions thereof and all security agreements and instruments related thereto.

231. "Trumbull" means Trumbull Memorial Hospital, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

232. "Trust Accounts" means the bank accounts to be held in the name of the Liquidating Trustee that are created pursuant to Section III.I.10.

233. "Trustee Fee Claims" means, collectively, the Master Trustee Fee Claims and the Bond Trustees Fee Claims.

234. "Uninsured Claim" means any Claim that is not an Insured Claim, excluding the Secured Bond Claims.

235. "Union Settlement Agreements" means, collectively, the AFSCME Settlement Agreement, the ONA Settlement Agreement and the SEIU Settlement Agreement.

236. "Unions" means, collectively, AFSCME, ONA and SEIU.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 126 of 169

237. "United States Trustee" means the Office of the United States Trustee for the Northern District of Ohio.

238. "Unrestricted Assets" means, collectively, all Cash and Cash equivalents or other assets of the Foundations which, as of the Effective Date, are not Restricted Assets.

239. "U.S. Bank" means U.S. Bank National Association, as Master Trustee and as the Bond Trustee.

240. "VNA" means Visiting Nurse Association and Hospice of Northeast Ohio, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

241. "Voting Deadline" means the deadline for submitting Ballots to either accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

242. "WCLC Reimbursement Agreement" means that certain reimbursement agreement and the Letter of Credit Reimbursement Agreement Rider among Fifth Third and the Obligated Group Debtors, dated October 26, 2006, whereby the Obligated Group Debtors deposited $4,114,000 into a segregated blocked cash collateral account maintained at Fifth Third, together with all amendments thereto and extensions thereof.

243. "WRCS" means Western Reserve Care System, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

244. "WRHF" means Western Reserve Health Foundation, an Ohio nonprofit 501(c)(3) corporation and a Debtor in these Chapter 11 Cases.

## B. Rules of Interpretation and Computation of Time

### 1. Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Confirmation Exhibit Filed or to be Filed means such document or Confirmation Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Confirmation Exhibits are references to Sections, Articles and Confirmation Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, articles of incorporation, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section I.B.1.

### 2. Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 127 of 169

## ARTICLE II.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS; CRAMDOWN

All Claims and Interests, except Administrative Claims, Administrative Superpriority Claims and Priority Tax Claims, are placed in the following Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Administrative Superpriority Claims and Priority Tax Claims, as described in Section II.A, have not been classified and thus are excluded from the following Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim qualifies within the description of such other Classes.

### A.    Unclassified Claims

#### 1.    Payment of Administrative Superpriority Claims and/or Administrative Claims

##### a.    Administrative Claims in General

Except as otherwise specified in this Section II.A, and subject to the Bar Date provisions herein, unless otherwise agreed by the holder of an Administrative Superpriority Claim or Administrative Claim and the applicable Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Superpriority Claim or Allowed Administrative Claim will receive, in full satisfaction of its Administrative Superpriority Claim or Administrative Claim, Cash equal to the amount of such Allowed Administrative Superpriority Claim or Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date on which such Administrative Superpriority Claim or Administrative Claim becomes an Allowed Administrative Superpriority Claim or Allowed Administrative Claim or (iii) the date that such Administrative Superpriority Claim or Administrative Claim will become due pursuant to its terms.

##### b.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Allowed Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

##### c.    Ordinary Course Liabilities

Allowed Administrative Claims based on Liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section IV.A, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

##### d.    Claims Under the Cash Collateral Order

Holders of Cash Collateral Claims that are Administrative Superpriority Claims or Administrative Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Unless otherwise agreed by a holder of a Cash Collateral Claim, on or before the Effective Date, the Cash Collateral Claims that are Allowed Administrative Superpriority Claims or Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Superpriority Claims or Allowed Administrative Claims.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 128 of 169

### e. Special Provisions Regarding the Claims of the Master Trustee and Bond Trustees

In full satisfaction of the Trustee Fee Claims, on the Effective Date, the Trustee Fee Claims shall be allowed as Administrative Claims against the Debtors pursuant to section 503(b) of the Bankruptcy Code and shall be paid by the Reorganized Debtors without the need for the Master Trustee or the Bond Trustees to File applications for allowance with the Bankruptcy Court. To receive payment pursuant to this Section II.A.1.e, the Master Trustee and Bond Trustees shall provide reasonable and customary detail or invoices in support of such Claims to counsel to the Reorganized Debtors no later than 30 days after the Effective Date. The Reorganized Debtors shall have the right to object to such Claims based on a "reasonableness" standard within 20 days after receipt of supporting documentation. The Reorganized Debtors shall pay the undisputed amount of any such Claims no later than 30 days after the receipt of supporting documentation from the Master Trustee or the Bond Trustees. In the event that the Reorganized Debtors and applicable Master Trustee or Bond Trustees are unable to resolve a dispute with respect to a Trustee Fee Claim, the Master Trustee or the Bond Trustees may submit any such dispute to the Bankruptcy Court for resolution. The Reorganized Debtors shall pay the remaining amount of the Trustee Fee Claims no later than 10 days after the resolution of any objections to such Claims by agreement of the parties or Final Order of the Bankruptcy Court. Charging Liens held by the Master Trustee and/or the Bond Trustees against distributions to Holders on account of the Trustee Fee Claims will be deemed released upon payment of the Trustee Fee Claims in accordance with the terms of the applicable Bond Indenture, Master Trust Indenture and this Plan. Except as provided herein, distributions received by Holders on account of Cash Collateral Claims or Allowed Secured Bond Claims pursuant to the Plan will not be reduced on account of the payment of the Trustee Fee Claims.

### f. Bar Dates for Administrative Claims

#### i. General Administrative Claim Bar Date Provisions

Except as otherwise provided in this Section II.A.1.f.i or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (A) 90 days after the Effective Date, (B) 30 days after the Filing of the applicable request for payment of Administrative Claims or (C) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

#### ii. Bar Dates for Certain Administrative Claims

##### A. Professional Compensation

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; *provided, however*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (1) 90 days after the Effective Date, (2) 30 days after the Filing of the applicable request for payment of the Fee Claim or (3) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 129 of 169

B.        **Ordinary Course Administrative Liabilities**

Holders of Administrative Claims arising from liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section IV.A, will not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.c. Any Administrative Claims that are Filed contrary to this Section II.A.1.f.ii.B shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

C.        **Claims Under the Cash Collateral Order and Related Stipulations**

Holders of Allowed Administrative Superpriority Claims or Administrative Claims on account of the Cash Collateral Order will not be required to File or serve any request for payment or application for allowance of such Claims. Such Allowed Administrative Superpriority Claims or Allowed Administrative Claims shall be satisfied pursuant to Section II.A.1.d.

iii.        **No Modification of Bar Date Order**

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

2.        **Payment of Priority Tax Claims**

a.        **Priority Tax Claims**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, at the option of the Reorganized Debtors, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim, on the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, (iii) on terms that conform to the requirements of section 1129(a)(9)(C) of the Bankruptcy Code or (iv) upon such other terms determined by the Bankruptcy Court to provide the holder of such Claims deferred Cash payments having a value in Cash on the Effective Date, equal to such Allowed Priority Tax Claims.

b.        **Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding the provisions of Section II.A.2.a, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 5 (General Unsecured Claims), as applicable, if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors or their respective property (other than as a holder of a Class 5 Claim).

B.        **Classified Claims**

1.        **Other Priority Claims Against the Consolidated Debtors (Class 1 Claims) are unimpaired**.

On the later of the Effective Date or on the allowance of such Other Priority Claim, each holder of an Allowed Other Priority Claim in Class 1 will receive Cash equal to the amount of such Allowed Claim, unless the holder of such Other Priority Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment. Each holder of a Class 1 Claim will be deemed to have accepted the Plan.

2.      **Other Secured Claims Against the Consolidated Debtors (Class 2 Claims) are unimpaired**.

On the later of the Effective Date or on the allowance of such Other Secured Claim, each holder of an Allowed Other Secured Claim in Class 2 will receive such treatment that either:  (a) Reinstates the Other Secured Claim; (b) results in the surrender of the collateral of the holder of such Other Secured Claim and preserves all statutory rights of the holder of such Other Secured Claim to assert deficiency Claim(s); or (c) pays the holder of such Other Secured Claim in the ordinary course, unless the holder of an Other Secured Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment.  Each holder of a Class 2 Claim will be deemed to have accepted the Plan.

Notwithstanding either of the foregoing, the holder of an Allowed Secured Tax Claim in Class 2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 5 (General Unsecured Claims), if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors, Liquidating Trust or their respective property (other than as a holder of a Class 5 Claim).

3.      **Series 1997A Bond Claims (Class 3A Claims) are impaired**.

On the Effective Date, unless otherwise agreed by the beneficial holder of a Series 1997A Bond Claim and the applicable Debtor or Reorganized Debtor, each beneficial holder of an Allowed Claim in Class 3A will receive treatment on account of such Allowed Series 1997A Bond Claim in the manner set forth in Option A or B below, at the election of the beneficial holder of the Series 1997A Bond Claim.  The beneficial holder of such Allowed Series 1997A Bond Claim will be deemed to have elected Option A unless such beneficial holder elects Option B on its Ballot.

