# <u>EXHIBIT A</u>

---

ASSET PURCHASE AGREEMENT

by and among

Sellers, as defined herein,

and

AHS Newco 9, LLC, as Buyer

Dated: June 9, 2010

---

# TABLE OF CONTENTS

**ARTICLE 1 PURCHASE AND SALE OF ACQUIRED ASSETS** ......................................... 1
1.1  Acquired Assets. ...................................................................................... 1
1.2  Excluded Assets. ...................................................................................... 4
1.3  Assumed Liabilities. ................................................................................. 5
1.4  Excluded Liabilities. ................................................................................ 6
1.5  Matters Relating to Assumption and Assignment and Cure Costs. ............ 7
1.6  Non-Assignment of Contracts. .................................................................. 7
1.7  Ohio Hospital Care Assurance Program ("HCAP"). .................................. 8

**ARTICLE 2 CONSIDERATION** .......................................................................... 8
2.1  Purchase Price. ........................................................................................ 8
2.2  Escrows. .................................................................................................. 8
2.3  Closing Cash Purchase Price Adjustment................................................. 9
2.4  Post-Closing Cash Purchase Price Adjustments. ...................................... 9
2.5  Allocation of Purchase Price. ................................................................. 10

**ARTICLE 3 CLOSING** ..................................................................................... 11
3.1  Closing. .................................................................................................. 11
3.2  Deliveries by Sellers. ............................................................................. 11
3.3  Deliveries by Buyer. ............................................................................... 12

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES** ...................................... 12
4.1  Representations and Warranties of Sellers. ............................................. 12
4.2  Representations and Warranties of Buyer. ............................................... 20
4.3  Representations Exclusive. ..................................................................... 22

**ARTICLE 5 COVENANTS AND OTHER AGREEMENTS** .................................... 23
5.1  Mutual Covenants. .................................................................................. 23
5.2  Additional Covenants of Sellers. ............................................................ 33
5.3  Additional Covenants of Buyer. .............................................................. 37

**ARTICLE 6 BUYER'S CONDITIONS TO CLOSING** .......................................... 39
6.1  Performance of Agreement. .................................................................... 39
6.2  Accuracy of Representations and Warranties. ......................................... 39
6.3  Officers' Certificate. ............................................................................... 39
6.4  Consents. ................................................................................................ 39
6.5  Ohio Law Requirements. ........................................................................ 39
6.6  No Violation of Orders. .......................................................................... 40
6.7  No Litigation. ......................................................................................... 40
6.8  Sale Order. ............................................................................................. 40
6.9  Closing Deliveries. ................................................................................. 40
6.10 HSR Approval. ....................................................................................... 40
6.11 Title Policy. ........................................................................................... 40
6.12 No Material Adverse Change. ................................................................. 40
6.13 Pre-Closing Confirmations. .................................................................... 41
6.14 Audited Financial Statements. ............................................................... 41
6.15 Collective Bargaining Agreements. ........................................................ 41

i

6.16     Assigned Contract Order. ........................................................................... 41

**ARTICLE 7 SELLERS' CONDITIONS TO CLOSING** ............................................. **41**
7.1      Performance of Agreement. ........................................................................ 41
7.2      Accuracy of Representations and Warranties. ............................................. 41
7.3      Officers' Certificate. ................................................................................. 41
7.4      Consents. ................................................................................................... 41
7.5      Ohio Law Requirements. ............................................................................ 41
7.6      No Violation of Orders. ............................................................................. 42
7.7      No Litigation. ............................................................................................ 42
7.8      Sale Order. ................................................................................................. 42
7.9      Closing Deliveries. .................................................................................... 42
7.10    HSR Approval. .......................................................................................... 42

**ARTICLE 8 TERMINATION** ..................................................................................... **42**
8.1      Termination. .............................................................................................. 42
8.2      Effect of Termination. ............................................................................... 43
8.3      Exclusive Remedy; Waiver. ...................................................................... 44

**ARTICLE 9 SURVIVAL AND REMEDIES** ............................................................. **44**
9.1      Indemnification by Buyer. ......................................................................... 44
9.2      Indemnification by Seller. .......................................................................... 44
9.3      Limitations. ............................................................................................... 44
9.4      Notice and Control of Litigation. ............................................................... 45
9.5      Notice of Claim ......................................................................................... 45
9.6      Survival. .................................................................................................... 45

**ARTICLE 10** ................................................................................................................ **46**
10.1    Notices. ..................................................................................................... 46
10.2    Press Releases and Public Announcements. ............................................... 47
10.3    Expenses. .................................................................................................. 47
10.4    Successors and Assigns. ............................................................................ 47
10.5    Counterparts. ............................................................................................. 47
10.6    Headings. .................................................................................................. 48
10.7    Entirety of Agreement; Amendments. ........................................................ 48
10.8    Construction of Agreement. ....................................................................... 48
10.9    Waiver. ...................................................................................................... 48
10.10  Governing Law; Jurisdiction. .................................................................... 48
10.11  Severability. .............................................................................................. 49
10.12  Consents Not Unreasonably Withheld. ...................................................... 49
10.13  Time Is of the Essence. ............................................................................. 49
10.14  Disclosure Schedules. ............................................................................... 49
10.15  Ardent Guaranty. ...................................................................................... 49

**ARTICLE 11 DEFINED TERMS** ............................................................................... **50**

ii

## EXHIBITS

| Description | Exhibit |
| --- | --- |
| Sale Order | A |
| Earnest Money Escrow Agreement | B |
| Indemnification Escrow Agreement | C |
| Indigent Care Policies | D |
| Limited Power of Attorney | E |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated June 9, 2010 (the "Execution Date"), is made by and among FORUM HEALTH, an Ohio non-profit corporation ("FH"), TRUMBULL MEMORIAL HOSPITAL, an Ohio non-profit corporation ("TMH"), WESTERN RESERVE CARE SYSTEM, an Ohio non-profit corporation ("WRCS"), FORUM HEALTH SERVICES CO., an Ohio non-profit corporation ("FHS"), FORUM HEALTH REHABILITATIVE SERVICES CO., an Ohio non-profit corporation ("Hillside"), FORUM HEALTH ENTERPRISES CO., an Ohio non-profit corporation ("FH Enterprises"), FORUM HEALTH VENTURES CO., an Ohio corporation ("FH Ventures"), FORUM HEALTH OUTREACH LABORATORIES, INC., an Ohio corporation ("FH Labs"), FORUM HEALTH DIAGNOSTICS CO., an Ohio non-profit corporation ("FH Diagnostics"), (FH, TMH, WRCS, FHS, Hillside, FH Enterprises, FH Ventures, FH Labs, and FH Diagnostics are referred to collectively herein as "Sellers" and each individually a "Seller") and AHS NEWCO 9, LLC, a Delaware limited liability company ("Buyer"). ARDENT MEDICAL SERVICES, INC., a Delaware corporation ("Ardent"), is a party to this Agreement for purposes of guarantying the obligations of Buyer as set forth herein. Capitalized terms used in this Agreement are defined or cross-referenced in Article 11.

## RECITALS

WHEREAS, on March 16, 2009 (the "Petition Date"), each Seller commenced a voluntary petition for relief (collectively, the "Bankruptcy Cases") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court");

WHEREAS, Sellers are in the business of providing medical care and services in the cities of Youngstown and Warren, Ohio, and surrounding areas (the "Business"); and

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, transfer, and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and an order, in substantially the form attached as Exhibit A, or such other form reasonably satisfactory to Buyer (the "Sale Order") and in accordance with sections 105, 363 and 365 and all other applicable provisions of the Bankruptcy Code.

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and their respective representations, warranties, and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ACQUIRED ASSETS

1.1     Acquired Assets. At the Closing, and upon the terms and conditions set forth herein, each Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase from each Seller, all of such Seller's right, title, and interest in, to, and under the following properties,

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 6 of 64

assets, and rights owned by such Seller, in each case, free and clear of all Liens, other than Permitted Encumbrances (collectively, the "Acquired Assets"):

(a)      all owned real property (the "Owned Real Property") and leased real property (the "Leased Real Property", together with the Owned Real Property, the "Real Property") of any Seller listed on Schedule 1.1(a), together with all fixtures and Improvements thereon;

(b)      all machinery, equipment, furniture, office and telephone equipment, administrative supplies, maintenance and janitorial equipment, computer hardware, fixtures and fittings, motor vehicles, tools, maintenance parts, spare parts, and including, but not limited to, other similar items of tangible personal property located on the Real Property (collectively, the "Equipment");

(c)      all inventories of supplies, drugs, pharmaceuticals and medications, food, janitorial and office supplies, forms, consumables, disposables, linens, medical, maintenance and shop supplies, and other similar items of tangible personal property wherever located on the Closing Date that is used, owned, or held primarily in the conduct of the Business (collectively, the "Inventory") (in the case of drugs, pharmaceuticals and medications, to the extent transferable by Seller);

(d)      all Contracts listed on Schedule 1.1(d) (the "Assigned Contracts");

(e)      all notes and accounts receivable in existence as of the Closing Date from patients, Payors, and other third parties (billed and unbilled, recorded and unrecorded, accrued and existing) arising from or in connection with the Business, together with rights to payment for services rendered through the Closing Date (collectively, the "Receivables");

(f)      all advance payments, deposits, prepayments, and prepaid expenses related to the Assigned Contracts and taken into account for purposes of calculating Net Working Capital (collectively, the "Prepayments"); except for the Master Debt Service Reserve Fund, all other Debt Service Reserve Funds, prepayments made to Retained Professionals, prepayments made to any insurance provider, and any amount issued, deposited or prepaid to secure certain Sellers' obligations to the Ohio Bureau of Workers' Compensation;

(g)      all Licenses used to operate the Acquired Assets that are legally transferable to Buyer and are owned by any Seller as of the Closing Date, including without limitation those Licenses listed on Schedule 1.1(g), to the extent such Licenses are legally transferable;

(h)      all unexpired warranties as of the Closing Date that are legally transferable to Buyer either received from third parties with respect to the Acquired Assets, including, but not limited to, obligations to repair or replace, or to refund the sales price or any other related expenses relating to alleged defects in goods sold or services, unliquidated rights under manufacturers' or vendors' warranties, and such warranties as are set forth in any Assigned Contract (collectively, the "Warranties") but excluding any warranties existing under Contracts that are not Assigned Contracts;

2

(i)    except as set forth in <u>Section 1.2</u> below, all causes of action, lawsuits, judgments, claims, and demands of any nature available to or being pursued by any Seller with respect to the Acquired Assets or the Assumed Liabilities, whether known or unknown, contingent or noncontingent, arising by way of counterclaim or otherwise, and all proceeds thereof, and all guarantees, warranties, indemnities, and similar rights, and other intangible property related to the Acquired Assets, the Assumed Liabilities, or the Business, *provided, however*, that no cause of action, lawsuit, judgment, claim, or demand of any kind or nature whatsoever arising between any Seller, on the one hand, and Buyer, on the other hand, relating to the transactions contemplated by this Agreement and the Related Agreements, shall be deemed to be transferred to Buyer hereunder and shall be retained in its entirety by Sellers solely and exclusively;

(j)    all intangible, intellectual, and proprietary property used in or related to the Business and owned by any Seller, including without limitation, all patents and patent applications, trademarks, service marks, inventions, trade secrets, know-how, software, computer files and data, assembly instructions, drawings, blueprints, telephone numbers, facsimile telephone numbers, e-mail addresses, confidential business information and all goodwill, rights to sue and collect with respect to any infringements, and the right to receive royalties with respect to the foregoing (collectively, the "<u>Intangible Assets</u>");

(k)    to the extent legally transferable, all documents, books, records, operating, employee and policy manuals, and files of any Seller used primarily in the conduct of the Business, whether in hard copy, electronic copy, or other form, including without limitation, all vendor and supplier records, financial records, equipment records, and medical and administrative libraries, and personnel records related to Hired Employees (collectively, the "<u>Business Records</u>"), but excluding any Seller's corporate record books, minute books, and Tax records, the Retained Hospital Records, the proprietary records, and the Business Records and Patient Records excluded under <u>Section 1.2(d)</u>;

(l)    to the extent legally transferable, all Patient Records maintained or stored as of the Closing Date pertaining to patients treated at any Seller's facility;

(m)    to the extent legally transferable, any and all Medicare, Medicaid and other similar provider numbers of or assigned to any Seller with respect to the Business listed on <u>Schedule 1.1(m)</u>, and all rights, benefits, and privileges appurtenant thereto, other than those noted in <u>Section 1.2(i)</u>;

(n)    the bank accounts of Sellers listed on <u>Schedule 1.1(n)</u> which are depository accounts for the Receivables and all information necessary to access such accounts, to the extent such accounts can be transferred by Sellers; and

(o)    except for the Excluded Assets, all other assets, rights, privileges, or interests (to the extent transferable) of Sellers that are used in the Business and located at any facility owned, leased or used by Sellers.

3

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the following properties and assets (the "<u>Excluded Assets</u>") are not included in the Acquired Assets, and Sellers shall retain and not transfer to Buyer, and Buyer shall not purchase or acquire, such Excluded Assets:

(a)    the rights of any Seller to offset or counterclaim listed on <u>Schedule 1.2(a)</u>;

(b)    the rights of any Seller under any insurance policy or to any insurance proceeds relating to the operation of the Acquired Assets (it being understood, however, that Sellers shall not have any obligation to take any action under any such policy to seek any recovery or to continue any such policy in force) prior to the Closing;

(c)    the rights of any Seller to receive mail and other communications addressed to any of them with respect to Excluded Assets or Excluded Liabilities;

(d)    any and all Business Records and Patient Records, whether or not maintained by Sellers, (i) which are not transferable under applicable Law or any collective bargaining agreement, (ii) which are protected by attorney-client privilege or work-product; or (iii) listed on <u>Schedule 1.2(d)</u>;

(e)    all amounts due to Sellers arising from Intercompany Transactions, which do not arise from Assigned Contracts;

(f)    all equity interests in any Seller, all equity interests in any Seller Affiliate, including but not limited to all equity interests in Forum Health Insurance Ltd. and all equity interests in and all assets of Trumbull Memorial Hospital Foundation and Western Reserve Health Foundation;

(g)    causes of action of the Sellers or the Sellers' bankruptcy estates (including parties acting for or on behalf of the Sellers' bankruptcy estates, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases) arising out of events occurring prior to the Closing Date, including, but not limited to, any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of the Sellers' bankruptcy estates, including, but not limited to, liens attaching to the Cash Purchase Price (as defined below) paid to the Sellers, and the proceeds from any of the foregoing;

(h)    all cash (other than petty cash on hand at the facilities), cash equivalents, distributions, rights to distributions, bank accounts, any prepayments made to Retained Professionals, prepayments to any insurance provider, any amount issued, deposited or prepaid to secure certain Sellers' obligations to the Ohio Bureau of Workers' Compensation, any deposit accounts (other than the accounts listed on <u>Schedule 1.1(n)</u> and all information necessary to access such accounts), trust accounts, escrow accounts, securities accounts, the Master Debt Service Reserve Fund, the Debt Service Reserve Funds and the assets and free credit balances held therein, security and performance deposits, and other liquid assets of any Seller, wherever located and however held, including, without limitation, those listed on <u>Schedule 1.2(h)</u>;

4

(i)     all regulatory settlements, rebates, adjustments, refunds, or group appeals, including without limitation pursuant to any Hospital Care Assurance Program or Cost Reports, arising out of time periods prior to the Closing; and

(j)     such other assets, if any, listed on Schedule 1.2(j), and assets which would be Acquired Assets except for the operation of Section 1.6 or as expressly provided in other provisions, if any, of this Agreement.

Sellers shall remove at any time prior to or within ninety (90) days following the Closing Date or, with respect to the Retained Hospital Records (as defined in Section 5.1(g)(i)), Sellers may remove from time to time within the relevant Document Retention Period (as defined in Section 5.1(g)(ii)) (in each case, at Sellers' expense, but without charge by Buyer for storage), any and all of the Excluded Assets, provided that Sellers shall do so in a manner that does not unduly or unnecessarily disrupt Buyer's normal business activities.

1.3     Assumed Liabilities.  At the Closing, Buyer shall assume and pay, discharge and perform as and when due, and indemnify, defend, and hold harmless Sellers and their Affiliates from and against, all of the following liabilities of Sellers (the "Assumed Liabilities"):

(a)     all Buyer's Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts;

(b)     all liabilities and obligations arising after the Closing Date relating to or arising out of the Assigned Contracts;

(c)     all liabilities and obligations arising after the Closing Date relating to or arising out of the Amended CBAs;

(d)     all liabilities and obligations arising after the Closing Date relating to or arising out of the Acquired Assets;

(e)     liabilities and obligations to any Hired Employee for "old paid days leave," "paid time off" and vacation pay (other than liabilities and obligations under the "frozen" vacation plan) to the extent that they are vested rights that are subject to payment upon termination of employment (collectively, "Paid Time Off") through the Closing Date, and related Taxes, but only in the amount and to the extent taken into account in determining Net Working Capital;

(f)     all liabilities and obligations to former employees of Sellers or qualified beneficiaries of Sellers' group health plans who are M&A qualified beneficiaries (as defined in Treas. Reg. Section 54.4980B-9 Q&A-4(a)) under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA");

(g)     such other liabilities and obligations, if any, listed on Schedule 1.3(g);

(h)     all accounts payable and accrued liabilities arising in the Ordinary Course of Business after the Petition Date, but only in the amount and to the extent taken into account in determining Net Working Capital; provided, however, that in no event shall Buyer assume any liability or obligation to any Retained Professional; and

5

(i)     all obligations for practice support loans with third party banks associated with physician support agreements that are in compliance as of the Closing Date, listed on Schedule 1.3(i).

