## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Case No. 09-40795 |
| | ) Jointly Administered |
| FORUM HEALTH, et. al.,[1] | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Judge Kay Woods |
| | ) |

~~FIRST~~[3] SECOND[4] AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' ~~FIRST~~[5] SECOND[6]
AMENDED CHAPTER 11 PLAN OF LIQUIDATION

~~THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY
COURT, AND AT THIS TIME IS NOT INTENDED TO SOLICIT VOTES FOR THE PLAN.~~[7]

McDONALD HOPKINS LLC

SHAWN M. RILEY  (0037235)
SEAN D. MALLOY  (0073157)
MATTHEW A. SALERNO  (0070847)
MELISSA S. GIBERSON  (0082413)
600 Superior Avenue, East, Suite 2100
Cleveland, OH  44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:   sriley@mcdonaldhopkins.com
         smalloy@mcdonaldhopkins.com
         msalerno@mcdonaldhopkins.com
         mgiberson@mcdonaldhopkins.com

Counsel to the Debtors and Debtors in Possession

- and -

NADLER NADLER & BURDMAN CO., L.P.A.

MICHAEL A. GALLO
20 West Federal Street, Suite 60
Youngstown, OH  44503-1423
Telephone:  (330) 744-0247
Facsimile:  (330) 744-8690
Email:   gallo@nnblaw.com

---

[1]  The Debtors include:  Forum Health (31-1560189), Forum Health Diagnostics Co. (34-1773672), Forum Health Enterprises Co. (34-1368151), Forum Health Outreach Laboratories, Inc. (34-1437294), Forum Health Ventures Co. (34-1489491), Forum Health Pharmacy Services Co. (34-1754092), Forum Health Rehabilitative Services Co. (31-1581767), Forum Health Services Co. (34-1461044), Western Reserve Care System (34-1454933), Western Reserve Health Foundation (34-1461047), Dacas Nursing Support Systems, Inc. (34-1482591), Dacas Nursing Systems, Inc. (34-1456983), Beeghly Oaks (31-1196072), PrideCare, Inc. (34-1490425), Trumbull Memorial Hospital (34-1461049), Trumbull Memorial Hospital Foundation (34-1195190), Comprehensive Psychiatry Specialists, Inc. (34-1697739) and Visiting Nurse Association and Hospice of Northeast Ohio (34-0714388).  The chapter 11 cases of debtors Western Reserve Health Foundation and Trumbull Memorial Hospital Foundation were dismissed prior to the filing of the ~~First~~[1] Second[2] Amended Plan and, accordingly, these debtors and their assets are not treated under the Plan or included in the defined term "Debtors" as used in the Plan.

{2453393:14}

Co-Counsel to the Debtors and Debtors in Possession

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTEREST ........................................................................................................1

II.    SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN ...........................2

    A.    Introduction ......................................................................................................2

    B.    Explanation of Chapter 11 ................................................................................3

    C.    Preliminary Statement and Summary of Recoveries .........................................3

    D.    Overview of Treatment ....................................................................................3

          1.    Summary of Classification and Treatment Under the Plan ..................4

    E.    Who Is Entitled to Vote on the Plan .................................................................6

III.   THE DEBTORS AND THE CHAPTER 11 CASES ...................................................6

    A.    Business Overview and History ........................................................................6

    B.    Prepetition Structure ........................................................................................7

    C.    Boards of Managers and Executive Officers .....................................................7

    D.    Prepetition Debt Structure ................................................................................8

          1.    Prepetition Bond Obligations ..............................................................8
          2.    Repayment of Bond Obligations .........................................................9

IV.   ACTIVITIES WITHIN THE CHAPTER 11 CASES .................................................9

    A.    Reasons for Chapter 11 Filing .........................................................................9

    B.    The Chapter 11 Cases .....................................................................................10

          1.    First Day Relief ..................................................................................10
          2.    The Debtors' Professional Advisors ....................................................10
          3.    Appointment of the Creditors' Committee ..........................................10
          4.    Exclusivity .........................................................................................10
          5.    Bar Dates ...........................................................................................11
          6.    Administrative Bar Date .....................................................................11
          7.    Postpetition Operations .......................................................................11
          8.    Post-Petition Grant of Adequate Protection Liens ..............................11
          9.    Post-Petition Management Structure .........................~~11~~[8] ~~12~~[9]
          10.   Sale and Marketing Efforts ......................................~~11~~[10] ~~12~~[11]
          11.   Asset Sale ...........................................................................................12

    C.    Executory Contracts and Unexpired Leases ...................................~~12~~[12] ~~13~~[13]

          1.    Assumption of Contracts and Leases ....................~~12~~[14] ~~13~~[15]
          2.    Rejection of Contracts and Leases .........................~~12~~[16] ~~13~~[17]

    D.    Forum Health Insurance Ltd. ...........................................................................13

    E.    Medical Malpractice and Personal Injury Claims ............................................13

    F.    Workers Compensation ....................................................................................13

    G.    The PBGC .......................................................................................................14

    H.    Collective Bargaining Agreements ...................................................................15

    I.    Objections to Claims .......................................................................................15

J.     Distributions Prior to Effective Date ........................................................... ~~15~~[18]~~16~~[19]

K.     Avoidance Actions ...................................................................................... ~~15~~[20]~~16~~[21]

L.     The Foundations .......................................................................................... 16

V.     SUMMARY OF THE PLAN OF LIQUIDATION ......................................................... 16

    A.     Overview ..................................................................................................... 16

    B.     Overall Structure of the Plan ...................................................................... 16

    C.     Classification and Treatment of Claims ..................................... ~~16~~[22]~~17~~[23]

         1.     Payment of Administrative Claims .................................. ~~16~~[24]~~17~~[25]

         2.     Payment of Priority Tax Claims ...................................... ~~17~~[26]~~18~~[27]

         3.     Class 1: Other Priority Claims– Unimpaired ............................... 18

         4.     Class 2: Secured Claims – Unimpaired ........................................ 18

         5.     Class 3: General Unsecured Claims – Impaired ........................... 18

         6.     Class 4: PBGC Claims – Impaired ............................................... 18

         7.     Class 5: Medical Malpractice Claims – Impaired ......... ~~18~~[28]~~19~~[29]

         8.     Class 6: Debtor Interests ................................................. ~~18~~[30]~~19~~[31]

         9.     Special Provisions Relating to the Rights of Setoff of Creditors ... 19

    D.     Means for Implementation of the Plan ........................................................ 19

         1.     The Sale Generally ......................................................................... 19

         2.     Confirmation Exhibits .................................................................... 19

         3.     Winddown of the Debtors ............................................................... 19

         4.     Western Reserve Health Foundation and Trumbull Memorial Hospital Foundation ....... 19

         5.     Restricted Charitable Funds ........................................................... 20

         6.     FHIL and Merger of Certain Debtors ............................................ 20

         7.     Pension Plan ...................................................................... ~~20~~[32]~~21~~[33]

         8.     Retiree Benefits ................................................................ ~~20~~[34]~~21~~[35]

         9.     Termination of Collective Bargaining Agreements ....... ~~20~~[36]~~21~~[37]

         10.     Liquidating Trust ............................................................................ 21

         11.     Funding of and Transfer of Assets into the Liquidating Trust ....... ~~21~~[38]~~22~~[39]

         12.     Liquidating Trustee .......................................................... ~~21~~[40]~~22~~[41]

         13.     Liquidating Trust Agreement .......................................................... 22

         14.     Reports to Be Filed by the Liquidating Trustee ............................. 22

         15.     Fees and Expenses of the Liquidating Trust .................................. 22

         16.     Indemnification ................................................................. ~~22~~[42]~~23~~[43]

         17.     Tax Treatment ................................................................... ~~22~~[44]~~23~~[45]

         18.     Disposition of Assets by Liquidating Trust .................................... 23

         19.     Settlement of Causes of Actions and Disputed Claims .................. 23

    E.     Special Provisions ............................................................... ~~23~~[46]~~24~~[47]

         1.     Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims ~~23~~[48]~~24~~[49]

         2.     Liquidation of Tort Claims and Medical Malpractice Claims ....... ~~23~~[50]~~24~~[51]

         3.     Preservation of Causes of Action; Avoidance Actions .. ~~23~~[52]~~24~~[53]

         4.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ....... 24

         5.     Comprehensive Settlement of Claims and Controversies ... ~~24~~[54]~~25~~[55]

    F.     Executory Contracts and Unexpired Leases ................................ ~~24~~[56]~~25~~[57]

         1.     Assumption and Assignment ........................................... ~~24~~[58]~~25~~[59]

         2.     Cure of Defaults ............................................................... ~~24~~[60]~~25~~[61]

3.     Bar Date for Rejection Damage Claims ................................................. 24[62]25[63]
4.     Approval of Rejection ............................................................................. 25

G.     Provisions Governing Distributions ................................................................. 25

1.     Distributions for Claims Allowed as of the Effective Date ................... 25
2.     Method of Distributions to Holders of Claims ...................................... 25[64]26[65]
3.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 25[66]26[67]
4.     Undeliverable and Unclaimed Distributions .......................................... 25[68]26[69]
5.     Timing and Calculation of Amounts to be Distributed .......................... 26[70]27[71]
6.     Other Provisions Applicable to Distributions in All Classes ................. 28
7.     Holders of Record .................................................................................. 28[72]29[73]
8.     Means of Cash Payments ....................................................................... 28[74]29[75]
9.     Withholding Requirements ..................................................................... 28[76]29[77]
10.    Setoffs ..................................................................................................... 29

H.     Procedures for Resolving Disputed Claims ..................................................... 29[78]30[79]

1.     Treatment of Certain Disputed Claims .................................................. 29[80]30[81]
2.     Prosecution of Objections to Claims ..................................................... 29[82]30[83]
3.     Distributions on Account of Disputed Claims Once Allowed ............... 30[84]31[85]

I.     Consolidation of Certain Debtors .................................................................... 30[86]31[87]

1.     Limited Consolidation for Certain Purposes ......................................... 30[88]31[89]
2.     Order Granting Consolidation for Certain Purposes .............................. 30[90]31[91]

J.     Confirmation of the Plan ................................................................................. 31

1.     Conditions Precedent to Confirmation ................................................... 31
2.     Conditions Precedent to the Effective Date ........................................... 31[92]32[93]
3.     Waiver of Conditions to Confirmation or Effective Date ...................... 31[94]32[95]
4.     Cramdown .............................................................................................. 31[96]32[97]
5.     Effect of Nonoccurrence of Conditions to the Effective Date ............... 32
6.     Effect of Confirmation of the Plan ........................................................ 32
7.     Request for Waiver of Stay of Confirmation Order ............................... 33[98]34[99]

K.     Retention of Jurisdiction ................................................................................. 33[100]34[101]

VI.     MISCELLANEOUS PROVISIONS ........................................................................... 34[102]35[103]

A.     Summary of Other Provisions of the Plan ...................................................... 34[104]35[105]

B.     Modification of the Plan ................................................................................. 35

C.     Revocation of the Plan .................................................................................... 35

D.     Severability of Plan Provisions ...................................................................... 35

E.     Dissolution of Creditors' Committee .............................................................. 35[106]36[107]

F.     Successors and Assigns ................................................................................... 35[108]36[109]

VII.     RISK FACTORS TO BE CONSIDERED ................................................................... 35[110]36[111]

A.     Failure to Satisfy Vote Requirement .............................................................. 35[112]36[113]

B.     Non-Confirmation or Delay of Confirmation of the Plan .............................. 35[114]36[115]

C.     Non-Consensual Confirmation ....................................................................... 36

D.     Risk of Non-Occurrence of the Effective Date .............................................. 36

E.     Classification and Treatment of Claims .................................................. ~~36~~[116]37[117]

F.     The OBWC's Claim ................................................................................ ~~36~~[118]37[119]

G.     Appeal of the Foundations' Dismissal and Other Litigation Related to the Foundations[120] .........37

H.     Claim Objections and Reconciliation .................................................. ~~37~~[121]38[122]

VIII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................... ~~37~~[123]38[124]

A.     U.S. Federal Income Tax Consequences to the Debtors ................................................ 38

B.     U.S. Federal Income Tax Consequences to Holders of Claims .......................... ~~38~~[125]39[126]

      1.     General Treatment of Holders of Claims ......................................... ~~38~~[127]39[128]

      2.     Holders of Allowed Medical Malpractice Claims ..................................... 39

      3.     Bad Debt Deduction ............................................................... 39

C.     Federal Income Tax Treatment of Liquidating Trust and Disputed Claims Reserve ........ ~~39~~[129]40[130]

      1.     Establishment of the Liquidating Trust ............................................ ~~39~~[131]40[132]

      2.     Taxation of Holders of Beneficial Interests in the Liquidating Trust ..........................40

D.     Information Reporting and Backup Withholding .............................................. ~~40~~[133]41[134]

E.     Importance of Obtaining Professional Tax Assistance ....................................... ~~40~~[135]41[136]

IX.     FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS ............................. ~~40~~[137]41[138]

A.     Feasibility of the Plan ........................................................................ ~~40~~[139]41[140]

B.     Acceptance of the Plan ............................................................................ 41

C.     Best Interests Test .......................................................................... ~~41~~[141]42[142]

D.     Application of the 'Best Interests' of Creditors Test to the Liquidation Analysis and the Valuation ...................................................................................... ~~41~~[143]42[144]

E.     Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative~~41~~[145]42[146]

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............... ~~42~~[147]43[148]

XI.     THE SOLICITATION; VOTING PROCEDURE .................................................... ~~42~~[149]43[150]

A.     Parties in Interest Entitled to Vote ........................................................ ~~42~~[151]43[152]

B.     Voting Procedures .......................................................................... ~~42~~[153]43[154]

C.     Waivers of Defects, Irregularities, Etc. .................................................. ~~42~~[155]43[156]

D.     Withdrawal of Ballots; Revocation ....................................................... ~~43~~[157]44[158]

E.     Further Information; Additional Copies .................................................. ~~43~~[159]44[160]

XII.     CONCLUSION AND RECOMMENDATION ....................................................... ~~44~~[161]45[162]

**TABLE OF APPENDICES**

| <u>Appendix</u> | <u>Name</u> |
|---|---|
| Appendix A | DEBTORS' ~~FIRST~~[163] <u>SECOND</u>[164] AMENDED CHAPTER 11 PLAN OF LIQUIDATION |
| Appendix B | DISCLOSURE STATEMENT ORDER |
| Appendix C | VOTING INSTRUCTIONS AND PROCEDURES |
| <u>Appendix D</u>[165] | <u>AVOIDANCE ACTIONS</u>[166] |
| <u>Appendix E</u>[167] | <u>LIQUIDATION ANALYSIS BY INDIVIDUAL DEBTOR</u>[168] |

{2453393:14}

# I. INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTEREST

Forum Health ("Forum") and its affiliated Debtors, Forum Health Diagnostics Co. ("FH Diagnostics"), Forum Health Enterprises Co. ("FH Enterprises"), Forum Health Outreach Laboratories, Inc. ("FH Labs"), Forum Health Ventures Co. ("FH Ventures"), Forum Health Pharmacy Services Co. ("FH Pharmacy"), Forum Health Rehabilitative Services Co. ("HRH"), Forum Health Services Co. ("FH Services"), Western Reserve Care System ("WRCS"), Dacas Nursing Support Systems, Inc. ("Dacas Support"), Dacas Nursing Systems, Inc. ("FH Private Duty"), Beeghly Oaks ("Beeghly Oaks"), PrideCare, Inc. ("PrideCare"), Trumbull Memorial Hospital ("TMH"), Comprehensive Psychiatry Specialists, Inc. ("Comprehensive Psychiatry"), and Visiting Nurse Association and Hospice of Northeast Ohio ("FH Home Care and Hospice," together with Forum Health, FH Diagnostics, FH Enterprises, FH Labs, FH Ventures, FH Pharmacy, HRH, FH Services, WRCS, FH Private Duty, Beeghly Oaks, PrideCare, TMH, and Comprehensive Psychiatry, the "Debtors" or the "Company") the chapter 11 cases 09-40795 through 09-40799, cases 09-40801 through 09-40808, case 09-40811 and case 09-40812, jointly administered under Case No. 09-40795 (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Northern District of Ohio ("Bankruptcy Court") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), provide this ~~first~~[169]second[170] amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Debtors' ~~First~~[171]Second[172] Amended Chapter 11 Plan of Liquidation (the "Plan"). The Plan is being proposed by the Company and was filed, as amended, with the Bankruptcy Court on May ~~3,~~[173]24,[174] 2011. A copy of the Plan is attached as <u>Appendix A</u> to this Disclosure Statement.