*Option A*:  On the Effective Date, for the beneficial holders electing or deemed to elect Option A, (a) their Series 1997A Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 1997A Bonds, the Series 1997A Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 1A, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 1997A Bonds, the Series 1997A Bond Indenture, the Series 1997A Policy, the Base Lease, the Lease, the Assignments, Obligation No. 1A and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture and the Amended Insurance Agreement shall replace the Master Trust Indenture and the Insurance Agreement, respectively.

*Option B*:  On the Effective Date, the Reorganized Debtors will satisfy such beneficial holder's Allowed Series 1997A Bond Claim by making the Series 1997A Alternative Cash Payment.  Any beneficial holder of an Allowed Series 1997A Bond Claim that elects and receives the Series 1997A Alternative Cash Payment shall surrender such Electing Holder's Bonds, such Electing Holder's Series 1997A Bonds that have been satisfied by the Series 1997A Alternative Cash Payment shall be canceled and no longer outstanding under the Series 1997A Bond Indenture, and such Electing Holder shall no longer have the benefit of or rights under the Series 1997A Policy on account of the Series 1997A Bonds being canceled. To the extent the Series 1997A Cash Option Funds are insufficient to satisfy all of the elections made by the Electing Holders of the Allowed Series 1997A Bond Claims, the Series 1997A Cash Option Funds will be applied Pro Rata to such Claims.  The remainder of the Allowed Series 1997A Bond Claims of the Electing Holders will receive treatment in the manner set forth in Option A above.  To the extent the Series 1997A Cash Option Funds exceed the amounts needed to satisfy all of the elections made by the Electing Holders of the Allowed Series 1997A Bond Claims, the Series 1997A Cash Option Funds will be withdrawn from the Series 1997A Cash Option Funds Account and applied by the Obligated Group Debtors to redeem Bonds (which may or may not include the Series 1997A Bonds).  Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

Nothing in this Section II.B.3 or any other provision in this Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 1997A Bonds and such

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 131 of 169

security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 1997A Bonds; *provided, however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

4.      **Series 1997B Bond Claims (Class 3B Claims) are impaired**.

On the Effective Date, (a) the Series 1997B Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 1997B Bonds, the Series 1997B Bond Indenture, the Standby Bond Purchase Agreement, the Series 1997B Policy, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 1B, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 1997B Bonds, the Series 1997B Bond Indenture, the Standby Bond Purchase Agreement, the Series 1997B Policy, the Base Lease, the Lease, the Assignments, Obligation No. 1B and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture and the Amended Insurance Agreement shall replace the Master Trust Indenture and the Insurance Agreement, respectively.

Nothing in this Section II.B.4 or any other provision in this Plan shall affect in any way the Series 1997B Policy, which shall remain in full force and effect, or shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 1997B Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 1997B Bonds; *provided, however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

5.      **Series 2002A Bond Claims (Class 3C Claims) are impaired**.

On the Effective Date, unless otherwise agreed by a beneficial holder of a Series 2002A Bond Claim and the applicable Debtor or Reorganized Debtor, each beneficial holder of an Allowed Series 2002A Bond Claim in Class 3C will receive treatment on account of such Allowed Series 2002A Bond Claim in the manner set forth in Option A or B below, at the election of the beneficial holder of the Series 2002A Bond Claim. The beneficial holder of such Allowed Series 2002A Bond Claim will be deemed to have elected Option A unless such Holder elects Option B on its Ballot.

*Option A*: On the Effective Date, for the beneficial holders electing or deemed to elect Option A, (a) their Series 2002A Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 2002A Bonds, the Series 2002A Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 2A, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 2002A Bonds, the Series 2002A Bond Indenture, the Base Lease, the Lease, the Assignments, Obligation No. 2A and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture shall replace the Master Trust Indenture.

*Option B*: On the Effective Date, the Reorganized Debtors will satisfy such beneficial holder's Allowed Series 2002A Bond Claim by making the Series 2002A Alternative Cash Payment. Any beneficial holder of an Allowed Series 2002A Bond Claim that elects and receives the Series 2002A Alternative Cash Payment shall surrender the Electing Holder's Bonds, such Electing Holder's Series 2002A Bonds that have been satisfied by the Series 2002A Alternative Cash Payment shall be canceled and no longer outstanding under the Series 2002A Bond Indenture. To the extent the Series 2002A Cash Option Funds are insufficient to satisfy all of the elections made by the Electing Holders of the Allowed Series 2002A Bond Claims, the Series 2002A Cash Option Funds will be applied Pro Rata to such Claims. The remainder of the Allowed Series 2002A Bond Claims of the Electing Holders will receive treatment in the manner set forth in Option A above. To the extent the Series 2002A Cash Option Funds exceed the amounts needed to satisfy all of the elections made by the Electing Holders of the Allowed Series 2002A Bond Claims, the Series 2002A Cash Option Funds will be withdrawn from the Series 2002A Cash Option Funds Account and deposited in the Series 2002A Reserve Fund to be applied in accordance with the Series 2002A Bond Indenture. Any Holder voting for the Plan shall be deemed to have consented to this transfer of Cash.

Nothing in this Section II.B.5 or any other provision in this Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 132 of 169

Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 2002A Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 2002A Bonds; *provided, however*, the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

6.       **Series 2002B Bond Claims (Class 3D Claims) are impaired**.

On the Effective Date, (a) the Series 2002B Bond Claims shall remain outstanding and shall be satisfied in accordance with the terms of the Series 2002B Bonds, the Series 2002B Bond Indenture, the Base Lease, the Lease, the Assignments, the Mortgages, Obligation No. 2B, the True-Up Agreement and the Amended and Restated Master Trust Indenture, (b) the Series 2002B Bonds, the Series 2002B Bond Indenture, the Base Lease, the Lease, the Assignments, Obligation No. 2B and the Mortgages shall remain in full force and effect and (c) the Amended and Restated Master Trust Indenture shall replace the Master Trust Indenture.

Nothing in this Section II.B.6 or any other provision in this Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Holders of the Series 2002B Bonds and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Holders of the Series 2002B Bonds; *provided, however*, the Amended and Restated Master Trust Indenture and the Amended Reimbursement Agreement will replace the Master Trust Indenture and Reimbursement Agreement, respectively.

7.       **Convenience Class Claims Against the Consolidated Debtors (Class 4 Claims) are impaired.**

On the later of the Effective Date or the allowance of the Claim, each holder of an Allowed Convenience Class Claim will receive, in exchange for and in full satisfaction of such Convenience Class Claim, its Pro Rata interest in the Convenience Class Claims Pool.

8.       **General Unsecured Claims Against the Consolidated Debtors (Class 5 Claims) are impaired**.

On the Effective Date, in full satisfaction of its Allowed Claim, each holder of an Allowed Claim in Class 5 will receive its Pro Rata interest in the Liquidating Trust as set forth more fully in Section III.I and Section V.F.3.

9.       **Intercompany Claims (Class 6 Claims) are unimpaired**.

On the Effective Date, prepetition Intercompany Claims in Class 6 that are not eliminated by operation of law in the Restructuring Transactions will be deemed settled and compromised in exchange for consideration and other benefits provided to the holders of prepetition Intercompany Claims, and such Claims are not entitled to any distributions under the Plan.  Each holder of a Class 6 Claim will be deemed to have accepted the Plan.

10.       **Subsidiary Debtor Member Interests (Class 7 Interests) are unimpaired.**

On the Effective Date, the Subsidiary Debtor Member Interests of all Reorganized Debtors will be Reinstated, subject to the Restructuring Transactions.   Each holder of a Class 7 Interest will be deemed to have accepted the Plan.

C.       **Impact of Classification of Claims on Subordination Rights**

The classification and manner of satisfying all Claims and Interests under the Plan takes into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510 of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  All subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 133 of 169

Accordingly, distributions pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

**D.      Special Provisions Relating to the Rights of Setoff of Creditors**

Nothing in this Plan shall expand or enhance a creditor's right of setoff, which shall be determined as of the Petition Date. Nothing in this Plan is intended to, or shall be interpreted to, approve any creditor's effectuation of a postpetition setoff without the consent of the Debtors or Reorganized Debtors, unless prior Bankruptcy Court approval has been obtained.

**E.      Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

Holders of Allowed Secondary Liability Claims against any of the Debtors will be entitled to only one distribution from the Debtors in respect of the Liabilities related to such Allowed Secondary Liability Claim and such Claims against all of the Debtors will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim. Holders of Allowed Secondary Liability Claims against a Debtor may not receive more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

**F.      Cramdown**

The Consent Parties request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

**ARTICLE III.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

The provisions of the Plan are intended to allow for the ongoing operation of the Reorganized Debtors, including, but not limited to, the following transactions:

**A.      Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section III.B), on the Effective Date: (1) the Reorganized Debtors will continue to be incorporated and shall exist as separate nonprofit and for-profit corporate entities, as applicable, with all corporate powers in accordance with the laws of the state of Ohio and the applicable Reorganized Articles of Incorporation and Reorganized Codes of Regulation attached hereto as Confirmation Exhibit III.C.1; (2) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, and, if applicable, with the same charitable purpose as previously set forth in the applicable articles of incorporation, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (3) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances and other interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

## B.     Restructuring Transactions

### 1.     Restructuring Transactions Generally

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors, in consultation with the Consent Parties, may determine to be necessary or appropriate to effect a corporate restructuring of their respective operations, activities or businesses, as applicable, or simplify the overall corporate structure of the Reorganized Debtors (including but not limited to merger or dissolution of Beeghly, CPS, Dacas, Dacas Nursing, FHPS, PCI and VNA) to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Consent Parties, in consultation with the Debtors and Reorganized Debtors, to be necessary or appropriate.  The actions to effect these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, right, Liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the members, directors or trustees, as applicable, of any of the Debtors or the Reorganized Debtors.