1.4     Excluded Liabilities.   Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Sellers (all such liabilities are, collectively, the "Excluded Liabilities").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)     amounts due pursuant to any Intercompany Transaction;

(b)     any liabilities or obligations related to any Excluded Asset;

(c)     liabilities or obligations existing by reason of any liability to refund any payment or reimbursement received from any Payor;

(d)     any liability or obligation resulting from Sellers' use of the Medicare, Medicaid, or other similar provider numbers for the Business;

(e)     Sellers' Cure Cost, if any;

(f)     any liabilities relating to fraud or the federal statutes relating to health care fraud and abuse and kickbacks (including 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1320a-7a, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. §§ 1395nn *et seq.*, and the federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*) or related or similar statutes or the regulations promulgated pursuant to any of such statutes, and any similar applicable state laws or regulations pertaining to fraud, kickbacks, or fee splitting;

(g)     all liabilities and obligations of Sellers under the Ohio Workers' Compensation program; and

(h)     all liabilities and obligations of Sellers of whatever nature whether presently in existence or hereafter arising, other than the Assumed Liabilities.

Except as expressly set forth in Section 1.3, neither Buyer nor its Affiliates will assume nor will any of them be liable for any liability, obligation, governmental overpayment, claim against or contract of Sellers or any of their respective Affiliates, of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent, or otherwise, whether known or unknown, and whether or not recorded on the books and records of Sellers or any of their respective Affiliates, arising out of or by reason of the transaction or any other transaction or event occurring prior to or subsequent to the Closing, including without limitation any Medicare, Medicaid or other third party payor program, including recapture, recoupment or set-off of any previously paid or reimbursed amounts.

6

1.5     <u>Matters Relating to Assumption and Assignment and Cure Costs</u>.

(a)     Within five (5) Business Days of the Execution Date, Sellers shall file a motion or motions with the Bankruptcy Court (the "<u>Assigned Contract Motion</u>") identifying those Contracts material to the operation of the Business that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code that Buyer has indicated to Sellers it may wish to assume (the "<u>Noticed Contracts</u>"). The Assigned Contract Motion shall identify the proposed cure cost amount for each Noticed Contract (the "<u>Proposed Cure Cost</u>"). <u>Schedule 1.5(a)</u> sets forth the Noticed Contracts that as of the Execution Date Buyer has indicated to Sellers it may wish to assume and the Proposed Cure Costs related thereto.

(b)     Sellers shall use commercially reasonable efforts to obtain an order or orders authorizing, but not requiring or directing, Sellers to assume and assign the Noticed Contracts (the "<u>Assigned Contract Order</u>"). The Assigned Contract Order shall fix the amount required to be paid to assume and assign each Noticed Contract (the "<u>Approved Cure Cost</u>").

(c)     At any time prior to or on the Closing Date, Buyer may, in it is sole discretion, add any Noticed Contracts to <u>Schedule 1.1(d)</u>. Upon such addition by Buyer, the added Noticed Contract shall be deemed an Assigned Contract, the Buyer's Cure Cost associated therewith shall be an Assumed Liability, and Sellers shall take all necessary steps to assume and assign such additional Noticed Contracts to Buyer.

(d)     At any time prior to or on the Closing Date, Buyer may, in its sole discretion, remove any previously added Noticed Contract (whenever added) from <u>Schedule 1.1(d)</u>. Upon such removal, the removed Noticed Contract shall become an Excluded Asset and there shall be no Buyer's Cure Cost for such Noticed Contract.

(e)     At the Closing, Buyer shall pay any Proposed Cure Cost associated with any Assigned Contract or such lower amount as the counterparty to such Assigned Contract and the Buyer may agree ("<u>Buyer's Cure Cost</u>").

(f)     For each Assigned Contract for which the Approved Cure Cost is greater than the Proposed Cure Cost, Sellers shall pay to the counter-party at Closing an amount equal to the excess (which shall in no event be greater than the excess of the Approved Cure Cost over the Proposed Cure Cost) of (i) the actual amount paid to the counter-party of such Assigned Contract in connection with its assumption and assignment over (ii) the Proposed Cure Cost (such excess, the "<u>Sellers' Cure Cost</u>").

(g)     Pursuant to <u>Section 5.3(h)</u>, Buyer shall deliver to Sellers, prior to or at the Closing, <u>Schedule 5.3(h)</u> listing Sellers' Cure Cost, if any, and the Assigned Contract related therewith.

1.6     <u>Non-Assignment of Contracts</u>.     Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other party thereto, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Buyer, as the assignee of such Assigned

7

Contract, as the case may be, thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Sellers shall cooperate with Buyer without further consideration in any reasonable arrangement designed to both (a) provide Buyer with the benefits of or under any such Assigned Contract, and (b) cause Buyer to bear all costs and obligations of or under any such Assigned Contract.

1.7     Ohio Hospital Care Assurance Program ("HCAP").     A system wide HCAP adjustment will be prorated between Buyer and Sellers for the program year (October 1 through September 30, each such twelve (12) month period is a "Federal Government Program Year") in which the Closing occurs. Any HCAP net gain shall be prorated between Buyer and Sellers based on the number of months in which the Acquired Assets were owned by Buyer or Sellers during such Federal Government Program Year. For the purposes of this Section 1.7, HCAP is defined by Ohio Revised Code ("ORC") § 5112 and is administered pursuant to the Ohio Administrative Code §§ 5101:3-2-08, -08.1 and -09. A HCAP net gain exists if the amount of funds received under this program for the system during the Federal Government Fiscal Year exceeds the amount paid into such program for the system during the Federal Government Fiscal Year. To the extent that a system gain is realized, Buyer will promptly remit Seller's portion of any such system gain to Seller by check within ten (10) Business Days following Buyer's receipt of the HCAP funds.

## ARTICLE 2
## CONSIDERATION

2.1     Purchase Price. The aggregate consideration for the sale, conveyance, assignment, transfer, and delivery of the Acquired Assets shall be (a) $69,800,000, (b) plus the amount, if any, by which the Estimated Net Working Capital (as hereinafter defined) exceeds the Reference Net Working Capital (as hereinafter defined), (c) minus the amount, if any, by which the Estimated Net Working Capital is less than the Reference Net Working Capital (collectively, the "Cash Purchase Price"), and (d) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Cash Purchase Price, the "Purchase Price"). The Cash Purchase Price shall be payable as provided in Section 3.3, and subject to adjustment as provided elsewhere in this Article 2.

2.2     Escrows.

(a)     On or within one (1) Business Day from the Execution Date, Buyer shall pay in escrow for the benefit of Sellers a deposit in the amount of $750,000 (the "Deposit"). Simultaneously with the execution of this Agreement by Buyer, Buyer and RBS Citizens, N.A. (the "Earnest Money Escrow Agent") shall enter into an escrow agreement (the "Earnest Money Escrow Agreement") substantially in the form of Exhibit B attached hereto, pursuant to which Buyer will pay the Deposit. Upon the execution of this Agreement by Sellers, Sellers shall become a party to the Earnest Money Escrow Agreement. Simultaneously with the Closing, Buyer shall give written instructions to the Earnest Money Escrow Agent for the release of the Deposit to Sellers which shall be applied towards the Cash Purchase Price.

(b)     At the Closing, an amount equal to $2,000,000 (the "Escrow Funds") shall be paid to SunTrust Bank or such other financial institution as the parties may mutually agree upon, as escrow agent (the "Escrow Agent"), who shall hold such amount in escrow for a period of eighteen (18) months following the Closing Date pursuant to the terms of an escrow agreement (the "Indemnification Escrow Agreement") substantially in

8

the form of <u>Exhibit C</u> attached hereto. The balance of the Cash Purchase Price shall be payable at the Closing by wire transfer of immediately available funds to one or more accounts designated by Sellers to Buyer in advance of the Closing.

2.3    <u>Closing Cash Purchase Price Adjustment</u>.

(a)    Not less than ten (10) Business Days prior to the Closing Date, Sellers shall submit to Buyer their good faith estimate of the Net Working Capital as of the end of the most recently ended calendar month prior to the Closing Date for which financial statements are available ("<u>Sellers' Estimated Net Working Capital</u>"), together with reasonable supporting documentation. The calculation of Net Working Capital shall be made using the policies, practices and procedures set forth on <u>Schedule 2.3(a)</u> (the "<u>Agreed Procedures</u>"). Within three (3) Business Days following receipt of Sellers' calculation, Buyer and Sellers shall work together in good faith to determine a mutually acceptable estimated Net Working Capital as of such date. If agreed by the parties, Sellers' Estimated Net Working Capital shall be the "<u>Estimated Net Working Capital</u>". If the parties are unable to agree, not less than five (5) Business Days prior to the Closing Date, Buyer shall submit to Sellers its good faith estimate of the Estimated Net Working Capital ("<u>Buyer's Estimated Net Working Capital</u>"), together with reasonable supporting documentation. In this case, the Estimated Net Working Capital shall be the average of Sellers' Estimated Net Working Capital and Buyer's Estimated Net Working Capital.

(b)    The Cash Purchase Price payable at the Closing shall be increased or decreased, as the case may be, dollar for dollar by the amount, if any, by which the Estimated Net Working Capital exceeds or is less than the Net Working Capital as of February 28, 2010, as calculated on <u>Schedule 2.3(a)</u> using the Agreed Procedures (the "<u>Reference Net Working Capital</u>").

2.4    <u>Post-Closing Cash Purchase Price Adjustments</u>.

(a)    Within ninety (90) days after the Closing, Buyer shall provide to Sellers, Buyer's proposed calculation of the Net Working Capital as of the Closing Date, calculated in accordance with this Agreement ("<u>Buyer's Final Net Working Capital</u>"), together with reasonable supporting documentation. If Sellers do not object to Buyer's Final Net Working Capital within thirty (30) days following Buyer's delivery of such amount to Sellers, such amount shall be binding on Sellers and Buyer as the "<u>Final Net Working Capital</u>".

(b)    If Sellers object to Buyer's Final Net Working Capital within the thirty (30) day objection period, Sellers shall give written notice to Buyer of their disagreement, specifying in reasonable detail the items of disagreement, the bases therefore, and provide their proposed calculation of the actual Net Working Capital as of the Closing Date, calculated in accordance with this Agreement ("<u>Sellers' Final Net Working Capital</u>"), together with reasonable supporting documentation. The parties shall work together in good faith for a period of thirty (30) days to resolve their disagreement, and any amount agreed upon by Buyer and Sellers shall become the Final Net Working Capital. If after the expiration of such thirty (30) days, the parties

9

are unable to agree, either party may invoke the provisions of <u>Section 2.4(c)</u> and the resulting Final Net Working Capital shall be final and binding on the parties.

(c)     If either Buyer or Sellers invoke the provisions of this <u>Section 2.4(c)</u>, PriceWaterhouseCoopers (the "<u>Arbitrator</u>") shall be retained to arbitrate the disagreement. Once the Arbitrator is retained, the parties shall each submit to the Arbitrator in writing, within fifteen (15) days after such retention, each parties' respective Final Net Working Capital proposal, together with supporting documentation as such party deems necessary or as required by the Arbitrator (collectively, the "<u>Submissions</u>") (provided that if any documentation requested by the Arbitrator cannot be obtained within such 15-day period (acting in good faith and in a diligent manner), then such 15-day period shall be extended for such a period of time as is reasonably necessary for such information to be obtained). The Arbitrator shall determine the Final Net Working Capital using the provided Submissions and the Agreed Procedures set forth on <u>Schedule 2.3(a)</u>. The Arbitrator's Final Net Working Capital shall be less than or equal to the higher Final Net Working Capital, and more than or equal to the lower Final Net Working Capital, as previously provided by the parties. The Arbitrator shall provide the Final Net Working Capital, including the calculations supporting any adjustment, to the parties, as soon as practical, but in any event within thirty (30) days after receiving the Submissions. The Arbitrator's determination of Final Net Working Capital shall be the Final Net Working Capital and shall be binding upon the parties.

(d)     If the Final Net Working Capital is more than the Estimated Net Working Capital, Buyer shall pay the amount that is the difference between the Final Net Working Capital and Estimated Net Working Capital within three (3) Business Days after the Final Net Working Capital is determined to an account designed by Sellers and provided in writing to Buyer. If the Final Net Working Capital is less than the Estimated Net Working Capital, Sellers shall pay the amount that is the difference between the Estimated Net Working Capital and Final Net Working Capital within three (3) Business Days after the Final Net Working Capital is determined to an account designed by Buyer and provided in writing to Sellers.

(e)     The Arbitrator's fees and expenses incurred in connection with the arbitration of the dispute shall be split equally between the parties with Sellers paying one-half (1/2) and Buyer paying one-half (1/2).

2.5     <u>Allocation of Purchase Price</u>. The Purchase Price shall be allocated among the various classes of the Acquired Assets and the Assumed Liabilities in accordance with and as provided by Section 1060 of the Code. Within thirty (30) days of the Closing, Buyer shall provide Sellers with a preliminary allocation of the Purchase Price for Sellers' review and approval, which approval shall not be unreasonably withheld or delayed. The parties agree that any tax returns or other tax information they may file or cause to be filed with any Governmental Entity shall be prepared and filed consistently with such agreed upon allocation. In this regard, the parties agree that, to the extent required, they will each properly prepare and timely file Form 8594 in accordance with Section 1060 of the Code.

10

# ARTICLE 3
# CLOSING

3.1     Closing.  The closing of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities and the consummation of any other transactions contemplated hereunder (the "Closing") shall take place at the offices of McDonald Hopkins LLC, 600 Superior Avenue, Suite 2100, Cleveland, Ohio, at 11:00 a.m. Eastern Standard Time (unless the parties agree to another time, date, or place) on the tenth (10th) Business Day after satisfaction or waiver of the conditions set forth in Articles 6 and 7, other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions (the "Closing Date").  The transactions to be consummated on the Closing Date shall be deemed to have been consummated as of 11:59 p.m. on the Closing Date.  At the Closing, all proceedings to be taken and all documents to be executed and delivered by all parties shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken or not taken nor documents executed or delivered until all have been taken, executed, and delivered.

3.2     Deliveries by Sellers.  On or prior to the Closing Date, Sellers shall deliver to Buyer the following:

(a)     The sale, conveyance, assignment, transfer, and delivery by Sellers of the Acquired Assets to Buyer, as herein provided, shall be effected on the Closing Date by limited warranty deeds, bills of sale, endorsements, assignments, and other instruments of transfer and conveyance, which shall be consistent with the terms of this Agreement and reasonably satisfactory in form and substance to counsel for Buyer;

(b)     Sellers shall execute and deliver an officer's certificate delivered in accordance with Section 6.3;

(c)     All instruments and documents required by the Title Company to issue the Title Policy as described in and provided by Section 6.11 hereto, including a FIRPTA affidavit, executed by each Seller;

(d)     Copies of resolutions duly adopted by the Board of Directors of each Seller, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force as of the Closing, by the appropriate officers of each Seller;

(e)     All consents, Orders and approvals of the Bankruptcy Court, including certified copies of the Sale Order, the Assigned Contracts Order and the CBA Order;

(f)     Certificates of incumbency for the respective officers of each Seller executing this Agreement or making certifications for the Closing dated as of the Closing Date;

(g)     Evidence of the existence of the "tail" insurance policies referred to in Section 5.2(g);

(h)     Certificates of existence and good standing of each Seller from the State of Ohio, dated the most recent practical date prior to the Closing;

11

(i)      Transition Services Agreement executed by Sellers; and

(j)      Such other instruments and documents as Buyer and Sellers deem mutually necessary to effect the transactions contemplated hereby.

3.3      <u>Deliveries by Buyer</u>.  On or prior to the Closing Date, Buyer shall deliver to Sellers the following:

(a)      Buyer shall cause the Earnest Money Escrow Agent to pay the Deposit to Sellers in accordance with the terms of the Earnest Money Escrow Agreement by wire transfer of immediately available funds to the bank account designated by Sellers in writing and provided to Buyer at least two (2) Business Days prior to the Closing Date;

(b)      Buyer shall pay Sellers the Cash Purchase Price, determined in accordance with <u>Article 2</u>, less the Deposit [and the Escrow Funds], by wire transfer of immediately available funds to Sellers' bank account, designated by Sellers in writing and provided to Buyer at least two (2) Business Days prior to the Closing Date;

(c)      Buyer shall execute and deliver to Sellers an instrument of assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for Sellers;

(d)      Buyer shall execute and deliver to Sellers an officer's certificate in accordance with <u>Section 7.3</u>;

(e)      Copies of resolutions duly adopted by the Board of Directors of each of Buyer and Ardent, authorizing and approving their performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing, by the appropriate officers of Buyer and Ardent;

(f)      Certificates of incumbency for the respective officers of Buyer and Ardent executing this Agreement or making certifications for the Closing dated as of the Closing Date;

(g)      Certificates of existence and good standing of Buyer and Ardent from the state in which each is formed or incorporated, dated the most recent practical date prior to Closing;

(h)      Transition Services Agreement executed by Buyer; and

(i)      Such other instruments and documents as Buyer and Sellers mutually deem necessary to effect the transactions contemplated hereby.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1      <u>Representations and Warranties of Sellers</u>.  Sellers, jointly and severally, represent and warrant to Buyer as follows:

12

(a)     Corporate Organization of Sellers. Each Seller is duly incorporated, validly existing, and in good standing under the laws of the State of Ohio. Each Seller has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted.

(b)     Authorization and Validity. Each Seller has the full power and authority to execute and deliver this Agreement and the Related Agreements, and, subject to Bankruptcy Court approval of this Agreement, to perform its obligations hereunder and thereunder. This Agreement and the Related Agreements are and will constitute the valid and legally binding obligations of each Seller, and are and will be enforceable against such Seller in accordance with the respective terms hereof or thereof.