The Plan generally provides for the liquidation of the Debtors' assets and distribution of proceeds to creditors in accordance with the Bankruptcy Code. **THE DEBTORS RECOMMEND ACCEPTANCE OF THE PLAN AND URGE CREDITORS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT IT.**

Except as otherwise provided herein, capitalized terms used, but not otherwise defined in this Disclosure Statement, have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On ____[175]May[176]__, 2011, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors and interest holders to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

The Disclosure Statement Order, a copy of which is attached as <u>Appendix B</u>, sets forth deadlines for voting to accept or reject the Plan, procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes. A Ballot for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan. In addition, voting instructions are attached hereto as <u>Appendix C</u>. THE BANKRUPTCY COURT HAS SCHEDULED A HEARING ON ____,[177]July 19,[178] 2011 AT ____[179]9:30 A[180].M. (EASTERN TIME) TO CONSIDER WHETHER TO CONFIRM THE PLAN.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Debtors' chapter 11 cases, and the closing of the sale of substantially all of Debtors' operating assets to Youngstown Ohio Hospital Company, LLC. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 8 of 53

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO PERSON IS AUTHORIZED BY ANY OF THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY ANY OF THE DEBTORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE VII, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS.

## II.    SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

### A.    Introduction

The Debtors are distributing this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to provide the Debtors' creditors with adequate information so that they can make an informed judgment on whether to accept or reject the Plan. Please read the Disclosure Statement and Plan carefully and follow the instructions on how to vote on the Plan.

### B. Explanation of Chapter 11

Pursuant to chapter 11 of the Bankruptcy Code, a debtor may reorganize or liquidate its assets for the benefit of its creditors and interest holders. In a chapter 11 case, the debtor typically remains in control of the estate as the "debtor in possession." Upon a filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay on certain actions against the debtor or its assets. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of creditors in the case. On March 23, 2009, the United States Trustee appointed the Creditors' Committee.

The provisions of the Bankruptcy Code are designed to encourage the parties in interest in a chapter 11 proceeding to negotiate the terms of the plan of reorganization or liquidation so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against a debtor. After the chapter 11 case has been filed, the holders of the claims against or interests in a debtor, whose claims or interests are impaired under the plan, may vote to accept or reject the plan. Section 1125 of the Bankruptcy Code requires a debtor, before soliciting acceptances of the proposed plan, to prepare a disclosure statement containing adequate information of the kind, and in such detail, as to enable a hypothetical reasonable investor to make an informed judgment on the plan.

### C. Preliminary Statement and Summary of Recoveries

On March 16, 2009 (the "Petition Date"), the Debtors each filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continued in the management and possession of their property as debtors in possession. No trustee or patient care ombudsman has been appointed for the Debtors.

The primary objective of the Plan is to provide a mechanism for completing the liquidation of the Debtors' remaining assets, including Causes of Action held by or in favor of the Debtors, reconciling and fixing the claims asserted against the Debtors and distributing the net liquidation proceeds in conformity with the distribution scheme provided by the Bankruptcy Code. As described below, a substantial portion of Debtors' assets were sold to Youngstown Ohio Hospital Company, LLC, an affiliate of CHS Community Health Systems, Inc., pursuant to the Order of the Bankruptcy Court issued on August 11, 2010; the Sale closed on October 1, 2010. Certain assets were excluded from the Sale, including but not limited to cash, insurance proceeds, Causes of Action and amounts due to a Debtor from intercompany transactions. The Debtors have ceased operations as a healthcare provider (such services now being provided by Youngstown Ohio Hospital Company, LLC) and the Debtors continue to wind down their affairs. Because the Plan is a plan of liquidation, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge, and will not engage in business after a final decree has been entered and their chapter 11 cases have been closed. The Allowed Claims of general unsecured creditors will not be paid in full under the Plan due to insufficient funds from the liquidation of the Debtors' assets.

### D. Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims (as defined in the Plan) are not classified under the Plan. Allowed Administrative Claims and Allowed Priority Tax Claims will be paid in full in Cash on the later of the Effective Date or when the relevant claim is Allowed. See Article V, Section C hereof for a more detailed discussion of treatment of Administrative Claims and Priority Tax Claims.

The table below summarizes the classification and treatment of the prepetition Claims under the Plan. For certain classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions for purposes of the Plan, as discussed below. See Article V, Section C hereof for a more detailed description of treatment of classified Claims and Interests.

The Debtors intend to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. The Debtors believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

**1.      Summary of Classification and Treatment Under the Plan**

The recoveries listed below for Class 3 General Unsecured Claims, the Class 4 PBGC Remaining Amount, and any remaining Class 5 Medical Malpractice Claims after payment by Insurance depend on the amount of Cash available for distribution. It is not possible at this time to definitively state that amount, as it depends on: (a) the liquidated value of the Debtors' remaining assets; (b) the amount of Allowed Administrative Claims and Allowed Priority Tax Claims; and (c) the amount of post-Effective Date Liquidating Trust Expenses. The Debtors have made a good faith estimate of that amount, which is used to calculate the estimated recoveries. In making that estimate, no value was ascribed to preference actions under section 547 of the Bankruptcy Code.

| **Description and Class of Claims** | **Estimated Allowed Amount**[2] | **Summary of Treatment** | **Estimated Projected Recovery** |
|---|---|---|---|
| **Class 1 Other Priority Claims**<br><br>Class 1 consists of all Other Priority Claims and is Unimpaired. | **$14,960** | Each holder of an Allowed Other Priority Claim will receive Cash in the amount of its Allowed Claim. | **100%** |
| **Class 2 Secured Claims**<br><br>Class 2 consists of all Secured Claims and is Unimpaired. | **$0.00** | Each holder of an Allowed Secured Claim will receive, at the option of the Debtors:<br><br>1. The net proceeds of the sale of the property securing such Claim, up to the Allowed amount of the Claim;<br><br>2. Return of the property securing the Claim; or<br><br>3. Cash equal to the value of the property securing the Claim, up to the Allowed amount of such Claim. | **100%** |

---

[2]  The dollar amounts included in the following table are estimates only and do not constitute an admission by the Debtors as to the validity or amount of any particular Claim. The Debtors reserve all rights to dispute the validity or amount of any Claim that has not already been established by the Bankruptcy Court. The summary of estimated distributions under the Plan set forth below lists both the estimated allowed amount of Claims in each Class and an estimated percentage recovery for such Class. The estimated aggregate amounts of all Classes of Claims are based on the Debtors' good faith estimates of the aggregate amount of such claims upon resolution of all such Claims that are Disputed Claims, based on all currently known information. Certain of those Disputed Claims are material, and the total asserted amount of all such Claims, including Disputed Claims, is materially in excess of the total amount of Allowed Claims assumed in the estimates listed below. The amount of any Disputed Claim that is ultimately allowed by the Bankruptcy Court may be significantly more or less than the estimated allowed amount of such Claim. For these reasons, no representation can be or is being made with respect to whether the estimated allowed amount of Claims in each Class will be accurate or whether the estimated percentage recoveries shown on the table below will be realized by the holder of an Allowed Claim in any particular Class.

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 11 of 53

| Description and Class of Claims | Estimated Allowed Amount[2] | Summary of Treatment | Estimated Projected Recovery |
|---|---|---|---|
| **Class 3 General Unsecured Claims**<br><br>Class 3 consists of all General Unsecured Claims and is Impaired. | **$152,000,000 - $~~167,000,000~~[181]162,000,000[182] (including PBGC Remaining Amount discussed below)** | Each holder of an Allowed General Unsecured Claim will receive a Pro Rata share of the net proceeds of the Liquidating Trust Assets after the payment of all Allowed Fee Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims, and the payment of all costs and expenses of the Liquidating Trust. | **~~4.88~~[183]5.49[184]% - ~~5.36~~[185]8.43[186]%** |
| **Class 4 PBGC Claims**<br><br>Class 4 consists of the Pension Benefit Guaranty Corporation ("PBGC") Claims and is Impaired. | **$140,000,000, which includes (a) $878,827 as the PBGC Administrative Claim (which amount is not classified); (b) $10,000,000, which is the deemed value of the FHIL Beneficial Interests; and (c) $129,121,173 as the PBGC Remaining Amount (which is treated in Class 3)** | In full satisfaction of the PBGC Claims, the PBGC will receive:<br>1. Payment in full in Cash of the PBGC Administrative Claim;<br>2. The Beneficial Interests in FHIL; and<br>3. Treatment of the PBGC Remaining Amount as a General Unsecured Claim in Class 3. | **100% on PBGC Administrative Claim; Unknown with respect to FHIL Beneficial Interests; ~~4.88~~[187]5.49[188]% - ~~5.36~~[189]8.43[190]% for PBGC Remaining Amount.** |
| **Class 5 Medical Malpractice Claims**<br><br>Class 5 consists of all Medical Malpractice Claims and is Impaired. | **Unknown** | Each holder of an Allowed Medical Malpractice Claim will receive recovery based on any Insurance applicable to its Claim. To the extent Insurance is insufficient to pay an Allowed Medical Malpractice Claim, the holder of such Claim will have an Allowed General Unsecured Claim for the deficiency. | **100% to the extent Claim is Insured; ~~4.88~~[191]5.49[192]% - ~~5.36~~[193]8.43[194]% for any deficiency Claim after Insurance.** |
| **Class 6 Debtor Interests**<br><br>Class 6 consists of Debtor Interests and is Impaired. | **$0.00** | No distributions will be made on account of Interests. | **0%** |

      **THE DEBTORS HAVE APPROVED THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY AND RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

      **E.**        **Who Is Entitled to Vote on the Plan**

      Only impaired classes receiving a distribution under the Plan are entitled to vote on the Plan. Accordingly, the holders of General Unsecured Claims (Class 3), PBGC Claims (Class 4), and Medical Malpractice Claims (Class 5) are the only Classes of Creditors entitled to vote on the Plan. The PBGC shall vote the PBGC Remaining

Amount in Class 3. Holders of Debtor Interests (Class 6) are not entitled to vote because no distributions will be paid under the Plan to Holders of Interest and they are deemed to reject the Plan. Holders of Other Priority Claims (Class 1) and Secured Claims (Class 2) are unimpaired and deemed to accept the Plan.

## III. THE DEBTORS AND THE CHAPTER 11 CASES

The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.

### A. Business Overview and History

Established July 29, 1997, Forum Health, an Ohio not-for-profit corporation, operated as the parent company of an extensive healthcare services network prior to October 1, 2010. Forum Health was formed as the result of the combination of separate healthcare delivery systems: Trumbull Memorial Hospital ("Trumbull," owned and operated by TMH as of the Petition Date), Northside Medical Center ("Northside," owned and operated by WRCS as of the Petition Date), and the now-closed Southside Medical Center based in Youngstown, Ohio. A third hospital campus, Hillside Rehabilitation Hospital ("Hillside") was operated by HRH as of the Petition Date.

The Debtors' primary service area consisted of Mahoning, Trumbull and Columbiana counties, located in northeast Ohio. The Debtors secondary service area consisted of Ashtabula, Geauga and Portage counties (also located in northeast Ohio) and the Pennsylvania counties of Mercer and Lawrence. In addition to the operations of Hillside, Northside and Trumbull, the Debtors operated off-site physician offices, various outpatient laboratory drawing ~~cites~~[195] sites[196], and other critical outpatient centers, making the Debtors one of the most comprehensive healthcare systems in their primary and secondary service areas.

Each of the three main hospital campuses previously operated by the Debtors had significant history in the community, with Trumbull, Northside and Hillside formed in 1907, 1881 and 1929 respectively. Trumbull and Northside are acute care facilities, housing a combined 572 beds. Hillside is a rehabilitative hospital with approximately 69 beds. In 2008, the Debtors provided critical medical care services to more than 600,000 patients through combined inpatient, outpatient and home-care visits.

Prior to the Petition Date, PrideCare, formerly a third-party administrator and licensed insurance agency, and FH Pharmacy, formerly a provider of pharmacy services to certain of the Forum Health entities, ceased operations. Also prior to the Petition Date, substantially all of the assets of Beeghly Oaks, FH Private Duty, FH Home Care & Hospice and Comprehensive Psychiatry were sold to various third-parties. As of the Petition Date, the operational Debtors employed more than 3,700 individuals, including full-time, part-time, salaried, union and temporary employees.

Shortly after the consolidation and formation of Forum Health in 1997, the Debtors began experiencing financial difficulties, leading to the implementation of several strategic cost-cutting and cost-savings initiatives. These initiatives included solicitation of additional capital through a bond issuance in 2002 (described below), significant reductions in labor and operating costs, and other strategic initiatives. In 2005, the Debtors engaged Wellspring Partners and Cain Brothers & Company LLC to assist with turnaround initiatives. These initiatives resulted in the sale or closure of several of the Debtors' operations, as described previously, although contemplated sales with respect to Northside and Trumbull were ultimately unsuccessful.