### 2.     Obligations of Any Successor Corporation in a Restructuring Transaction

The Restructuring Transactions may result in substantially all of the respective Assets, properties, rights, Liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### 3.     Dissolution of Certain Debtors

On the Effective Date, each Debtor that is not one of the Reorganized Debtors shall cease to exist as a separate entity without any other action being required to effect such dissolution as of the Effective Date and the Reorganized Debtors shall file appropriate certificates or documents either related to the merger of the entity into one of the Reorganized Debtors or the dissolution of such entity in accordance with applicable law.

## C.     Corporate Governance and Directors or Trustees and Officers

### 1.     Articles of Incorporation and Codes of Regulation of the Reorganized Debtors

As of the Effective Date, the Reorganized Articles of Incorporation and Reorganized Codes of Regulation (or comparable constituent documents) of the Reorganized Debtors will be substantially in the forms set forth in Confirmation Exhibit III.C.1.  After the Effective Date, each Reorganized Debtor may amend and restate their respective articles of incorporation or codes of regulation (or comparable constituent documents) as permitted by applicable law, subject to the terms and conditions of the Plan and such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such Reorganized Articles of Incorporation and Reorganized Codes of Regulation (or comparable constituent documents) with the Ohio Secretary

of State and with such other governmental authorities as may be necessary to make such documents effective under, or as otherwise may be required by, applicable law.

### 2. Reorganized Boards

      **a.** Subject to any requirement of Bankruptcy Court approval, pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date, the initial officers of the Reorganized Debtors will consist of the individuals identified on Confirmation Exhibit III.C.2. The initial Reorganized Parent Board will be comprised of nine independent members (to be identified on Confirmation Exhibit III.C.2 as selected), as follows: (i) the then-serving Chief Executive Officer of Reorganized Forum Health; (ii) two individuals designated by the Restructuring Committee; (iii) one individual designated by the Creditors' Committee; and (iv) five individuals designated by the Consent Parties. One of the independent members designated by the Consent Parties shall serve as chair of the Reorganized Parent Board.

      **b.** The Reorganized Boards of the other Reorganized Debtors shall each consist of five independent members (to be identified on Confirmation Exhibit III.C.2 as selected), as follows: (i) the then-serving Chief Executive Officer of Reorganized Forum Health; (ii) the Reorganized Parent Board member designated by the Creditors' Committee; and (iii) three Reorganized Parent Board members designated by the Consent Parties. One of the independent members designated by the Consent Parties shall serve as chair of each Reorganized Board.

      **c.** The initial Reorganized Boards shall continue in effect until removed or replaced pursuant to applicable law or in accordance with the Reorganized Debtors' corporate governance policies. Thereafter, until such time as the Consent Parties are paid in full in Cash, if a member of any Reorganized Board who was initially appointed by the Consent Parties resigns, dies or becomes disabled such that he or she cannot perform his or her duties as a Reorganized Board member, the replacement of such members shall be determined by the other Reorganized Board members who were initially appointed by the Consent Parties. After such time as the Consent Parties are paid in full in Cash, the Reorganized Board shall determine, by majority vote of the then-serving members, all replacement Reorganized Board members as vacancies arise.

### 3. Corporate Action

      The Restructuring Transactions; the adoption of new or amended and restated articles of incorporation and codes of regulation (or comparable constituent documents) for the Reorganized Debtors; the initial selection of directors, trustees and officers for the Reorganized Debtors; the establishment of the Liquidating Trust and the appointment of the Liquidating Trustee; the distribution of Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, incentive compensation programs, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and the Reorganized Debtors, will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the members, directors or trustees, as applicable, of the Debtors or the Reorganized Debtors.

## D. Alternative Cash Payment Option

### 1. FHIL Cash Infusion

      On the Effective Date of the Plan, Reorganized Forum Health will issue the FHIL Note in exchange for the FHIL Cash Infusion. Immediately thereafter, on the Effective Date, Reorganized Forum Health shall transfer the FHIL Cash Infusion to the Master Trustee for the benefit of the Holders of the Bonds and used, in accordance with the True-Up Agreement, for debt service reduction, including the Alternative Cash Payment Option.

2. **Use of Unrestricted Foundation Funds**

On the Effective Date (a) WRHF will transfer all of its Unrestricted Assets to the Master Trustee, and (b) TMHF will transfer all of its Unrestricted Assets to the Master Trustee.  On the Effective Date, all such Unrestricted Assets shall be released to the Master Trustee for the benefit of the Holders of the Bonds and used, in accordance with the True-Up Agreement, for debt service reduction, including the Alternative Cash Payment Option.

3. **Indemnity Account and the Segregated Proceeds Account**

On the Effective Date, any and all funds in the Indemnity Account and the Segregated Proceeds Account shall be released to the Master Trustee for the benefit of the Holders of the Bonds, and used, in accordance with the True-Up Agreement, for debt service reduction, including pursuant to the Alternative Cash Payment Option.

4. **Master DSRF and DSRFs**

On the Effective Date, any and all funds in the Master DSRF shall be transferred by the Master Trustee in accordance with the True-Up Agreement as follows:  (a) approximately $14,300,000.00 to the Series 1997A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 1997A Cash Option Payment for the Electing Holders; and (b) approximately $206,000.00 to the Series 2002A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 2002A Alternative Cash Payment for the Electing Holders.

On the Effective Date, approximately $8,700,000.00 in the DSRF relating to the Series 1997A Bonds shall be released by the applicable Bond Trustee for the Series 1997A Bonds and transferred to the Master Trustee to be deposited in the Series 1997A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 1997A Alternative Cash Payment for the Electing Holders.

On the Effective Date, approximately $470,000.00 in the DSRF relating to the Series 2002A Bonds shall be released by the applicable Bond Trustee for the Series 2002A Bonds and transferred to the Master Trustee to be deposited in the Series 2002A Cash Option Subaccount of the Cash Option Funds Account to be used by the Master Trustee to fund the Series 2002A Alternative Cash Payment for the Electing Holders.

5. **Fifth Third Cash Collateral Account**

On the Effective Date, the approximately $5,000,000.00 in the Fifth Third Cash Collateral Account shall be released by Fifth Third and applied to redeem $5,000,000.00 of the Series 2002B Bonds.

6. **Cancellation and Surrender of Instruments, Securities and Other Documentation**

On the Effective Date and concurrently with the applicable distributions made pursuant to Article V, any and all Bonds of the Electing Holders that receive the Alternative Cash Payment, but only to the extent that the Secured Bond Claims of such Electing Holders were satisfied by the Alternative Cash Payment, will be surrendered to the applicable Bond Trustee and canceled.  Such Bonds shall be of no further force and effect without any further action on the part of any Debtor or Reorganized Debtor.  To the extent that an Electing Holder's Secured Bond Claims were satisfied by an Alternative Cash Payment, such Electing Holder, the Bond Trustees and the Master Trustee will have no rights against the Issuer, the Debtors, the Reorganized Debtors or the Bond Insurer arising from or relating to their Secured Bond Claims and other documentation; *provided, however*, that no distribution under the Plan will be made to or on behalf of any Electing Holder until such Bonds are surrendered to and received by the Master Trustee, to the extent required in Section V.F.2.  This Section III.D.6 does not affect or alter any legal, equitable or contractual rights of the Non-Electing Holders except as otherwise set forth in the Plan.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 137 of 169

### E. Amended and Restated Master Trust Indenture

On the Effective Date, the Reorganized Debtors and the Master Trustee will enter into the Amended and Restated Master Trust Indenture. The Amended and Restated Master Trust indenture shall replace the Master Trust Indenture. The Obligations issued under the Master Trust Indenture shall remain outstanding under the Amended and Restated Master Trust Indenture and continue to secure the Bonds, subject to the terms of the Amended and Restated Master Trust Indenture. On the Effective Date, the Debtors will also pledge to the Master Trustee, for the benefit of the holders of the Obligations, the Mortgaged Premises, but excluding the unencumbered real estate assets of the Debtors as set forth on Confirmation Exhibit I.A.122.

Nothing in this Section III.E or any other provision in this Plan shall release or discharge any security interests, liens or collateral provided to or held by the Master Trustee and Bond Trustees under the Master Trust Indenture and applicable Bond Indenture for the benefit of the Master Trustee, the Bond Trustees, the holders of the Obligations and the Holders of the Bonds, and such security interests, liens and collateral will continue to be retained and preserved for the benefit of the Master Trustee, Bond Trustees, the holders of the Obligations and the Holders of the Bonds; *provided, however*, that the Amended and Restated Master Trust Indenture will replace the Master Trust Indenture.

### F. Amended Insurance Agreement

On the Effective Date, the Reorganized Debtors and the Bond Insurer will enter into the Amended Insurance Agreement. The Amended Insurance Agreement will replace the Insurance Agreement. The New Obligated Group will issue Obligation No. 4 to Bond Insurer to secure the New Obligated Group's obligations under the Amended Insurance Agreement.