(c)     No Conflict or Violation. Subject to: (i) Bankruptcy Court approval of this Agreement; (ii) receipt of the consents listed on Schedule 4.1(d); (iii) compliance with the requirements of the HSR Act; (iv) entry of the Sale Order; (v) entry of the Assigned Contract Order; (vi) entry of the CBA Order; and (vii) delivery of written notice to the Ohio Attorney General or receipt of approval from the Ohio Attorney General, as applicable, the execution, delivery, and performance by Sellers of this Agreement and the Related Agreements, and the performance by Sellers of the transactions contemplated by this Agreement and the Related Agreements, do not: (1) violate any provision of Sellers' governance documents; (2) violate any Law or Order; (3) result in a breach of or default (with or without notice or lapse of time or both and assuming the consent of individual physicians and residents to the assumption and assignment of their respective employment agreements) under any material Assigned Contract to which Sellers are a party, or by which they or any of their properties may be affected or bound; or (4) cause the acceleration of the maturity of any of the Assumed Liabilities, or the creation of any Lien upon any material Acquired Asset.

(d)     Consents. Upon entry of the Sale Order, the Assigned Contract Order and the CBA Order and other than consent of individual physicians and residents to the assumption and assignment of their respective employment agreements, or as set forth on Schedule 4.1(d), the execution, delivery, and performance by Sellers of this Agreement and the Related Agreements, and the performance by Sellers of the transactions contemplated by this Agreement and the Related Agreements, do not require the authorization, consent, or approval of any Governmental Entity.

(e)     Brokers. Except as set forth on Schedule 4.1(e), no broker, finder, investment banker, or other Person is entitled to any brokerage, finder's, or other fee or commission in connection with this Agreement, or the transactions contemplated hereby, based upon any agreements or arrangements or commitments, written or oral, made by or on behalf of Sellers.

(f)     Title to Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Sellers shall obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Acquired Assets, which shall be transferred to Buyer free and clear of all Liens, other than Permitted Encumbrances.

13

(g)     Assigned Contracts.  Sellers have compiled and prepared the Noticed Contracts for filing assumption and assignment notification.  Copies of all Noticed Contracts (including all material modifications and amendments thereto) have been provided or made available to Buyer.  Except as set forth on Schedule 4.1(g), giving pro forma effect to the Sale Order and the Assigned Contract Order, each of the Assigned Contracts is the valid and binding agreement of the Seller(s) portion thereto, and is in full force and effect in all material respects.  Upon entry of the Sale Order and the Assigned Contract Order and payment of the Buyer's Cure Cost or provision of adequate assurances, Sellers shall not be in breach or default in any material respect thereunder.  To Sellers' Knowledge and except as set forth in Schedule 4.1(g), no other party to any of the Assigned Contracts is in material breach or default thereunder.

(h)     Licenses.  Schedule 1.1(g) contains a list of material Licenses owned or held by Sellers necessary for the conduct of the Business as it is currently conducted.  Sellers are in material compliance with such material Licenses.

(i)     Employee Relations.  With respect to the Retained Employees:

   (i)     except as set forth on Schedule 4.1(i)(i), Sellers are not a party to any agreement with any union, trade association, or other similar employee organization, and Sellers have provided Buyer with access to a copy of all collective bargaining agreements listed on Schedule 4.1(i)(i) (collectively, the "CBAs"), including all amendments to such listed collective bargaining agreements;

   (ii)    except as set forth on Schedule 4.1(i)(ii), there are no material unfair labor practice complaints, labor strikes, arbitrations, to Sellers' Knowledge, material disputes, work slowdowns, or work stoppages pending, or, to Sellers' Knowledge, threatened, and Sellers have not experienced any strike, material slowdown, or material work stoppage or lockout during the last three (3) years; and

   (iii)   except as set forth on Schedule 4.1(i)(iii), Sellers are in compliance in all material respects with all applicable laws respecting labor, employment, fair employment practices, terms and conditions of employment, workers' compensation, occupational safety, plant closings, and wages and hours with respect to the employees of the Business.

(j)     Litigation.  Except for the Bankruptcy Cases and proceedings therein, or any garnishment, domestic relation, foreclosure or collection proceedings, or as set forth on Schedule 4.1(j), there is no material action, suit, proceeding in equity or at law, arbitration, or administrative or other proceeding by or before any person (including, without limitation, any Governmental Entity), pending, or to Sellers' Knowledge, threatened in writing against Sellers, and the Acquired Assets are not subject to any Order entered in any material lawsuit or proceeding.

14

(k)  Hazardous Substances.  Sellers have provided to Buyer the environmental reports listed on Schedule 4.1(k) (the "Environmental Reports").  Except as disclosed in such Environmental Reports or as disclosed on Schedule 4.1(k):

  (i)  there has been no treatment, disposal, or Release of Hazardous Material on the Real Property or any other site to which Sellers have sent or otherwise arranged the transportation of Hazardous Materials (other than Releases involving de minimis quantities of Hazardous Materials and other than disposal and transportation by licensed disposers or haulers of Hazardous Materials) that would: (i) constitute a violation of any Environmental Law by Sellers, or by any third party if the effect of such violation by such third party imposes a remediation obligation on the part of Sellers; (ii) trigger any release-reporting obligations of Sellers under any Environmental Law; or (iii) trigger any clean-up or remediation obligations of Sellers under any Environmental Law;

  (ii)  Sellers are in compliance with, in all material respects, all Environmental Laws that govern the Real Property;

  (iii)  Sellers have obtained all material Licenses required under the Environmental Laws for operation of the Business, and currently are in compliance in all material respects with, such Licenses; and

  (iv)  Sellers have not received in the most recent five (5) year period any written notice of any proceeding, action, or other claim or liability arising under any Environmental Laws (including, without limitation, notice of potentially responsible party status under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601 et seq. or any state counterpart) from any Person or Governmental Entity regarding the Real Property or the businesses operated from such properties, or any properties to which Sellers have sent or arranged for the transportation of Hazardous Materials.

(l)  Financial Information.  Sellers have furnished to Buyer interim unaudited financial statements as of and for the three months ended March 31, 2010, unaudited financial statements as of and for the year ended December 31, 2009, and audited financial statements as of and for the year ended December 31, 2008 (the "Financial Statements"), attached as Schedule 4.1(l).  Except as set forth on Schedule 4.1(l), such Financial Statements were prepared in accordance with GAAP and fairly represent in all material respects the financial position, results of operations, and cash flows of Sellers as of the dates and for the periods presented.

(m)  Compliance with Laws.  Except as set forth on Schedule 4.1(m) (and other than any disclosures relating to Regulatory Compliance and the Compliance Program, the only representation as to which is made in Section 4.1(y)), Sellers are in compliance in all material respects with Laws and requirements applicable to the conduct of the Business or to the ownership or use of any of the Acquired Assets.

15

(n)     <u>Certain Post-Balance Sheet Results</u>.  Except as set forth in <u>Schedule 4.1(n)</u> hereto, since March 31, 2010, there has not been any:

       (i)     material damage, destruction, or loss (whether or not covered by insurance) affecting the Acquired Assets;

       (ii)     change in the condition, financial or otherwise, of the Acquired Assets or the Business, or in the results of operations of the Acquired Assets or the Business, the result of which may have a Material Adverse Effect;

       (iii)     threatened employee strike, work stoppage, or labor dispute pertaining to the Business;

       (iv)     sale, assignment, transfer, or disposition of any item of property, plant or equipment included in the Acquired Assets having a value in excess of ten thousand dollars ($10,000) (other than supplies), except in the Ordinary Course of Business with comparable replacement thereof;

       (v)     general increases in the compensation payable by Sellers to any of their employees or independent contractors or any increase in, or institution of, any bonus, insurance, pension, profit sharing or other employee benefit plan, remuneration or arrangements made to, for or with such employees;

       (vi)     changes in the composition of the medical staffs of the Hospitals, other than normal turnover occurring in the Ordinary Course of Business;

       (vii)     changes in the rates charged by the Hospitals for their services, other than those made in the Ordinary Course of Business;

       (viii)     adjustments or write-offs in Receivables or reductions in reserves for Receivables outside the Ordinary Course of Business;

       (ix)     changes in the accounting methods or practices employed by Sellers or changes in depreciation or amortization policies; or

       (x)     transaction pertaining to the Acquired Assets by Sellers outside the Ordinary Course of Business.

(o)     <u>Medicare Participation/Accreditation</u>.  The Hospitals are currently certified for participation in the Medicare, Medicaid and CHAMPUS/TRICARE programs and have current and valid provider agreements with such programs.  Sellers are in compliance with the conditions of participation in such programs and have received all material approvals or qualifications necessary for participation in such programs. The Hospitals are accredited, with no uncorrected contingencies, by The Joint Commission.  A copy of the most recent accreditation letters from The Joint Commission pertaining to the Hospitals have been made available to Buyer.  Except as otherwise identified by Sellers to Buyer and its counsel, to Sellers' Knowledge, the billing practices of Sellers with respect to the Business to all third party payors, including the Medicare, Medicaid and CHAMPUS/TRICARE programs and private

16

insurance companies, have been in compliance in all material respects with applicable laws, regulations and policies of such third party payors and the Medicare, Medicaid and CHAMPUS/TRICARE programs. Neither Sellers nor any of their officers, directors, or managing employees are excluded from participation in the Medicare, Medicaid or CHAMPUS/TRICARE programs, nor to Sellers' Knowledge is any such exclusion threatened. Except as Sellers shall have identified to Buyer and its counsel, Sellers have not received any written notice from any of the Medicare, Medicaid or CHAMPUS/TRICARE programs, or any other third party payor programs of any pending or to Sellers' Knowledge threatened investigations or surveys. Sellers have registered with the QNet Exchange ("QNet") of The Centers for Medicare and Medicaid Services ("CMS") under its Hospital Quality Initiative Program (the "HQI Program"). Sellers have submitted quality data under the HQI Program to CMS or its agent, and quality data under the ORYX Core Measure Performance Measurement System ("ORYX") to The Joint Commission, for all calendar quarters concluded prior to the Execution Date, except for any quarter for which the respective reporting deadlines have not yet expired. All such submissions of quality data have been made in accordance with applicable reporting deadlines and in the form and manner required by CMS and The Joint Commission, respectively. Sellers have not received written notice of any reduction in reimbursement under the Medicare program resulting from its failure to report quality data to CMS or its agent as required under the HQI Program. Sellers have provided Buyer with the HQI Program "validation results" for all calendar quarters concluded prior to the date of this Agreement, except for any quarter for which the respective reporting deadlines have not yet expired.

(p)   Real Property. Schedule 1.1(a) contains a true and correct description of the Owned Real Property. At the Closing, Sellers will convey to Buyer fee simple title to the Owned Real Property, free and clear of any Liens, other than the Permitted Encumbrances. Other than Intercompany Transactions or as provided on Schedule 4.1(p), Sellers are not a lessor of any parcel of the Owned Real Property or any portion thereof or interest therein. Other than as provided on Schedule 4.1(p), the Real Property constitutes all interests in real property currently used in connection with the Business. Except as disclosed on the ALTA surveys previously provided by Sellers to Buyer, to Sellers' Knowledge, all of the Improvements lie wholly within the boundaries of the Owned Real Property and do not encroach upon the property, or otherwise conflict with the property rights, of any other Person. To Sellers' Knowledge, except as set forth in the ALTA surveys previously provided by Sellers to Buyer, the Owned Real Property is in material compliance with all applicable laws, including zoning requirements, and no Seller has received any written notification from any Governmental Entity requiring improvements to the Owned Real Property or any other modifications to the Owned Real Property. Except for Intercompany Transactions and as provided on Schedule 1.1(a), Sellers are not lessees of any parcel of real property used in connection with the Business. None of the Owned Real Property is located within a flood zone. Neither the whole nor any portion of the Real Property has been condemned, requisitioned or otherwise taken by any Governmental Entity, no written notice of any such condemnation, requisition or taking has been received by Sellers and, to the Sellers' Knowledge, no such condemnation, requisition or taking is threatened or contemplated. Sellers have not received written or posted notice that there are any public improvements which may

17

result in special assessments against or otherwise materially adversely affect the Real Property.

(q)     **Employee Benefits.** Except as set forth on Schedule 4.1(q), there are no Plans (as defined below) contributed to, maintained or sponsored by Sellers to which Sellers are obligated to contribute or with respect to which Sellers have any material liability or potential material liability, whether direct or indirect. For purposes of this Agreement, the term "Plans" shall mean any: (i) employee benefit plans whether or not funded and whether or not terminated, (ii) employment agreements, and (iii) personnel policies or fringe benefit plans, policies, programs and arrangements, whether or not funded, and whether or not terminated, including without limitation stock bonus, deferred compensation, profit sharing, pension, severance, bonus, vacation, travel, incentive, and health, disability and welfare plans, agreements or arrangements. Within the six (6) year period ending on the Closing Date, Sellers have not sponsored, contributed to or had an obligation to contribute to a multiemployer plan, multiple employer plan, or single employer plan to which at least two or more of the contributing sponsors are not part of the same controlled group.

(r)     **Taxes.** Sellers have filed, on a timely basis or validly extended the time for filing, all federal, state and local tax returns required to be filed by them. All tax returns are true and correct in all material respects and accurately reflect in all material respects the Tax liabilities of Sellers. All amounts shown as due on the tax returns have been or will be paid on a timely basis (including any interest or penalties and amounts due to state unemployment authorities) to the appropriate tax authorities. Sellers have withheld proper and accurate amounts from their employees compensation in compliance with withholding and similar provisions of the Code, including employee withholding and social security Taxes, and any and all other applicable laws and have duly paid or made provision for the payment of all such amounts (including any interest or penalties and amounts due state unemployment authorities) which are due and payable to the appropriate tax authorities. No deficiencies for any of such Taxes have been asserted or to Sellers Knowledge threatened, and no audit on any such returns is currently under way or to Sellers Knowledge threatened. There are no outstanding agreements by Sellers for the extension of time for the assessment of any such Taxes. Other than Permitted Encumbrances there are no tax Liens on any of the Acquired Assets and, to Sellers Knowledge, no basis exists for the imposition of any such Liens.

(s)     **Insurance.** Schedule 4.1(s) contains Sellers' insurance policies covering the ownership and operations of the Business and the Acquired Assets, and lists such policies', if applicable, numbers, terms, identity of insurers, amounts, and coverage. All of such policies are in full force and effect with no premium arrearage. Since the Petition Date, Sellers have given in a timely manner to their insurers all notices required to be given under their insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions. Sellers have not (a) received any notice or other communication from any such insurance company canceling or materially amending any of such insurance policies, and no such cancellation or amendment is threatened or (b) since the Petition Date, failed to give any required notice or present any claim which is still

18

outstanding under any of such policies with respect to the Business or any of the Acquired Assets.

(t) <u>Third Party Payor Cost Reports</u>. Sellers have duly filed all required Cost Reports for all the fiscal years through and including the fiscal year specified on <u>Schedule 4.1(t)</u>, and if the Closing occurs after July 31, 2010, Sellers shall have filed their Medicaid Cost Reports for the fiscal year ended December 31, 2009. All of such Cost Reports accurately reflect in all material respects the information required to be included thereon and such Cost Reports do not claim and Sellers have not received reimbursement in any amount in excess of the amounts provided by law or any applicable agreement, except where such was noted as a disputed amount on such Cost Report. <u>Schedule 4.1(t)</u> indicates which of such Cost Reports have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such Cost Reports. Sellers have established adequate reserves to cover any potential reimbursement obligations that Sellers may have in respect of any such third party Cost Reports, and such reserves are set forth in the Financial Statements.

(u) <u>Receivables</u>. The Receivables represent and will represent at the Closing valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business by Sellers in advance of the Closing. The respective reserves in respect of Receivables shown in the Financial Statements are adequate and calculated consistent with past practice in accordance with GAAP.

(v) <u>Software</u>. Except as is not material, the Noticed Contracts include all Contracts pursuant to which any Seller licenses any software (respectively, a "<u>Software License</u>" and "<u>Licensed Software</u>") necessary for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing. All software owned or licensed by Sellers in the operation of the Business prior to the Closing will be available for use by Buyer on identical terms and conditions, immediately following the Closing, provided that, in the case of any Licensed Software, Buyer designates the Software License therefore as an Assigned Contract and any necessary consents are received.

(w) <u>Medical Staff Matters</u>. Sellers have provided to Buyer true, correct, and complete copies of the bylaws and rules and regulations of the medical staff of each Hospital, as well as a list of all current members of the medical staff. Sellers have identified to Buyer and its counsel a listing, if any, of adverse actions with respect to any medical staff members of a Hospital or any applicant thereto for which a medical staff member or applicant has requested a judicial review hearing which has not been scheduled or has been scheduled but has not been completed. Sellers have identified to Buyer and its counsel any pending or, to Sellers' Knowledge, threatened disputes with applicants, staff members, or health professional affiliates. All appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.

(x) <u>Experimental Procedures</u>. During the past five (5) years, Sellers have not performed or permitted the performance of any experimental or research procedures or studies

19

involving patients in the Hospitals not authorized and conducted in accordance with the procedures of an Institutional Review Board of such Hospital or the Case Western Reserve University Cancer Institutional Review Board.

(y) <u>Compliance</u>.

    (i)    No Seller is a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services. No Seller has reporting obligations pursuant to any settlement agreement entered into regarding any governmental healthcare program. Sellers have identified to Buyer and its counsel material issues, if any, arising during the last six (6) years regarding any: (i) government payor program investigation conducted by any federal or state enforcement agency, (ii) proceeding regarding any qui tam/False Claims Act litigation pursuant to which any Hospital is a defendant, (iii) search warrant, subpoena, civil investigative demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency indicating that any Seller has violated any law or regulation regulating health care fraud, or (iv) written complaints received by the compliance department of Sellers' or through Sellers' compliance "hotline" indicating that any Seller has violated any law or regulation regulating health care fraud. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services.