Despite these extensive turnaround initiatives, the Debtors' financial position continued to deteriorate. The deterioration of the Debtors' financial performance contributed to its deferral of maintenance and capital expenditures, compromising the long-term viability of the hospital system. Moreover, by 2008, a significant percentage of the Debtors' patients were covered by government reimbursement programs such as Medicare and Medicaid: 71% at Northside, 65% at Trumbull and 77% at Hillside.

The Debtors continuously engaged in a series of cost-cutting and revenue-enhancing initiatives in an effort to ensure the long-term viability and continuity of their services. These strategic initiatives, discussed later in this Disclosure Statement, have resulted in the Sale of substantially all of Debtors' Assets.

B.      **Prepetition Structure**

The ownership structure of the Debtors is relatively straightforward: Non-Debtor Forum Health Holding Company is the sole member of Forum Health, an Ohio not-for-profit corporation. Forum Health is, in turn, the sole member of TMH, WRCS and FH Services and FHF. TMH, WRCS, FH Services, and FHF are Ohio not-for-profit corporations. FH Services is the sole member of Ohio not-for-profit corporations Beeghly, Dacas Support, HRH, FH Home Care and Hospice, FH Pharmacy, and FH Enterprises. FH Services also is 100% owner of non-Debtor Forum Health Insurance Ltd., a Bahamian captive insurance company, and Debtor FH Ventures, an Ohio for-profit corporation. FH Ventures, in turn, is shareholder of the non-operational PrideCare, Comprehensive Psychiatry, and FH Private Duty, as well as operational for-profit Ohio corporations FH Labs and FH Diagnostics.

Following is a schematic of the ownership structure of the Debtors and operational status as of the Petition Date:



C.      **Boards of Managers and Executive Officers**

The following is the current list of the board of trustees for Forum Health.

| **Forum Health** |
| --- |



| | Name | Title | Debtor |
|---|---|---|---|
| 1. | Phillip B. Dennison | Chairman, Board of Trustees | Forum Health |
| 2. | Diane Sauer | Vice Chairman, Board of Trustees | Forum Health |
| 3. | Nancy Jastatt-Juergens | Secretary, Board of Trustees | Forum Health |
| 4. | David Cole | Trustee, Board of Trustees | Forum Health |
| 5. | Jeffrey Heintz, Esq. | Trustee, Board of Trustees | Forum Health |
| 6. | Robert Hoy | Trustee, Board of Trustees | Forum Health |
| 7. | Thomas Hura | Trustee, Board of Trustees | Forum Health |
| 8. | Nazim Jaffer, MD | Trustee, Board of Trustees | Forum Health |
| 9. | Kenneth Jones, M.D. | Trustee, Board of Trustees | Forum Health |
| 10 | David Ritchie, D.P.M. | Trustee, Board of Trustees | Forum Health |
| 11 | Stephanie Shaw | Trustee, Board of Trustees | Forum Health |
| 12 | Lee Snelson, DDS | Trustee, Board of Trustees | Forum Health |
| 13 | Peter DeVito, M.D. | Trustee, Board of Trustees | Forum Health |
| 14 | James Sudimack, M.D. | Trustee, Board of Trustees | Forum Health |

**D. Prepetition Debt Structure**

**1. Prepetition Bond Obligations**

The Debtors' Prepetition secured debt structure consisted exclusively of certain bond indebtedness incurred for the purpose of defeasing certain bonds issued on behalf of certain of the Debtors and to finance the costs of additional hospital facilities for certain of the Debtors. The Prepetition Bond Obligations (as defined below), issued by the County of Mahoning, Ohio (the "Issuer"), were as follows:

a. The Series 1997A Bonds

Fixed Rate Hospital Revenue Bonds issued by the County of Mahoning, Ohio in the original aggregate principal amount of $91,610,000 (the "Series 1997A Bonds"), pursuant to the Bond Indenture dated as of December 1, 1997 (the "Original 1997A Bond Indenture"), between Issuer and U.S. Bank National Association, as successor-in-interest to National City Bank, as bond trustee (the "Series 1997A and 2002A Bond Trustee").

b. The Series 1997B Bonds

Variable Rate Hospital Revenue Bonds issued by the County of Mahoning, Ohio in the original aggregate principal amount of $42,600,000 (the "Series 1997B Bonds"), pursuant to the Bond Indenture, dated as of December 1, 1997 (the "Original 1997B Bond Indenture") between Issuer and U.S. Bank National Association, as successor-in-interest to National City Bank, as bond trustee (the "Series 1997B and 2002B Bond Trustee, and, together with the Series 1997A and 2002A Bond Trustee, the "Bond Trustees").

c. The Series 2002A Bonds

Fixed Rate Hospital Revenue Bonds issued by the County of Mahoning, Ohio in the original aggregate principal amount of $40,000,000 (the "Series 2002A Bonds") pursuant to the original 1997A Bond Indenture, as supplemented by the First Supplemental Series 1997A Bond Indenture, dated as of November 1, 2002 (collectively, as further supplemented from time to time and in accordance with its terms, the "Series 1997A and 2002A Bond Indenture").

        d.        The Series 2002B Bonds

Variable Rate Hospital Revenue Bonds issued by the County of Mahoning, Ohio in the original aggregate principal amount of $20,000,000 (the "Series 2002B Bonds"), pursuant to the Original Series 1997B Bond Indenture, as amended and supplemented by the First Supplemental Series 1997B Bond Indenture, dated as of March 1, 2003 (as further supplemented and amended from time to time in accordance with its terms, collectively, the "Series 1997B and 2002B Bond Indenture," and together with the Series 1997A and 2002A Bond Indenture, the "Bond Indentures") (the Series 1997A Bonds, the Series 1997B Bonds, the Series 2002A Bonds and the Series 2002B Bonds, collectively, the "Prepetition Bond Obligations" or the "Bonds"). As of the Petition Date, the Prepetition Bond Obligations totaled approximately $194 million.

        **2.**        **Repayment of Bond Obligations**

As of the date of this Disclosure Statement, all of the Bonds and the Prepetition Bond Obligations have been repaid, either through adequate protection payments, the application of reserve funds, or the proceeds of the Sale of substantially all of the Debtors' assets.

## IV.        ACTIVITIES WITHIN THE CHAPTER 11 CASES

### A.        Reasons for Chapter 11 Filing

In 2002, the Debtors borrowed $60 million to invest in their business through a formal plan (the "Master Facility Plan"), which the Debtors executed between 2002 and 2005. The Master Facility Plan did not produce the expected positive results due in part to numerous economic challenges.

During this period, the Debtors' primary service area experienced a decline in population, which resulted in a lower amount of hospital admissions. As a result of this and the dramatic economic decline, admissions dropped and demographics changed. Payer mix changed unfavorably through increases in self-pay admissions and indigent admissions. The terms of private-pay insurance also changed unfavorably, as did the percentages received per patient for Medicaid and Medicare patients. Since 2005, the Debtors have not been in compliance with certain financial covenants and have experienced recurring operating losses.

In 2007 and 2008, the Debtors either closed or sold: (i) Tod Children's Hospital; (ii) Beeghly Oaks; (iii) Beeghly Medical Park; (iv) Comprehensive Psychiatry Specialists, Inc.; (v) FH Home Care and Hospice; and (vi) FH Private Duty. A proposed sale of TMH in the fourth quarter of 2007 was not successful. Despite the implementation of turnaround initiatives, the Debtors suffered operating losses of approximately $22 million, including investment losses of approximately $6 million.

The Debtors struggled with restrictive labor agreements and had difficulty reducing labor costs in conjunction with declining revenue. Although the Debtors worked with their labor unions to address contractual agreements and correlate with admission volume, these improvements were not enough. In 2006, the Debtors froze their defined benefit plan for all non-union participants and revised the non-union 401(k) plan. The Debtors also made other significant changes to the non-union benefit plans, including implementing a redesign of the healthcare program and converting vacation, sick-time and personal days into a paid-time-off program.

Despite the financial challenges, the Debtors maintained and even increased their quality of care, as noted by numerous national awards and quality benchmarks — HealthGrades 2008; Thomson Rueters pick of Top 100 Hospitals; Get with Guidelines American Heart Association — as well as continued accreditation by the Joint Commission. The Debtors' commitment to the community is evident through their mission of not turning anyone away regardless of the ability to pay. However, the Debtors' pre-existing problems, coupled with the economic crisis, combined to reduce the Debtors' liquidity to the point where filing for chapter 11 protection became necessary.

### B.     The Chapter 11 Cases

After evaluating their alternatives and consulting with their advisors, the Debtors determined that the interests of their creditors, patients and employees were best served by attempting to reorganize under the Bankruptcy Code.  On the Petition Date, as authorized and directed by the Board of Trustees of the Debtors, the Debtors each filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court in an effort to preserve and maximize the value of their businesses and assets.  At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code.  The Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### 1.     First Day Relief

On the Petition Date, the Debtors filed "first day" motions with the Bankruptcy Court seeking certain relief in order to continue uninterrupted operations, including payment of prepetition wages, trust fund taxes and insurance and the acquisition of the use of cash collateral, among other things.  Such relief helped to facilitate the administration of the Chapter 11 Cases.

### 2.     The Debtors' Professional Advisors

The Debtors have been advised by the following:  McDonald Hopkins LLC and Nadler, Nadler and Burdman Co., L.P.A. as the Debtors' chapter 11 co-counsel; Huron Consulting Services LLC, as the Debtors' Chief Restructuring Officer and Financial Support Personnel; Houlihan Lokey Howard and Zukin Capital, Inc. ("Houlihan Lokey") as the Debtors' Investment Banker; Ernst & Young LLP as the Debtors' independent auditors; Baker and Hostetler as special counsel; Thompson Hine LLP as special counsel; Squire, Sanders & Dempsey LLP as bond counsel, and various other legal firms as ordinary course or special counsel, primarily defending various lawsuits and providing compliance counsel.

### 3.     Appointment of the Creditors' Committee

The Office of the United States Trustee appointed the Creditors' Committee on March 23, 2009, as ~~modified on March 25, 2009.~~[197] amended thereafter.[198]  On April 30, 2009, the Bankruptcy Court entered orders approving the retention of Alston & Bird LLP as counsel to the Creditors' Committee.  Grant Thornton LLP was retained as the financial advisor to the Creditors' Committee.

### 4.     Exclusivity

The Debtors filed their Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and to Solicit Acceptances Thereto (the "Exclusivity Motion"), Docket No. 290 on June 15, 2009.  After a hearing on July 14, 2009, the Court entered an order, Docket No. 373, (a) extending the Debtors' exclusive period to file a chapter 11 plan of reorganization under section 1121(d) of the Bankruptcy Code to September 15, 2009 (the "Exclusivity Period"), (b) extending the Debtors' exclusive period to solicit acceptances for such plan pursuant to section 1121(c) of the Bankruptcy Code to September 15, 2009 (the "Solicitation Period"), (c) further providing that, in the event the Debtors filed a Plan acceptable to the Consent Parties on or before September 15, 2009, the Solicitation Period would extend through and including November 16, 2009.  The Exclusivity Period and the Solicitation Period have both subsequently expired.

On May 14, 2010, certain of the Debtors' secured creditors or their agents (the "Consent Parties") filed the Joint Plan of Reorganization Proposed by the Consent Parties, Docket No. 784 (the "Consent Parties' Plan"). Concurrently therewith, the Consent Parties also filed the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Joint Plan of Reorganization Proposed by the Consent Parties, Docket No. 785.  In light of the Sale closing on October 1, 2010, the Consent Parties voluntarily withdrew their disclosure statement and plan on October 6, 2010, Docket No. 1160.

The Creditors' Committee filed a Plan of Liquidation, Docket No. ~~1339,~~[199]1339 (the "Committee Plan"),[200] on February 2, 2011. Concurrently therewith, the Creditors' Committee also filed a Disclosure Statement, Docket No. ~~1340. The objection deadline for~~[201]1340 (the "Committee Disclosure Statement") and a Motion to Approve the Committee Disclosure Statement, Docket No. 1341. On April 12, 2011, the Debtors filed their Objection to the Committee's Disclosure Statement, Docket No. 1545. On May 9, 2011,[202] the Creditors' Committee ~~disclosure statement is March 8, 2011, and the hearing is March 15, 2011.~~[203]voluntarily withdrew, without prejudice, its Motion to Approve the Committee Disclosure Statement, but did not withdraw the Committee Plan or the Committee Disclosure Statement. After notice and a hearing held May 10, 2011, the Bankruptcy Court entered an order disapproving the Committee Disclosure Statement for failure to contain adequate information, Docket No. 1633. [204]

On February 11, 2011, the Debtors filed their Chapter 11 Plan of Liquidation, Docket No. 1364, their Disclosure Statement to the Chapter 11 Plan of Liquidation, Docket No. 1365, and their Motion for an Order Approving the Disclosure Statement, Docket No. 1366. On April 12, 2011, the Creditors' Committee filed its Objection to the Debtors' Disclosure Statement and Disclosure Statement Motion, Docket No. 1544. On May 3, 2011, the Debtors filed their First Amended Chapter 11 Plan of Liquidation, Docket No. 1602 and their First Amended Disclosure Statement, Docket No. 1603, in each instance containing modifications to the Debtors' Plan and Disclosure Statement to account for events which had transpired since the initial filing of the Debtors' Chapter 11 Plan in February 2011 and to clarify certain mechanisms for distribution. On May 10, 2011, the Bankruptcy Court held a hearing at which the Bankruptcy Court approved the Debtors' First Amended Plan and First Amended Disclosure Statement, subject to certain clarifying modifications, which are reflected in this Second Amended Disclosure Statement and the Second Amended Plan. [205]

## 5. Bar Dates

The Bankruptcy Court established a bar date for filing proofs of Claim. Generally, proofs of Claim were required to be filed no later than August 3, 2009, except that proofs of Claim for any governmental units were required to be filed no later than September 14, 2009, Docket No. 301.

## 6. Administrative Bar Date

The Bankruptcy Court established an Administrative Claims Bar Date of December 22, 2010, Docket No. 1234. The Administrative Claims Bar Date applies to each and every administrative expense claim incurred or arising on or before October 1, 2010 with the exception of the following: (i) professionals pursuant to sections 330, 331 and 503(b) of the Bankruptcy Code; (ii) claims of the U.S. Trustee under section 28 U.S.C. § 1930(a)(6); and (iii) any administrative expense previously approved by the Court. The Debtors published the Administrative Claims Bar Date in the Wall Street Journal, the Vindicator, and The Tribune Chronicle and filed a certification of the notice in these publications, Docket No. 1311.

## 7. Postpetition Operations

Immediately following the Petition Date, the majority of the Debtors' time was spent on stabilizing their business operations and completing the transition to operating as chapter 11 debtors in possession. The Debtors worked diligently with various key parties to achieve these tasks through various means, including: (a) implementing various forms of relief granted by the Bankruptcy Court on the Petition Date to allow the Debtors to maintain business as usual to the fullest extent possible; (b) negotiating for the use of cash generated by the Debtors' businesses; (c) analyzing various issues relating to executory contracts; and (d) formulating an overall restructuring strategy, or in the alternative, a sale of substantially all assets.