### G. Implementation of Settlements

#### 1. Union Settlement Agreements

The Plan contemplates the implementation of the Union Settlement Agreements and/or the New 1113 Relief and the transactions contemplated thereby.

#### 2. Assumption of New Collective Bargaining Agreements

On the Effective Date, the applicable Debtor will assume the New Collective Bargaining Agreements as set forth under Section IV.A. Ordinary course obligations arising under the assumed agreements shall be unaltered by the Plan and shall be satisfied by the Reorganized Debtors in the ordinary course of business.

#### 3. Pension Plan

The Plan assumes that the Pension Plan will be terminated. The Debtors' obligations under ERISA § 4006(a)(7) and 29 U.S.C. § 1306(a)(7)(A) shall be satisfied by the Reorganized Debtors issuing the PBGC Note on the Effective Date.

### H. Employment, Retirement and Other Related Agreements; Workers' Compensation Programs.

#### 1. Employment-Related Agreements

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with, or programs for, their active employees, subject to the terms and conditions of any such agreement or program; and (b) enter into new employment, retirement, welfare, incentive, severance and other agreements or programs for active employees.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 138 of 169

2. **Compensation and Benefit Programs**

Except as provided in Sections III.G.3, VIII.A.6 and IV.B.1, all savings plans, retirement plans (other than the Pension Plan), health care plans, performance based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability and other insurance plans are deemed assumed and assigned under Section IV.A and Reinstated as of the Effective Date; *provided, however,* the Pension Plan, the Collective Bargaining Agreements and the New Collective Bargaining Agreements shall be treated in accordance with the terms of the Plan and as set forth herein.

3. **Continuation of Workers' Compensation Programs**

From and after the Effective Date, (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtor or Reorganized Debtors are responsible under Ohio's workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures, applicable plan documents and Ohio's workers' compensation law and (b) nothing in the Plan shall discharge, release or relieve the Debtors or Reorganized Debtors from any current or future liability under Ohio's workers' compensation law. The Debtors expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

## I. Liquidating Trust

1. **Liquidating Trust Generally**

On or prior to the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of distributing assets contributed to the Liquidating Trust to holders of Allowed Class 5 Claims, pursuing any Avoidance Actions, making all distributions to holders of Allowed Class 5 Claims in accordance with the terms of the Plan and otherwise implementing the applicable terms of the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Liquidating Trust (and the Liquidating Trustee) shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the Liquidating Trust provisions of the Plan; (b) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan or Liquidating Trust Agreement; (c) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the assets of the Liquidating Trust (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan; (d) sell, liquidate, transfer, distribute or otherwise dispose of the assets of the Liquidating Trust (directly or through its professionals or a Third Party Disbursing Agent) or any part thereof or any interest therein upon such terms as the Liquidating Trustee determines to be necessary, appropriate or desirable; (e) calculate and make distributions to holders of Allowed Class 5 Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (f) comply with the Plan and exercise the Liquidating Trustee's rights and fulfill its obligations thereunder; (g) review, reconcile or object to Class 5 Claims and resolve such objections as set forth in the Plan; (h) pursue Avoidance Actions that are transferred to the Liquidating Trust to the extent their pursuit would likely result in an economic benefit to creditors classified in Class 5 hereunder; (i) retain and compensate professionals to represent the Liquidating Trustee with respect to its responsibilities; (j) file appropriate Tax returns and other reports on behalf of the Liquidating Trust and pay Taxes or other obligations owed by the Liquidating Trust; (k) exercise such other powers as may be vested in the Liquidating Trustee under the Liquidating Trust Agreement or the Plan, or as deemed by the Liquidating Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidating Trust Agreement; and (l) dissolve the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Notwithstanding anything to the contrary in this Section III.I.1, the Liquidating Trust's primary purpose is liquidating the assets transferred to it by the Debtors, pursuing Avoidance Actions and making distributions of the assets of the Liquidating Trust to holders of Allowed Class 5 Claims.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 139 of 169

2. **Funding of and Transfer of Assets into the Liquidating Trust**

      **a.**      On the Effective Date, the Liquidating Trust shall receive the Liquidating Trust Assets. The assets will be transferred to and vest in the Liquidating Trust on the Effective Date, free and clear of all liens.

      **b.**      The Liquidating Trustee shall have the authority to create sub-accounts or sub-trusts within the Liquidating Trust, and into which the Liquidating Trustee may deposit any non-Cash property, including real or personal property pending its liquidation. Such sub-accounts or sub-trusts may hold legal title to such property. Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts shall be deposited directly into the primary Trust Account.

      **c.**      The act of transferring assets and rights to the Liquidating Trust, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the applicable Debtor.

3. **Liquidating Trustee**

      **a.**      The initial Liquidating Trustee shall be selected by the Creditors' Committee, subject to the consent of the Debtors (with such consent not being unreasonably withheld).

      **b.**      The powers, rights and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section III.I.1 above. Other rights and duties of the Liquidating Trustee and the beneficiaries of the Liquidating Trust shall be as set forth in the Liquidating Trust Agreement.

4. **Liquidating Trust Agreement**

      The Liquidating Trust Agreement generally will provide for, among other things: (a) the payment of reasonable compensation to the Liquidating Trustee; (b) the payment of other expenses of the Liquidating Trust, including the cost of pursuing the claims assigned to the Liquidating Trust; (c) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (d) the investment of Cash by the Liquidating Trustee within certain limitations; (e) the preparation and filing of appropriate Tax returns and other reports on behalf of the Liquidating Trust and the payment of Taxes or other obligations owed by the Liquidating Trust; (f) the orderly liquidation of the Liquidating Trust's assets; and (g) the litigation, settlement, abandonment or dismissal of the Avoidance Actions or any other claims, rights or causes of action assigned to the Liquidating Trust.

5. **Reports to be Filed by the Liquidating Trustee**

      The Liquidating Trustee, on behalf of the Liquidating Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidating Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

6. **Fees and Expenses of the Liquidating Trust**

      Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Liquidating Trust (including the reasonable and necessary fees and expenses of any professionals assisting the Liquidating Trustee in carrying out its duties under the Plan) will be funded by the assets in the Liquidating Trust in accordance with the Liquidating Trust Agreement without further order from the Bankruptcy Court.

7.     **Indemnification**

The Liquidating Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidating Trustee and/or other parties. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the assets of the Liquidating Trust.

8.     **Tax Treatment**

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated either as discrete trusts taxed pursuant to Section 641 et seq. of the Internal Revenue Code or as disputed ownership funds described in Treasury Regulation § 1.468B-9. For federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the holders of Allowed Class 5 Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one or more Disputed Claims reserves. The holders of Allowed Class 5 Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the holders of Allowed Class 5 Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to such assets. The holders of Allowed Class 5 Claims will be required to use the values assigned to such assets by the Liquidating Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest. The Liquidating Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (a) require that the Liquidating Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the holders of Allowed Class 5 Claims the Liquidating Trust's net income and the net proceeds from the sale of Liquidating Trust assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Liquidating Trust assets. Liquidating Trust assets reserved for holders of Disputed Claims will be treated as one or more Disputed Claims reserves for tax purposes, which will be subject to an entity-level Tax on some or all of their net income or gain. No holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as discrete trusts or disputed ownership funds, and will pay all Taxes owed from Liquidating Trust assets.

9.     **Sales of Assets by Liquidating Trust**

In connection with the sale, liquidation, transfer, distribution or other disposition of the assets of the Liquidating Trust by the Liquidating Trustee, the Liquidating Trustee shall deposit any proceeds of the litigation or settlement of Avoidance Actions into the primary Trust Account. The Liquidating Trustee may conduct any sales or liquidations of non-Cash assets from the Liquidating Trust on any terms it deems reasonable, without further order of the Bankruptcy Court.

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 141 of 169

10.    **Creation and Maintenance of Trust Accounts**

a.    **Creation of Trust Accounts**

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trustee. To effect distributions, the Liquidating Trustee may establish and maintain multiple Trust Accounts.

b.    **Additional Funding of Trust Accounts**

After the funding of the Trust Accounts on the Effective Date, each Trust Account will continue to be funded by the transfers provided under the Plan, including Cash distributions and proceeds from litigation. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Liquidating Trust Agreement.

c.    **Investment of Trust Accounts**

The Liquidating Trustee shall invest Cash in the Trust Accounts, subject to the limitations established by the Liquidating Trust Agreement; *provided, however*, that should the Liquidating Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may choose not to invest such Cash. Distributions of Cash from accounts held by the Liquidating Trustee will include a Pro Rata share of any Cash Investment Yield, net of any Taxes payable with respect thereto.

d.    **Closure of Trust Accounts**

Upon obtaining an order of the Bankruptcy Court authorizing final distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Liquidating Trust Agreement, and the Trust Accounts will be closed.

J.    **Special Provisions Regarding Insured Claims**

1.    **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but (other than with respect with any Secured Bond Claim) solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in this Section III.J.1 constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

2.    **Assumption and Continuation of Insurance Contracts**

From and after the Effective Date, each of the Insurance Contracts will be, as applicable, either deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section IV.A of the Plan or continued in accordance with its terms such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the parties to each Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred. Nothing in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred. In addition, notwithstanding anything to the contrary in the Plan, nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect. Any such

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 142 of 169

rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

### 3. Liquidation of Tort Claims

All Tort Claims will be liquidated, determined or otherwise resolved under section 502(c) of the Bankruptcy Code and will be subject to the Claims allowance process set forth in the Plan.