    (ii)    Sellers have identified to Buyer and its counsel material issues, if any, regarding compliance with federal or state laws regulating health care fraud, including but not limited to the federal Anti-Kickback Law, 42 U.S.C. §1320a-7b, the Stark I and II Laws, 42 U.S.C. §1395nn, as amended, and the False Claims Act, 31 U.S.C. §3729, <u>et seq</u>. Sellers have identified to Buyer and its counsel material issues, if any, regarding compliance with the administrative simplification provisions required under the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>"), including the electronic data interchange regulations and the health care privacy regulations, as of the applicable effective dates for such requirements.

(z) <u>CBAs</u>. Copies of all CBAs (including all modifications and amendments thereto) have been provided or made available to Buyer. Except as set forth on <u>Schedule 4.1(z)</u>, giving pro forma effect to the Sale Order and the CBA Order, each of the CBAs is the valid and binding agreement of the Seller(s) portion thereto, and is in full force and effect in all material respects. Upon entry of the Sale Order and the CBA Order, Sellers shall not be in breach or default in any material respect thereunder. To Sellers' Knowledge and except as set forth in <u>Schedule 4.1(z)</u>, no other party to any of the CBAs is in material breach or default thereunder.

    4.2    <u>Representations and Warranties of Buyer.</u> Buyer hereby represents, warrants to Sellers, and agrees with Sellers as follows:

20

(a)     <u>Organization and Corporate Power</u>.  Buyer is a limited liability company organized and validly existing under the laws of the State of Delaware, and is authorized to exercise its limited liability company powers, rights, and privileges, and is in good standing in, the State of Delaware, and has the requisite power and authority to carry on its business as presently conducted, and to own or lease and operate its properties and assets now owned or leased and operated by it, to own the Acquired Assets, and to perform the transactions on its part contemplated by this Agreement and all Related Agreements.  Ardent is a corporation duly incorporated and validly existing in good standing under the laws of the State of Delaware.  Ardent has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted.

(b)     <u>Authorization and Validity</u>.  Buyer has, or on the Closing Date shall have, all requisite power and authority to enter into this Agreement and any Related Agreement, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each Related Agreement to, and the performance of, its obligations hereunder and thereunder, have been, or on the Closing Date shall be, duly authorized by all necessary corporate action by the board of directors of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery, and performance. This Agreement has been, and each Related Agreement has been, or on the Closing Date shall be, duly executed by Buyer or Ardent, respectively, and constitute, or shall constitute, when executed and delivered, Buyer's or Ardent's valid and binding obligation, enforceable against Buyer or Ardent in accordance with its respective terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(c)     <u>Absence of Breach</u>.  Subject to the provisions of <u>Section 4.2(d)</u> below regarding private party and Governmental Entity consents, and subject to compliance with the requirements of the HSR Act, the execution, delivery and performance by Buyer of this Agreement and the Related Agreements do not: (i) violate any of the provisions of the governing documents of Buyer; (ii) violate any Law or cause the suspension or revocation of any License presently in effect; or (iii) result in a breach of or default (with or without notice or lapse of time or both) under any Contract to which Buyer is a party or by which it or any of its properties may be affected or bound.

(d)     <u>Consents</u>.  Except as set forth on <u>Schedule 4.2(d)</u>, the execution, delivery, and performance by Buyer of this Agreement and the Related Agreements, and the performance by Buyer of the transactions contemplated hereby and thereby, do not require the authorization, consent, or approval of any Governmental Entity or third party.

(e)     <u>Brokers</u>.  Except as set forth on <u>Schedule 4.2(e)</u>, no broker, finder, investment banker, or other Person is entitled to any brokerage, finder's, or other fee or commission in connection with this Agreement, or the transactions contemplated hereby based upon any agreements or arrangements or commitments, written or oral, made by or on behalf of Buyer or any of its Affiliates.  Buyer shall be solely responsible for the payment of any such fee or commission to any Person listed on <u>Schedule 4.2(e)</u>.

21

(f)    Financial Ability to Perform.  Buyer has, and shall have at Closing, liquid capital or committed sources therefore sufficient to permit it to perform timely its obligations hereunder, including, but not limited to, the payment of the Cash Purchase Price to Sellers and the other payments to Sellers required hereunder, and the due and timely discharge of the Assumed Liabilities.

(g)    Litigation.  Except as set forth on Schedule 4.2(g), there is no action, suit, proceeding in equity or at law, arbitration, or administrative or other proceeding by or before any person (including, without limitation, any Government Entity), pending, or threatened in writing against Buyer which, if adversely determined, would result in a Buyer Material Adverse Effect at any time before or after the Closing Date.

(h)    Collective Bargaining Agreements.  Subject to entry of the CBA Order, upon Closing, Buyer shall be party to fully and validly executed and enforceable memorandums of understanding (collectively, the "MOUs") that amend the following: (a) the Agreement between Western Reserve Care System a subsidiary of Forum Health and the Ohio Nurses Association, dated July 20, 2008 to July 19, 2011, as amended, modified and supplemented; (b) the Agreement between AFSCME, Ohio Council 8 United Nurses of America Local 2026 and Trumbull Memorial Hospital a wholly Owned Subsidiary of Forum Health, dated October 1, 2004 to September 30, 2007, as amended, modified and supplemented; (c) the Agreement between Forum Health Trumbull Memorial Hospital and Ohio Council 8, and Local 2804 of the American Federation of State, County and Municipal Employees, AFL-CIO, dated May 1, 2008 to March 31, 2010, as amended, modified and supplemented; (d) the Agreement Between Forum/Hillside Hospital and Local Union No. 2288 and Ohio Council 8 American Federation of State, County and Municipal Employees, AFL-CIO, dated April 1, 2008 to March 31, 2009, as amended, modified and supplemented; (e) the Agreement Between Forum Health and District 1199, Service Employees International Union, dated October 1, 2008 to March 31, 2012, as amended, modified and supplemented; (f) the Labor Agreement between Service Employees International Union, District 1199, AFL-CIO/CLC and Forum Health Outreach Laboratories, dated November 1, 2008 to October 31, 2011, as amended, modified and supplemented; and (g) the Agreement between Forum Health Hillside Rehabilitation Hospital and the Ohio Nurses Association, dated July 20, 2008 to July 19, 2011.

4.3    Representations Exclusive. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLERS TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, UNDER CONTRACT, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, OR PRIVILEGES OF SELLERS, ANY OF THE LIABILITIES, OBLIGATIONS, OPERATIONS, AFFAIRS, OR PROSPECTS OF SELLERS, OR ANY PRESENT OR FUTURE FINANCIAL CONDITION OF SELLERS OR THEIR RESPECTIVE OPERATIONS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATION OR WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP,

22

QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLERS SPECIFICALLY SET FORTH IN THIS AGREEMENT AND IN THE RELATED AGREEMENTS, ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS, AND BUYER SHALL RELY ON ITS OWN EXAMINATION AND INVESTIGATION THEREOF IN MAKING ITS ACQUISITION INVESTMENT DECISION.

## ARTICLE 5
## COVENANTS AND OTHER AGREEMENTS

5.1     <u>Mutual Covenants</u>.  Each Seller covenants to Buyer and Buyer covenants to each Seller the following:

(a)     <u>General</u>.  Each of the parties shall use its commercially reasonable efforts to take all actions to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement, including without limitation, satisfaction of each party's obligations pursuant to <u>Articles 6</u> and <u>7</u>.

(b)     <u>Notices, Consents and Licenses</u>.  Upon execution of this Agreement, each party hereto shall: (i) cooperate with the other and take all reasonable steps to obtain, as promptly as practicable, all consents and Licenses required of any party hereto to consummate the transactions contemplated by this Agreement, and (ii) provide such other information and communications to any Governmental Entity as may be reasonably requested.  Sellers shall be responsible for obtaining all consents and Licenses required for Sellers to transfer the Acquired Assets to Buyer, and Buyer shall be responsible for obtaining all consents and Licenses required for Buyer to acquire the Acquired Assets from Sellers, and to operate the Acquired Assets following the Closing.  Upon request, each party hereto shall cooperate with the other parties hereto in all reasonable respects in such party's efforts to obtain the consents and Licenses for which such party is responsible.  The parties shall work diligently and in good faith to complete all necessary regulatory filings, applications, and notices, and secure all necessary consents, and approvals, if any, including, without limitation, filings with the Ohio Attorney General pursuant to Chapter 109 and Chapter 1702 of the ORC, in order to complete the transactions contemplated under this Agreement.   From and after the Execution Date, the parties shall use commercially reasonable efforts to complete, prepare, and obtain all materials necessary or desirable to make the filings contemplated by <u>Sections 5.1(c)</u> and <u>5.1(d)</u> promptly after the entry of the Sale Order.

(c)     <u>ODH, OBP, ODJFS and CMS Filings</u>.  Sellers shall promptly as practical execute and file any and all forms, notices, consents and applications with the Ohio Department of Health (the "<u>ODH</u>"), the Ohio Department of Job and Family Services (the "<u>ODJFS</u>"), Ohio State Board of Pharmacy (the "<u>OBP</u>"), and CMS as may be necessary for the ODH, the OBP, the ODJFS, and CMS to timely issue or transfer any provider agreement to Buyer required for Buyer to operate the Acquired Assets

23

immediately upon the Closing. Buyer shall promptly as practical execute and file any and all forms, notices, consents, and applications with the ODH, the OBP, the ODJFS, and CMS as may be necessary for the ODH, the OBP, the ODJFS and CMS to timely apply for the issuance or transfer of any provider agreement to Buyer required for Buyer to operate the Acquired Assets immediately upon the Closing. Buyer shall acquire Sellers' provider agreements to participate in the Medicare and Medicaid programs, as applicable.

(d)    HSR Act Notification.  As promptly as practical after the Execution Date, the parties shall file with the Federal Trade Commission (the "FTC") and the United States Department of Justice (the "Justice Department") any Notification and Report Form required to be filed with respect to the transaction provided in this Agreement under the HSR Act (and request early termination of the waiting period), and thereafter shall promptly make any other required submissions under the HSR Act.  If applicable, each of the parties hereto shall "substantially comply" and certify substantial compliance with any request for additional information (also known as a "second request") issued pursuant to the HSR Act (the "Request for Additional Information") as soon as reasonably practicable following the issuance of the Request for Additional Information, so that the waiting period specified in the HSR Act shall expire as soon as reasonably possible after the execution and delivery of this Agreement.  Buyer agrees to pay all fees required in connection with any filing required under the HSR Act, and each party hereto agrees to take all commercially reasonable actions necessary to insure that the waiting period imposed under the HSR Act is terminated as soon as reasonably possible after the execution and delivery of this Agreement.  Without limiting the foregoing, the parties hereto agree to use commercially reasonable efforts to cooperate and oppose any preliminary injunction sought by any Governmental Entity preventing the consummation of the transactions contemplated by this Agreement. Each party hereto shall cause its respective counsel to furnish each other party hereto such necessary information and reasonable assistance as any such party may reasonably request in connection with its preparation of necessary filings or submissions under the provisions of the HSR Act. Each party hereto shall cause its respective counsel to supply to each other party hereto copies of all correspondence, filings, or written communications by such party or its Affiliates with any Governmental Entity or staff members thereof, with respect to the transactions contemplated by the Agreement and any related or contemplated transactions, subject to appropriate confidentiality protections for documents filed pursuant to Item 4(c) of the Hart-Scott-Rodino Notification and Report Form, or communications regarding the same documents or information submitted in response to any Request for Additional Information pursuant to the HSR Act that reveal any party's negotiating objectives or strategies or purchase price expectations.

(e)    Further Assurances.  From time to time, at the reasonable request of either party, whether on or after the Closing, without further consideration, either party, at its expense and within a reasonable amount of time after request hereunder is made, shall: (i) execute and deliver such further instruments of assignment, transfer and assumption and take such other action as may be reasonably required to more effectively assign and transfer the Acquired Assets to, and vest the Assumed Liabilities in, Buyer; (ii) deliver or make the payment of the Cash Purchase Price to Sellers or any amounts due from one party to the other pursuant to the terms of this

24

Agreement; or (iii) confirm Sellers' ownership of the Excluded Assets and obligations with respect to the Excluded Liabilities.

(f)     Cooperation Respecting Proceedings.     After the Closing, upon prior reasonable written request, each party shall cooperate with the other, at the requesting party's expense (but including only out-of-pocket expenses to third parties and not the costs incurred by any party for the compensation or other benefits paid to its officers, directors, or employees), in furnishing information, testimony, and other assistance in connection with any inquiries, actions, Tax or Cost Report audits, proceedings, arrangements, or disputes involving either of the parties hereto (other than in connection with disputes between the parties hereto) and based upon Contracts, arrangements, or acts of Sellers which were in effect or occurred on or prior to the Closing and which relate to the Business or the Acquired Assets, including, without limitation, arranging discussions with (and the calling as witness of) officers, directors, employees, agents, and representatives of Buyer or Sellers.

(g)     Preservation of and Access to Certain Records.

        (i)     Hospital Records.     As set forth in Sections 1.1(k) and 1.1(l), the Business Records and certain Patient Records are Acquired Assets under this Agreement (the Business Records and such Patient Records are collectively referred to herein as the "Transferred Hospital Records").     As set forth in Section 1.2(d), the Business Records and certain Patient Records referred therein, are Excluded Assets under this Agreement (such records are collectively referred to herein as the "Retained Hospital Records"). Notwithstanding anything to the contrary in this Agreement, the parties hereto shall cooperate in providing copies and access to such Transferred Hospital Records and Retained Hospital Records as set forth below.

        (ii)    Document Retention.     Notwithstanding that the Retained Hospital Records are Excluded Assets, to the extent required by applicable Law or at Sellers' election, Sellers may choose not to remove the Retained Hospital Records or otherwise acquire possession of such records after the Closing.     Unless and until removed by Sellers, Buyer shall, in accordance with applicable Laws, maintain the Retained Hospital Records at the facilities used in the Business (or at such other mutually approved locations) at Buyer's cost, and as agent of and bailee for Sellers, until the expiration of ten (10) years from the Closing, or longer pursuant to any applicable statute of limitations period (if, at the expiration of such period, any Tax or Payor audit or judicial proceeding is in progress, or the applicable statute of limitations has been extended, for any such longer period as such audit or proceeding is in progress, or such statutory period is extended) (the "Document Retention Period").     After the Closing, and subject to applicable Laws, Buyer shall grant Sellers reasonable access to the Retained Hospital Records (including any Patient Records) as needed for any lawful purpose (including Sellers' inspection and copying of same, at Sellers' expense), and Sellers shall have the same rights of access to inspect and copy any or all of the Retained Hospital Records that Sellers had prior to the Closing.     Buyer shall instruct the appropriate employees to cooperate in providing access to such records to Sellers and its authorized

representatives as contemplated herein. Access to such records shall be, wherever reasonably possible, during normal business hours, with reasonable prior written notice to Buyer of the time when such access shall be needed. Sellers' employees, representatives, and agents shall conduct themselves in such a manner so that Buyer's normal business activities shall not be unduly or unnecessarily disrupted. After the expiration of the Document Retention Period, Buyer shall not, without ninety-one (91) days prior written notification to Seller, destroy any Retained Hospital Records in its possession. Within ninety (90) days after its receipt of such notice of intent to destroy, Sellers shall have the right to require Buyer to deliver any such Retained Hospital Records to Sellers, at Sellers' expense, in accordance with Sellers' reasonable instructions. Buyer shall adopt a record retention policy with respect to the Retained Hospital Records which requires that all Retained Hospital Records be maintained for the Document Retention Period, and destroyed only after compliance with the notice provisions of this Section 5.1(g)(ii) (including the passage of time), and shall inform its employees of such policy.

(iii)     Removal of Retained Hospital Records. Sellers shall have the right to remove, and may remove, from time to time on or prior to the Closing Date and during the Document Retention Period, any or all of the Retained Hospital Records. In the event of Sellers' removal of any Retained Hospital Records, they shall, subject to applicable Laws, provide Buyer with copies (or originals, if required by applicable Law or accreditation standards) of the following Retained Hospital Records if Buyer elects to retain such copies: (i) the Patient Records, and (ii) any records Buyer would be required to have to comply with License and accreditation standards. If the Retained Hospital Records are removed by Sellers, then they shall maintain such Retained Hospital Records at their expense during such period of time and at such location as is deemed appropriate by Sellers in their reasonable discretion. For so long as the Retained Hospital Records are maintained by Sellers, Sellers shall make the Retained Hospital Records (other than those protected by or subject to the attorney-client privilege) available to Buyer, subject to applicable Laws, as needed by Buyer for any lawful purpose, and if reasonably necessary to permit Buyer to operate the Business. Sellers shall instruct their appropriate employees to cooperate in providing access to such records to Buyer and its authorized representatives as contemplated herein. Buyer's access to such Retained Hospital Records shall be during normal business hours, with reasonable prior written notice to Sellers of the time when such access shall be needed. Buyer may make copies of or extracts, at Buyer's expense, from any such Retained Hospital Records to which Buyer has access hereunder. Notwithstanding the foregoing, Buyer's access to, or right to copies of, any Patient Records or medical staff records shall be subject to any applicable Law, accreditation standard or rule of confidentiality or privilege.