## 8. Post-Petition Grant of Adequate Protection Liens

In accordance with the terms of that certain Agreed Final Order Authorizing Debtors' Use of Cash Collateral, Pursuant to 11 U.S.C. §§ 101, 361 and 363, and Granting Replacement Liens, Adequate Protection and Administrative Expense Priority to the Master Trustee, Bond Trustees and Prepetition Secured Creditors, as the

same has been supplemented and amended from time to time (the "Final Cash Collateral Order"), the Debtors granted certain replacement liens in substantially all of the Debtors' assets, for the benefit of the holders of the Prepetition Bond Obligations, as adequate protection during the pendency of these Chapter 11 Cases.

### 9. Post-Petition Management Structure

On September 9, 2009, the then-chief executive officer of the Debtors, Walter Pishkur, notified the Debtors' Board of Trustees of his intent to separate from his employment with the Debtors. On October 30, 2009, an Order was entered by the Bankruptcy Court, Docket No. 539, approving the engagement of Mr. Charles Neumann as interim chief executive officer of the Debtors. Mr. Neumann continued in this interim role through October 31, 2010. The Debtors wind down is now being managed by Dalton Edgecomb, the Debtors' Chief Restructuring Officer.

### 10. Sale and Marketing Efforts

The Debtors engaged Houlihan Lokey as their investment banker. Houlihan Lokey was charged with assisting the Debtors in developing a plan of reorganization as well as pursuing a sale. Houlihan Lokey spent significant time identifying and contacting potential bidders, soliciting bids, and helping Debtors select a lead bidder for the sale of the Debtors' assets.

### 11. Asset Sale

In June 2010, the Debtors in conjunction with their advisors determined that one party, AHS Newco 9, LLC, a subsidiary of Ardent Medical Services ("Ardent"), provided the best "stalking horse" offer for the Debtors' assets with a purchase price of $69,800,000. The sale procedures, as set forth in the Sale Order, Docket No. 1072, provided for an auction of Debtors' assets with Ardent as the stalking horse bidder. Pursuant to the procedures approved in the sale procedures order, bids for the purchases of the sale assets were due by 5:00 p.m. (E.S.T.) August 3, 2010. As of the bid deadline, the Debtors received one competing bid from Youngstown Ohio Hospital Company, LLC, an affiliate of CHS Community Health Systems, Inc.

On August 5, 2010, the Debtors conducted an auction. Following the receipt of multiple bids and counter bids, the Debtors decided that the bid from Youngstown Ohio Hospital Company, LLC (the "Purchaser") was the highest and best bid for the sale of assets and declared such bid to be the prevailing bid.

Ardent was the backup bidder, having submitted the backup bid as its final bid at the auction. As such, Ardent was entitled to a break-up fee, as well as payment for certain expenses to be approved by the Bankruptcy Court. Following the Bankruptcy Court approval of the Sale, the Debtors and Purchaser sought to satisfy the closing conditions and obtain necessary regulatory approvals.

The Asset Purchase Agreement between the Debtors and the Purchaser was entered into on August 10, 2010. On August 11, 2010, the Court granted the Debtors' Motion to (i) approve the Asset Purchase Agreement and (ii) authorized the sale of certain assets of the Debtors. CHS Community Health Systems, Inc. was a party to the Asset Purchase Agreement for purposes of guarantying the obligations of the Buyer. The Asset Purchase Agreement provided that the Purchaser would acquire substantially all of the Debtors' assets. Additionally, in accordance with the Sale Order, Ardent was granted a break-up fee of $750,000 and reimbursement expenses in the amount of $1,750,000, Docket No. 1260.

The Sale Closing Date occurred on October 1, 2010. At closing, the Debtors received a cash payment of $119,974,000 after, among other things, purchase price adjustments. Thereafter, and consistent with the Sale Order, the Debtors paid, from the proceeds of the Sale, all of the Prepetition Bond Obligations. A dispute regarding the exact payoff amount for the Series 2002A Bonds was resolved in a stipulation and agreed order regarding payment of the Series 2002A Bond, Docket No. 1275, entered by the Court on November 30, 2010. As a result, all of the Prepetition Bond Obligations have been satisfied. The Debtors and the Creditors' Committee disputed the payoff amount for the Series 2002A Bonds. After agreeing by stipulation to escrow the amount in dispute, the final payoff was agreed to pay the parties. The agreement was documented in the Stipulation and Agreed Order Regarding

Payment of Series 2002A Bonds, Docket No. 1275 (the "Stipulation"). The Stipulation allowed the Series 2002A Bonds to be satisfied as of December 2010, and the Prepetition Bond Obligations to be satisfied in full.

### C. Executory Contracts and Unexpired Leases

#### 1. Assumption of Contracts and Leases

The Debtors filed numerous motions with the Bankruptcy Court that identified certain contracts material to the operation of the business that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. The related orders concerning the assumption and assignment of contracts, authorized, but did not direct the Debtors to assume and assign the applicable agreements to the Purchaser. Prior to the Effective Date, the Debtors provided notice of the contracts that they wanted to assume and assign to the Purchaser. In accordance with the Sale Order, the Purchaser paid any and all necessary cure costs as part of the assumption and assignment of the assigned executory contracts.

#### 2. Rejection of Contracts and Leases

The Debtors reviewed various executory contracts and unexpired leases and concluded that certain contracts and leases were not beneficial to the estate. The costs associated with maintaining and/or marketing such contracts and leases, in addition to the cure amounts, that would be required to be paid if the contracts and leases were to be assumed and assigned, would be significantly greater than any potential value that might be realized by any future sale or sublease of such contracts and leases. All executory contracts of the Debtors other than contracts previously assumed will be rejected pursuant to the Plan.

### D. Forum Health Insurance Ltd.

Western Reserve Insurance Limited ("WRIL") was created on May 18, 1994. WRIL changed its name to Forum Health Insurance Limited ("FHIL") on April 15, 1998. FHIL is a non-debtor entity that is registered as a captive insurance company under Bermuda law. FHIL provides professional liability insurance coverage for the hospital and its employees, as well as physician professional medical liability, independent physician professional liability, general liability, and directors' and officers' liability coverage. FHIL is a wholly-owned subsidiary of Forum and is jointly and severally liable for the claims of the Pension Benefit Guaranty Corporation ("PBCG") for unfunded benefits. The Debtors plan to wind down FHIL, and use their Beneficial Interests in FHIL to pay a portion of the PBGC's Claims, as described in more detail below.

### E. Medical Malpractice and Personal Injury Claims

Due in large part of the nature of the business, the Debtors are subject to various law suits and claims made against them. These law suits and claims include medical malpractice and personal injury claims. FHIL insures the Debtors in these instances and the Debtors believe that there is adequate coverage for such claims. Medical Malpractice Claims are more specifically addressed in Article V, Section C.7 below.

### F. Workers Compensation

Ohio law required the Debtors to maintain workers' compensation policies and programs to provide their employees with workers' compensation coverage for claims arising from or related to their employment with one of more of the Debtors (collectively the "Workers' Compensation Claims"). Pursuant to these requirements, the Debtors previously maintained a partially Self-Insured Policy for Workers' Compensation Claims (the "Workers' Compensation Self-Insured Policy") covering, *inter alia*, Workers' Compensation Claims up to the statutory limits placed on such claims by the State of Ohio. Claims against this policy were paid from an account maintained at Fifth Third Bank solely for the purpose of funding and paying Workers' Compensation Claims. In connection with the administration of the Workers' Compensation Self-Insured Policy, the state of Ohio was the beneficiary of a letter of credit insured by Fifth Third Bank in the amount of approximately $4,114,000 (the "Letter of Credit"). The Letter of Credit was issued on November 1, 2006, by Fifth Third Bank. In 2009, Fifth Third informed the Ohio Bureau of Workers' Compensation (the "OBWC") that it would not renew the Letter of Credit and OBWC drew the

entire $4,114,000. In accordance with the terms and conditions of the Letter of Credit, Fifth Third was obligated to pay the OBWC the full amount. As a result, OBWC is holding at least $4,114,000 in cash on account of the Debtors' obligations to OBWC.

Additionally, under Ohio state law the Debtors were required to maintain excess workers' compensation coverage. Debtors' excess coverage for Workers' Compensation Claims was provided through Safety National Casualty Company, a commercial third-party insurer (the "Excess Workers' Compensation Coverage", and together with the Workers' Compensation Self-Insured Policy, the "Workers' Compensation Program"). The Excess Workers' Compensation Coverage provides for losses in excess of $400,000 per occurrence retention for recent policy years. The Excess Workers Compensation Coverage provides coverage for allowed Workers' Compensation Claims incurred through October 1, 2010, the Closing Date.

After the Closing Date, the Debtors ceased making payments on workers' compensation claims because they were no longer required to be complying employers. In accordance with the terms and conditions of the Letter of Credit, the OBWC will use the proceeds from the Letter of Credit to satisfy Workers' Compensation Claims. The OBWC filed two proofs of claim, a general unsecured claim of $11,640,674.79, and a priority claim in the amount of $4,140,967.35. The Debtors believe that the OBWC's general unsecured claim is overstated and will file an objection accordingly. In addition, the Debtors will file an objection to the OBWC's unsecured priority claim of $4,140,967.35 as they do not believe that the claim is calculated properly or entitled to priority under section 507(a)(8) of the Bankruptcy Code.

G.      The PBGC

The Debtors and their predecessors have maintained the Pension Plan since January 1, 1968. The Pension Plan is a qualified defined benefit pension plan covered under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Pension Plan is subject to the funding requirements of ERISA and the Internal Revenue Code of 1986, as amended (the "IRC") and is qualified under the section 401(a) of the IRC. The PBGC is a wholly owned United States government corporation, and an agency of the United States, that administers the defined benefit pension termination insurance program under Title IV of ERISA. As a qualified defined benefit plan, the Pension Plan is insured by the PBGC. When a pension plan covered by Title IV terminates without sufficient assets to pay all of its accrued liabilities, the PBGC typically becomes trustee and administrator of the pension plan, assumes responsibility for the administration of the plan and its trust, and pays plan participants their pension benefits, subject to certain statutory limits.

The Pension Plan covers approximately 7,132 former employees (the "Participants"). The majority of the Participants previously retired and have started receiving benefits (1,763 retirees) under the Plan, or have terminated their employment with the right to receive retirement benefits at some point in the future (1,814 deferred vested participants). Prior to the Petition Date, the Pension Plan had been amended to freeze additional accrual of benefits for all remaining employees of Forum, other than eligible employees that had attained age 55 and 10 years of service with Forum as of December 31, 2001 (the "Grandfathered Participants"). The number of Grandfathered Participants in the Pension Plan as of the Petition Date was approximately 107.

Since the filing of the Petition, the Debtors failed to make the quarterly required minimum contribution because of the lack of available funds. On March 15, 2009, the Debtors filed a notice of failure to make required contributions with the PBGC. Thereafter, on or about July 15, 2009, the Debtors sent a Notice of Intent to Terminate the Pension Plan to affected Participants and the PBGC. On July 16, 2009, a PBGC Form 600, *et seq.,* the form required to initiate a distress termination, was filed with the PBGC requesting the PBGC to approve termination of the Pension Plan in the form of a distress termination. On September 15, 2009, Forum filed for distress termination of the Pension Plan with the PBGC. Also, as of September 15, 2009, the Pension Plan was amended to freeze all remaining benefit accruals for the Grandfathered Participants and all further benefits accruing under the plan. The amendment to the Pension Plan was permitted under the various Collective Bargaining Agreements covering the Grandfathered Participants in the Pension Plan as of such date. Notice of the cessation of all remaining benefit accruals was timely provided to the applicable unions, the PBGC and the participants in the Pension Plan in accordance with the requirements of ERISA. With few Participants still accruing benefits under the Plan as of the time of the Petition Date, and because of all accruals ceased as of September 15, 2009, only a small portion of total contribution owed to the Forum Plan is due post-petition services with the Debtors.

During the course of these events, the PBGC filed contingent Claims against the Debtors on behalf of itself and the Pension Plan, which included: (i) Proof of Claim No. 606, filed as an unliquidated administrative priority claim for unfunded contributions; (ii) Proof of Claim No. 607, filed as an unliquidated administrative priority claim for the alleged additional PBGC premium on termination; (iii) Proof of Claim No. 629, filed as an administrative priority claim for unfunded benefit liabilities in the amount of $207,300,000; and (iv) Proof of Claim No. 954, filed as an administrative priority claim for the portion of the cost of benefits earned by Plan participants during the post-petition period in the amount of $648,183.

Pursuant to a request from the PBGC, the Debtors delayed seeking court approval to determine that they met the financial requirements under ERISA for a distress termination. The Debtors and the PBGC have recently engaged in negotiations and an agreement has been reached under which the PBGC has assumed the obligations of Debtors' Pension Plan, which is deemed to have terminated as of September 30, 2009. This agreement is effectuated by a trust agreement. The PBGC and Debtors have entered into a settlement agreement (the "PBGC Settlement Agreement") whereby, in exchange for a full release from the PBGC, the PBGC will have an allowed unsecured claim in the amount of $140,000,000 ("PBGC Unsecured Claim") and an allowed administrative claim of $878,827 ("PBGC Administrative Claim"). The PBGC Settlement Agreement was approved by the Bankruptcy Court on April 28, 2010, Docket No. 1593. The PBGC will also be granted the Beneficial Interests in FHIL, which shall be deemed to reduce the General Unsecured Claim by $10 million in accordance with Plan Section 5.4.3 Accordingly, the PBGC will receive $878,827 in cash for its Administrative Claim, the FHIL Beneficial Interest (estimated at $10 million), and an unsecured claim. The PBGC Unsecured Claim will be offset by: (a) the FHIL Beneficial Interest, which is estimated at $10 million, and (b) the PBGC Administrative Claim. The resulting net amount is $129,121,173 (the "PBGC Remaining Amount"). The PBGC Remaining Amount will be paid pro rata with other General Unsecured Claims.

### H.  Collective Bargaining Agreements

As of the Petition Date, the Debtors were a party to seven Collective Bargaining Agreements with the Unions, covering approximately 2,800 employees. Since before the Petition Date, the Debtors were engaged in negotiations with the Unions regarding modifications to the Collective Bargaining Agreements to cut operating losses at the hospitals. The Debtors, led by their former Chief Executive Officer, reached agreements with all collective bargaining units except the bargaining unit of SEIU operating at Northside ("SEIU Northside") and the bargaining unit of ONA operating at Northside ("ONA Northside"). Accordingly, on July 3, 2009, the Debtors filed their Omnibus Motion for an Order Pursuant to 11 U.S.C. § 1113(I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Granting Interim Relief Related Thereto, Docket No. 319 (the "1113 Motion"). Prior to the Bankruptcy Court ruling on the 1113 Motion, however, the Debtors entered into stipulated orders (the "1113 Orders") resolving the 1113 Motion with respect to SEUI Northside and ONA Northside and achieving certain negotiated concessions to the SEUI Northside and ONA Northside Collective Bargaining Agreements.