## K. Cash Management

The Reorganized Debtors shall maintain the cash management system of the Reorganized Debtors in effect on the Effective Date and cause to be maintained in all material respects, and shall not transfer funds out of (except in the ordinary course of business) the cash management system, cash management accounts and investments accounts of the Reorganized Debtors. Each of the Reorganized Debtors further jointly and severally agrees that, until such time the Secured Bond Claims are paid in full in Cash, to the extent any new accounts (including, without limitation, any operating, Cash or investment accounts) are opened by, or for the benefit of, the Reorganized Debtors, the Reorganized Debtors shall execute and deliver a deposit account control agreement (in form and substance acceptable to the Master Trustee), or amend the existing account control agreements (if applicable) and deliver such amendment, to the Master Trustee prior to or on the date such account is opened.

## L. No Change in Control

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to another Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in Control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease, contract or agreement in existence on the Effective Date to which a Debtor is a party.

## M. Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Avoidance Actions

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Liquidating Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Liquidating Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain the Avoidance Actions to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court. For the avoidance of doubt, the Avoidance Actions exclude any and all causes of action against the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors.

## N. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and except as specified in the treatment provided for Secured Claims and Secured Bond Claims in Article II, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns. As of the Effective Date, except as specified in the treatment provided for Secured Claims and Secured Bond Claims in Article II, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section III.N.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 143 of 169

## O.      Releases

### 1.      General Releases by Debtors and Reorganized Debtors

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 2.      General Releases by Holders of Claims

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan, and to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code).

## P.      Exculpation

From and after the Effective Date, except with respect to obligations arising under the Plan, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, preparation, dissemination, implementation, Confirmation or approval of the Plan, the Confirmation Exhibits, the Disclosure Statement or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however,* that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

## Q.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The President, Chief Executive Officer, Chief Financial Officer or any Chief Operating Officer of each Debtor or Reorganized Debtor, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax:  (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) the making, execution and delivery of the FHIL Note and PBGC Note; (4) any Restructuring Transaction; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

## R.      Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Articles II and III, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of

a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable

**ARTICLE IV.**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.      Executory Contracts and Unexpired Leases to Be Assumed**

**1.      Assumption and Assignment Generally**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts or Unexpired Leases between the Debtors and any Person shall be deemed assumed by the Debtors or the Reorganized Debtors as of the Effective Date or after the Effective Date in accordance with Section IV.A, except for any Executory Contract or Unexpired Lease: (a) that has been rejected pursuant to an order of the Bankruptcy Court; (b) as to which a motion for rejection of such Executory Contract or Unexpired Lease has been filed and served prior to the Confirmation Date; or (c) that is listed on Confirmation Exhibit IV.B.1 (Prepetition Executory Contracts or Unexpired Leases Designated for Rejection), which may be amended, modified or supplemented prior to the Effective Date. All Executory Contracts or Unexpired Leases will be deemed assigned to the applicable Reorganized Debtor, or if such Debtor is not a Reorganized Debtor, then to Reorganized Forum Health.

**2.      Cure of Defaults**

To the extent that the Cure Amount Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Consent Parties, in consultation with the applicable Debtor or Reorganized Debtor: (a) by payment of the Cure Amount Claim in Cash within 30 days of the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If a party disputes: (a) the amount of any Cure Amount Claim; (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made (a) pursuant to the Plan if the dispute is resolved as part of the Confirmation Order or (b) within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption, if such dispute is not resolved as part of the Confirmation Order; *provided, however*, if a dispute resolving any Executory Contract or Unexpired Lease issue is decided against the Debtors or Reorganized Debtors by Final Order, the Consent Parties, in consultation with the Debtors or Reorganized Debtors, may amend Confirmation Exhibit IV.B.1 to reject such Executory Contract or Unexpired Lease within 10 days of such Final Order, regardless of whether such Final Order is entered after the Effective Date.

**B.      Rejection of Executory Contracts and Unexpired Leases**

**1.      Rejection Generally**

Each Executory Contract or Unexpired Lease listed on Confirmation Exhibit IV.B.1 will be deemed rejected as of the Effective Date under section 365 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease listed on Confirmation Exhibit IV.B.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Confirmation Exhibit IV.B.1. The Consent Parties may amend, modify or supplement Confirmation Exhibit IV.B.1 at any time prior to the later of the Effective Date, the periods set forth in Section IV.A.2 or within 30 days of implementing the Northside Disposition Plan. In the event of such amendment, modification or

supplement, such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be rejected by the Debtors or Reorganized Debtors as of the Effective Date. The Debtors or the Reorganized Debtors shall provide notice of any amendments to Confirmation Exhibit IV.B.1 to the other parties to the Executory Contracts or Unexpired Leases affected thereby. This Section IV.B.1 does not provide the Debtors or the Reorganized Debtors the authority to remove a party from Confirmation Exhibit IV.B.1, and any such deletion shall be void and of no effect. Listing a contract or lease on Confirmation Exhibit IV.B.1 will not constitute an admission that such contract or lease (including any related agreements) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

### 2. Bar Date for Rejection Damage Claims

Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to Section IV.B.1 must be Filed with the Bankruptcy Court and served on the Debtors and the Consent Parties or, on and after the Effective Date, the Reorganized Debtors, the Consent Parties and the Liquidating Trustee, by no later than 30 days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or Unexpired Lease, (b) notice of the Confirmation Order or (c) notice of an amendment to Confirmation Exhibit IV.B.1, and upon allowance, shall be an Allowed General Unsecured Claim classified in Class 5. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors, the Estates or the Liquidating Trust.

### C. Approval of Assumption, Assumption and Assignment or Rejection

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of: (a) the assumption and assignment of the Executory Contracts and Unexpired Leases pursuant to Section IV.A; and (b) the rejection of the Executory Contracts and Unexpired Leases pursuant to Section IV.B.

### D. Executory Contracts and Unexpired Leases Entered Into After the Petition Date

Other than with respect to the Collective Bargaining Agreements, which are addressed in Section III.G.1, contracts, leases and other agreements entered into after the Petition Date by a Debtor and any Executory Contracts or Unexpired Leases assumed by a Debtor will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### E. Certain Nonresidential Real Property Leases

Upon information and belief, the Debtors' deadline for the assumption of nonresidential real property leases expired on October 12, 2009, pursuant to section 365(d)(4) of the Bankruptcy Code. The Consent Parties are under the belief that certain of the nonresidential real property leases were not assumed by October 12, 2009 and that the Debtors, upon the written consent of the lessor, entered into new leases with the non-Debtor party of such leases. For the avoidance of doubt, the Consent Parties, in consultation with the Debtors and the Reorganized Debtors, reserve the right to treat such leases in the same manner as other unexpired leases set forth in Article IV.

### ARTICLE V.
### PROVISIONS GOVERNING DISTRIBUTIONS

### A. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in this Article V, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article II that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 146 of 169

applicable conditions of Section IV.A (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section IV.B.2 (regarding payment of Claims related to the rejection of an Executory Contract or Unexpired Lease), Section V.E (regarding undeliverable distributions) or Section V.F.2 (regarding the surrender of instruments), as applicable, are satisfied. Distributions on account of Claims that become Allowed, respectively, after the Effective Date will be made pursuant to Section VI.C.

**B.     Method of Distributions to Holders of Claims**

Except for distributions to Electing Holders of Allowed Secured Bond Claims electing the Alternative Cash Payment Option, which shall be made to the Master Trustee for the benefit of such Electing Holders, the Reorganized Debtors or the Liquidating Trustee, or Third Party Disbursing Agents as the Reorganized Debtors or the Liquidating Trustee may employ in their sole discretion, will make all distributions of Cash and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan. The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

**C.     Distributions on Account of Secured Bond Claims**

Distributions to Electing Holders on account of Allowed Secured Bond Claims electing the Alternative Cash Payment Option shall be made by the Master Trustee. The Master Trustee in its capacity as Third Party Disbursing Agent, shall administer the distributions to Electing Holders in accordance with the Plan and the applicable Amended and Restated Master Trust Indenture or the applicable Bond Indentures and be compensated in accordance with Section II.A.

**D.     Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. Except as otherwise provided in the Plan, these payments shall be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims receiving distributions from a Third Party Disbursing Agent. For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed. To the extent that there are any disputes that the Reorganized Debtors or the Liquidating Trustee are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors or the Liquidating Trustee may submit such dispute to the Bankruptcy Court for resolution.

**E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.     Delivery of Distributions**

**a.     Generally**

Except as provided in Section V.F.2, distributions to holders of Allowed Claims will be made by a Disbursing Agent: (i) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims or request for payment of Administrative Claim, as applicable; (ii) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (iii) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Claims and Noticing Agent after the date of Filing of any related proof of Claim; (iv) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Claims and Noticing Agent has not received a written notice of a change of address; or (v) if clauses (i) through (iv) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 147 of 169

b.  **Special Provisions for Distributions to Electing Holders**

　　　　i.　　Except as provided in Section V.F.2, and subject to the requirements of Section V.F.2 below, distributions to Electing Holders will be made by the Master Trustee as of the Distribution Record Date.

　　　　ii.　　Except as provided in Section V.F.2, on the Effective Date (or as soon as practicable thereafter in accordance with Section V.F.2), the Master Trustee will make all distributions of Cash under the Alternative Cash Payment Option to the Electing Holders in accordance with the Plan and the Amended and Restated Master Trust Indenture.  For the purposes of distribution under this Section V.E.1.b, the Master Trustee shall be considered a Third Party Disbursing Agent.

　　　　iii.　　The Master Trustee shall only be required to act and make distributions in accordance with the terms of the Plan.  The Master Trustee shall have no (A) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

　　　　iv.　　Notwithstanding any of the foregoing, nothing herein shall be deemed to impair, waive or extinguish any rights of the Master Trustee and the Bond Trustees, as applicable, with respect to a Charging Lien; *provided, however*, that any such Charging Lien will be released upon payment of the Master Trustee's and the Bond Trustees' reasonable fees and expenses in accordance with the terms of the applicable Amended and Restated Master Trust Indenture, Bond Indentures or this Plan.