(iv)     Sellers' Access to Transferred Hospital Records. Notwithstanding that the Transferred Hospital Records are Acquired Assets under this Agreement, Buyer shall provide copies and access to such records to Sellers as set forth

26

herein. After the Closing and subject to applicable Laws, Buyer shall grant Sellers reasonable access to the Transferred Hospital Records (including any Patient Records) as needed for any lawful purpose (including Sellers' inspection and copying of same, at Sellers' expense), and Sellers shall have the same rights of access to inspect and copy any or all of the Transferred Hospital Records that Sellers had prior to the Closing. Buyer shall instruct the appropriate employees to cooperate in providing access to the Transferred Hospital Records to Sellers and their authorized representatives as contemplated herein. Access to the Transferred Hospital Records shall be, wherever reasonably possible, during normal business hours, with reasonable prior written notice to Buyer of the time when such access shall be needed. Sellers' employees, representatives, and agents shall conduct themselves in such a manner so that Buyer's normal business activities shall not be unduly or unnecessarily disrupted. After the expiration of the Document Retention Period, Buyer shall not, without ninety-one (91) days prior written notification to Sellers, destroy any the Transferred Hospital Records in its possession. Within ninety (90) days after its receipt of such notice of intent to destroy, Sellers shall have the right to require Buyer to deliver any such records to Sellers, at Sellers' expense, in accordance with Sellers' reasonable instructions. Notwithstanding anything to the contrary in this Agreement, Sellers' access to, or right to copies of, any Transferred Hospital Records shall be subject to any applicable Law, accreditation standard, or rule of confidentiality or privilege. Buyer shall adopt a record retention policy with respect to the Business Records which requires that all Transferred Hospital Records be maintained for the Document Retention Period and destroyed only after compliance with the notice provisions of this Section 5.1(g)(iv) (including the passage of time), and shall inform its employees of such policy.

(v)     Electronic Medical Records. Buyer may convert to electronic form, at Buyer's expense, all Retained Hospital Records and Transferred Hospital Records in its possession pursuant to this Agreement, and may provide Sellers access electronically in fulfillment of its obligations in this Section 5.1(g)(v).

(vi)    HIPAA Compliance. With respect to any Retained Hospital Records or Transferred Hospital Records transferred to or in the possession of Buyer or Sellers pursuant to this Agreement, Buyer and Sellers shall comply with all state and federal laws and regulations applicable to the maintenance, use, and disclosure of medical records and individually identifiable health information, including, but not limited to, HIPAA and regulations promulgated pursuant to HIPAA.

(h)    Remittances and Receivables.

(i)     Remittances. All remittances, mail, and other communications relating to the Excluded Assets or Excluded Liabilities received by Buyer or its Affiliates at any time after the Closing shall be promptly turned over by Buyer to the addressee thereof, or if the addressee is no longer affiliated with Sellers, to

27

Sellers, and pending such delivery, Buyer shall have no interest in the same and shall hold such remittances, mail, and other communications in trust for the benefit of Sellers. All remittances, mail, and other communications relating to the Acquired Assets or the Assumed Liabilities received by Sellers, or any of their Affiliates at any time after the Closing shall be promptly turned over by Sellers, or Affiliate to Buyer, and pending such delivery, Sellers shall have no interest in the same and shall hold such remittances, mail, and other communications in trust for the benefit of Buyer.

(ii) <u>Receivables</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Receivable, the assignment of which is either prohibited by Law or by the terms of any Contract with a Payor without the consent of such Payor. Any payments received by Sellers after the Closing Date from patients, Payors, clients, customers, or others who are the obligors on Receivables transferred to Buyer as a part of the Acquired Assets on the Closing Date shall be paid over to Buyer within ten (10) days after receipt by Sellers. In addition, and without limitation, in the event of a determination by any governmental or third-party payor that payments to the Sellers resulted in an overpayment or other determination that funds previously paid by any program or plan to the Sellers must be repaid, Sellers shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered on or prior to the Closing Date and Buyer shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered after the Closing Date.

(i) <u>Employee Matters</u>. The terms of this <u>Section 5.1(i)</u> shall apply to all employees, <u>provided that</u>, to the extent the terms of employment by Buyer of Sellers' employees who are covered by CBAs are determined by reference to the MOUs and Amended CBAs, and conflict with the terms provided herein, Buyer shall be entitled to act in accordance with the terms set forth in the MOUs and Amended CBAs with respect to such employees.

(i) <u>Retained Employees</u>. Upon the Closing, Buyer shall offer to hire the employees of Sellers who, as of the Closing, are actively working in the Business ("<u>Retained Employees</u>"). All offers of employment by Buyer to Retained Employees shall be to perform comparable services in a comparable position for each respective Retained Employee, and for compensation (including base compensation which is not less than such Retained Employee's base compensation in effect immediately prior to the Closing), and benefits that are substantially similar to those provided to similarly situated employees of Affiliates of Buyer. Except in the Ordinary Course of Business, between the Execution Date and the earlier of the Closing or a termination of this Agreement, Sellers shall consult with Buyer before hiring new employees to replace any employees who are terminated, or who voluntarily resign their position of employment. With respect to employees who are on authorized medical leave, military leave, short-term disability (including maternity), or workers' compensation as of the Closing, and who

28

worked at Sellers' facilities immediately prior to such disability or leave ("Absent Employees"), Buyer shall offer to hire such Absent Employees at the time their leave of absence expires and, if appropriate, they present a doctor's note stating that they are released to return to work and perform the essential functions of their jobs, with or without reasonable accommodation (all such Retained Employees and Absent Employees that accept such employment to be referred to as "Hired Employees"). For those Absent Employees who are not released to return to work within six (6) months after the Closing, or, if later, the time required by law, Buyer shall not be obligated to immediately offer to hire such Absent Employees, but shall only be obligated to maintain them on a preferential hiring list, and to employ them only if and when a position for which they are qualified becomes available. All Hired Employees shall be retained by Buyer as employees at will (except to the extent that such Hired Employees are physicians who are parties to Assigned Contracts relating to their employment). For the avoidance of doubt, Buyer is not assuming any of the Plans set forth on Schedule 4.1(q) hereto except to the extent that such Plans are listed as Assigned Contracts on Schedule 1.1(d).

(ii) Paid Time Off and EST Balance. Buyer shall give the Hired Employees credit for the Paid Time Off and EST Balance earned and accrued by them as of the Closing, but only to the extent of the maximum amounts under Buyer's plans and as reflected on Schedule 5.1(i)(ii).

(iii) Buyer's Employee Benefit Plans and Policies. Buyer shall recognize the entire length of the prior service with Sellers (based, on the Closing Date, on the time then worked by such Hired Employee during the then most recent period of continuous employment with Sellers) for the purposes of determining the eligibility of any Hired Employee to participate in and receive benefits under Buyer's paid time off, severance, and health and medical benefit plans and programs, and for purposes of determining such employees' eligibility to participate in and receive vesting under (but not the amount of benefits accruing under) Buyer's pension or profit sharing plans, in each case to the extent permitted by law and the terms of such plan. In that regard, no additional waiting periods, deductibles, exclusions, or benefit limitations for pre-existing conditions shall be imposed or assessed against such Hired Employees (or their dependents) under Buyer's plans which are "employee welfare benefit plans" as that term is defined in Section 3(l) of ERISA (other than as would have been applicable to such Hired Employees or their dependents under Sellers' employee welfare benefit plans as in effect on the date hereof), in each case to the extent permitted by law and the terms of such plan. In addition, Buyer's medical, dental, pharmaceutical, and vision benefit plans shall recognize any expenses paid by Hired Employees (or their dependents) which were applied to meet deductibles and out-of-pocket limits under Sellers' medical, dental, pharmaceutical, and vision benefit plans for the calendar year of the Closing, as if such expenses had been paid under Buyer's benefit plans for purposes of applying Buyer's benefit plans' deductible and out-of-pocket limits for such calendar year, in each case to the extent permitted by law and the terms of such plan. Buyer retains the right to

29

change or terminate any of its employment practices, policies, and procedures, and any of its employee benefits, at any time and from time to time as Buyer deems appropriate in its sole discretion.

(iv) <u>Rollover of Defined Contribution Plan</u>. Buyer shall establish or designate a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Code Section 401(k) (the "<u>Buyer Plan</u>") to be effective as of the Closing. Buyer shall cause the Buyer Plan to accept "direct rollovers" (within the meaning of Section 401(a)(31) of the Code) of distributions from a defined contribution plan of Sellers that includes a cash or deferred arrangement with the meaning of Code Section 401(k) (the "<u>Seller Plan</u>") to Hired Employees in cash (but including direct rollovers of outstanding loans and promissory notes or other documents evidencing such loans), if such rollovers are elected in accordance with the terms of the Seller Plan and applicable Law by such Hired Employee, and except for any such requested rollover that the Administrator of the Buyer Plan determines may adversely affect the qualification of the Buyer Plan under the Code or ERISA, or otherwise fails to satisfy applicable technical rules, uniformly applied to all similarly-situated participants in the Buyer Plan.

(v) <u>Pre-Closing Compensation and Benefits</u>. Sellers shall retain all liability and responsibility for compensation and benefits for their employees attributable for periods on or before the Closing Date, including with respect to their employees who become Hired Employees; <u>provided</u>, <u>however</u>, any liability or responsibility for accrued but unused Paid Time Off as of the Closing Date, and reflected in Net Working Capital, shall be assumed by Buyer. In that regard, Sellers shall retain liability and responsibility for any severance benefits payable with respect to its employees for events arising prior to the Closing, and Sellers represent and warrant to Buyer that Sellers' benefit programs do not provide any right to severance benefits for any Retained Employee as a result of the Closing (whether or not the Retained Employee accepts employment with Buyer). The parties further agree that Sellers shall retain all liability for any retention bonus to their employees. For the avoidance of doubt, Sellers shall retain all liability and responsibility for compensation and benefits for all retirees of Sellers who commenced retirement on or before the Closing Date.

(vi) <u>Acknowledgement of Responsibility</u>. As of the Closing Date, Buyer shall be considered for purposes of the Worker Adjustment and Retraining Notification Act (the "<u>WARN Act</u>") the employer of the Retained Employees related to the Acquired Assets transferred at the Closing, and that Buyer (and not Sellers) shall thereupon be responsible for complying with the WARN Act with respect to such Retained Employees, and that prior to such time none of such Retained Employees shall be, nor shall they be deemed to be, terminated.

(vii) <u>COBRA Provisions</u>. Each party will be obligated to comply with the obligations imposed on such party pursuant to COBRA.

30

(viii)    <u>No Third Party Beneficiaries</u>. Notwithstanding anything in this Agreement to the contrary, nothing in this <u>Section 5.1(i)</u> shall, or shall be deemed to, create any rights in favor of any Person not a party hereto or to constitute an employment agreement or condition of employment for any employee of Sellers or any Affiliate of Sellers or any Retained Employee.

(ix)    <u>Cooperation</u>. During the period between the Execution Date and the Closing Date, Buyer and Sellers shall reasonably cooperate on labor matters to effect the transactions contemplated by this Agreement, and the orderly transition of the operations of the Acquired Assets from Sellers to Buyer.

(x)    <u>Escrow of Self-Insured Liabilities</u>. On the Closing Date, Sellers shall establish an escrow account pursuant to and in accordance with an escrow agreement reasonably acceptable to Buyer and Sellers, and Sellers shall deposit therein that amount which is actuarially determined to represent the payment of claims for a period of 90 days pursuant to Seller's employee health insurance plan with respect to claims incurred prior to the Closing Date (the "<u>Insurance Escrow Amount</u>"). The escrow agreement shall limit the use of the Insurance Escrow Amount to payment of self-insured liabilities for employee health insurance claims. Any amounts remaining in the escrow account following the payment of all self-insured liabilities shall be paid to Sellers.

(j)    <u>Governance</u>. For a period of at least five (5) years following the Closing Date, Buyer will appoint a Board of Trustees for each Hospital (each a "<u>Board of Trustees</u>") comprised of that Hospital's Chief Executive Officer, Chief of the Medical Staff, physicians on that Hospital's medical staff and local community members. Each Board of Trustees shall meet on a regular basis and have the following responsibilities: (i) developing a strategic plan for their respective Hospital; (ii) adopting a vision, mission and values statement, and developing policies and monitoring progress toward strategic goals; (iii) participating in development and review of operating and capital budgets and facility planning (Buyer reserving ultimate authority for budgets and planning); (iv) participating in periodic evaluations of the Chief Executive Officer of their respective Hospital; (v) granting medical staff membership and clinical privileges and, when necessary, taking disciplinary action consistent with Hospital and medical staff bylaws applicable to their respective Hospital (with the advice of counsel); (vi) assuring medical staff compliance with The Joint Commission requirements (with the advice of counsel); (vii) supporting physician recruitment efforts; and (viii) fostering community relations and identifying service and educational opportunities.

(k)    <u>Indigent Care Policies</u>. For a period of at least five (5) years following the Closing Date, Buyer shall adopt and adhere to the indigent care policies of Ardent attached as <u>Exhibit D</u> hereto. Buyer shall cause the Hospitals to treat any patient presented to the emergency room who has a medical emergency or who, in the judgment of a staff physician, has an immediate emergency need. No such patient will be turned away because of age, race, gender or inability to pay. Buyer shall cause the Hospitals to continue to provide services to patients covered by the Medicare and Medicaid programs and those unable to pay for emergent and medically necessary care. This

31

covenant shall be subject in all respects to changes in legal requirements or governmental guidelines or policies (e.g., if legislation is passed permitting hospitals to render lower levels of indigent care, providing for universal health coverage or imposing on hospitals a tax in lieu of the provision of indigent care).

(l)     <u>Cooperation on Tax Matters</u>. Following the Closing, the parties shall cooperate fully with each other, and shall make available to the other, as reasonably requested and at the expense of the requesting party, and to any taxing authority, all information, records or documents relating to tax liabilities, or potential tax liabilities, of Sellers for all periods on or prior to the Closing, and any information which may be relevant to determining the amount payable under this Agreement, and shall preserve all such information, records, and documents (to the extent a part of the Acquired Assets delivered to Buyer at Closing) at least until the expiration of any applicable statute of limitations or extensions thereof.

(m)     <u>Cost Reports</u>. Sellers, at their expense, shall prepare and timely file all terminating and other Cost Reports required or permitted by law to be filed under the Medicare and Medicaid or other third party payor programs for periods ending on or prior to the Closing Date, or as a result of the consummation of the transactions described herein ("<u>Sellers' Cost Reports</u>"). Following the Closing, Buyer shall make available to Sellers, as reasonably requested and at the expense of Sellers, all information, records or documents (to the extent a part of the Acquired Assets delivered to Buyer at Closing) necessary for Sellers to prepare the Sellers' Cost Reports. Buyer shall forward to Sellers any and all correspondence relating to the Sellers' Cost Reports within five (5) Business Days after receipt by Buyer. Buyer shall remit any receipts of funds relating to the Sellers' Cost Reports within ten (10) Business Days after receipt by Buyer and shall forward to Sellers any demand for payments within three (3) Business Days after receipt by Buyer. Sellers shall retain all rights to the Sellers' Cost Reports including any amounts receivable or payable in respect of such reports or reserves relating to such reports. Such rights shall include the right to appeal any Medicare or Medicaid determinations relating to the Sellers' Cost Reports. Sellers shall retain the originals of the Sellers' Cost Reports, correspondence, work papers and other documents relating to the Sellers' Cost Reports. Sellers will furnish copies of such Cost Reports, correspondence, work papers and other documents to Buyer upon request. Buyer agrees to make certain of Sellers' former employees available to Sellers for up to six (6) months after Closing to gather documents and information to assist Sellers with the preparation of Sellers' Cost Reports, to assist with gathering documents and information in connection with audits, compliance with governmental requirements and regulations, and the prosecution or defense of claims, and to assist with the submission of the quality data required under <u>Section 5.1(n)</u>. Notwithstanding the foregoing, the assistance provided in this <u>Section 5.1(m)</u> shall not unreasonably interfere with the conduct of Buyer's business at the Hospitals, and Buyer's obligation to provide personnel to assist Sellers in conducting the activities described in this <u>Section 5.1(m)</u> shall be subject to the reasonable availability of such personnel, having regard for Buyer's needs to conduct its business at the Hospitals, and in no event shall such assistance require Buyer to employ additional personnel. Sellers shall indemnify and hold harmless Buyer from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and

32

fees of expert consultants and witnesses) that Buyer may incur as a result of such assistance with the Sellers' Cost Reports. Buyer shall not be deemed to be the "preparer" of Sellers' Cost Reports as a result of such assistance.

(n)     Quality Reporting. Sellers shall submit all quality data required under the HQI Program to CMS or its agent, and all quality data required under ORYX to The Joint Commission, for any calendar quarter with reporting deadlines between the date of this Agreement and the Closing Date. If a calendar quarter ends prior to the Closing Date, but the reporting deadline for such quarter ends after the Closing Date, Sellers shall prepare and submit the quality data for the Hospitals required under the HQI Program and ORYX in accordance with applicable filing deadlines and in the form and manner required by CMS and The Joint Commission, respectively, or, at the sole option of Buyer, Sellers shall transmit such quality data to Buyer in a form mutually agreeable to Buyer and Sellers or allow Buyer access to such data, to enable Buyer to submit quality data for the Hospitals required under the HQI Program and ORYX for such quarter. If the Closing Date falls between the first and last day of a calendar quarter, Sellers shall cooperate with Buyer to ensure that all quality data required to be submitted for the Hospitals under the HQI Program and ORYX for the portion of the quarter during which Sellers owned the Hospitals can be aggregated with the quality data for the portion of the quarter during which Buyer owned the Hospitals, to enable Buyer and/or Sellers to submit the quality data for the Hospitals required under the HQI Program and ORYX in accordance with applicable filing deadlines and in the form and manner required by CMS and The Joint Commission, respectively.

(o)     Use of Controlled Substance Permits. To the extent permitted by applicable law, Buyer shall have the right, for a period not to exceed one hundred twenty (120) days following the Closing Date, to operate under the licenses and registrations of Sellers relating to controlled substances and the operations of pharmacies and laboratories, until Buyer is able to obtain such licenses and registrations for itself. In furtherance thereof, Sellers shall execute and deliver to Buyer at or prior to the Closing a limited power of attorney substantially in the form of Exhibit E hereto.