Ultimately, the concessions received consensually by the Debtors were insufficient to meet the needs of the Purchaser. The Purchaser, therefore, opted not to assume any of the Debtors' Collective Bargaining Agreements or the obligations and liabilities related thereto (with the exception of certain successorship provisions detailed in the applicable Collective Bargaining Agreement or, if not provided for in the Collective Bargaining Agreement, as provided by law). The Debtors have approached the Unions in an effort to secure consensual termination of the Collective Bargaining Agreements. If consensual termination cannot be agreed to, or is not ultimately approved by the Bankruptcy Court, the Debtors will pursue termination in accordance with the provisions of section 1113 of the Bankruptcy Code.

### I.  Objections to Claims

On February 3, 2010, the Debtors filed three omnibus objections seeking to disallow and expunge Claims based upon the following grounds: (i) Claims that were amended and replaced by subsequently filed Claims, along with Claims that were filed past the Bar Date, (ii) Claims that were duplicate in nature, and (iii) Claims that were filed without supporting documentation. A number of the objections to Claims resulted in claimants filing responses. The Debtors worked with many of the responding claim holders of Claims to reach a resolution and entered into a number of agreed orders that were filed with the Court. The Bankruptcy Court entered orders granting certain relief requested in Debtors' omnibus objections on March 25, 2010, which resulted in the

disallowance and expungement of claims in the approximate amount of $21 million. The Debtors intend to continue the Claims objection process to accurately reconcile Claims and ensure that creditors are treated fairly.

### J.  Distributions Prior to Effective Date

As discussed above, prior to the Effective Date, substantially all of the Debtors' Assets will have been liquidated and converted to Cash for ultimate distribution in a manner described in the Plan. As of the date of this Disclosure Statement, the Debtors have paid in full or otherwise satisfied the Prepetition Bond Obligations. Through the Closing Date, the Debtors continued to pay post-petition obligations in the ordinary course of business. Subsequent to the Closing Date, the Debtors have ceased operations and do not continue to incur ordinary course obligations.

### K.  Avoidance Actions

The Debtors, together with the Creditors' Committee's advisors, ~~are conducting~~[206] conducted[207] an analysis of potential avoidance actions ~~that are~~[208] available to the Debtors under chapter 5 of the Bankruptcy Code or otherwise. Where appropriate, such actions ~~will be commenced in order to recover avoidable prepetition transfers (or achieve potential Claim reductions under section 502(d) of the Bankruptcy Code).~~[209] were commenced by the Debtors. A list of avoidance actions filed by the Debtors is set forth on Appendix D to this Disclosure Statement. Subsequent to the commencement of these actions, the statute of limitations with respect to avoidance actions available under chapter 5 of the Bankruptcy Code expired, and no further avoidance actions will be commenced. Notwithstanding anything in this Disclosure Statement or the Plan to the contrary, the Debtors do not waive or release the right to assert any avoidance action or potential avoidance action (whether filed or not) as a defense to any claim. [210] The recoveries from these avoidance actions may increase cash available for the benefit of the Debtors' unsecured creditors.

### L.  The Foundations

On February 4, 2010, Western Reserve Health Foundation ("WRHF") and Trumbull Memorial Hospital Foundation ("TMHF" and together with WRHF, the "Foundations") filed motions to dismiss their respective chapter 11 cases, Docket Nos. 1347 and 1349 respectively. The Committee objected to the proposed dismissals, seeking access to the unrestricted funds of the Foundations to pay the creditors of all of the Debtors. After notice and a hearing, the Bankruptcy Court overruled the Committees' objection and entered an order dismissing the Foundations' chapter 11 cases, Docket No. 1483. The Committee moved for an order staying the dismissal pending the outcome of an appeal filed by the Committee. On April 22, 2011, the Bankruptcy Court denied the Committee's request for a stay pending appeal. The appeal is currently pending before the United States District Court for the Northern District of Ohio.

## V.  SUMMARY OF THE PLAN OF LIQUIDATION

### A.  Overview

The Plan provides for the assets and liabilities of all Debtors (other than the Foundations, whose cases have been dismissed) to be substantively consolidated. The assets will be contributed to a Liquidating Trust, which will complete the liquidation of all assets and distribute the available cash to creditors in accordance with the priority scheme of the Bankruptcy Code.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

B.      **Overall Structure of the Plan**

The Plan follows the closing of a Sale of most of the Debtors' operating assets to Youngstown Ohio Hospital Company, LLC and contemplates the liquidation of the unsold assets and distribution of all proceeds pursuant to the Plan. The Debtors believe that the Plan provides the highest, best and most timely possible recovery to the Debtors' Claim holders. Under the Plan, Claims against the Debtors are divided into different Classes. If the Plan is confirmed by the Bankruptcy Court and consummated, at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Debtors and/or the Liquidating Trustee will make distributions to certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

Under the Plan, there are four classes of Impaired Claims (Class 3 General Unsecured Claims, Class 4 PBGC Claims, Class 5 Medical Malpractice Claims and Class 6 Debtor Interests). All other Claims are unimpaired; Holders of Class 1 Other Priority Claims and Class 2 Secured Claims will be unimpaired by the Plan.

C.      **Classification and Treatment of Claims**

1.      **Payment of Administrative Claims**

a.      Administrative Claims in General

Except as otherwise specified in Plan Section 2.1, and subject to the Bar Date provisions in the Plan, unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim on the later of (i) the Effective Date, or (ii) to the date on which such Administrative Claim becomes an Allowed Administrative Claim.

b.      Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Allowed Administrative Claims. With respect to any Chapter 11 Case not converted, closed or dismissed in accordance with the provisions of Plan Sections 2.2.6 and 3.4, all fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Liquidating Trustee until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

c.      Bar Date for Administrative Claims

(i)      General Administrative Claim Bar Date Provisions

Except as otherwise provided in the Plan or an order of the Bankruptcy Court, requests for payment of Administrative Claims must have been Filed pursuant to the procedures specified in the Administrative Bar Date Order. Holders of Administrative Claims that did not File and serve such a request by the Administrative Bar Date are forever barred from asserting such Administrative Claims against the Debtors, the Liquidating Trust or their respective property, and any such alleged Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed by the Claims Objection Bar Date.

(ii)      Bar Dates for Professional Compensation

All unpaid Fee Claims incurred by Professionals prior to the Effective Date will be subject to final allowance or disallowance upon application to the Bankruptcy Court pursuant to sections 328, 330 or 503(b)(4) of the Bankruptcy Code. Final applications for allowance of Fee Claims for services rendered in connection with the Chapter 11 Cases will be Filed with the Bankruptcy Court no later than 30 days after the Effective Date, provided, however, that any professional receiving compensation or reimbursement of expenses pursuant to the Ordinary

Course Professionals Order may continue to receive compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further review or approval of the Bankruptcy Court (except as provided in the Ordinary Course Professional Order). Objections to any Fee Claims must be filed and served on the Notice Parties and the requesting party by the later of: (a) 60 days after the Effective Date; (b) 30 days after the filing of the applicable request for payment of the Fee Claim; and (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

### 2.     Payment of Priority Tax Claims

a.     Priority Tax Claims

Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim, on the later of (a) the Effective Date or (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. With respect to any Allowed Priority Tax Claim held by the OBWC, the OBWC will be entitled to draw on the Workers' Compensation Fund, which will be deemed to constitute the Debtors' timely Cash payment pursuant to Plan Section 2.1.2.a.

b.     Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Plan Section 2.1.2.a, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 3 (General Unsecured Claims), as applicable, if not subordinated to Class 3 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Liquidating Trust or their respective property (other than as a holder of a Class 3 Claim).

### 3.     Class 1:  Other Priority Claims– Unimpaired

Each Holder of an Allowed Other Priority Claim will receive, in full satisfaction of its Other Priority Claim, Cash equal to the amount of such Allowed Other Priority Claim on the later of (a) the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

### 4.     Class 2:  Secured Claims – Unimpaired

Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, 30 days after the later of (a) the Effective Date and (b) the date on which the Claim is Allowed, in full satisfaction of its Allowed Claim, each Holder of an Allowed Secured Claim will receive, at the option of the Debtors: (a) the net proceeds of the sale of the property securing such claim, up to the Allowed amount of such claim; (b) the return of property securing such claim; or (c) Cash equal to the value of the property securing such claim, up to the value of the Allowed Secured Claim.

### 5.     Class 3:  General Unsecured Claims – Impaired

On one or more Distribution Dates, each Holder of an Allowed General Unsecured Claim will receive a Pro Rata share of the net proceeds of the Liquidating Trust Assets after the payment of all Allowed Fee Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims, and the payment of all costs and expenses of the Liquidating Trust.

The obligations to holders of Allowed General Unsecured Claims will be governed by the Liquidating Trust Agreement.

09-40795-kw     Doc 1645     FILED 05/24/11     ENTERED 05/24/11 17:13:25     Page 25 of 53

6. **Class 4: PBGC Claims – Impaired**

In full satisfaction of the PBGC Claims, the PBGC will receive: (i) the PBGC Administrative Claim, to be treated in accordance with Plan Section 2.1.1; (ii) the Beneficial Interests in FHIL, which will be delivered to the PBGC in accordance with the agreement between the PBGC and the Debtors; and (iii) the PBGC Remaining Claim, to be treated in accordance with Plan Section 2.2.3. The PBGC will be entitled to vote the PBGC Remaining Claim as a part of Class 3 (General Unsecured Claims).

7. **Class 5: Medical Malpractice Claims – Impaired**

On the Effective Date, each holder of a Medical Malpractice Claim will (i) affirmatively elect, by submission of an executed copy of the Election Form attached to the Plan as Plan Exhibit B to counsel for the Debtors, to be granted relief from the automatic stay to liquidate the amount of such holder's Medical Malpractice Claim in an appropriate legal forum or (ii) in the absence of an affirmative election of the type specified in subsection (i) have such Medical Malpractice Claim estimated by the Bankruptcy Court. If the holder of a Medical Malpractice Claim elects relief from the stay to liquidate the amount of its Claim, and the Claim has not been liquidated within one year of the Effective Date, the Liquidating Trustee may seek estimation of the Claim by the Bankruptcy Court for purposes of determining the amount of Class 3 deficiency Claim. In each instance, any recovery by such holder on account of an Estimated Medical Malpractice Claim or an Adjudicated Medical Malpractice Claim will be limited to Insurance. To the extent Insurance is insufficient to pay any Estimated Medical Malpractice Claims and/or any Adjudicated Medical Malpractice Claims, the holder of such claim will be entitled to a Class 3 Allowed General Unsecured Claim for any deficiency. Nothing in Plan Section 2.2.5. will alter, modify, void, limit or impair the provisions of any Relief From Stay Order previously entered in these Chapter 11 Cases.

8. **Class 6: Debtor Interests**

On the Effective Date, except as provided in Plan Section 3.4, with respect to Interests in Forum Health and Forum Health Ventures Co., all Interests will be cancelled. All Interests are not entitled to any distributions under the Plan.

9. **Special Provisions Relating to the Rights of Setoff of Creditors**

Nothing in the Plan will expand or enhance a creditor's right of setoff, which will be determined as of the Petition Date. Nothing in the Plan is intended to, or will be interpreted to, approve any creditor's effectuation of a postpetition setoff without the consent of the Debtors unless prior Bankruptcy Court approval has been obtained.

D. **Means for Implementation of the Plan**

1. **The Sale Generally**

On October 1, 2010, the closing of the purchase and sale of the acquired Assets and assumption of the assumed Liabilities took place at the offices of McDonald Hopkins LLC. On the Closing Date, the Debtors and Purchaser executed and delivered all applicable documents simultaneously. Immediately following the closing of the Sale, a portion of the proceeds was wired to the Master Trustee for the benefit of the holders of the Bonds. The remaining proceeds of the Sale will be distributed in accordance with the terms of the Plan and by the Liquidating Trustee.

2. **Confirmation Exhibits**

All Confirmation Exhibits to the Plan will be filed with the Bankruptcy Court no later than 10 days before the Confirmation Hearing.

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 26 of 53

3.      **Windown of the Debtors**

As soon as practicable subsequent to the Effective Date and except as provided in Plan Sections 3.4 and 3.5, each of the Debtors will take all necessary steps to effect their windown and dissolution.

4.      **Western Reserve Health Foundation and Trumbull Memorial Hospital Foundation**

On March 17, 2011, the chapter 11 cases pending with respect to the Foundations were dismissed. The Committee had objected to dismissal of the Foundations, seeking access to the Foundations' unrestricted charitable funds to pay the creditors of all Debtors. The Bankruptcy Court overruled the Committee's objection and dismissed the Foundations' cases. The Committee appealed the Bankruptcy Court's order and moved the Bankruptcy Court for a stay of the effectiveness of the dismissal orders pending appeal, which stay motion was denied. During the hearing on the Foundations' motions to dismiss, the Foundations had noted that they were solvent and intended to pay their own creditors in full. In addition, the Foundations agreed to pay their own bankruptcy expenses, such as the costs of litigating the motions to dismiss, the motion of the Committee for stay pending appeal, and other similar matters.

The Foundations consulted with the Committee regarding the appropriate share of bankruptcy expenses that should be paid by the Foundations. After discussion, the Foundations agreed to pay $1 million (the "Foundations Payment") in the aggregate into the Debtors' estates for distribution to creditors. The Debtors believe that this is an appropriate resolution of the Foundations' obligations, and this Plan constitutes a motion under Bankruptcy Rule 9019 to resolve all obligations of the Foundations for expenses related to their chapter 11 cases and any other claims or causes of action of the Debtors against the Foundations. In addition, the Foundations Payment shall be considered additional consideration for the releases granted to the Foundations pursuant to Plan Section 8.6.2.

As of the date of filing of the Plan, the PBGC (the Debtors' largest unsecured creditor) has voiced its support for the resolution of the claims and causes of actions of the Debtors' estates against the Foundations as resolved by the Plan. The Committee, however, has not. Accordingly, there is a possibility that there will be continued litigation over approval of this provision of the Plan, the Committee's appeal of the dismissal orders, and other issues impacting the Foundations. The Foundations' agreement to make the Foundations Payment is explicitly conditioned upon entry of a Final Order fully and finally resolving all claims against the Foundations and releasing them in full without any further risk of litigation. As a result, the Debtors have agreed to indemnify the Foundations for the costs of further litigation related to these matters. The practical effect of this agreement (which is a critical term of the Foundations' agreement to make the Foundations Payment) is that the value of the $1 million to the Debtors' creditors will be reduced dollar for dollar with any further costs of litigation to the Foundations.