2.  **Undeliverable Distributions Held by Disbursing Agents**

a.  **Holding of Undeliverable Distributions**

　　　　Subject to Section V.E.2.c, distributions returned to a Disbursing Agent, or otherwise undeliverable will remain in the possession of the Disbursing Agent, pursuant to this Section V.E.2.a, until such time as a distribution becomes deliverable.  A Disbursing Agent holding undeliverable Cash will invest such Cash in a manner consistent with the Liquidating Trust Agreement or the Reorganized Debtors' corporate governance policies, as applicable.

b.  **After Distributions Become Deliverable**

　　　　On each Distribution Date, the applicable Disbursing Agent will make all distributions that became deliverable to holders of Allowed Claims during the preceding calendar quarter; *provided, however*, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each periodic Distribution Date, such that only Allowed Claims as of the record date will participate in such periodic distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, to the extent it determines a distribution on any periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a periodic Distribution Date.

c.  **Failure to Claim Undeliverable Distributions**

　　　　Any holder of an Allowed Claim or Allowed Interest that does not assert its right to an undeliverable distribution prior to the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against a Disbursing Agent and their respective property or accounts.  In such cases, unclaimed distributions held by a Disbursing Agent will be returned to Reorganized Forum Health or the Liquidating Trust, as applicable.  Any unclaimed distributions or any distributions that are returned as undeliverable, will become property of Reorganized Forum Health or the Liquidating Trust, as applicable, free of any restrictions thereon.  Nothing contained in the Plan will require a Debtor, a Reorganized Debtor, the Liquidating Trustee or a Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### F. Timing and Calculation of Amounts to be Distributed

#### 1. Distributions on Account of Allowed Claims in Class 1 and Class 2

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan shall be made within 30 days of such Claim becoming an Allowed Claim.

#### 2. Distributions on Account of Allowed Claims in Class 3

##### a. Alternative Cash Payment Option

Payments made to an Electing Holder will be made no later than 40 days after the Effective Date.

###### i. Exchange of Bonds

If and to the extent a beneficial holder elects the Alternative Cash Payment Option, such Electing Holder shall authorize and instruct its broker/custodial bank to initiate a Deposit/Withdrawal at Custodian to surrender its Bond(s) within 30 days of the Effective Date.

###### ii. Failure to Surrender Bonds

Any Electing Holder of a Bond that fails to surrender or is deemed not to have surrendered the applicable Bond within 30 days after the Effective Date will be deemed to have elected Option A. In the event that Cash remains in the Series 1997A Cash Option Funds Account, the Cash in the Series 1997A Cash Option Subaccount shall be transferred by the Master Trustee to the Bond Trustees to redeem Bonds, in accordance with the terms of the Bond Indentures, at the direction of the Bond Insurer, including, without limitation, to redeem the Series 1997B Bonds. In the event that Cash remains in the Series 2002A Cash Option Funds Account, the Cash in the Series 2002A Cash Option Subaccount shall be transferred by the Master Trustee to the Series 2002A Reserve Fund to be used in accordance with the terms of the Series 2002A Bond Indenture.

#### 3. Distributions on Account of Allowed Claims in Class 5

##### a. Selection of Distribution Dates for Class 5 Claims and Provision of Notice Thereof

Except where this Plan requires the making of a distribution on account of a particular Allowed Claim within a particular time, the Liquidating Trustee shall have the authority to select Distribution Dates that, in the judgment of the Liquidating Trustee, provide holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred by the distribution process; *provided, however*, that the first Distribution Date after the Effective Date must occur prior to 180 days after the Effective Date and a Distribution Date must occur at least once every twelve months thereafter, if any amounts are available for distribution on such date. Upon the selection of a Distribution Date by the Liquidating Trustee, the Liquidating Trustee may File a notice of such Distribution Date with the Bankruptcy Court that provides information regarding the distribution to be made.

##### b. Calculation of Amounts to Be Distributed to Holders of Class 5 Claims

###### i. Provisions Governing Disputed Unsecured Claim Reserve

Prior to any distribution to holders of Allowed Class 5 Claims, the Liquidating Trustee shall estimate the amount of Cash on hand that will remain after payment of all Liquidating Trust Expenses. Such estimations shall utilize assumptions that the Liquidating Trustee will be unsuccessful in litigation with claimants with respect to any issue that is being reasonably contested. Such estimations shall also assume that any unresolved Avoidance Actions shall result in no recovery for the Liquidating Trust and that remaining non-Cash assets shall produce no recovery for the Liquidating Trust. Only if, after applying such assumptions, the estimated Cash is greater than zero shall the Liquidating Trustee be permitted to make any distributions to holders of Allowed Class 5 Claims.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 149 of 169

### ii. Allowed Class 5 Claims

On each Distribution Date, each holder of an Allowed Claim in Class 5 will receive a distribution of any Cash that has been determined to be available for distribution in accordance with Section V.F.3 such that each holder of an Allowed Claim in such Class 5 has received, in the aggregate, its Pro Rata share of the amounts of Cash that are made available for distribution to such Claim holders. All distributions shall be made pursuant to the terms and conditions of the Plan and the Liquidating Trust Agreement, and shall be subject to the Debtors', the Reorganized Debtors' or the Liquidating Trustee's rights of setoff or deduction.

### iii. De Minimis Distributions

On each Distribution Date prior to the Final Distribution Date, the Liquidating Trustee shall not distribute Cash to the holder of an Allowed Class 5 Claim if the amount of Cash to be distributed on account of such Claim is less than $25 in the aggregate. Any Cash not distributed pursuant to this Section V.F.3.b.iii will be returned to the applicable Trust Account until the next Distribution Date. On the Final Distribution Date, if the aggregate amount of distributions to be made to such claimant is $25 or greater, such distribution shall be made. Otherwise, the amount shall be redistributed to other holders of Allowed Claims in such Class and such holder of an Allowed Claim will be forever barred from asserting its Claim for such distribution against the Liquidating Trust or its property.

### c. Provisions Governing Disputed Unsecured Claims Reserve

### i. Funding

On the Effective Date or otherwise prior to the initial distributions under Section V.F.3, the Disputed Unsecured Claims Reserve will be established by the Liquidating Trustee for the benefit of holders of Allowed Claims in Class 5 and Disputed Claims that become Allowed Claims in Class 5. For the purpose of calculating the Assets to be contributed to the Disputed Unsecured Claims Reserve, all Disputed Claims will be treated (solely for purposes of establishing the Disputed Unsecured Claims Reserve) as Allowed Claims in the Face Amount of such Claims as of the Effective Date. In addition, Disputed Claims rendered duplicative as a result of the limited consolidation of the Consolidated Debtors pursuant to Article VII will only be counted once for purposes of establishing the Disputed Unsecured Claims Reserve. As Disputed Claims are resolved, the Liquidating Trustee or Third Party Disbursing Agent shall make adjustments to the reserves for Disputed Claims, but the Debtors, Reorganized Debtors or the Liquidating Trustee shall not be required to increase such reserves from and after the Effective Date. The Liquidating Trustee may File a motion seeking an order of the Bankruptcy Court approving additional procedures for the establishment of the Disputed Unsecured Claims Reserve.

### ii. Distributions

The distributions received by the Liquidating Trustee or Third Party Disbursing Agent on account of the Disputed Unsecured Claims Reserve from the Liquidating Trust, along with any Cash Investment Yield held in the Disputed Unsecured Claims Reserve, will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5 and Disputed Claims that become Allowed Claims in Class 5, (b) be accounted for separately and (c) not constitute property of the Reorganized Debtors. The Disbursing Agent will invest any Cash held in the Disputed Unsecured Claims Reserve in a manner consistent with the Liquidating Trust Agreement.

### iii. Recourse

Each holder of an Allowed Claim in Class 5 and each holder of a Disputed Claim that ultimately becomes an Allowed Claim in Class 5 will have recourse only against the Disputed Unsecured Claims Reserve Assets and not to any other assets held by the Reorganized Debtors or the Liquidating Trust, their property or any assets previously distributed on account of any Allowed Claim or Allowed Interest.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 150 of 169

### iv. No Transfer of Rights

The rights of holders of Allowed Claims to receive distributions from the Disputed Unsecured Claims Reserve in accordance with the Plan will be non-transferable, except with respect to a transfer by will, the laws of descent and distribution or operation of law.

### G. Other Provisions Applicable to Distributions in All Classes

#### 1. Postpetition Interest

No interest shall have accrued on any Claim that is not an Allowed Secured Claim or Allowed Secured Bond Claim on and after the Petition Date, nor will interest accrue on or after the Effective Date.