5.2     Additional Covenants of Sellers.

(a)     Conduct Pending Closing. Prior to consummation of the transactions contemplated hereby, or the termination of this Agreement pursuant to its terms, unless Buyer shall otherwise consent in writing, which consent shall not be unreasonably withheld, conditioned, or delayed, Sellers shall conduct the Business and otherwise deal with the Acquired Assets only in the usual and Ordinary Course of Business materially consistent with practices followed prior to the execution of this Agreement, except for: (i) actions which arise from, or are related to, the anticipated transfer of the Acquired Assets; (ii) the effectuation of ongoing compliance programs; (iii) actions contemplated by this Agreement, the transactions contemplated hereby, and the Related Agreements; or (iv) actions disclosed on any Schedule to this Agreement. Prior to Closing or termination of this Agreement, Sellers shall promptly inform Buyer of any material events or changes relating to the operation of the Business, consult with Buyer regarding the Business as reasonably requested by Buyer, and shall promptly respond to Buyer regarding the Business or the Acquired Assets.

33

Without limiting the generality of the foregoing, and except as required pursuant to the terms of this Agreement, from the Execution Date until the Closing or termination of this Agreement, Sellers shall not with respect to the Business, except in the Ordinary Course of Business, or pursuant to preexisting Contracts, Orders, agreements, policies, or with the consent of Buyer:

(A)     incur any indebtedness other than in the Ordinary Course of Business;

(B)     amend their governance documents;

(C)     pay or increase any bonuses, salaries, or other compensation to any director, officer, or employee, or enter into any employment, severance, or similar contract with any director, officer, or employee;

(D)     adopt or increase the payments to, or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees;

(E)     except as maybe necessary for the continued operation of the Business, acquire any material assets (other than in connection with customary retirement and replacement programs), or sell (other than sales of Inventory in the Ordinary Course of Business), lease, or otherwise dispose of any material asset or property (other than retirements of assets in accordance with their respective useful lives, or the normal policies and procedures of Sellers), or mortgage, pledge, or impose any material Lien on any material asset or property constituting a part of the Acquired Assets, other than Permitted Encumbrances;

(F)     enter into any material contract which would be an Assigned Contract, or any material amendment, modification, or termination (partial or complete) of any Assigned Contract, or grant any material waiver under or give any material consent with respect to any Assigned Contract;

(G)     knowingly or intentionally cancel or waive any claims or rights with a value in excess of One Hundred Thousand Dollars ($100,000);

(H)     change its significant accounting principles, except as required by GAAP or applicable Laws;

(I)     merge or consolidate with, or make any material capital investment in, any material loan to, any material advance to, or material acquisition of the securities or assets of, any other Person;

(J)     settle or agree to settle any litigation relating to the Acquired Assets, except with respect to claims having a value of less than One Hundred Thousand Dollars ($100,000) individually or in the aggregate;

(K)     incur, create, or suffer to exist any Liens on the Acquired Assets (other than Permitted Encumbrances) that shall not be removed at or prior to Closing;

34

(L)     transfer, abandon, cancel, or terminate before the natural expiration of its term any Assigned Contract or License included in the Acquired Assets.

Notwithstanding anything in this Agreement to the contrary, nothing in this Section 5.2 shall: (i) obligate Sellers to make expenditures other than in the Ordinary Course of Business, and consistent with practices of the recent past, or to otherwise suffer any economic detriment outside the Ordinary Course of Business; (ii) preclude each Seller from instituting or completing any program designed to promote compliance, or comply with Laws or other good business practices respecting the Business; or (iii) preclude Sellers from transferring, selling, or otherwise dealing in any manner with any of the Excluded Assets.

(b)     Access and Information. Sellers shall afford Buyer, and the counsel, accountants, and other representatives of Buyer, reasonable access, unless such access is otherwise restricted pursuant to this Agreement, throughout the period from the Execution Date to the Closing Date, to the Acquired Assets, and the employees, personnel, and medical staff associated therewith, and all the properties, books, contracts, commitments, Cost Reports, and records respecting the Business and the Acquired Assets (regardless of where such information, may be located) which any Seller possesses, or to which it has access. Such access shall be afforded to Buyer during normal business hours, and only in such manner so as not to disturb patient care, or to interfere in any material respect with the normal operations of the Business; *provided, however,* that without first obtaining the written consent of the Chief Legal Officer of Sellers, which consent shall not be unreasonably withheld, conditioned, or delayed, neither Buyer nor its counsel, accountants or other representatives shall tour or visit the facilities, or contact any of the employees, personnel, or medical staff thereof, or of any Affiliate of Sellers. Sellers' covenants under this Section 5.2(b) are made with the understanding that Buyer shall use all such information in compliance with all Laws, and for the sole purpose of consummating the transactions. The foregoing notwithstanding, Buyer acknowledges and agrees that Buyer's access to the books and records of the Business and the Acquired Assets shall not include access to, and Sellers shall not have any obligation to deliver to Buyer, any information concerning any alleged dispute or any pending litigation, investigation, or proceeding involving Sellers or any of their respective Affiliates that is protected by, or subject to, the attorney-client privilege, or the disclosure of which is restricted by an agreement entered into in connection with such dispute, litigation, investigation, or proceeding or an Order; moreover, Buyer shall not have access to Patient Records, or employee or medical staff records, or any other records the disclosure of which would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality, except that Buyer may be granted access to such records to the extent they are appropriately redacted, and in conformity with such other reasonable procedures as may be required to conform to any such requirements of Law, accreditation standards, or rule or agreement of confidentiality. Buyer hereby agrees to defend, indemnify, and hold harmless from and against, and to reimburse and compensate, Sellers for all losses arising out of or relating to Buyer's access provided pursuant to this Section 5.2(b).

(c)     Updating. Prior to consummation of the transactions contemplated hereby, or the termination or expiration of this Agreement pursuant to its terms, Sellers shall notify Buyer of any changes or additions to any of Sellers' Schedules to this Agreement by

35

the delivery of updates thereof, if any, promptly upon Sellers becoming aware of such change or addition. No such supplement or amendment shall have any effect on any representation or warranty contained herein or upon the satisfaction of the condition to closing set forth in Section 6.2.

(d)     Sellers' Cure Costs. Sellers shall, at or prior to the Closing, pay Sellers' Cure Costs, if any.

(e)     Additional Financial Information. Within two (2) Business Days after they are created (but in any event no later than twenty-five (25) days following the end of each calendar month prior to Closing), Sellers shall deliver to Buyer true and substantially complete copies of the unaudited balance sheets and the related unaudited statements of income (collectively, the "Interim Statements") of Sellers for each month then ended, together with a year-to-date compilation and the notes, if any, related thereto, which presentation shall be true, correct and substantially complete in all material respects, shall have been prepared from, and in accordance with, the books and records of Sellers, and shall fairly present the financial position and results of operations of Sellers as of the date, and for the period indicated, all in accordance with GAAP consistently applied, except that such financial statements need not include required footnote disclosures.

(f)     Insurance Ratings. Sellers will take all action reasonably requested by Buyer to enable Buyer to succeed to the Workers' Compensation and Unemployment Insurance ratings, and other ratings for insurance or other purposes. Buyer shall not be obligated to succeed to any such ratings, except as it may elect to do so.

(g)     Tail Insurance. Sellers shall, at their sole cost and expense, obtain "tail" insurance to insure against professional liabilities relating to all periods prior to the Closing arising out of the acts, errors and omissions of any employed physician or resident. Sellers will cause Buyer to be an additional named insured with respect to any such policies of insurance. Such "tail" insurance shall be for a period of at least five (5) years, with limits of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate for each employed physician or resident.

(h)     Bankruptcy Court Approval.

(i)     Sellers shall use their best efforts to gain approval by the Bankruptcy Court of this Agreement, to the full extent required by section 363 and other applicable provisions of the Bankruptcy Code and rules within seventy-five (75) days following execution of this Agreement. Immediately following the execution and delivery of this Agreement, but in no event later than two (2) Business Days following execution of this Agreement, Sellers shall file a motion (the "Sale Motion") with the Bankruptcy Court seeking the entry of an order or orders, in form and substance reasonably satisfactory to Buyer, approving (i) certain bid procedures and bid protections in connection with the sale of the Acquired Assets (the "Sale Procedure Order"); and (ii) the form of the Sale Order.

36

(ii)    The Sale Procedure Order shall prescribe the procedures that will govern the sale process and auction (the "Auction") of some or substantially all of the Acquired Assets, including but not limited to: (i) the deposit that prospective bidders (other than Buyer, the "Prospective Bidders") must deposit in order to qualify to participate at the Auction, and the procedure for the return of the deposit if the Prospective Bidder is not the successful bidder; (ii) the nature of financial information that Prospective Bidders must submit to establish their financial capacity to consummate a successful bid; (iii) the nature of the notice of the proposed sale that must be disseminated; (iv) the minimum bid required to start the Auction, which in any event shall be no less than the sum of the Purchase Price plus Four Hundred Fifty Thousand Dollars ($450,000) plus the Break-Up Fee and bid increment amounts; (v) the payment of the Break-Up Fee described in Section 8.2(d) of this Agreement; and (vi) the timetable for bidders to conduct due diligence and the last day to submit bids, which in any event shall be at least two (2) days prior to the Auction.

(iii)   Upon obtaining a hearing date, Sellers shall give notice of the Sale Motion and the hearing thereon as and when required by applicable provisions of the Bankruptcy Code and rules and Orders of the Bankruptcy Court. This Agreement, the Sale Motion, and the transaction contemplated herein shall be subject to the entry of the Sale Procedure Order and the Sale Order. Buyer acknowledges and agrees that if Buyer is not the prevailing bidder for the Acquired Assets under the Sale Procedure Order, the Acquired Assets will not be sold to Buyer, and this Agreement will terminate with no liability to Sellers except as expressly set forth in Section 8.2(d).

(i)     Loss Experience. Sellers' shall cause FHIL to provide for a period of ten (10) years following the Closing Date, at the request of Buyer and not more than two (2) times per year, Buyer with reports concerning the professional liability and general liability loss experience of the Business related to events occurring prior to the Closing Date.

5.3     Additional Covenants of Buyer.

(a)     Conduct Pending Closing. Prior to consummation of the transactions contemplated hereby, or the termination of this Agreement pursuant to its terms, unless Sellers shall otherwise consent in writing, which consent shall not be unreasonably withheld, conditioned, or delayed, Buyer shall not take any action, or fail or omit to take any action, that would cause any of Buyer's representations and warranties set forth in Section 4.2 to be false as of the Closing.

(b)     Resale Certificate. Buyer shall furnish to Sellers any resale certificate or certificates or other similar documents reasonably requested by Sellers to comply with or obtain an exemption from pertinent excise, sales, and use tax laws.

(c)     Access to Information Following Closing. After Closing, Buyer shall, and shall cause its employees, representatives, and advisors to, afford to Seller, including its advisors, reasonable access to all books, records, files, and documents related to the Business, the Acquired Assets, and the Assumed Liabilities upon at least two (2) Business Days' written notice, and during regular business hours, in order to permit

Sellers to prepare and file, for itself, tax returns, and to prepare for and participate in any investigation with respect thereto, to prepare for and participate in any other investigation, and defend any actions, proceedings, or investigations relating to or involving Sellers or Business, for which Sellers may be responsible, to discharge their respective obligations under this Agreement and the other Related Agreements to which any of them is a party, and for other reasonable purposes, and shall afford Sellers reasonable assistance in connection therewith. Except for documents which are protected by the attorney-client privilege, Buyer shall cause such records to be maintained for not less than ten (10) years from the Closing Date, and shall not dispose of such records without first offering in writing to deliver them to Sellers; *provided, however*, that in the event that Buyer transfers all or a portion of the Business to any third party during such period, Buyer may transfer to such third party all or a portion of the books, records, files, and documents related thereto, provided such third party transferee expressly assumes in writing the obligations of Buyer under this <u>Section 5.3(c)</u>. In addition, on and after the Closing Date, at Sellers' request, Buyer shall generally cooperate with Sellers, and, without limiting the forgoing, make reasonably available to Sellers and its Affiliates, employees, medical staff, representatives, agents, and advisors, those employees of Buyer requested by Sellers in connection with any action, proceeding, or investigation, including to provide testimony, to be deposed, to act as witnesses, and to assist counsel, all without cost to Sellers or its Affiliates.

(d)     <u>Required Orders</u>.  Buyer shall promptly take all actions as are reasonably requested by Sellers, and in accordance with the applicable provisions of the Bankruptcy Code, to assist in obtaining entry of the Sale Order, the Assigned Contract Order and the CBA Order, including, without limitation, furnishing affidavits, financial information, or other documents, or information for filing with the Bankruptcy Court, and making Buyer's Related Persons available to testify before the Bankruptcy Court.

(e)     <u>Cooperation with the PBGC</u>.  Buyer shall reasonably cooperate with Sellers and Sellers' Affiliates in dealing with the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") and its agents, in connection with their activities with respect to the PBGC's assumption of the benefit plans which are subject to Title IV of ERISA.

(f)     <u>Physician Privileges</u>.  Buyer shall continue to accord, from and after the Closing, all privileges to practice medicine at the facilities operated as part of the Business to each physician who, immediately prior to the Closing, is on the medical staff; *provided, however,* that such physicians continue to meet the qualifications and guidelines which may be established from time to time by the applicable provider.

(g)     <u>Donor Figure Recognition</u>.  Buyer shall maintain and preserve following the Closing for a period equal to the remaining useful life of the relevant facility, or such longer period as is called for by the condition of a donation, the names, images, and other designations accorded throughout Sellers' facilities or on any Acquired Assets to donors as of immediately prior to the Closing, specifically including, without limitation, the placement of names and likenesses on buildings, rooms, plaques, and other designated areas in a manner of recognition that is at least as prominent as that displayed immediately prior to the Closing; *provided, however*, that nothing herein requires Buyer to maintain and preserve any facility or Acquired Asset, and Buyer

can demolish, remodel, build, or otherwise transfer or dispose of any facility or Acquired Asset in its absolute discretion. In the event of such an occurrence, Buyer shall reinstate the names, images, and other designations throughout any such remodeled or rebuilt facility or Acquired Asset (as applicable), and, in the case of a demolished or disposed facility or portion thereof or Acquired Asset, shall relocate such names, images, and other designations to another suitable place within a facility or to another facility, if necessary, in all cases to a location of equal or greater prominence, as Buyer deems in good faith, in the discharge of its obligations hereunder, is reasonably appropriate, for a period equal to the remaining life of such remodeled or rebuilt facility or Acquired Asset, or such longer period as is called for by the condition of a donation.

(h)     Buyer's Cure Costs. Buyer shall, prior to or at the Closing, pay Buyer's Cure Costs, if any, and shall deliver to Sellers Schedule 5.3(h) listing any Sellers' Cure Cost, calculated pursuant to Section 1.5, and the Assigned Contract associated thereto.

(i)     Change in Ownership. Following the Closing, Buyer shall file any and all necessary notices and documents, including without limitation, CMS-Form 855A as required pursuant to the change in ownership (the "CHOW") provisions applicable to transfer of the Medicare provider numbers and applicable provider agreements to Buyer.

## ARTICLE 6
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions under this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions, unless, except for Sections 6.5, 6.8 and 6.10, Buyer waives in writing such fulfillment:

6.1     Performance of Agreement. Sellers shall have performed, in all material respects, their respective agreements and obligations contained in this Agreement required to be performed on or prior to the Closing.

6.2     Accuracy of Representations and Warranties. The representations and warranties of Sellers set forth in Section 4.1 shall be accurate, in all respects, as of the Closing (as updated by the revising of Schedules contemplated by Section 5.2(c)), as if made as of such time (except for those representations and warranties which speak as of a specific time, which shall have been true in all respects as of such time), except for any inaccuracy or inaccuracies which, individually or in the aggregate, would not result in a Material Adverse Effect.

6.3     Officers' Certificate. Buyer shall have received from Sellers an officer's certificate, executed on Sellers' behalf by their chief executive officer, president, chief financial officer, or treasurer (in his or her capacity as such), dated the Closing Date, and stating that to the knowledge of such individual, the conditions in Sections 6.1 and 6.2 have been satisfied.

6.4     Consents. Buyer shall have obtained all material consents listed on Schedule 4.2(d).

6.5     Ohio Law Requirements. All notices required to have been given under Section 109.34 and Chapter 1702 of the ORC shall have been given, any approvals required to have been obtained including, without limitation, those under Section 109.35 and Chapter 1702 of the ORC

39

shall have been obtained, and any application time period under such sections shall have been satisfied.

6.6     No Violation of Orders.  No Order by any Governmental Entity shall be in effect that: (i) prevents the sale and purchase of the Acquired Assets, or any of the other material transactions contemplated by this Agreement, and (ii) would materially adversely affect or interfere with the operation of the Business as contemplated to be conducted after the Closing.

6.7     No Litigation.    There shall not be pending, or threatened in writing by any Governmental Entity, any suit, action, or proceeding, challenging or seeking to restrain, prohibit, alter, or materially delay, the sale and purchase of the Acquired Assets, or any of the other transactions contemplated by this Agreement, or seeking to obtain from Buyer or any of its Affiliates, in connection with the sale and purchase of the Acquired Assets to be acquired by Buyer, any material damages.

6.8     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating, or amending the Sale Order shall be in effect on the Closing Date.

6.9     Closing Deliveries.    Sellers shall have made the deliveries contemplated under Section 3.2.

6.10    HSR Approval.  The waiting period (including any extension thereof by reason of a Request for Additional Information) relating to any Notification and Report Form filed pursuant to the HSR Act shall have expired or been terminated.

6.11    Title Policy.    At the Closing, Buyer shall have received a pro forma of a title policy (the "Title Policy") issued by the Title Company or, if the Title Company is not willing to issue the pro forma of the title policy, such other title insurance company as Sellers determine after consultation with Buyer, with respect to the Owned Real Property.  The Title Policy shall be issued on an ALTA Form 2006 Owner's Title Policy in an amount equal to the portion of the Cash Purchase Price being allocated to the Owned Real Property and shall insure to Buyer good and marketable, fee simple title to the Owned Real Property subject only to (i) the Permitted Encumbrances, and (ii) Taxes for the current and subsequent years "not yet due and payable."  The Title Policy shall have all standard and general exceptions deleted so as to afford full "extended form coverage" and shall contain such endorsements thereto as Buyer may reasonably require in connection with its review of the title commitments and the surveys with respect to the Owned Real Property.  Sellers shall be responsible for all search and exam fees and other charges associated with the title commitments issued with respect to the Owned Real Property, and Buyer shall be responsible for the premiums for the Title Policy and the cost of all endorsements thereto.