5.      **Restricted Charitable Funds**

No later than 10 days before the Confirmation Hearing, the Debtors will affirmatively indicate their intentions with respect to disposition of the Restricted Charitable Funds. The Debtors will affirmatively elect to dispose of the Restricted Charitable Funds by either:

A.      continuing the corporate existence of each of Debtor Trumbull memorial Hospital and Debtor Western Reserve Care System, for the sole purpose of holding the Restricted Charitable Funds so that such funds may be directed to the fulfillment of an Appropriate Purpose pursuant to applicable laws;

B.      delivering all Restricted Charitable Funds held by Debtor Trumbull Memorial Hospital to non-debtor Trumbull Memorial Hospital Foundation and all Restricted Charitable Funds held by Debtor Western Reserve Care System to non-debtor Western Reserve Health Foundation so that such funds may be directed to the fulfillment of an Appropriate Purpose pursuant to applicable laws; or

C.      delivering the Restricted Charitable Funds to a local or community foundation capable of utilizing the Restricted Charitable Funds in accordance with an Appropriate Purpose.

In no event shall the Restricted Charitable Funds be disposed of in such a way as to violate any charitable or other restriction placed on the use or disposition of such Restricted Charitable Funds or any applicable state law.

### 6.     FHIL and Merger of Certain Debtors

On the Effective Date, the Board of Trustees of Forum Health will be replaced by the Liquidating Trust. To complete the wind down of FHIL, disburse the Beneficial Interests of FHIL as described in Plan Section 2.2.4 and ensure continued insurance coverage, (a) all not-for-profit Debtors necessary for continued insurance coverage as identified on Confirmation Exhibit 3.5(a) will be merged into Debtor Forum Health; (b) all for-profit Debtors necessary for continued insurance coverage as identified on Confirmation Exhibit 3.5(b) will be merged into Debtor Forum Health Ventures Co.; (c) Debtor Forum Health will retain the Interests of Debtor Forum Health Ventures Co. and non-debtor FHIL; and (d) non-debtor Forum Health Holding Company will retain the Interests of Debtor Forum Health.

### 7.     Pension Plan

On January 26, 2011, the PBGC and the Debtors executed a Trusteeship Agreement by which the Pension Plan was terminated, the PBGC became statutory trustee of the Pension Plan, and September 30, 2009, was established as the Pension Plan termination date.

### 8.     Retiree Benefits

Certain consensual modifications to various retiree benefits reached with the authorized representatives of such retirees have been approved by the Bankruptcy Court, which modifications have resulted in the termination of any continuing liability or obligation of the Debtors for retiree benefits (as such term is used and defined in section 1114 of the Bankruptcy Code) under any of the Debtors' Collective Bargaining Agreements.

### 9.     Termination of Collective Bargaining Agreements

Prior to the Effective Date, the Debtors will have entered into consensual terminations of the Debtors' Collective Bargaining Agreements with each applicable Union, and such consensual terminations will have been approved by the Bankruptcy Court. In the absence of such Union consent or in the absence of Bankruptcy Court approval, the applicable Debtors shall seek termination in accordance with section 1113 of the Bankruptcy Code.

### 10.     Liquidating Trust

On or prior to the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement for the purpose of liquidating remaining Assets (other than FHIL) and distributing the proceeds thereof to creditors in accordance with the terms of the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Liquidating Trust (and the Liquidating Trustee) will be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the Liquidating Trust provisions of the Plan; (b) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Liquidating Trust Assets (directly or through its professionals, in accordance with the Plan); (c) sell, liquidate, transfer, distribute or otherwise dispose of the Liquidating Trust Assets (directly or through its professionals) or any part thereof or any interest in the Plan upon such terms as the Liquidating Trustee determines to be necessary, appropriate or desirable; (d) calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (e) comply with the Plan and exercise the Liquidating Trustee's rights and fulfill its obligations thereunder; (f) review, reconcile or object to Claims and resolve such objections as set forth in the Plan; (g) pursue Avoidance Actions that are transferred to the Liquidating Trust, if any, to the extent that their pursuit would likely result in an economic benefit to holders of Claims; (h) retain and compensate professionals to represent the Liquidating Trustee with respect to his responsibilities; (i) establish and maintain a Disputed Claims Reserve; (j) file appropriate Tax returns and other reports on behalf of the Liquidating Trust and pay Taxes or other obligations owed by the Liquidating Trust; (k) exercise such other powers as may be vested in the Liquidating Trustee under the Liquidating

Trust Agreement or the Plan, or as deemed by the Liquidating Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidating Trust Agreement; (l) object to the amount of any Claim on any Schedule if the Liquidating Trustee determines in good faith that the Claim is invalid or has been previously been paid or satisfied; (m) pay any and all residual statutory fees of any Debtors as provided in Plan Section 2.1.1.b; and (n) dissolve the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Notwithstanding anything to the contrary in Plan Section 3.8.1, the Liquidating Trust's primary purpose is liquidating the assets transferred to it by the Debtors and making distributions of the assets of the Liquidating Trust to holders of Allowed Claims.

## 11. Funding of and Transfer of Assets into the Liquidating Trust

a.      On the Effective Date, the Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust. The Liquidating Trust Assets will be transferred to and vest in the Liquidating Trust on the Effective Date, free and clear of all liens, claims and other encumbrances.

b.      The Liquidating Trustee will have the authority to create sub-accounts or sub-trusts within the Liquidating Trust, and into which the Liquidating Trustee may deposit any non-Cash property, including real or personal property pending its liquidation. The Liquidating Trustee, as trustee of such sub-accounts or sub-trusts may hold legal title to such property. Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts will be deposited directly into the primary trust account.

c.      The act of transferring assets and rights to the Liquidating Trustee of the Liquidating Trust, as authorized by the Plan, will not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the applicable Debtor.

## 12. Liquidating Trustee

a.      The initial Liquidating Trustee will be Dalton Edgecomb.

b.      The powers, rights and responsibilities of the Liquidating Trustee will be specified in the Liquidating Trust Agreement and will include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the Liquidating Trustee and the beneficiaries of the Liquidating Trust shall be as set forth in the Liquidating Trust Agreement.

## 13. Liquidating Trust Agreement

The Liquidating Trust Agreement generally will provide for, among other things: (a) the payment of reasonable compensation to the Liquidating Trustee; (b) the payment of other expenses of the Liquidating Trust, including the cost of pursuing the claims, rights and causes of action assigned to the Liquidating Trust; (c) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (d) the investment of Cash by the Liquidating Trustee within certain limitations; (e) the preparation and filing of appropriate Tax returns and other reports on behalf of the Liquidating Trust and the payment of Taxes or other obligations owed by the Liquidating Trust; (f) the orderly liquidation of the Liquidating Trust's assets; and (g) the litigation, settlement, abandonment or dismissal of any claims, rights or causes of action assigned to the Liquidating Trust.

## 14. Reports to Be Filed by the Liquidating Trustee

The Liquidating Trustee, on behalf of the Liquidating Trust, will File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidating Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

## 15. Fees and Expenses of the Liquidating Trust

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 29 of 53

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Liquidating Trust (including the reasonable and necessary fees and expenses of any professionals assisting the Liquidating Trustee in carrying out its duties under the Plan) will be funded by the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement without further order from the Bankruptcy Court.

### 16. Indemnification

The Liquidating Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidating Trustee and/or other parties. Any such indemnification shall be the sole responsibility of the Liquidating Trust and payable solely from the Liquidating Trust Assets.

### 17. Tax Treatment

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated either as discrete trusts taxed pursuant to Section 641 et seq. of the Internal Revenue Code or as disputed ownership funds described in Treasury Regulation § 1.468B-9. For federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one or more Disputed Claims reserves. The holders of Allowed Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the holders of Allowed Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to such assets. The holders of Allowed Claims will be required to use the values assigned to such assets by the Liquidating Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest. The Liquidating Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (a) require that the Liquidating Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the holders of Allowed General Unsecured Claims the Liquidating Trust's net income and the net proceeds from the sale of Liquidating Trust Assets in excess of an amount reasonably necessary to meet senior Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Liquidating Trust assets. Liquidating Trust Assets reserved for holders of Disputed Claims will be treated as one or more Disputed Claims reserves for tax purposes, which will be subject to an entity-level Tax on some or all of their net income or gain. No holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as discrete trusts or disputed ownership funds, and will pay all Taxes owed from Liquidating Trust assets, provided that income taxes of the Disputed Claims reserves shall only be paid from the Liquidating Trust assets allocable to the Disputed Claims reserves.

### 18. Disposition of Assets by Liquidating Trust

The Liquidating Trustee may conduct any sales or liquidations of non-Cash Liquidating Trust Assets on any terms he deems reasonable, without further order of the Bankruptcy Court, unless either the book value or proposed sale price of the relevant Liquidating Trust Asset(s) is greater than $100,000, in which case approval of the Bankruptcy Court will be required[211]. Notwithstanding anything herein to the contrary, the Restricted Charitable

Funds are not Liquidating Trust Assets and there will be no "net proceeds" from the Restricted Charitable Funds available for distribution to creditors under Plan Section 2.2.3 or otherwise.

19.     **Settlement of Causes of Actions and Disputed Claims**

The Liquidating Trustee may settle, compromise, abandon or withdraw any Cause of Action, including any Avoidance Action, on any grounds or terms he deems reasonable,[212] without further order of the Bankruptcy Court, unless the face value of such Cause of Action is greater than $50,000, in which case approval of the Bankruptcy Court will be required[213].   The Liquidating Trustee may settle or compromise any Disputed Claims on any terms he deems reasonable,[214] without further order of the Bankruptcy Court, unless the face value of such Disputed Claim is greater than: (a) $50,000 for an Administrative Claim, Priority Tax Claim,  Other Priority Claim or Secured Claim; or (b) $250,000 for a General Unsecured Claim[215].

E.     **Special Provisions**

1.     **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in Plan Section 3.9.1 constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

2.     **Liquidation of Tort Claims and Medical Malpractice Claims**

All Tort Claims (other than Adjudicated Medical Malpractice Claims) including all Estimated Medical Malpractice Claims will be liquidated, determined or otherwise resolved in accordance with the provisions of section 502(c) of the Bankruptcy Code and will be subject to the Claims allowance process set forth in the Plan.  To the extent any Holder of a Medical Malpractice Claim has affirmatively elected to have such Claim adjudicated by a court other than the Bankruptcy Court in accordance with the provisions of Plan Section 2.2.5 or such Medical Malpractice Claim is the subject of a Relief From Stay Order, to the extent such Medical Malpractice Claim has not been the subject of final adjudication on or before the date that is 12 months after the Effective Date, the Liquidating Trustee will have the authority to seek estimation of the Claim by the Bankruptcy Court for purposes of determining the amount of any Class 3 Claim as a result of an estimated Insurance deficiency.

3.     **Preservation of Causes of Action; Avoidance Actions**

On the Effective Date, the Debtors will transfer to the Liquidating Trustee, as the representative of the Estates under section 1123(b) of the Bankruptcy Code, all Causes of Action, including Avoidance Actions, and the Liquidating Trustee may enforce Causes of Action that the Debtors or the Estates may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court, including but not limited to those items identified on Confirmation Exhibit 3.10.3.  The Liquidating Trustee will also control any privilege rights of the Debtors, including but not limited to the attorney/client privilege, related to the Causes of Action.

4.     **Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

The Chief Restructuring Officer of each Debtor and the Liquidating Trustee will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax:  (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 31 of 53

deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### 5. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Article VIII of the Plan, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

### F. Executory Contracts and Unexpired Leases

#### 1. Assumption and Assignment

Each Executory Contract, Unexpired Lease or other agreement listed on Confirmation Exhibit 4.1 will be or has been assumed and assigned to the Purchaser as of the Effective Date. All other Executory Contracts and Unexpired Leases or other agreements will be deemed rejected as of the Closing Date.

#### 2. Cure of Defaults

Upon information and belief, all Cure Amount Claims have been satisfied by the Purchaser in accordance with the terms and procedures of the Sale and related process.

#### 3. Bar Date for Rejection Damage Claims

To the extent not previously rejected in accordance with an Order of the Bankruptcy Court, claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to Plan Section 4.1 must be Filed with the Bankruptcy Court and served on the Debtors or, on and after the Effective Date, the Liquidating Trustee, by no later than 30 days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or Unexpired Lease, (b) notice of the entry of Confirmation Order or (c) notice of an amendment to Confirmation Exhibit 4.1, and upon allowance, will be an Allowed General Unsecured Claim. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Estates, the Liquidating Trust, or the Purchaser.

#### 4. Approval of Rejection

Entry of the Confirmation Order will constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all the Executory Contracts and Unexpired Leases pursuant to Plan Section 4.1, to the extent not previously assumed or rejected by order of the Bankruptcy Court.

### G. Provisions Governing Distributions

#### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article V of the Plan, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article II of the Plan that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than 30 days after the Effective Date; or with respect to undeliverable distributions, when the

provisions of Plan Section 5.4.2 are satisfied. Distributions on account of Claims that become Allowed after the Effective Date will be made pursuant to Plan Section 6.3.

### 2. Method of Distributions to Holders of Claims

The Liquidating Trustee, or such Third Party Disbursing Agent as the Liquidating Trustee may employ in his sole discretion, will make all distributions of Cash and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond.

### 3. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a. Delivery of Distributions

Distributions to holders of Allowed Claims will be made: (i) at the addresses set forth on the respective proofs of Claim or request for payment of Administrative Claim Filed by holders of such Claims, as applicable; (ii) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (iii) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Claims and Noticing Agent after the date of Filing of any related proof of Claim; (iv) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Claims and Noticing Agent has not received a written notice of a change of address; or (v) if clauses (i) through (iv) are not applicable, at the last address known or directed by such holder after such Claim becomes an Allowed Claim.

### 4. Undeliverable and Unclaimed Distributions

#### a. Holding of Undeliverable Distributions.

Subject to Plan Section 5.3.2.c, distributions returned to a Disbursing Agent, or otherwise undeliverable will remain in the possession of the Disbursing Agent, pursuant to Plan Section 5.3.2.a, until such time as a distribution becomes deliverable. The Liquidating Trustee, or such Third Party Disbursing Agent as may be employed by the Liquidating Trustee, holding undeliverable Cash will invest such Cash in a manner consistent with the Liquidating Trust Agreement.