#### 2. Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under this Plan.

### H. Distribution Record Date

1. As of the close of business on the Distribution Record Date, the transfer registers for the Electing Holders' Bonds will be closed. The Master Trustee, the Bond Trustees or the Reorganized Debtors will have no obligation to recognize the transfer or sale of any of the Bonds held by the Electing Holders that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those beneficial holders who are beneficial holders of such Secured Bond Claims as of the close of business on the Distribution Record Date.

2. Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. No transfers Filed with the Bankruptcy Court after the Distribution Record Date shall be recognized by the Liquidating Trustee or the Reorganized Debtors.

### I. Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Reorganized Debtors, the Liquidating Trustee, the Master Trustee or a Disbursing Agent, as applicable, or at the option of the Reorganized Debtors, the Liquidating Trustee, Master Trustee or a Disbursing Agent, as applicable, by wire transfer, electronic funds or ACH from a domestic bank; *provided, however*, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors, the Liquidating Trustee, the Master Trustee or a Disbursing Agent, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### J. Withholding Requirements

1. In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications. To the

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 151 of 169

extent any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's distribution will be deemed undeliverable and subject to Section V.E.2.

2.      Notwithstanding any other provision of the Plan, each entity receiving a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding and other Tax obligations.

3.      The Debtors or the Reorganized Debtors reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

## K.      Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; *provided, however,* that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Liquidating Trustee of any claims, rights and causes of action that the Debtors or the Reorganized Debtors or Liquidating Trustee may possess against a Claim holder, which are expressly preserved under Section III.M.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A.      Treatment of Disputed Claims

### 1.      Tort Claims

Each Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.  The amount of a Tort Claim that is not otherwise settled and resolved by a Stipulation of Amount and Nature of Claim shall be determined and liquidated, in the discretion of the Debtors or Reorganized Debtors in either (a) the administrative or judicial tribunal of appropriate jurisdiction or (b) the United States District Court for the Northern District of Ohio. The Debtors or Reorganized Debtors shall provide written notice of its selection of the appropriate forum promptly after the Effective Date.  Such judicial tribunal shall determine the amount of the Tort Claim, but shall not enter or enforce a judgment against the Debtors, their Estates or the Liquidating Trust, as all distributions on account of Tort Claims resolved in accordance with this Section VI.A.1 shall be subject to and made in accordance with the Plan. All claims, demands, rights, defenses and causes of action that the Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

### 2.      Disputed Insured Claims

The resolution of Disputed Insured Claims, including Tort Claims, pursuant to this Section VI.A shall be subject to the provisions of Section III.J of the Plan.

### 3.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever.

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 152 of 169

**B.**     **Prosecution of Objections to Claims**

**1.**     **Objections to Claims**

All objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date. If an objection has not been Filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

**2.**     **Authority to Prosecute Objections**

**a.**     **Objections Filed Prior to the Effective Date**

After the Confirmation Date, but prior to the Effective Date, the Debtors or any other party in interest will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

**b.**     **Objections Filed On or After the Effective Date**

On or after the Effective Date, the Reorganized Debtors will have the sole authority, except as set forth herein, to File, settle, compromise, withdraw or litigate to judgment objections to Claims. The Liquidating Trustee shall have the authority to review, reconcile or object to Class 5 Claims and resolve such objections as set forth in Section III.I.

**c.**     **Settlement or Compromise of Disputed Claims On or After the Effective Date**

On or after the Effective Date, only the Reorganized Debtors may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court; *provided, however,* that the Reorganized Debtors shall give the Liquidating Trustee notice of all such settlements or compromises of any Class 4 or Class 5 Claim. The Liquidating Trustee may File an objection to a stipulation, compromise or other agreement filed by the Debtors or Reorganized Debtors within 14 days of receiving written notice of such stipulation or other agreement. In the event the Liquidating Trustee Files an objection, Bankruptcy Court approval will be required for such stipulation or settlement agreement, unless the Liquidating Trustee withdraws the objection.

**3.**     **Authority to Amend Schedules**

The Debtors or Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim except the Secured Bond Claims, and to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor will provide (a) the holder of such Claim and (b) the Creditors' Committee or the Liquidating Trustee, as applicable, with notice of such amendment, and such parties will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the applicable Reorganized Debtor or Liquidating Trustee may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court.

**4.**     **Request for Extension of Claims Objection Bar Date**

Upon motion to the Bankruptcy Court, the Reorganized Debtors or the Liquidating Trustee may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 153 of 169

C.    **Distributions on Account of Disputed Claims Once Allowed**

           Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

**ARTICLE VII.**
**CONSOLIDATION OF CERTAIN DEBTORS FOR PLAN PURPOSES ONLY**

A.    **Limited Consolidation for Voting, Confirmation and Distribution Purposes**

           Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the Debtors' election to treat the Estates as if they were consolidated solely for the purpose of voting, Confirmation and distributions to be made under the Plan.  Accordingly, for purposes of implementing the Plan, pursuant to such order:  (1) all Assets and Liabilities of the Debtors shall be treated as if they are pooled; and (2) with respect to any guarantees by one Debtor of the obligations of any Debtor, and with respect to any joint or several liability of any Debtor, the holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors, in each case except to the extent otherwise provided in the Plan.

           Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect:  (1) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that have been or will be assumed or (b) pursuant to the Plan; (3) Interests between and among the Debtors; (4) distributions from any insurance policies or proceeds of such policies; (5) preservation of the separate Estates for purposes of Confirmation to the extent provided in the Plan; and (6) the revesting of assets in the separate Reorganized Debtors pursuant to Section III.A of the Plan.  In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

B.    **Order Granting Consolidation for Voting, Confirmation and Distribution Purposes**

           This Plan serves as a motion seeking entry of an order consolidating the Debtors solely for the purposes of voting, Confirmation and distributions to be made under the Plan, as described and to the limited extent set forth in Section VII.A above.  Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section X.F on or before seven days before either the Voting Deadline or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing.  Notwithstanding this provision, nothing herein shall affect the obligation of each and every Debtor to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930.

           In the event that the Bankruptcy Court does not approve the Consent Parties' election to treat the Estates as if they are consolidated solely for voting, Confirmation and distribution purposes, (1) the Plan shall be treated as a separate plan of reorganization for each Debtor, and (2) the Consent Parties shall not be required to re-solicit votes with respect to the Plan.

**ARTICLE VIII.**
**CONFIRMATION OF THE PLAN**

A.    **Conditions Precedent to Confirmation**

           The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section VIII.C:

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 154 of 169

1.      The Confirmation Order will be reasonably acceptable in form and substance to the Consent Parties.

2.      The Plan shall not have been materially amended, altered or modified from the Plan as Filed on May 14, 2010, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

3.      All Confirmation Exhibits to the Plan are in form and substance reasonably satisfactory to the Consent Parties.

4.      The CBA Modifications shall be implemented after being either (a) agreed to by the Unions and, if necessary, ratified by their memberships and approved by order of the Bankruptcy Court, or (b) obtained through New 1113 Relief by order of the Bankruptcy Court.

5.      In the event the Debtors and the Unions are unable to agree upon the CBA Modifications for Northside Medical Center on or before 14 days prior to the Disclosure Statement hearing, the Debtors shall have sought the New 1113 Relief.  If such relief cannot be obtained from the Bankruptcy Court, the Debtors shall implement the Northside Disposition Plan, and Debtor WRCS shall be administered outside this Plan.

6.      The Pension Plan shall have been terminated.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section VIII.C:

1.      The Bankruptcy Court shall have entered the Confirmation Order.

2.      No stay of the Confirmation Order shall then be in effect.

3.       The Liquidating Trust Agreement shall be executed, the Liquidating Trust shall be created and the Liquidating Trustee shall have been appointed and accepted such appointment.

4.      The Plan and all Confirmation Exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

**C.      Waiver of Conditions to Confirmation or Effective Date**

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Consent Parties without an order of the Bankruptcy Court.

**D.      Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C, then upon motion by the Consent Parties made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section VIII.D:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Article IV, (c) the releases described in Section III.O and (d) the Alternative Cash Payment Options; (2) nothing contained in the Plan will (a) constitute a waiver or release of

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 155 of 169

any Claims by or against any Debtor or (b) prejudice in any manner the rights of the Debtors, Consent Parties or any other party in interest; and (3) the Liquidating Trust, if already created, shall be promptly dissolved.

## E. Effect of Confirmation of the Plan

### 1. Discharge of Claims

#### a. Complete Satisfaction, Discharge and Release

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan.

#### b. Discharge and Termination

In accordance with the foregoing, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and Liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### 2. Injunction

On the Effective Date, except as otherwise provided herein or in the Confirmation Order,

a. all Persons who have been, are or may be holders of Claims against a Debtor shall be enjoined from taking any of the following actions against or affecting a Debtor, its Estate or its Assets with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):

i. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against a Debtor, its Estate, its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

ii. enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against a Debtor, its Estate or its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor;

iii. creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien against a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor other than as contemplated by the Plan;

iv. except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor; and

v. proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 156 of 169

b.     All Persons that have held, currently hold or may hold any Liabilities released pursuant to Section III.O and Section III.P will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan; and (v) in the case of Electing Holders of the Series 1997A Bond Claims, commencing any action to collect against the Series 1997A Policy.