6.12    No Material Adverse Change.  From the Execution Date until the Closing Date, there shall not have been the occurrence or discovery of any event or condition which have, or which reasonably may be expected to have, individually or in the aggregate, a Material Adverse Effect, and Buyer shall have received a certificate from an executive officer of each Seller to such effect, and no litigation, administrative proceeding, audit, or investigation shall have been initiated which, if concluded adversely, might reasonably be expected to cause such an event or condition.

40

6.13    Pre-Closing Confirmations.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that Buyer has received all material Licenses from all Governmental Entities whose approval is required to consummate the transactions herein contemplated and continue the operation of the Business by Buyer from and after the Closing (including being eligible to receive payment, subject only to restrictions applicable to any participating provider, under the Medicare and Medicaid programs) provided that receipt of the CHOW contemplated in Section 5.3(i) shall not be a condition to Buyer's obligations under this Section 6.13.

6.14    Audited Financial Statements.  Sellers shall, in conjunction with their independent accounting firm, have prepared and delivered to Buyer audited financial statements of Sellers as of and for the year ended December 31, 2009.

6.15    Collective Bargaining Agreements.  The Bankruptcy Court shall have entered the CBA Order, the CBA Order shall be in full force and effect, and no order staying, reversing, modifying, vacating, or amending the CBA Order shall be in effect on the Closing Date.

6.16    Assigned Contract Order.  The Bankruptcy Court shall have entered the Assigned Contract Order, the Assigned Contract Order shall be in full force and effect, and no order staying, reversing, modifying, vacating, or amending the Assigned Contract Order shall be in effect on the Closing Date.

## ARTICLE 7
## SELLERS' CONDITIONS TO CLOSING

The obligation of Sellers to consummate the transactions shall be subject to the fulfillment at or prior to the Closing of the following conditions, unless, except for Sections 7.8 and 7.10, Sellers waive in writing such fulfillment.

7.1    Performance of Agreement.  Buyer shall have performed in all material respects all obligations required under this Agreement or any Related Agreement which are to be performed by Buyer on or before the Closing.

7.2    Accuracy of Representations and Warranties.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Buyer again as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

7.3    Officers' Certificate.  Sellers shall have received from Buyer an officer's certificate, executed on Buyer's behalf by its chief executive officer, president, chief financial officer, or treasurer (in his or her capacity as such) dated the Closing Date, and stating that to the knowledge of such individual, the conditions in Sections 7.1 and 7.2 have been satisfied.

7.4    Consents.  Sellers shall have obtained all consents listed on Schedule 4.1(d).

7.5    Ohio Law Requirements.  All notices required to have been given under Section 109.34 and Chapter 1702 of the ORC shall have been given, any approvals required to have been

41

obtained under Section 109.35 and Chapter 1702 of the ORC shall have been obtained, and any application time period under such sections shall have been satisfied.

7.6    No Violation of Orders.  No Order by any Governmental Entity shall be in effect that: (i) prevents the sale and purchase of the Acquired Assets or any of the other transactions contemplated by this Agreement, and (ii) would adversely affect or interfere with the operation of the Business as contemplated to be conducted after the Closing in a matter which would reasonably be expected to constitute a Material Adverse Effect.

7.7    No Litigation.    There shall be no pending, or threatened in writing by any Governmental Entity, any suit, action, or proceeding: (i) challenging or seeking to restrain, prohibit, alter, or materially delay the consummation of any of the transactions contemplated by this Agreement, or (ii) seeking to obtain from Sellers or any of their Affiliates any damages in connection with the transactions contemplated hereby.

7.8    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating, or amending the Sale Order shall be in effect on the Closing Date.

7.9    Closing Deliveries.  Buyer shall have made the deliveries contemplated under Section 3.3.

7.10    HSR Approval.  The waiting period (including any extension thereof by reason of a Request for Additional Information) relating to any Notification and Report Form filed pursuant to the HSR Act shall have expired or been terminated.

## ARTICLE 8
## TERMINATION

8.1    Termination.    This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated at any time before the Closing as follows:

(a)    By mutual consent of Sellers and Buyer;

(b)    By Sellers, by notice to Buyer, if Sellers have previously provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any covenant or agreement of Buyer contained in this Agreement or any Related Agreement to which Buyer is party, and Buyer has failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Sellers of Buyer's ability to remedy such inaccuracy or perform such covenant; provided, however, that Sellers shall not have the right to terminate this Agreement under this Section 8.1(b) if any Seller is then in material breach of this Agreement or if this Agreement is otherwise subject to termination pursuant to any other provision of this Section 8.1;

(c)    By either Sellers or Buyer, if there shall be any Order of any Governmental Entity binding on Sellers or Buyer that prohibits or restrains Sellers or Buyer from consummating the transactions contemplated by this Agreement;

42

(d)    By: (i) Buyer, if satisfaction of any condition in Article 6 is or becomes impossible (for reasons other than the failure of Buyer to comply with its obligations under this Agreement), or (ii) Sellers, if satisfaction of any condition in Article 7 is or becomes impossible (for reasons other than the failure of any Seller to comply with its obligations under this Agreement);

(e)    By Buyer, by notice to Sellers, if Buyer has previously provided Sellers with notice of any material inaccuracy of any representation or warranty of Sellers contained in Section 4.1 or a material failure to perform any covenant or agreement of Sellers contained in this Agreement or any Related Agreement to which Sellers are party, and Sellers have failed, within ten (10) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Sellers' ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(e) if (i) Buyer is then in material breach of this Agreement or if this Agreement is otherwise subject to termination pursuant to any other provision of this Section 8.1, or (ii) such material inaccuracies and material failures individually or in the aggregate would not give rise to a failure of the condition set forth in Section 6.2;

(f)    By Buyer, so long as Buyer is not then in breach of its obligations under this Agreement in any material respect, (i) at any time after the thirtieth (30th) day after the Execution Date, if the Sale Procedure Order has not been entered by the time of Buyer's notice of termination or (ii) at any time after the seventy-fifth (75th) day after the Execution Date, if the Sale Order has not been entered by the time of Buyer's notice of termination; or

(g)    Automatically, upon the consummation of an Alternative Transaction.

8.2    Effect of Termination.

(a)    In the event of termination pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Article 8, Article 10 and Article 11, which shall survive termination), with no liability on the part of Sellers, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Related Agreement, except for any liability provided for in this Article 8.

(b)    If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(c), 8.1(d), 8.1(e), or 8.1(f), then, within two (2) Business Days after such termination, the Deposit shall be returned to Buyer, with interest.

(c)    If this Agreement is terminated pursuant to Section 8.1(b), then all right, title, and interest to the Deposit shall automatically vest in Sellers, and Sellers shall have the right to pursue any remedies they have at law or in equity.

(d)    If this Agreement is terminated pursuant to Section 8.1(g), then: (i) the Deposit shall be returned to Buyer, with interest, and (ii) Sellers shall pay to Buyer a break-up fee equal to $3,000,000 (the "Break-Up Fee"). Any payments of the Break-Up Fee under this Section 8.2 shall be made by Sellers from the proceeds of the Alternative

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 48 of 64

Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer within two (2) Business Days from the close of such Alternative Transaction.

(e)     Nothing in this <u>Section 8.2</u> shall relieve Sellers or Buyer of any liability for a breach of this Agreement prior to the date of termination.

8.3    <u>Exclusive Remedy; Waiver</u>.    Prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this <u>Article 8</u>. The failure by either Sellers or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this <u>Article 8</u> shall be effective only if made in writing. After the Closing, the remedies provided in <u>Article 9</u> shall be the sole and exclusive remedies for any dispute arising out of the this Agreement or the transactions contemplate hereby.

# ARTICLE 9
# SURVIVAL AND REMEDIES

9.1    <u>Indemnification by Buyer</u>.  Subject to the limitations set forth in <u>Section 9.3</u> hereof, Buyer shall defend, indemnify and hold harmless Sellers and their Affiliates, and their respective officers, employees, agents or independent contractors (collectively, "<u>Seller Indemnified Parties</u>"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Seller Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Buyer under this Agreement, (ii) any breach by Buyer of, or any failure by Buyer to perform, any covenant or agreement of, or required to be performed by, Buyer under this Agreement, (iii) any of the Assumed Liabilities, or (iv) any claim made by a third party with respect to the operation of the Business following the Closing Date.

9.2    <u>Indemnification by Seller</u>.  Subject to the limitations set forth in <u>Section 9.3</u> hereof, Sellers shall, jointly and severally, defend, indemnify and hold harmless Buyer and its Affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "<u>Buyer Indemnified Parties</u>"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Buyer Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Seller under this Agreement, (ii) any breach by Seller of, or any failure by Seller to perform, any covenant or agreement of, or required to be performed by, Seller under this Agreement, (iii) any of the Excluded Liabilities, or (iv) any claim made by a third party with respect to the operation of the Business on or prior to the Closing Date.

9.3    <u>Limitations</u>.  Buyer and Sellers shall be liable under <u>Section 9.1(i)</u> or <u>Section 9.2(i)</u> (i.e., for misrepresentations and breaches of warranties), as applicable, only when total indemnification claims exceed Two Hundred Fifty Thousand Dollars ($250,000), after which Buyer or Sellers, as applicable, shall be liable for all such claims beginning with the first dollar of claims. No party shall be liable for any indemnification pursuant to <u>Section 9.1(i)</u> or <u>Section 9.2(i)</u>, as applicable, for any claims for misrepresentations and breaches of warranty which are the basis upon which any other party shall have failed to consummate the transactions described herein pursuant to

44

Article 6 or Article 7, as applicable, or which are based upon misrepresentations and breaches of warranty which have been waived pursuant to the initial paragraph of Article 6 or Article 7, as applicable. The liability of Sellers for indemnification under this Article 9 shall be limited to the amount held pursuant to the Indemnification Escrow Agreement. Notwithstanding anything to the contrary, the limitations contained in this Section 9.3 shall not apply to any indemnification claims arising as a result of fraud of Buyer or Sellers, respectively.

9.4    Notice and Control of Litigation.  If any claim or liability is asserted in writing by a third party against a party entitled to indemnification under this Article 9 (the "Indemnified Party") which would give rise to a claim under this Article 9, the Indemnified Party shall notify the person giving the indemnity (the "Indemnifying Party") in writing of the same within fifteen (15) days of receipt of such written assertion of a claim or liability.  The Indemnifying Party shall have the right to defend a claim and control the defense, settlement, and prosecution of any litigation. If the Indemnifying Party, within ten (10) days after notice of such claim, fails to defend such claim, the Indemnified Party shall (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise, or settlement of such claim on behalf of and for the account and at the risk of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such claim at any time prior to settlement, compromise, or final determination thereof. Anything in this Section 9.4 notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments, the Indemnified Party shall have the right, at its own cost and expense, to defend, compromise, and settle such claim, and (ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party of a release from all liability in respect of such claim. The foregoing rights and agreements shall be limited to the extent of any requirement of any third-party insurer or indemnitor. All parties agree to cooperate fully as necessary in the defense of such matters. Should the Indemnified Party fail to notify the Indemnifying Party in the time required above, the indemnity with respect to the subject matter of the required notice shall be limited to the damages that would have resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

9.5    Notice of Claim.  If an Indemnified Party becomes aware of any breach of the representations or warranties of the Indemnifying Party hereunder or any other basis for indemnification under this Article 9, the Indemnified Party shall notify the Indemnifying Party in writing of the same within forty-five (45) days after becoming aware of such breach or claim, specifying in detail the circumstances and facts which give rise to a claim under this Article 9. Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the indemnity with respect to the subject matter of the required notice shall be limited to the damages that would have nonetheless resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

9.6    Survival.  All of the representations, warranties, covenants, and agreements made by the parties in this Agreement or pursuant hereto in any certificate, instrument, or document shall survive the consummation of the transactions described herein, and may be fully and completely relied upon by Sellers and Buyer, as the case may be, notwithstanding any investigation heretofore or

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 50 of 64

hereafter made by any of them or on behalf of any of them, and shall not be deemed merged into any instruments or agreements delivered at the Closing or thereafter. Notwithstanding anything in this Section 9.6 which may be to the contrary, any claim, demand, or cause of action with respect to a breach of any representation or warranty made in this Agreement, must be made or brought, if at all, within eighteen (18) months after the Closing Date.

## ARTICLE 10

10.1    Notices.  Any and all notices, required or permitted, pursuant to the provisions of this Agreement shall be in writing and given to a party by one of the methods provided below, and shall be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following:  (i) at the time of personal delivery, if delivery is in person; (ii) at the time of transmission by facsimile or electronic mail, addressed to the other party at its facsimile number or electronic mail address specified herein, with confirmation of receipt made by printed confirmation sheet verifying successful transmission of the facsimile or electronic mail; (iii) one (1) Business Day after deposit with an express overnight courier; or (iv) three (3) Business Days after deposit in the United States or foreign mail by certified mail (return receipt requested).  All notices shall be sent with postage and/or other charges prepaid and properly addressed or directed to each party at the address or electronic destination set forth below, or to such other address or electronic destination as any party may designate by one of the indicated means of notice herein.

If to Seller, addressed to:

        Forum Health
        2911 Northview Boulevard
        Youngstown, Ohio  44504
        Attention:       Kristin K. C. Howard
                         Chief Legal Officer and Senior Vice President
        Facsimile:       (330) 884-1010
        Telephone:       (330) 884-1031
        Email:           khoward@forumhealth.org

with a copy to counsel for Seller, which shall not constitute notice, to:

        McDonald Hopkins LLC
        600 Superior Avenue, East
        Suite 2100
        Cleveland, Ohio  44114
        Attention:       David D. Watson and Rebecca L. Smith
        Facsimile:       (216) 348-5474
        Telephone:       (216) 348-5400
        Email:           dwatson@mcdonaldhopkins.com
                         rsmith@mcdonaldhopkins.com

If to Buyer, addressed to:

        c/o Ardent Health Services
        One Burton Hills Boulevard
        Suite 250

46

Nashville, Tennessee 37215
Attention:    David T. Vandewater
                President and Chief Executive Officer
Facsimile:   (615) 296-6351
Telephone:  (615) 296-3351
Email:        david.vandewater@ardenthealth.com

with a copy to counsel for Buyer, which shall not constitute notice, to:

Ardent Health Services
One Burton Hills Boulevard
Suite 250
Nashville, Tennessee 37215
Attention:    Stephen C. Petrovich
                General Counsel
Facsimile:   (615) 296-6384
Telephone:  (615) 296-3384
Email:        steve.petrovich@ardenthealth.com

10.2   <u>Press Releases and Public Announcements</u>.  No party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other party; *provided, however*, that any party may make any public disclosure it believes in good faith is required by applicable law.

10.3   <u>Expenses</u>.  Except as otherwise provided in this Agreement, Sellers and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.  At the Closing, Buyer shall pay any applicable sales or transfer taxes due in connection with the conveyance of the Acquired Assets to Buyer and the cost of recording any instruments releasing any Liens encumbering any portion of the Acquired Assets, and Buyer shall pay any local recording fees in connection with the transfer of the Owned Real Property to Buyer.

10.4   <u>Successors and Assigns</u>.  The rights under this Agreement shall not be assignable or transferable, nor the duties delegable, by either party without the prior written consent of the other, and nothing contained in this Agreement, express or implied, is intended to confer upon any Person, other than the parties hereto, and their permitted successors-in-interest and permitted assignees, any rights or remedies under or by reason of this Agreement, unless so stated to the contrary.  Notwithstanding the foregoing, Buyer may, without the prior written consent of Sellers, assign its rights and delegate its duties hereunder to one or more Affiliates; provided that no such assignment or delegation shall relieve Parent of its obligations hereunder.  This Agreement shall inure to the benefit of and is binding upon each party's permitted successors-in-interest and permitted assigns.

10.5   <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement.  The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf"), or other electronic means capable, or by creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

47

10.6   Headings.  Article and Section headings used herein are for convenience only.  They are not a part of this Agreement, and shall not be used in its interpretation.

10.7   Entirety of Agreement; Amendments.  This Agreement (including the Schedules and Exhibits hereto), the Related Agreements, and the other documents and instruments specifically provided for in this Agreement and in the Related Agreements contain the entire understanding between and among the parties concerning the subject matter of this Agreement, the Related Agreements, and such other documents and instruments and, except as expressly provided for herein, supersede all prior and contemporaneous understandings and agreements, whether oral or written, between or among them with respect to the subject matter hereof and thereof.  There are no representations, warranties, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement, the Related Agreements, and such other documents and instruments which are not fully expressed herein or therein, and there are no conditions precedent to the effectiveness of this Agreement.  This Agreement may be amended, supplemented, or modified only by an agreement in writing signed by each of the parties hereto.  All Exhibits and Schedules attached to or delivered in connection with this Agreement are integral parts of this Agreement as if fully set forth herein.

10.8   Construction of Agreement.  The parties acknowledge that each party has reviewed this Agreement and has sought and obtained the legal advice of counsel of its choice, and the parties and their respective legal counsel have together negotiated the final terms of this Agreement. Accordingly, all rules of construction that would otherwise require that any ambiguities be resolved against the drafting party are not applicable and shall not be employed in the interpretation of this Agreement.  Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which any Sellers are a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that Sellers actually own, or to which any Sellers are actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

10.9   Waiver.  The failure of a party to insist, in any one or more instances, on performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder, or of the future performance of any such term, covenant, or condition, but the obligations of the parties with respect thereto shall continue in full force and effect.  No waiver of any provision or condition of this Agreement by a party shall be valid unless in writing signed by such party or operational by the terms of this Agreement.  A waiver by one party of the performance of any covenant, condition, representation, or warranty of the other party shall not invalidate this Agreement, nor shall such waiver be construed as a waiver of any other covenant, condition, representation, or warranty.  A waiver by any party of the time for performing any act shall not constitute a waiver of the time for performing any other act, or the time for performing an identical act required to be performed at a later time.