#### b. After Distributions Become Deliverable.

On each Distribution Date, the applicable Disbursing Agent will make all distributions that became deliverable to holders of Allowed Claims at the next Distribution Date; *provided, however*, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each periodic Distribution Date, such that only Allowed Claims as of the record date will participate in such periodic distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, to the extent it determines a distribution on any periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

#### c. Failure to Claim Undeliverable Distributions.

Any holder of an Allowed Claim that does not assert its right to an undeliverable distribution within the earlier of one year of such distribution and the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against the Debtors,[216] a Disbursing Agent and their respective property or accounts. In such cases, unclaimed distributions held by a Disbursing Agent will be returned to the Liquidating Trust for distribution to other creditors, and the Liquidating Trustee will have no responsibility to make further distributions to such creditor[217]. Any unclaimed distributions or any distributions that are returned as undeliverable and unclaimed under Plan Section 5.3.2.c, will become property of the Liquidating Trust free of any restrictions thereon. Any distributions that are made on the Final Distribution Date and that are undeliverable or (in the event of a distribution made by check) remain uncashed for 180 days after the Final Distribution Date will be remitted to the Bankruptcy Court as unclaimed funds. Upon such remittance, the Liquidating Trustee will be deemed to have satisfied his obligations to make distributions under the Plan and will not be required to make additional

distributions. [218]Nothing contained in the Plan will require a Debtor, the Liquidating Trustee or a Disbursing Agent to attempt to locate any holder of an Allowed Claim.

5.      **Timing and Calculation of Amounts to be Distributed**

a.      Distributions on Account of Allowed Claims in Class 1 and Class 2

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan will be made within 30 days of such Claim becoming an Allowed Claim or the Effective Date, whichever is later.

b.      Distributions on Account of Allowed Claims in Class 3

(i)      *Selection of Distribution Dates for Class 3.*  Except where the Plan requires the making of a distribution on account of a particular Allowed Claim within a particular time, the Liquidating Trustee will have the authority to select Distribution Dates that, in the judgment of the Liquidating Trustee, provide holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred by the distribution process; *provided, however*, that the first Distribution Date after the Effective Date must occur prior to 180 days after the Effective Date and a Distribution Date must occur at least once every twelve months thereafter, if any amounts are available for distribution on such date.

(ii)      *Calculation of Amounts to Be Distributed to Holders of Class 3 Claims.*  Prior to any distribution to holders of Allowed General Unsecured Claims, the Liquidating Trustee will estimate the amount of Cash on hand that will remain after payment of all senior Claims and all Liquidating Trust Expenses.  Such estimations will utilize assumptions that litigation with claimants with respect to any issue that is being reasonably contested will be unsuccessful.  Such estimations will also assume that any unresolved Causes of Action will result in no recovery for the Liquidating Trust and that remaining non-Cash assets shall produce no recovery for the Liquidating Trust. Only if, after applying such assumptions, the estimated Cash is greater than zero will the Liquidating Trustee be permitted to make any distributions to holders of Allowed General Unsecured Claims.

(iii)      *Distributions to Holders of Allowed Claims in Class 3.*  On each Distribution Date, each holder of an Allowed General Unsecured Claim will receive a distribution of any Cash that has been determined to be available for distribution in accordance with Plan Section 5.5.4 such that each holder of an Allowed General Unsecured Claim has received, in the aggregate, its Pro Rata share of the amounts of Cash that are made available for distribution to such Claim holders. All distributions will be made pursuant to the terms and conditions of the Plan and the Liquidating Trust Agreement, and shall be subject to the Debtors' or the Liquidating Trustee's rights of setoff or deduction.

(iv)      *De Minimis Distributions.*  On each Distribution Date prior to the Final Distribution Date, the Liquidating Trustee will not distribute Cash to the holder of an Allowed General Unsecured Claim if the amount of Cash to be distributed on account of such Claim is less than $25 in the aggregate.  Any Cash not distributed pursuant to Plan Section 5.4.2.d will be retained in the Liquidating Trust until the next Distribution Date. On the Final Distribution Date, if the aggregate amount of distributions to be made to such claimant is $25 or greater, such distribution shall be made.  Otherwise, the amount shall be redistributed to other holders of

09-40795-kw     Doc 1645     FILED 05/24/11     ENTERED 05/24/11 17:13:25     Page 34 of 53

Allowed Claims in such Class and such holder of an Allowed Claim will be forever barred from asserting its Claim for such distribution against the Liquidating Trust or its property.

> (v)      *Provisions for Excess Funds.*   After the Final Distribution Date and the remittance to the Bankruptcy Court of unclaimed funds[219], if the Liquidating Trust retains or [220]receives any funds as a result of undeliverable distributions or otherwise[221] and, in good faith, does not believe that an additional distribution will be cost effective or materially beneficial to creditors, the Liquidating Trustee may donate such excess funds half to WRHF and half to TMHF.

> (vi)      *Provisions Governing Disputed Claims Reserve.*

> A.      *Funding.*   On the Effective Date or otherwise prior to the initial distributions under Plan Section 5.4.2, the Disputed Claims Reserve will be established by the Liquidating Trustee for the benefit of holders of Disputed Claims that become Allowed Claims.  For the purpose of calculating the Assets to be contributed to the Disputed Claims Reserve, all Disputed Claims will be treated (solely for purposes of establishing the Disputed Claims Reserve) as Allowed Claims in the Face Amount of such Claims as of the Effective Date. In addition, Disputed Claims rendered duplicative as a result of the limited consolidation of the Debtors pursuant to Article VII of the Plan will only be counted once for purposes of establishing the Disputed Claims Reserve.  In making and establishing the Disputed Claims Reserve, the Liquidating Trustee may rely on the Debtors' estimates as to Disputed Claims and will have no liability therefore in the absence of bad faith or gross negligence, and the Debtors will have no liability for their estimation of Disputed Claims in the absence of bad faith or gross negligence.  As Disputed Claims are resolved, the Liquidating Trustee or Third Party Disbursing Agent will make adjustments to the reserves for Disputed Claims, but neither the Debtors nor the Liquidating Trustee will be required to increase such reserves from and after the Effective Date.  The Liquidating Trustee may File a motion seeking an order of the Bankruptcy Court approving additional procedures for the establishment of the Disputed Claims Reserve.

> B.      *Distributions.*   The distributions received by the Liquidating Trustee or Third Party Disbursing Agent on account of the Disputed Claims Reserve from the Liquidating Trust, along with any Cash Investment Yield held in the Disputed Claims Reserve, will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of Allowed Claims and Disputed Claims that become Allowed Claims, (b) be accounted for separately and (c) not constitute property of the Debtors.  The Disbursing Agent will invest any Cash held in the Disputed Claims Reserve in a manner consistent with the Liquidating Trust Agreement.

> C.      *Recourse.*   Each Holder of an Allowed Claim and each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only against the Disputed Claims Reserve and not to any other assets held by the Liquidating Trust, its property or any assets previously distributed on account of any Allowed Claim.

> D.      *No Transfer of Rights.*   The rights of Holders of Allowed Claims to receive distributions from the Disputed Claims Reserve in accordance with the Plan will be non-transferable, except with respect to a transfer by will, the laws of descent and distribution or operation of law.

> c.      Distributions on Account of Allowed Claims in Class 4.

Distributions to be made to the PBGC will be made as soon as reasonably practicable in accordance with Plan Section 3.5 and the wind down of FHIL, except as may otherwise be provided in accordance with Plan Sections 2.1.1 and 5.4.2 and any subsequent order of the Bankruptcy Court.

d.    Distributions on Account of Allowed Claims in Class 5.

Holders of Class 5 Claims will be entitled to distributions in accordance with the terms of any applicable Insurance on account of any Estimated Medical Malpractice Claim or any Adjudicated Medical Malpractice Claim. Any such holder with a deficiency claim as described in Plan Section 2.2.5 will be entitled to distributions in accordance with Plan Section 5.4.2.

**6.    Other Provisions Applicable to Distributions in All Classes**

a.    Postpetition Interest

No interest will have accrued on any Claim that is not an Allowed Secured Claim that is oversecured on and after the Petition Date.

b.    Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**7.    Holders of Record**

Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the close of business on the Confirmation Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Confirmation Date.   No transfers Filed with the Bankruptcy Court after the Distribution Record Date shall be recognized by the Liquidating Trustee.

**8.    Means of Cash Payments**

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Debtors, the Liquidating Trustee, or any Disbursing Agent, as applicable, by wire transfer, electronic funds or ACH from a domestic bank; *provided, however,* that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Liquidating Trustee, or any Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**9.    Withholding Requirements**

a.    Withholding

In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications. To the extent any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's distribution will be deemed undeliverable and subject to Plan Section 5.4.2.

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 36 of 53

b.     Distributions

Notwithstanding any other provision of the Plan, each entity receiving a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding and other Tax obligations.

c.     Allocations

The Debtors reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

**10.     Setoffs**

Except with respect to claims of a Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Debtor or the Liquidating Trustee on behalf of the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Liquidating Trust may hold against the holder of such Allowed Claim; *provided, however*, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Liquidating Trustee of any claims, rights and causes of action that the Debtors or Liquidating Trustee may possess against a Claim holder, which are expressly preserved under Plan Section 3.9.3.

**H.     Procedures for Resolving Disputed Claims**

**1.     Treatment of Certain Disputed Claims**

a.     Tort Claims

Each Tort Claim, including Medical Malpractice Claims, will be resolved in accordance with Plan Section 3.10.2.

b.     Disputed Insured Claims

The resolution of Disputed Insured Claims, including Tort Claims, will be subject to the provisions of Plan Sections 3.10.1 and 3.10.2.

c.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever.

**2.     Prosecution of Objections to Claims**

a.     Objections to Claims

All objections to Claims will be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, will be made by the Debtors or the Liquidating Trustee by the Claims Objection Bar Date. If an objection has not been Filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

09-40795-kw     Doc 1645     FILED 05/24/11     ENTERED 05/24/11 17:13:25     Page 37 of 53

b.     Authority to Prosecute Objections

On or after the Effective Date, the Liquidating Trustee will have the sole authority, to File, settle, compromise, withdraw or litigate to judgment objections to Claims.[222], subject to the requirements to obtain Bankruptcy Court authority for certain actions in accordance with Plan Section 3.9.[223]

c.     Authority to Amend Schedules

The Debtors or the Liquidating Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim, and to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If[224], provided, however, that the Liquidating Trustee will seek prior approval from the Bankruptcy Court prior to increasing by more than $50,000 the proposed Allowed amount of any Claim on the Schedules. In addition, if[225] any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Liquidating Trustee, as applicable, will provide the holder of such Claim with notice of such amendment and such holder will have 30 days to File an objection to such amendment with the Bankruptcy Court. The notice will contain the same specificity to affected creditors that would be required if the Schedules amendment was a Claim objection.[226] If no such objection is Filed, the Liquidating Trustee may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court. Notwithstanding anything contained in Plan Section 6.2.3 or the Plan to the contrary, the Liquidating Trustee will have the authority to object to the amount of any Claim indicated on the Schedules if the Liquidating Trustee determines in good faith that the Claim is invalid or has previously been paid or satisfied.

d.     Request for Extension of Claims Objection Bar Date

Upon motion to the Bankruptcy Court, the Liquidating Trustee may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

3.     **Distributions on Account of Disputed Claims Once Allowed**

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date will be made in accordance with Article V of the Plan.

I.     **Consolidation of Certain Debtors**

1.     **Limited Consolidation for Certain Purposes**

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the Debtors' election to treat the Estates (who do not include WRHF and TMHF, whose cases have been dismissed) as if they were consolidated. Accordingly, for purposes of implementing the Plan, pursuant to such order: (a) all Assets and Liabilities of the Debtors will be treated as if they are pooled; and (b) with respect to any guarantees by one Debtor of the obligations of any Debtor, and with respect to any joint or several liability of any Debtor, the holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors, in each case except to the extent otherwise provided in the Plan.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan will not affect: (a) the legal and corporate structures of the Debtors; and (b) distributions from any insurance policies or proceeds of such policies. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

09-40795-kw     Doc 1645     FILED 05/24/11     ENTERED 05/24/11 17:13:25     Page 38 of 53

## 2.    Order Granting Consolidation for Certain Purposes

The Plan serves as a motion seeking entry of an order consolidating the Debtors (who do not include WRHF and TMHF, whose cases have been dismissed) as described and to the limited extent set forth in Plan Section 7.1.  Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed on Plan Exhibit C on or before the date fixed by the Bankruptcy Court for objecting to Confirmation of the Plan, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at or before the Confirmation Hearing.

In the event that the Bankruptcy Court does not approve the Debtors' election to treat the Estates as if they are consolidated, (a) the Plan will be treated as a separate plan of liquidation for each Debtor, and (b) the Debtors will not be required to re-solicit votes with respect to the Plan.  See Section IX.D. of this Disclosure Statement for a discussion of a liquidation analysis if the Plan is treated as a separate plan of liquidation for each Debtor. [227]

## J.    Confirmation of the Plan

### 1.    Conditions Precedent to Confirmation

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Plan Section 8.3:

a.    The Confirmation Order will be reasonably acceptable in form and substance to the Debtors.

b.    The Plan will not have been materially amended, altered or modified from the First[228]Second[229] Amended Plan as Filed on May 3,[230]24,[231] 2011, unless such material amendment, alteration or modification has been made in accordance with Plan Section 10.1.

c.    All Confirmation Exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors.

d.    The dismissal of the chapter 11 cases of TMHF and WRHF will not have been overturned on appeal.

### 2.    Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Plan Section 8.3:

a.    The Bankruptcy Court will have entered the Confirmation Order, and the Confirmation Order will be a Final Order.

b.    No stay of the Confirmation Order will then be in effect.

c.    The Liquidating Trust Agreement will be executed, the Liquidating Trust will be created and the Liquidating Trustee will have been appointed and accepted such appointment.

d.    The Plan and all Confirmation Exhibits to the Plan will not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 10.1 of the Plan.

e.    The Collective Bargaining Agreements will have been terminated.

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 39 of 53

3. **Waiver of Conditions to Confirmation or Effective Date**

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the Debtors without an order of the Bankruptcy Court.

4. **Cramdown**

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

5. **Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Plan Section 8.3, then upon motion by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Plan Section 8.5: (1) the Plan will be null and void in all respects, including with respect to the releases described in Plan Section 8.6.2; (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest; and (3) the Liquidating Trust, if already created, will be promptly dissolved.

6. **Effect of Confirmation of the Plan**

a. Limitation of Rights of Holders of Claims

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no holder of a Claim against the Debtors may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtors, the Liquidating Trustee, or property of the Estates, except as expressly provided in the Plan.

b. Releases

Each and every entity receiving a distribution pursuant to the Plan on account of its Allowed Claim or Interest will be deemed to forever release and waive all claims, demands, debts, rights, causes of action, and liabilities in connection with or related to any of the Debtors, the Chapter 11 Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, that are based in whole or in part on any act, omission, or other occurrence taking place on or prior to the Effective Date, against the Released Parties to the fullest extent permitted under applicable law. In addition, the Debtors will be deemed to release any and all such claims, demands, debts, rights, causes of action, and liabilities against the Released Parties other than themselves. Notwithstanding anything in the Plan or in the releases set forth above to the contrary, nothing herein will be construed to release, and the Debtors do not hereby release, any rights of the respective Debtors: (a) to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder; (b) to litigate Disputed Claims, including without limitation to make any claim, or demand or allege and prosecute any cause of action against any holder of any Disputed Claims; and (c) to litigate claims and causes of action not specifically released herein, including claims and Causes of Action contained in any adversary complaint filed during the pendency of the Chapter 11 Cases that have not been withdrawn or dismissed prior to the Confirmation Date.