**F.     Request for Waiver of Stay of Confirmation Order**

This Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served on the parties listed in Section X.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

**ARTICLE IX.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

A.     Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim (other than litigation between or among any Reorganized Debtor and any Insurer or the Bond Insurer arising under or relating to an Insurance Contract or the Amended Insurance Agreement that has been assumed, continued or entered into under the Plan), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims;

B.     Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

C.     Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

D.     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter (other than with respect to any litigation between or among any Reorganized Debtor and any Insurer or the Bond Insurer arising under or relating to an Insurance Contract or the Amended Insurance Agreement that has been assumed, continued or entered into under the Plan);

F.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Liquidating Trust Agreement, the Disclosure Statement or the Confirmation Order;

G.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Liquidating Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Liquidating Trust Agreement or any entity's rights arising from or obligations incurred in connection with the Plan, the Liquidating Trust Agreement or such documents;

H.     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

I.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

K.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.     Enter a final decree or decrees closing the Chapter 11 Cases;

N.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.     Recover all assets of the Debtors and their Estates, wherever located; and

P.     Hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE X.
### MISCELLANEOUS PROVISIONS

**A.     Modification of the Plan**

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the Consent Parties reserve the right to alter, amend or modify the Plan before the Effective Date.

**B.     Revocation of the Plan**

The Consent Parties reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Consent Parties revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will:  (1) constitute a waiver or release of any Claims by or against any Debtor; (2) prejudice in any manner the rights of the Consent Parties (or any of them), any Debtor

09-40795-kw     Doc 785     FILED 05/14/10     ENTERED 05/14/10 15:43:27     Page 158 of 169

or any other party in interest; or (3) constitute an admission of any sort by the Consent Parties (or any of them), any Debtor or any other party in interest.

## C.      Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## D.      Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee and any other official committees appointed in the Chapter 11 Cases will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim whatsoever for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Creditors' Committee, except to the extent necessary to File, prepare and defend any fee application.

## E.      Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## F.      Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to the counsel of the parties identified below and must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

### 1.      The Debtors and Reorganized Debtors

Shawn M. Riley
MCDONALD HOPKINS, LLC
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio  44114
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:  sriley@mcdonaldhopkins.com

### 2.      The Consent Parties

Heather Lennox
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Email:  hlennox@jonesday.com

09-40795-kw    Doc 785    FILED 05/14/10    ENTERED 05/14/10 15:43:27    Page 159 of 169

- and -

Amy Edgy Ferber
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Email:  aeferber@jonesday.com

- and –

Frank A. Oswald
TOGUT, SEGAL & SEGAL, LLP
One Penn Plaza
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Email:  foswald@teamtogut.com

Counsel to MBIA Insurance Corporation

Matthew Botica
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700
Email:  MBotica@winston.com

Counsel for JPMorgan Chase Bank, N.A.

Michael B. Fisco
FAEGRE & BENSON LLP
Suite 2200
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone:  (612) 766-7000
Facsimile:  (612) 766-1600
Email:  mfisco@faegre.com

Counsel for U.S. Bank National Association, as the Master Trustee and the Bond Trustees

Eric A. Schaffer
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
Email:  eschaffer@reedsmith.com

Counsel for Fifth Third Bank

3.        **The Creditors' Committee**

Martin G. Bunin
Craig E. Freeman
ALSTON & BIRD, LLP
90 Park Avenue
New York, New York  10016-1387
Telephone:  (212) 210-9400
Facsimile:  (212) 210-9444
Email:  marty.bunin@alston.com
            craig.freeman@alston.com

Counsel to the Creditors' Committee

4.        **The United States Trustee**

Ronna Jackson
Howard M. Metzenbaum U.S. Courthouse
201 Superior Avenue., East – Suite 441
Cleveland, Ohio 44114
Telephone:  (216) 522-7800
Facsimile:  (216) 522-7193

5.        **The Unions**

Frederick Perillo
Sara J. Geenen
PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.
1555 N. River Center Drive, Suite 202
P.O. Box 12993
Milwaukee, Wisconsin 53212
Telephone:  (414) 271-4500
Facsimile:  (414) 271-6308
Email:  fp@previant.com
            sjg@previant.com

Counsel to the Ohio Nurses Association

        - and -

R. Sean Grayson
General Counsel
Bethany E. Sanders, Esq.
Associate General Counsel
Ohio Counsel 8, AFSCME AFL-CIO
6800 N. High Street
Worthington, Ohio 43085-2512
Telephone:  (614) 841-1918
Facsimile:  (614) 430-7960
Email:  grayson.sean@gmail.com
            bsanders@afscme8.org

Counsel to Ohio Counsel 8, American Federation of State, County and Municipal Employees,
AFL-CIO, Local 2026, AFSCME, AFL-CIO, Local 2804, AFSCME, AFL-CIO and Local 2288,
AFSCME, AFL-CIO

- and –

David M. Fusco
Sharlee M. Cendrosky
SCHWARZWALD MCNAIR & FUSCO LLP
616 Penton Media Building
1300 East Ninth Street
Cleveland, Ohio 44114-1503
Telephone: (216) 566-1600
Facsimile: (216) 566-1814
Email: dfusco@smcnlaw.com
        ccendrosky@smcnlaw.com

Counsel to Service Employees International Union, District 1199

6.    **The Liquidating Trustee**

      **[To Be Added Upon Selection]**

Dated:  May 14, 2010                          Respectfully submitted:


/s/ Heather Lennox                            /s/ Matthew Botica
Heather Lennox  (OH 0059649)                  Matthew Botica  (IL 260118)
JONES DAY                                     WINSTON & STRAWN LLP
North Point                                   35 W. Wacker Drive
901 Lakeside Avenue                           Chicago, IL  60601
Cleveland, OH  44114-1190                     Telephone:  (312) 558-5600
Telephone:  (216) 586-3939                    Facsimile:   (312) 558-5700
Facsimile:   (216) 579-0212

                                              Counsel for JP Morgan Chase Bank, N.A.
-AND-

Amy Edgy Ferber  (GA 013819)
JONES DAY                                     /s/ Eric Schaffer
1420 Peachtree Street, N.E.                   Eric A. Schaffer  (PA 30797)
Suite 800                                     REED SMITH LLP
Atlanta, Georgia  30309-3053                  Reed Smith Centre
Telephone:  (404) 581-3939                    225 Fifth Avenue
Facsimile:  (404) 581-8330                    Pittsburgh, PA  15222
                                              Telephone:  (412) 288-3131
                                              Facsimile:   (412) 288-3063
Counsel for MBIA Insurance Corporation

                                              Counsel for Fifth Third Bank


/s/ Michael Fisco
Michael B. Fisco  (MN175341)
FAEGRE & BENSON LLP
Suite 2200
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone:  (612) 766-7000
Facsimile:   (612) 766-1600


Counsel for U.S. Bank National Association, as Master
Trustee and the Bond Trustees

**CONFIRMATION EXHIBIT I.A.67**

**DEBTORS IN THE CHAPTER 11 CASES**

| Debtor Name | Tax ID No. | Case No. | Date Filed |
|---|---|---|---|
| Forum Health | 31-1560189 | 09-40795 | March 16, 2009 |
| Forum Health Rehabilitative Services Co. | 31-1581767 | 09-40796 | March 16, 2009 |
| Forum Health Diagnostics Co. | 34-1773672 | 09-40797 | March 16, 2009 |
| Forum Health Enterprises Co. | 34-1368151 | 09-40798 | March 16, 2009 |
| Forum Health Outreach Laboratories, Inc. | 34-1437294 | 09-40799 | March 16, 2009 |
| Western Reserve Health Foundation | 34-1461047 | 09-40800 | March 16, 2009 |
| Forum Health Ventures Co. | 34-1489491 | 09-40801 | March 16, 2009 |
| Forum Health Pharmacy Services Co. | 34-1754092 | 09-40802 | March 16, 2009 |
| Forum Health Services Co. | 34-1461044 | 09-40803 | March 16, 2009 |
| Western Reserve Care System | 34-1454933 | 09-40804 | March 16, 2009 |
| Dacas Nursing Support Systems, Inc. | 34-1482591 | 09-40805 | March 16, 2009 |
| Dacas Nursing Systems, Inc. | 34-1456983 | 09-40806 | March 16, 2009 |
| Beeghly Oaks | 31-1196072 | 09-40807 | March 16, 2009 |
| Trumbull Memorial Hospital | 34-1461049 | 09-40808 | March 16, 2009 |
| Trumbull Memorial Hospital Foundation | 34-1195190 | 09-40809 | March 16, 2009 |
| Comprehensive Psychiatry Specialists, Inc. | 34-1697739 | 09-40810 | March 16, 2009 |
| Pridecare, Inc. | 34-1490425 | 09-40811 | March 16, 2009 |
| Visiting Nurse Association and Hospice of Northeast Ohio | 34-0714388 | 09-408112 | March 16, 2009 |

CLI-1802035v1

**EXHIBIT B**

**ORGANIZATIONAL CHART**

CLI-1803443v1



**EXHIBIT C**

**LIQUIDATION ANALYSIS**

CLI-1803443v1

**EXHIBIT D**

**FINANCIAL PROJECTIONS**

CLI-1803443v1

**EXHIBIT E**

**FEASIBILITY ANALYSIS**

CLI-1803443v1