10.10   Governing Law; Jurisdiction.  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Ohio (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial

forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

10.11 <u>Severability</u>. If any term or other provision of this Agreement is deemed by any court or other tribunal of competent jurisdiction to be invalid, illegal, or incapable of being enforced under any rule of law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the greatest extent possible.

10.12 <u>Consents Not Unreasonably Withheld</u>. Wherever the consent or approval of any party is required under this Agreement, such consent or approval shall not be unreasonably withheld, conditioned, or delayed, unless such consent or approval is to be given by such party at the sole or absolute discretion of such party or is otherwise similarly qualified.

10.13 <u>Time Is of the Essence</u>. Time is hereby expressly made of the essence with respect to each and every term and provision of this Agreement. The parties acknowledge that each shall be relying upon the timely performance by the other of its obligations hereunder as a material inducement to each party's execution of this Agreement.

10.14 <u>Disclosure Schedules</u>. Any disclosure made under any specific disclosure Schedule to this Agreement is intended to apply to and qualify disclosures contained under any one or more other disclosure Schedules to this Agreement to the extent that such disclosure contains sufficient information to make it reasonably apparent that it would apply to such other disclosure schedule or Schedules.

10.15 <u>Ardent Guaranty</u>. Ardent hereby unconditionally and absolutely guarantees (i) the prompt performance and observation of Buyer for each and every obligation, covenant and agreement of Buyer arising out of, connected with, or related to, this Agreement or any ancillary documents hereto and any extension, renewal and/or modification thereof and (ii) the accuracy and completeness of Buyer's representations and warranties. The obligation of Ardent under this <u>Section 10.15</u> is a continuing guaranty and shall remain in effect, and the obligations of Ardent shall not be affected, modified or impaired upon the happening from time to time of any of the following events, whether or not with notice or consent of Ardent:

(a)     The compromise, settlement, release, change, modification, amendment (except to the extent of such compromise, settlement release, change, modification or amendment) of any or all of the obligations, duties, covenants, or agreements or any party under this Agreement or any ancillary documents hereto; or

(b)     The extension of the time for performance of payment of money pursuant to this Agreement, or of the time for performance of any other obligations, covenants or agreements under or arising out of this Agreement or any ancillary documents hereto or the extension or the renewal thereof.

49

# ARTICLE 11
## DEFINED TERMS

For purposes of this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any corporation, limited liability company, partnership, sole proprietorship, or other Person, which directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. The term "control" means the possession, direct or indirect, of the power to direct, or cause the direction of, the management and policies of a Person.

"Alternative Transaction" shall mean any transaction or series of transactions (regardless of the form thereof) involving a plan of reorganization or a sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer.

"Amended CBAs" shall mean the CBAs as amended, assumed and assigned pursuant to the CBA Order.

"Business Day" shall mean any day other than Saturday, Sunday, and any day that is a legal holiday, or a day on which banking institutions are authorized by Law or other governmental action to close.

"Buyer Material Adverse Effect" shall mean any event, occurrence, condition, circumstance, effect, or change that would be (or could reasonably be expected to be) materially adverse to the business, assets, condition (financial or otherwise), operating results, operations, or business prospects of Buyer's business.

"CBA Order" shall mean a final, non-appealable order, in form and substance reasonably acceptable to Buyer, approving the amendment of the CBAs pursuant to the MOUs and the assumption and assignment of the Amended CBAs to Buyer.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contract" shall mean any contract, agreement, lease or sublease, license or sublicense, instrument, note, indenture, commitment or undertaking, whether in written form or otherwise.

"Cost Report" shall mean any cost report required to be filed, as of the end of a provider cost year or for any other required period, with cost-based Payors with respect to cost reimbursement.

"Environmental Law" shall mean any Law regulating Hazardous Materials, the environment, natural resources, pollution, environmental protection, waste management, industrial hygiene, health, or safety.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"EST Balance" shall mean the aggregate amount of accrued extended sick leave time earned by the employees of the Business.

"Exhibit" shall mean any exhibit to this Agreement.

50

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any agency, division, subdivision, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state, county, or political subdivision thereof.

"Hazardous Materials" shall mean any chemicals, materials, substances, or items in any form, whether solid, liquid, gaseous, semisolid, or any combination thereof, whether waste materials, raw materials, chemicals, finished products, by-products, or any other materials or articles, which are regulated by or form the basis of liability under any Environmental Laws, including, without limitation, any hazardous waste, medical waste, biohazardous waste, industrial waste, solid waste, hazardous substance, pollutant, hazardous air pollutant, contaminant, asbestos, polychlorinated biphenyls, petroleum, formaldehyde, industrial solvents, flammables, explosives, and radioactive substances.

"Hospital" shall mean any of Trumbull Memorial Hospital, Northside Medical Center, and Hillside Rehabilitation Hospital, and "Hospitals" shall mean collectively Trumbull Memorial Hospital, Northside Medical Center, and Hillside Rehabilitation Hospital.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Improvements" shall mean, the buildings, improvements and structures owned by Sellers existing on the Real Property, and all privileges, rights, appurtenances, easements, rights of way, right, title, and interest, if any, in adjacent streets and alleys, hereditaments, water, mineral, oil, and gas rights, development rights, air rights, and rights to claims for adverse possession on adjacent properties, and all improvements, structures and fixtures, in each case, as same are located upon or used or connected with the beneficial use of the Real Property.

"Intercompany Transaction" shall mean any Contract between any Seller, or between any Seller and an Affiliate of any Seller, whether or not such transaction relates to the provision of goods and services, tax sharing arrangement, payment arrangement, intercompany charges or balances, or the like.

"Law" shall mean all statutes, rules, regulations, ordinances, orders, codes, permits, licenses, and agreements with or of federal, state, local, and foreign governmental and regulatory authorities, and any order, writ, injunction, subpoena, settlement agreement, or decree, issued or approved, by any court, arbitrator, or Governmental Entity, or in connection with any judicial or administrative proceeding.

"Licenses" shall mean required certificates of need, certificates of exemption, franchises, accreditations, registrations, licenses, permits, and other consents or approvals issued by any Governmental Entity or accreditation organizations necessary to operate the Business.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, claim, interest, charge or liability.

51

"Material Adverse Effect" shall mean any event, occurrence, condition, circumstance, effect, or change that would be (or could reasonably be expected to be) materially adverse to the business, assets, condition (financial or otherwise), operating results, or operations of the Business. None of the following shall, in each case, be deemed to constitute a Material Adverse Effect and none shall be considered in determining whether a Material Adverse Effect has occurred: (i) changes affecting generally the industries in which Sellers conduct the Business; (ii) any adverse effect on the Business, the Acquired Assets, or the Assumed Liabilities, taken as a whole, or the operations, properties, assets, and/or condition (financial or otherwise) relating to the Business, the Acquired Assets, or the Assumed Liabilities, taken as a whole, resulting from the execution, announcement, or pendency of the transactions contemplated by this Agreement, or other communication by Buyer of its plans or intentions (including in respect of employees) with respect to any of the Business, the Acquired Assets, or the Assumed Liabilities; (iii) the consummation of the transactions contemplated hereby, or any actions by Buyer or Sellers taken pursuant to, this Agreement or in connection with the transactions contemplated hereby; (iv) changes in general economic or political conditions, or the financing or capital markets in general; (v) changes in Laws, rules, regulations, or Orders of any Governmental Entity, or changes in accounting requirements or principles; (vi) any events or acts of terrorism, sabotage, military action, or war (whether or not declared), or any escalation or worsening thereof; (vii) any failure, in and of itself, by the Business to meet any financial projections or forecasts (it being understood that any change in Sellers underlying, or contributing to, such failure may be taken into account in determining whether there exists a Material Adverse Effect on Sellers); or (viii) changes in GAAP.

"Net Working Capital" shall be as defined on Schedule 2.3(a), as determined in accordance with GAAP and using the Agreed Procedures.

"Order" shall mean any applicable statute, rule, regulation, executive order, decree, temporary restraining order, judgment, preliminary or permanent injunction, or other order enacted, entered, promulgated, enforced, or issued by any Governmental Entity.

"Ordinary Course of Business" shall mean the ordinary course of the Business consistent with past custom and practice (including with respect to quantity and frequency).

"Patient Records" shall mean any and all written, or electronically or magnetically stored, files, charts, lists, medical histories, and other similar data maintained with respect to any Person treated, or medically consulted with, in accordance with the Business.

"Payor" shall mean Medicare, Medicaid, or any other third party payor (including any insurance company or self-insured employer), or any health care provider (such as a health maintenance organization, preferred provider organization, peer review organization, or any other managed care program).

"Permitted Encumbrances" shall mean: (a) Liens for Taxes, assessments and Governmental Entity or other similar charges that are not yet due and payable; (b) easements, licenses, restrictions and other matters of record which do not adversely effect the operation of the Business in question as currently operated and which can not reasonably be expected to adversely effect the future operation of the Business by Buyer in a manner consistent with the current use by Seller; (c) any state of facts a survey would show that do not adversely effect the operation of the Business in question as currently operated; (d) Liens arising from the Assumed Liabilities; and (e) Liens or exceptions to coverage

52

which have been reasonably approved by Buyer and are included on any policy of title insurance for the Owned Real Property that is issued to Buyer or any Related Person thereto.

"Person" shall mean any individual, corporation (including a nonprofit corporation), partnership, limited liability company, joint venture, trust, estate, association, organization, or other business entity, and any governmental body, agency, or regulatory authority.

"Related Agreements" shall mean each other related certificate, instrument or agreement required pursuant to this Agreement and to which any Seller or Buyer is a party.

"Related Person" shall mean, with respect to any Person, all past, present, and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers, or representatives of any such Person.

"Release" shall mean any release, spill, emission, leaking, pumping, emptying, dumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration of Hazardous Materials into or within the environment.

"Retained Professional" shall mean all professionals retained pursuant to an Order entered by the Bankruptcy Court.

"Schedule" shall mean any schedule to this Agreement.

"Sellers' Knowledge" shall mean and refer to all matters with respect to which (i) Sellers have received written notice or (ii) the actual knowledge of Sellers' current Interim Chief Executive Officer, Chief Restructuring Officer, Chief Financial Officer, Controller, Chief Operating Officers, Chief Nursing Officers, Chief Information Officer, and the Chief Compliance Officer, only to the extent that such officer is affiliated with such a Seller or Sellers.

"Taxes" shall mean: (i) all federal, state, county, and local sales, use, excise, property, recordation, transfer, and conveyance taxes; (ii) all state, county, and local taxes, levies, fees, assessments, or surcharges (however designated, including privilege taxes, room or bed taxes, and user fees) which are based on the gross receipts, net operating revenues, or patient days of a Sellers' facility for a period ending on, before, or including the Closing Date or a formula taking any one of the foregoing into account; and (iii) any interest, penalties and additions to tax attributable to any of the foregoing.

"Title Company" shall mean Land Services USA, Inc. or Fidelity National Title Insurance Company, as determined by Buyer in its reasonable discretion.

In addition to those terms defined above, the following terms shall have the respective meanings given thereto in the Sections indicated below:

| Defined Term | Section |
|---|---|
| Absent Employees | 5.1(i)(i) |
| Acquired Assets | 1.1 |
| Agreement | Preamble |
| Agreed Procedures | 2.3(a) |

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 58 of 64

| | |
|---|---|
| Approved Cure Cost | 1.5(b) |
| Arbitrator | 2.4(c) |
| Ardent | Preamble |
| Assigned Contracts | 1.1(d) |
| Assigned Contract Motion | 1.5(a) |
| Assigned Contract Order | 1.5(b) |
| Assumed Liabilities | 1.3 |
| Auction | 5.2(h)(ii) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Board of Trustees | 5.1(j) |
| Break-Up Fee | 8.2(d) |
| Business | Recitals |
| Business Records | 1.1(k) |
| Buyer | Preamble |
| Buyer Indemnified Parties | 9.2 |
| Buyer Plan | 5.1(i)(iv) |
| Buyer's Cure Cost | 1.5(e) |
| Buyer's Estimated Net Working Capital | 2.3(a) |
| Buyer's Final Net Working Capital | 2.4(a) |
| Cash Purchase Price | 2.1 |
| CBAs | 4.1(i)(i) |
| CHOW | 5.3(i) |
| Closing | 3.1 |
| Closing Date | 3.1 |
| COBRA | 1.3(f) |
| CMS | 4.1(o) |
| Deposit | 2.2(a) |
| Document Retention Period | 5.1(g)(ii) |
| Earnest Money Escrow Agent | 2.2(a) |
| Earnest Money Escrow Agreement | 2.2(a) |
| Equipment | 1.1(b) |
| Environmental Reports | 4.1(k) |
| Escrow Agent | 2.2(b) |
| Escrow Funds | 2.2(b) |
| Estimated Net Working Capital | 2.3(a) |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |
| Execution Date | Preamble |
| Federal Government Program Year | 1.7 |
| Final Net Working Capital | 2.4(a) |
| FH | Preamble |
| FH Diagnostics | Preamble |
| FH Enterprises | Preamble |
| FH Labs | Preamble |
| FH Ventures | Preamble |
| FHS | Preamble |
| Final Net Working Capital | 2.4(a) |

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 59 of 64

| | |
|---|---|
| Financial Statements | 4.1(l) |
| FTC | 5.1(d) |
| HCAP | 1.7 |
| Hillside | Preamble |
| HIPAA | 4.1(y)(ii) |
| Hired Employees | 5.1(i)(i) |
| HQI Program | 4.1(o) |
| Indemnification Escrow Agreement | 2.2(b) |
| Indemnified Party | 9.4 |
| Indemnifying Party | 9.4 |
| Insurance Escrow Amount | 5.1(i)(x) |
| Intangible Assets | 1.1(j) |
| Interim Statements | 5.2(e) |
| Inventory | 1.1(c) |
| Justice Department | 5.1(d) |
| Leased Real Property | 1.1(a) |
| Licensed Software | 4.1(v) |
| MOUs | 4.2(h) |
| Noticed Contracts | 1.5(a) |
| OBP | 5.1(c) |
| ODH | 5.1(c) |
| ODJFS | 5.1(c) |
| ORC | 1.7 |
| ORYX | 4.1(o) |
| Owned Real Property | 1.1(a) |
| Paid Time Off | 1.3(e) |
| PBGC | 5.3(e) |
| Petition Date | Recitals |
| Prepayments | 1.1(f) |
| Proposed Cure Cost | 1.5(a) |
| Prospective Bidders | 5.2(h)(ii) |
| Purchase Price | 2.1 |
| QNET | 4.1(o) |
| Real Property | 1.1(a) |
| Receivables | 1.1(e) |
| Reference Net Working Capital | 2.3(b) |
| Request for Additional Information | 5.1(d) |
| Retained Employees | 5.1(i)(i) |
| Retained Hospital Records | 5.1(g)(i) |
| Sale Motion | 5.2(h)(i) |
| Sale Order | Recitals |
| Sale Procedure Order | 5.2(h)(i) |
| Seller(s) | Preamble |
| Seller Indemnified Parties | 9.1 |
| Seller Plan | 5.1(i)(iv) |
| Sellers' Cost Reports | 5.1(m) |
| Sellers' Cure Cost | 1.5(f) |
| Sellers' Estimated Net Working Capital | 2.3(a) |
| Sellers' Final Net Working Capital | 2.4(b) |

| | |
|---|---|
| Software License | 4.1(v) |
| Submissions | 2.4(c) |
| Title Policy | 6.11 |
| Transferred Hospital Records | 5.1(g)(i) |
| TMH | Preamble |
| WARN Act | 5.1(i)(vi) |
| Warranties | 1.1(h) |
| WRCS | Preamble |

[SIGNATURE PAGE FOLLOWS]

56

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the date first above written.

FORUM HEALTH

By: _____

Name: Charles W. Neumann

Title: Interim Chief Executive Officer


TRUMBULL MEMORIAL HOSPITAL

By: _____

Name: Charles W. Neumann

Title: Interim Chief Executive Officer


WESTERN RESERVE CARE SYSTEM

By: _____

Name: Charles W. Neumann

Title: Interim Chief Executive Officer


FORUM HEALTH SERVICES CO.

By: _____

Name: Charles W. Neumann

Title: Interim Chief Executive Officer


FORUM HEALTH REHABILITATIVE
SERVICES CO.

By: _____

Name: Charles W. Neumann

Title: Interim Chief Executive Officer


Page 1

**FORUM HEALTH ENTERPRISES CO.**

By: _____

Name: _Charles W. Neumann_____

Title: _Interim Chief Executive Officer_


**FORUM HEALTH VENTURES CO.**

By: _____

Name: _Charles W. Neumann_____

Title: _Interim Chief Executive Officer_


**FORUM HEALTH OUTREACH
LABORATORIES, INC.**

By: _____

Name: _Charles W. Neumann_____

Title: _Interim Chief Executive Officer_


**FORUM HEALTH DIAGNOSTICS CO.**

By: _____

Name: _Charles W. Neumann_____

Title: _Interim Chief Executive Officer_


SELLERS


Page 2

AHS NEWCO 9, LLC

By: _____

Name: _____Stephen C. Petrovich_____

Title: ___Sr. VP, General Counsel_____
               & Corporate Secretary

BUYER


ARDENT MEDICAL SERVICES, INC.

By: _____

Name: _____Stephen C. Petrovich_____

Title: ___Sr. VP, General Counsel_____
               & Corporate Secretary

ARDENT

09-40795-kw    Doc 839-1    FILED 06/10/10    ENTERED 06/10/10 00:13:31    Page 64 of 64