Except as set forth in the last sentence of this paragraph, no provision contained in the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed as discharging, releasing or relieving any party other than the Debtors in any capacity, from any liability with respect to the Pension Plan under any law, government policy or regulatory provision. Except as set forth in the last sentence of this paragraph, the

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 40 of 53

PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability against any such party as a result of this Plan's provisions for satisfaction, release and discharge of claims. Nothing herein, however, shall in any way limit or modify the release or discharge of any party as set forth in the agreement dated January 31, 2011, between the PBGC, the Debtors, and certain other parties, attached as Exhibit A to the Debtors' Motion for an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) Approving the Terms of the Settlement with the Pension Benefit Guaranty Corporation, Docket No. 1344, and approved by an Order of the Bankruptcy Court dated April 27, 2011, Docket No. 1593.

c.    Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability against the Debtors or an Interest or other right of an equity security holder are permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Released Parties or their property; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Released Parties or their property; (c) creating, perfecting, or enforcing any lien or encumbrance against the Released Parties or their property; (d) asserting a right of subordination of any kind against any debt, liability, or obligation due to the Released Parties or their property; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

d.    Exculpation

Subject to the occurrence of the Effective Date, none of the Exculpated Parties will have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases and the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, that the Exculpated Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan will, or will be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

**7.    Request for Waiver of Stay of Confirmation Order**

The Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served on the parties listed in Plan Section 10.6 on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

**K.    Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims;

2.    Resolve any issues arising under the Asset Purchase Agreement or the Sale Order;

3.    Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

4.     Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

5.     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor that may be pending on the Effective Date or brought thereafter;

7.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Liquidating Trust Agreement, the Disclosure Statement or the Confirmation Order;

8.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Liquidating Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Liquidating Trust Agreement or any entity's rights arising from or obligations incurred in connection with the Plan, the Liquidating Trust Agreement or such documents;

9.     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

10.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

11.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

12.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

13.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

14.     Enter a final decree or decrees closing the Chapter 11 Cases;

15.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

16.     Hear all matters arising out of the consummation of the Sale;

17.     Recover all assets of the Debtors and their Estates, wherever located; and

18.     Hear any other matter not inconsistent with the Bankruptcy Code.

## VI.    MISCELLANEOUS PROVISIONS

### A.    Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan.  The Plan should be referred to for the complete text of these and other provisions of the Plan.

### B.    Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

### C.    Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against any Debtor; (2) prejudice in any manner the rights of the Debtors (or any of them), any Debtor or any other party in interest; or (3) constitute an admission of any sort by the Debtors (or any of them), any Debtor or any other party in interest.

### D.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee and any other official committees appointed in the Chapter 11 Cases will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases. The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim whatsoever for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Creditors' Committee, except to the extent necessary to File, prepare and defend any fee application.

### F.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## VII.    RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.    Failure to Satisfy Vote Requirement

If the Debtors obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtors intend, as promptly as practicable thereafter, to seek confirmation of the Plan.  In the

event that sufficient votes are not received, the Debtors may be forced to pursue an alternative plan of liquidation or to convert the cases to a chapter 7 liquidation.

**B.      Non-Confirmation or Delay of Confirmation of the Plan**

The Debtors anticipate that the Creditors' Committee will object to the Plan and argue that the assets of WRHF and TMHF be included in the substantive consolidation of the Debtors. The Debtors believe that the Plan provides for the correct result for WRHF, TMHF, and the other Debtors under relevant law. However, it is possible that the Bankruptcy Court does not approve confirmation of the Plan.

**C.      Non-Consensual Confirmation**

In the event any impaired Class of Claims does not accept a plan, the Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Classes 3, 4 and 5. The Debtors believe that the Plan satisfies these requirements.

**D.      Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

**E.      Classification and Treatment of Claims**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class. The Debtors believe that all Claims have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors presently anticipate that they would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Federal Rules of Bankruptcy Procedure the Debtors would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that they have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### F.    The OBWC's Claim

The OBWC filed an unsecured priority claim on June 2, 2009, Claim No. 147, in the amount of $4,140,967.35. The OBWC is seeking priority treatment under section 507(a)(8) of the Bankruptcy Code. The Debtors object to the claim on a number of grounds. First, the Debtors contend that the claim is not entitled to priority tax status because the claim does not qualify as excise tax under section 507(a)(8) of the Bankruptcy Code. Second, the Claim is overstated and not calculated in accordance with Ohio law. Third, the Debtors are seeking a reclassification of the claim to a general unsecured claim and seeking to reduce the claim in accordance with Ohio law. Fourth, to the extent that the Court allows any portion of the Claim as a priority claim, that portion of the Claim should be deemed satisfied by application of the proceeds Letter of Credit described in Article IV, Section F of this Disclosure Statement. In the event that the Bankruptcy Court does not grant Debtors' objection concerning the OBWC's Claim, the holders of General Unsecured Claims will receive a lower distribution than presently allocated.

### G.    Appeal of the Foundations' Dismissal and Other Litigation Related to the Foundations[232]

There ~~is a risk~~[233] are risks that the Committee will continue to pursue the appeal of the dismissal of the Foundations' cases and[234] that the Committee will continue to litigate the appropriateness of the ~~Foundations~~[235] Foundations[236] Payment and other issues related to the Foundations. Further litigation will be costly and reduce the value to creditors of the Foundations Payment, and may impede or delay consummation of the Plan. Additionally, the Foundations Payment will not become available for distribution pursuant to the terms of the Plan unless and until an appropriate Final Order is entered. There is a possibility that such order may not be entered.[237]

### H.    Claim Objections and Reconciliation

The potential recovery to Classes 3, 4 and 5 depends on, among other things, the outcome of the claims reconciliation and objection process. Therefore, as described in more detail in Article IV, Section I above, the distribution to Classes 3, 4 and 5 may increase or decrease depending on the resolution of outstanding claims.

## VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO MANY OF THE TAX ISSUES DISCUSSED BELOW.  THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.  NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain holders of Claims. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an equity interest or a security in a Debtor in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Plan and the transactions contemplated thereby. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **U.S. Federal Income Tax Consequences to the Debtors**

Due to their status as non-profit corporations and therefore exempt from federal income tax pursuant to Section 501 of the Code, Debtors do not expect that the Plan will result in any significant federal income tax consequences to the Debtors.

B.      **U.S. Federal Income Tax Consequences to Holders of Claims**

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the holder of a Claim reports income on the accrual or cash basis; and (g) whether the holder of a Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A holder who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

1.      **General Treatment of Holders of Claims**

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to Holders of Allowed Claims in satisfaction of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the holder's hands.

To the extent that cash received or deemed received by a holder of a Claim is attributable to accrued interest on the Claim, the Cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes. To the extent the holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the holder had previously included in gross income.

### 2. Holders of Allowed Medical Malpractice Claims

The federal income tax treatment of a receipt of payments by a Holder of an Allowed Medical Malpractice Claim will depend on the nature of the claim. To the extent amount received by a holder of an Allowed Medical Malpractice Claim are attributable to, and are compensation for, such holder's personal injuries or sickness, within the meaning of Section 104 of the Tax Code, and such amounts received by the holder generally should be nontaxable. To the extent that a holder of an Allowed Medical Malpractice Claim receives payments over time, it is possible that a portion of these payments would be treated as imputed interest.

### 3. Bad Debt Deduction

The Holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full, to take a deduction related to such debt's partial or total worthlessness are very complex, as are rules relating to whether such deduction, if allowed, is a capital or ordinary loss. Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to their ability to take such deduction.

### C. Federal Income Tax Treatment of Liquidating Trust and Disputed Claims Reserve

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more disputed claims reserves treated as disputed ownership funds described in Treasury Regulation § 1.468B-9. The Liquidating Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (a) require that the Liquidating Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the holders of Allowed Claims the Liquidating Trust's net income and the net proceeds from the sale of Liquidating Trust assets (excluding assets and income of any Disputed Claims Reserve) in excess of an amount reasonably necessary to meet Claims and contingent liabilities and to maintain the value of the Liquidating Trust assets. No Holder of a Claim will be treated as the grantor or deemed owner of an asset allocated to a Disputed Claims Reserve until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 47 of 53

in part as one or more disputed claims reserves taxed as disputed ownership funds. All income of the Liquidating Trust and of any Disputed Claims Reserve taxable thereto shall be subject to income tax on a current basis and the Liquidating Trustee shall pay such tax from the Liquidating Trust or Disputed Claims Reserve that generated income.

### 1. Establishment of the Liquidating Trust

For federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the Holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one or more disputed claims reserves.

### 2. Taxation of Holders of Beneficial Interests in the Liquidating Trust

The holders of Allowed Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust excluding any Disputed Claims Reserve (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the Holders of Allowed Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to the Liquidating Trust excluding any Disputed Claims Reserve. The holders of Allowed Claims will be required to use the values assigned to such assets by the Liquidating Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest.

### D. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder of a Claim's U.S. Federal income tax liability, and such holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### E. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT**

THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

IX.     FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

     A.     Feasibility of the Plan

     The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by further liquidation or financial reorganization of the Debtors. The Plan contemplates that the Debtors will liquidate their remaining assets and will distribute all proceeds pursuant to further Court order. As a result, the Plan satisfies section 1129(a)(ii).

     B.     Acceptance of the Plan

     As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

     Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. For example, Class 3 General Unsecured Creditors votes to accept the Plan only if two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

     C.     Best Interests Test

     Even if a plan is accepted by the holders of each class of claims, the Bankruptcy Code requires a Bankruptcy Court to determine that the plan is in the best interests of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

     D.     Application of the 'Best Interests' of Creditors Test to the Liquidation Analysis and the Valuation

     In this case, the Debtors sold substantially all of their assets, with the remaining assets to be liquidated and distributed. A liquidation under chapter 7 would accomplish the same result but with the additional cost of administering and proceeding with a chapter 7 case. The recovery available in a chapter 7 liquidation to creditors in each Class in these Chapter 11 Cases would be substantially less because of the additional administrative costs associated with a chapter 7 trustee and professionals not familiar with the Debtors' cases. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the members of each Impaired Class will receive greater or equal value under the Plan than they would in a chapter 7 liquidation.

     As described in Section V.I. hereof, the Plan proposes the substantive consolidation of the Debtors, but provides for an alternative if a party objects to substantive consolidation and the Court does not approve substantive consolidation. In addition, it is possible that in a chapter 7 situation, the liquidation of the Debtors would occur on an individual basis rather than a consolidated basis. Accordingly, the Debtors have provided a liquidation analysis on an individual Debtor basis so that creditors may review the Plan as proposed in comparison to such a liquidation analysis. That liquidation analysis is attached hereto as Appendix E. [238]

E.    **Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown' Alternative**

In view of a potential rejection of the Plan by certain Classes of Claims, the Debtors may have to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtors believe the Plan does not discriminate unfairly with respect to holders of Class 3, Class 4, Class 5 and Class 6.

A plan is fair and equitable as to a class of secured claims that rejects a plan if, among other things, the plan provides (a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtors believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Classes 3, 4, 5 and 6.  The Debtors understand, however, that the Plan may not be confirmable with respect to such Classes if any such Class does not vote in favor of the Plan.

X.    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors believe that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders.  If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan of liquidation or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

XI.    **THE SOLICITATION; VOTING PROCEDURE**

A.    **Parties in Interest Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim as it existed before the default.

In general, a holder of a claim may vote to accept or to reject a plan if (i) the claim is "allowed," which means generally that no party in interest has objected to such claim, and (ii) the claim is impaired by the plan.  If, however, the holder of an impaired claim will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims do not actually vote on the plan.  If a claim is not impaired by the plan, the Bankruptcy Code deems

09-40795-kw    Doc 1645    FILED 05/24/11    ENTERED 05/24/11 17:13:25    Page 50 of 53

the holder of such claim to have accepted the plan and, accordingly, holders of such claims are not entitled to vote on the plan. Claims in Classes 1 and 2 are Unimpaired under the Plan, and holders of such Claims are deemed to accept the Plan and therefore not entitled to vote. Class 6 will not receive any distributions on account of the Interests and is deemed to reject the Plan. Accordingly, only Holders of Claims in Classes 3, 4 and 5 are entitled to vote on the Plan.

### B. Voting Procedures

Detailed Voting Procedures are set forth in <u>Appendix C</u> of this Disclosure Statement and in the motion to approve this Disclosure Statement.

### C. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D. Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Kurtzman Carson Consultants LLC at the address set forth in Section E of this Article at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by Kurtzman Carson Consultants LLC in a timely manner at the address set forth below. The Debtors will determine whether any withdrawals of Ballots were received and whether the Requisite Acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by Kurtzman Carson Consultants LLC will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to Kurtzman Carson Consultants LLC a properly completed Ballot prior to the Voting Deadline may revoke such Ballot and change his or its vote by submitting to Kurtzman Carson Consultants LLC prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date of receipt by Kurtzman Carson Consultants LLC will be counted for purposes of determining whether the Requisite Acceptances have been received.

**E.**     **Further Information; Additional Copies**

      If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Kurtzman Carson Consultants LLC:

Forum Health
KURTZMAN CARSON CONSULTANTS LLC
2335 Alaska Avenue
Los Angeles, CA 90245
Telephone:  (310) 823-9000
Website:  www.kccllc.net/forum

## XII. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

May 3, [239] 24, [240] 2011

Respectfully submitted,

FORUM HEALTH
(for itself and on behalf of the Debtors)

By:     /s/  Dalton Edgecomb
        Name:  Dalton Edgecomb
        Title:  Chief Restructuring Officer

Counsel:

McDONALD HOPKINS LLC

SHAWN M. RILEY  (0037235)
SEAN D. MALLOY  (0073157)
MATTHEW A. SALERNO  (0070847)
MELISSA S. GIBERSON  (0082413)
600 Superior Avenue, East, Suite 2100
Cleveland, OH  44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:     sriley@mcdonaldhopkins.com
           smalloy@mcdonaldhopkins.com
           msalerno@mcdonaldhopkins.com
           mgiberson@mcdonaldhopkins.com

and

NADLER NADLER & BURDMAN CO., L.P.A.

MICHAEL A. GALLO
20 West Federal Street, Suite 60
Youngstown, OH  44503-1423
Telephone:  (330) 744-0247
Facsimile:  (330) 744-8690
Email:     gallo@nnblaw.com

Co-Counsel to the Debtors and Debtors in Possession