## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-40795 |
| FORUM HEALTH, et al.,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| | ) | Judge Kay Woods |
| _____ | ) | |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CONFIRMATION OF THE DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION

---

[1]     As of the Petition Date, the Debtors included: Forum Health (31-1560189), Forum Health Diagnostics Co. (34-1773672), Forum Health Enterprises Co. (34-1368151), Forum Health Outreach Laboratories, Inc. (34-1437294), Forum Health Ventures Co. (34-1489491), Forum Health Pharmacy Services Co. (34-1754092), Forum Health Rehabilitative Services Co. (31-1581767), Forum Health Services Co. (34-1461044), Western Reserve Care System (34-1454933), Western Reserve Health Foundation (34-1461047), Dacas Nursing Support Systems, Inc. (34-1482591), Dacas Nursing Systems, Inc. (34-1456983), Beeghly Oaks (31-1196072), PrideCare, Inc. (34-1490425), Trumbull Memorial Hospital (34-1461049), Trumbull Memorial Hospital Foundation (34-1195190), Comprehensive Psychiatry Specialists, Inc. (34-1697739), and Visiting Nurse Association and Hospice of Northeast Ohio (34-0714388).

# Table of Contents

Table of Authorities ................................................................................................. i

Preliminary Statement ............................................................................................. 1

Background .............................................................................................................. 2

    A.    Retention of Professionals by the Debtors and the Foundations ............................ 2

    B.    The Bonds, Cash Collateral Orders, and the Sale of Substantially All of the Debtors' Assets ............................................................................................ 4

    C.    Dismissal of the Foundations' Cases and the PBGC Settlement ........................... 6

    D.    The Debtors' Plan ........................................................................................ 7

Confirmation Objection ........................................................................................... 7

    A.    The Proposed Settlement With the Foundations Cannot Be Approved ................. 7

    B.    The Broad Releases and Other Protection in Favor of the Foundations and the Debtors' (Including the Foundations') Current and Former Officers, Directors, and Trustees Are Impermissible. ................................................................... 20

    C.    The Plan Cannot Be Confirmed Because It Has Not Been Proposed in Good Faith. .............................................................................................................. 23

    D.    The Plan Cannot Be Confirmed Because Unsecured Creditors Would Receive More in a Chapter 7 Liquidation ................................................................... 24

    E.    The Plan Impermissibly Dissolves the Committee. ............................................ 26

Prayer for Relief .................................................................................................... 28

LEGAL02/32708950v4

## Table of Authorities

Cases                                                                                    Page(s)

*Bauer v. Commerce Union Bank*, 849 F.2d 438 (6th Cir. 1988) .....................................9

*CFTC v. Weintraub*, 471 U.S. 343 (1985) ...............................................................24

*Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059 (5th Cir. 1990) .................27

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982)..............................................26

*In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002)...................................................21-22, 23

*In re Future Energy Corp.*, 83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................23-24, 25

*In re Ionosphere Clubs, Inc.*, 139 B.R. 772 (S.D.N.Y. 1992)...........................................27

*In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006).............................................27

*In re Padilla*, 222 F.3d 1184, 1189 (9th Cir. 2000) .....................................................26-27

*In re Salem*, 465 F.3d 767 (7th Cir. 2006) ..............................................................27

*In re SL Liquidating*, 428 B.R. 799 (Bankr. S.D. Ohio 2010)................................................21, 22

*In re Sun Valley Foods Co.*, 801 F.2d 186 (6th Cir. 1986)............................................27

*In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)..........................................23

*Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469 (6th Cir. 1988) ...................................8-9

*Whispering Pine Estates, Inc. v. Flash Island, Inc.*, 370 B.R. 452 (B.A.P. 1st Cir. 2007)............23


Statutes and Rules                                                                       Page(s)

11 U.S.C. § 541..................................................................................................25

11 U.S.C. § 701..................................................................................................25

11 U.S.C. § 702..................................................................................................25

11 U.S.C. § 704(a)(1).........................................................................................25

11 U.S.C. § 1129(a)(3)........................................................................................23, 24-25

11 U.S.C. § 1129(a)(7).......................................................................................1, 24

26 U.S.C. § 509(a)(3)(B)(i)..................................................................................26

28 U.S.C. § 158..................................................................................................27

| Statutes and Rules | Page(s) |
|---|---|
| 28 U.S.C. § 158(a) | 27 |
| Fed. R. Bankr. P. 9019 | 7, 8 |

LEGAL02/32708950v4

The Official Committee of Unsecured Creditors of Forum Health, *et al.* (the "Committee"), hereby objects to confirmation of the Debtors' Second Amended Chapter 11 Plan of Liquidation (Docket No. 1642; the "Plan") filed by the above-captioned debtors (collectively with Trumbull Memorial Hospital Foundation and Western Reserve Health Foundation, the "Debtors").[2]  In support of this objection, the Committee respectfully states as follows:

## Preliminary Statement

1.     In its current form, the Plan cannot be confirmed.  An integral component of the Plan is its proposed settlement with the Foundations (defined below).  As described more fully below, the proposed settlement cannot be approved because it is woefully inadequate to cover even the Foundations' fair and equitable share of the professional fees incurred during the two years the Foundations enjoyed the benefits of bankruptcy protection.  Moreover, the Plan contains impermissible releases and other protections, *i.e.* the injunction and exculpation, in favor of the Foundations and the Debtors' (including the Foundations') current and former officers, directors, and trustees.  Furthermore, since the non-Foundation Debtors have proposed the improper settlement as part of their Plan, the Plan has not been proposed in good faith and cannot be confirmed.  Similarly, the Plan does not maximize value for creditors and fails the best interests of creditors test of section 1129(a)(7) of the Bankruptcy Code.  Finally, the Plan would improperly deprive the Committee of its appellate and other rights because it would dissolve the Committee on the Effective Date.  For all of these reasons, the Committee respectfully requests that the Court deny confirmation of the Plan.

---

[2] For the avoidance of doubt, as used herein the term "Debtors" includes the Foundations (defined below).

**Background**

2.    On March 16, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  As of the Petition Date, the Debtors included Trumbull Memorial Hospital Foundation ("Trumbull Foundation" or "TMHF") and Western Reserve Health Foundation ("Western Foundation" or "WRHF," and together with Trumbull Foundation, the "Foundations").[3]

A.    Retention of Professionals by the Debtors and the Foundations

3.    On April 15, 2009, the Court entered the Order Upon the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 164; the "Fee Procedures Order").

4.    On or about April 17, 2009, the Court entered an order approving the retention of McDonald Hopkins LLC ("McDonald Hopkins") as bankruptcy counsel for all of the Debtors. (Docket Nos. 173, 183.)  Pursuant to the Fee Procedures Order, McDonald Hopkins has filed six interim fee applications and circulated an additional four monthly fee requests[4] seeking aggregate payment of $6,914,657 in fees and reimbursement of $171,982 in expenses.  (*See* Docket Nos. 366, 547, 698, 1014, 1265, 1475.)

5.    On or about April 17, 2009, the Court entered an order (i) authorizing the retention and employment of Huron Consulting Services LLC (practicing as Huron Consulting Group) ("Huron") as financial advisors by all of the Debtors and (ii) designating Dalton T. Edgecomb as Chief Restructuring Officer of all of the Debtors.  (Docket Nos. 174, 184.) Pursuant to the Fee Procedures Order, Huron has filed six interim fee applications and circulated

---

[3] For the avoidance of doubt, as used herein the term "Debtors" includes the Foundations.

[4] If necessary, these monthly fee requests will be submitted into evidence at the confirmation hearing.

LEGAL02/32708950v4

an additional four monthly fee requests[5] seeking payment of $6,047,528 in fees and reimbursement of $339,412 in expenses.  (*See* Docket Nos. 366, 547, 698, 1014, 1265, 1475.)

6.    On April 30, 2009, the Court entered an order approving the retention of Nadler Nadler & Burdman Co., L.P.A. ("Nadler") as co-counsel to all of the Debtors.  (Docket No. 213.) Pursuant to the Fee Procedures Order, Nadler has filed five interim fee applications and an additional six monthly fee requests[6] seeking payment of $409,212 in fees and reimbursement of $16,776 in expenses.  (*See* Docket Nos. 400, 568, 710, 1021, 1280.)

7.    On August 20, 2009, the Court entered an order approving the retention of Houlihan Lokey Capital, Inc. (formerly Houlihan Lokey Howard & Zukin Capital, Inc.) ("Houlihan") as investment banker to all of the Debtors.  (Docket No. 443.)  Specifically, Houlihan assisted the Debtors with the Sale (defined below) of substantially all of their assets, the proceeds of which were ultimately used to satisfy the Bond Obligations (defined below).  On February 17, 2011, the Court entered an order approving Houlihan's final fee application, which sought payment of $7,108,606 in fees (consisting of $2,250,000 in monthly fees plus a $4,858,606 "Transaction Fee") and reimbursement of $186,169.86 in expenses.  (Docket No. 1378.)

8.    On or about June 24, 2010, the Court entered an order authorizing the retention and employment of Thompson Hine LLP ("Thompson Hine") as special counsel to all of the Debtors.  (Docket No. 903.)  Specifically, Thompson Hine was retained and employed "to provide services related to the review of restricted and unrestricted funds" held by certain Debtors, including the Foundations. (Docket No. 780 ¶ 5.)  Thompson Hine filed one interim fee application seeking payment of $257,554.00 in fees and reimbursement of $3,517.03 in

---

[5] If necessary, these monthly fee requests will be submitted into evidence at the confirmation hearing.
[6] If necessary, these monthly fee requests will be submitted into evidence at the confirmation hearing.

LEGAL02/32708950v4

expenses. (Docket No. 1261.) Thompson Hine reviewed restricted and unrestricted funds totaling approximately $23.9 million (*id.* ¶ 6), and the Committee understands that the Foundations held approximately $19.6 million of these funds.

B.      The Bonds, Cash Collateral Orders, and the Sale of Substantially All of the Debtors' Assets

9.     The Debtors' prepetition debt structure included certain bond indebtedness incurred for the purpose of defeasing certain bonds issued to finance the cost of additional hospital facilities for certain Debtors. These bonds included the following: (a) Series 1997A bonds, (b) Series 1997B bonds, (c) Series 2002A bonds, and (d) Series 2002B bonds (collectively, the "Bonds").

10.    Forum Health Services Co., Forum Health, Trumbull Memorial Hospital, Western Reserve Care System, Trumbull Foundation, Western Foundation, Forum Health Rehabilitative Services Co., Beeghly Oaks, and Dacas Nursing Systems (the "Obligated Debtors") were jointly and severally liable for the obligations relating to the Bonds (the "Bond Obligations"). As of the Petition Date, the Bond Obligations were approximately $139.2 million in outstanding principal.

11.    The Foundations' unrestricted cash was pledged as collateral securing the Bond Obligations.

12.    On March 17, 2009, the Court entered the Interim Order Authorizing Debtors' Limited Use of Cash Collateral, Pursuant to 11 U.S.C. §§ 101, 361 and 363, and Granting Replacement Liens, Adequate Protection and Administrative Expense Priority to the Master Trustee, Bond Trustees and Prepetition Secured Creditors (Docket No. 50; the "Interim Cash Collateral Order"). The Court subsequently entered orders from time to time respecting the use of cash collateral, including the Foundations' unrestricted cash (Docket Nos. 165, 490, 526, 583, 584, 601, 627, 671, 728, 762, 766, 774, 795, 823, 861, 1076; together with the Interim Cash

- 4 -

Collateral Order, the "Cash Collateral Orders"). Among other provisions, the Cash Collateral Orders authorized and required adequate protection payments by the Debtors (including the Foundations) to the Consent Parties (as defined in the Cash Collateral Orders, the "Consent Parties"), *inter alia*,

> in the amount of all reasonable fees, charges and expenses, (including, without limitation, documented legal, accounting, collateral examination, audit, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses and other out of pocket expenses) of the Master Trustee, the Bond Trustees and the Prepetition Secured Creditors [i.e., the Consent Parties] in accordance with the Prepetition Financing Agreements, which payments shall not be subject to review, determination or allowance by the Bankruptcy Court.

(Docket No. 165 ¶ 4(d)(i).)[7] In accordance with this provision of the Cash Collateral Orders, the Debtors have been invoiced for fees and expenses totaling $11,219,173 by the Consent Parties' professionals. The Foundations have neither paid nor reimbursed the other Debtors for any portion of this amount.

13. On August 11, 2010, the Court entered an order (Docket No. 1072; the "Sale Order") authorizing certain of the Debtors[8] (not including the Foundations) to sell substantially all of their assets.

14. The sale authorized by the Sale Order (the "Sale") closed on October 1, 2010.

15. None of the Foundations' assets were included in the Sale.

16. Consistent with the provisions of the Sale Order, the Stipulation Regarding Distribution of Proceeds of Sale (Docket No. 1157), and the Stipulated and Agreed Order

---

[7] This language was subsequently amended to provide the Debtors and the Committee twenty days to object to the allowance of such fees and expenses. (*See* Docket No. 526 ¶ 2.)

[8] The Sale Order authorized Forum Health, Trumbull Memorial Hospital, Western Reserve Care System, Forum Health Services Co., Forum Health Rehabilitative Services Co., Forum Health Enterprises Co., Forum Health Ventures Co., Forum Health Outreach Laboratories, Inc., and Forum Health Diagnostics Co. to sell substantially all of their assets.

LEGAL02/32708950v4

Regarding Payment of Series 2002A Bonds (Docket No. 1275), the outstanding Bond Obligations were satisfied from the proceeds of the Sale.

C.      Dismissal of the Foundations' Cases and the PBGC Settlement

17.     On February 4, 2011, the Foundations filed motions to dismiss their cases (Docket Nos. 1347, 1349; together, the "Dismissal Motions").

18.     On February 4, 2011, the Debtors also filed the Debtors' Motion (Docket No. 1344; the "PBGC Settlement Motion") for an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Approving the Terms of the Settlement with the Pension Benefit Guaranty Corporation (the "PBGC Settlement").

19.     Among other things, the PBGC Settlement was intended to resolve the following claims filed by the Pension Benefit Guaranty Corporation ("PBGC") against each of the Debtors, including the Foundations: (i) Proof of Claim No. 606 asserting an unliquidated claim for unpaid minimum funding contributions; (ii) Proof of Claim No. 607 asserting an unliquidated claim for alleged additional PBGC premiums due on termination; (iii) Proof of Claim No. 629 asserting a claim for unfunded benefit liabilities in the estimated amount of $207,300,000 (the "Unfunded Benefit Claim"); and (iv) Administrative Expense Claim Form No. 954 filed as an administrative priority claim for minimum funding contributions attributable to the post-petition period in the amount of $648,183.

20.     On March 17, 2011, the Court entered an order (Docket No. 1483; the "Dismissal Order") granting the Dismissal Motions and dismissing the Foundations' cases.

21.     On March 24, 2011, the Committee timely filed notice of its appeal of the Dismissal Order (the "Appeal"). (Docket No. 1503.) The Appeal is still pending before the United States District Court for the Northern District of Ohio (the "District Court").

LEGAL02/32708950v4

22.     On April 28, 2011, the Court entered an order approving the PBGC Settlement (Docket No. 1593; the "PBGC Settlement Order").

D.      The Debtors' Plan

23.     On May 24, 2011, the non-Foundation Debtors filed their Plan.

24.     On May 25, 2011, the Court entered an order approving the Plan's disclosure statement and scheduling a hearing to consider confirmation of the Plan.  (Docket No. 1649.)

## Confirmation Objection

25.     The proposed settlement with the Foundations contained in the Plan cannot be approved because it fails to cover the Foundations' fair and equitable share of the professional fees (and certain expenses) incurred during the two years that they enjoyed the benefits of bankruptcy protection.  Furthermore, the Plan contains impermissible, broad general releases and other protections in favor of the Foundations and the Debtors' (including the Foundations') current and former officers, directors, and trustees.  The non-Foundation Debtors have failed to maximize value for their creditors by proposing the improper settlement with the Foundations, and thus the Plan cannot be confirmed because it was not proposed in good faith.  Similarly, the Plan fails the best interests of creditors test because a chapter 7 trustee would pursue a more adequate settlement with the Foundations that would ultimately allow for greater distributions to creditors.  Finally, the Plan's dissolution of the Committee on the Effective Date improperly restricts the Committee's appellate and other rights.

A.      The Proposed Settlement With the Foundations Cannot Be Approved.

26.     The "Plan constitutes a motion under Bankruptcy Rule 9019[9] to resolve all obligations of the Foundations for expenses related to their chapter 11 cases and any other claims or causes of action of the Debtors against the Foundations."  (Plan § 3.3.)  The Foundations are

---

[9] "Bankruptcy Rule 9019" is Rule 9019 of the Federal Rules of Bankruptcy Procedure.

LEGAL02/32708950v4

proposing to pay $1 million for resolution of all claims against them by the other Debtors and by non-Debtor third parties. Yet this $1 million payment is totally insufficient to satisfy even one important class of claims against the Foundations – *i.e.* claims for their fair and equitable share of the professional fees and expenses incurred on behalf of all of the Debtors during the two years that the Foundations spent under the protection of chapter 11 – let alone to provide consideration for the releases and other protections in favor of the Foundations contained in the Plan. As described more fully below, the Committee has analyzed most of the primary professionals' fees and has determined that the Foundations owe approximately $4,682,228. Even using the most conservative alternative calculation methods applied by the Committee, the Foundations owe at least $2,752,656. The $1 million settlement offered by the Foundations fails to cover even this conservative estimate.[10] Indeed, this $1 million is not really $1 million – it "will be reduced dollar for dollar with any further costs of litigation to the Foundations." (Plan § 3.3.) Theoretically, the Foundations could be providing no consideration whatsoever for this proposed settlement. Moreover, the non-Foundation Debtors "have agreed to indemnify the Foundations for the costs of further litigation related to these matters." (*Id.*) Thus, the non-Foundation Debtors' estates could potentially pay the Foundations' costs of litigation and receive nothing in return. Accordingly, the settlement is illusory. Thus, the proposed settlement does not fall within even the lowest bounds of reasonableness, and the Court should deny approval of it and deny confirmation of the Plan.

27. In evaluating a proposed settlement under Bankruptcy Rule 9019, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Reynolds v.*

---

[10] The Committee notes, for example, that it has not included in its analysis any of the fees and expenses incurred by its professionals, although the Committee believes that the Foundations should bear a share of these fees and expenses as well.

LEGAL02/32708950v4

*Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988). "The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is 'reasonable.'" *Id.* In determining whether a proposed settlement is fair and equitable, the bankruptcy court must weight the relevant parties' conflicting interests and must consider "such factors as the probability of success on the merits, the complexity and expense of litigation, and the reasonable views of creditors." *Bauer v. Commerce Union Bank*, 849 F.2d 438, 441 (6th Cir. 1988).

28.     The proposed settlement is not fair and equitable. One million dollars is insufficient to cover the Foundations' fair and equitable share of the more than $39 million in restructuring costs incurred in these cases.[11] In fact, the Foundations' fair and equitable share of the professional fees (including only certain expenses)[12] incurred by McDonald Hopkins, Huron, Nadler, Houlihan, and Thompson Hine alone is between $1,724,711 and $2,189,078. In addition, as Obligated Debtors under the Bond Obligations, the Foundations should also pay their fair share of the approximately $11,219,173 in professional (and certain other) fees and expenses invoiced to the Debtors by the Consent Parties' professionals and U.S. Bank. The Committee submits that the Foundations' fair and equitable share of these Consent Parties' fees and expenses is between $1,027,945 and $2,493,150. Accordingly, the Foundations should contribute at least $2,752,656 to satisfy their fair and equitable share of all of the restructuring costs of these bankruptcy cases, even using a conservative approach to allocating these costs. In fact, the Committee submits that the Foundations' fair and equitable share of these restructuring

---

[11] The Committee also believes that the Foundations are liable for contribution on account of the payment of the Bond Obligations by the other Obligated Debtors. However, since these contribution claims are currently subject to the Appeal, and since the settlement proposed in the Plan is plainly unfair and inequitable without including them, the Committee has not included these contribution claims in this analysis.

[12] The Committee has included only those expenses that were clearly incurred on behalf of the Foundations. For example, Thompson Hine's expenses incurred in researching Ohio law regarding restricted and unrestricted funds are included. The Committee believes that far more expenses could be included, but the Committee has not undertaken an analysis of all expenses.

- 9 -

costs is approximately $4,682,228, even without taking into consideration certain other fees and expenses that could also reasonably be allocated to the Foundations. Thus, the (less than) $1 million settlement contemplated by the Plan is not fair and equitable, and the Court should not approve it and should deny confirmation of the Plan. A summary of the Foundations' fair and equitable share of fees and certain expenses is submitted herewith as Exhibit A. A more detailed description of what is included follows.

29. In order to identify fees (and certain, limited expenses) incurred directly or indirectly on behalf of the Foundations, the Committee's professionals reviewed the interim fee applications filed by and certain monthly fee statements circulated by McDonald Hopkins, Huron, and Nadler. The Committee then classified these entries[13] and proposes to allocate them as follows (such classification and allocation, the "Methodology"):

Foundation Direct

a. **Foundations** – These entries include time that specifically references one or both of the Foundations, that the timekeeper specifically classified as relating to one or both of the Foundations, or that was clearly done at the request of the Foundations (e.g., research related to or preparation of motions to dismiss, even if the Foundations were not specifically mentioned). The Foundations are responsible for 100% of this time.

b. **Restricted and Unrestricted Investment Review** – These entries include time that references research or analysis related to the Debtors' unrestricted and restricted funds. As of the Petition Date, the Foundations held approximately $26.7 million in Unrestricted and Restricted Investments. All Debtors held approximately $40.0 million in Unrestricted and Restricted Investments and Restricted Cash as of the Petition Date. Thus, the Foundations held approximately 66.8% of all restricted and unrestricted cash. Accordingly, that is the approximate amount of fees that should be allocated to the Foundations, since they would have been the super-majority beneficiaries of any such work. (In fact, since this research and analysis was ultimately used in prosecuting the Foundations' Dismissal Motions, it is likely that the Foundations derived nearly all of the benefit from it.)

---

[13] The time entries from McDonald Hopkins's, Huron's, and Nadler's interim fee applications and monthly fee statements identified by the Committee as allocable to the Foundations, along with the Committee's classification of such entries, have been designated as hearing exhibits by the Committee and submitted to the Court in the Committee's exhibit binders.

LEGAL02/32708950v4

    c.   **General Administration (Obligor Group)** – These entries include all time related to preparation for and attendance at meetings (including negotiations) with the Consent Parties and/or their professionals. The Foundations were Obligated Debtors, and they were jointly and severally liable on the Bond Obligations. Each of the Foundations has claimed that it "filed for chapter 11 protection only because of its liability under the Bond Obligations." (Dismissal Mots. ¶ 4.) This category also includes any time spent in connection with the plan of reorganization filed by the Consent Parties, which contemplated using all of the Foundations' unrestricted assets for the benefit of the holders of the Bonds. (*See* Docket No. 784 Art. III § D.2 at 30.) Accordingly, there can be no doubt that the Foundations benefitted from the services in this category. Since the Foundations were jointly and severally liable with the other Obligated Debtors, and since the Foundations unrestricted cash was pledged (and could have been used) to satisfy the Bond Obligations, the Committee submits that each of the Obligated Debtors (including the Foundations) should bear an equal proportion of these costs. This results in an allocation of approximately 22.2% of such fees to the Foundations [2 divided by 9].

Alternatively, since the Foundations' unrestricted cash was pledged to secure the Bond Obligations, and since the Bond Obligations were ultimately satisfied by the proceeds of the Sale, as a more conservative minimum allocation, the Committee submits that the Foundations should pay a percentage of these fees equivalent to the Foundations' *pro rata* share of the market value of the Debtors' assets. That is, since the Consent Parties would have had recourse to (at least the Obligated) Debtors' assets, including the Foundations' unrestricted cash, to satisfy the Bond Obligations, the Foundations' *pro rata* share of these available assets represents the approximate benefit they received from the satisfaction of the Bond Obligations. The total market value of the Debtors' assets is assumed to be the sum of (a) all assets sold to CHS on 10/01/10 for $120 million, (b) the net working capital adjustment of $2.99 million, and (c) the market value of the assets not sold to purchaser in the Sale, which includes the two Foundations. The Committee understands that the unrestricted cash value of the Foundations was approximately $12.4 million on the date of the closing of the Sale and that the other unsold assets had no material market value. Accordingly, the ratio of the Foundations' unrestricted cash to total market value is approximately 9.2% [$12.4 million divided by $135.4 million].

    d.   **Bonds** – These entries include all time related to the Bonds, including issues related to the covenants of the Bonds. Since the Bonds underlie the Obligated Debtors' Bond Obligations to the Consent Parties, the Committee submits that each of the Obligated Debtors (including the Foundations) should bear an equal proportion of these costs for the reasons stated above. This results in an allocation of approximately 22.2% of such fees to the Foundations.

For the reasons stated with respect to General Administration (Obligor Group) fees, the Committee submits that the use of the market value methodology

described above represents a reasonable minimum allocation for these fees. This results in an allocation of approximately 9.2% of such fees to the Foundations.

e. **Cash Collateral** – These entries include all time related to use of cash collateral, including the Cash Collateral Orders. The Foundations' unrestricted cash was pledged to secure the Bond Obligations, and accordingly it was subject to the Cash Collateral Orders. Accordingly, the Foundations benefited from the continued extensions of the Cash Collateral Orders, which granted them the ability to use their unrestricted cash to the extent allowed by the Cash Collateral Orders. Since certain of the Obligated Debtors' assets, including the Foundations' unrestricted cash, was pledged as collateral securing the Bond Obligations, the Committee submits that dividing these costs equally among all of the Obligated Debtors (including the Foundations) is a fair and equitable division [2 divided by 9]. (Indeed, since the Foundations' unrestricted cash would have been subject to foreclosure by the Consent Parties had there been any breaches of the Cash Collateral Orders, and the Foundations' unrestricted cash constituted a significant portion of the cash subject to the Cash Collateral Orders, the Foundations benefitted greatly from work related to the Cash Collateral Orders.) This results in an allocation of approximately 22.2% of such fees to the Foundations.

Alternatively, for the reasons stated with respect to General Administration (Obligor Group) fees, the Committee submits that the use of the market value methodology described above represents a reasonable minimum allocation for these fees. This results in an allocation of approximately 9.2% of such fees to the Foundations.

Fixed Bankruptcy

Fixed Costs

f. **General Administration (Fixed Bankruptcy Fees)** – These entries include time for services that would be performed in all bankruptcy cases, including time spent (i) on first day motions, (ii) preparing for and attending unspecified or general status meetings with other professionals, (iii) preparing for and attending unspecified or general status meetings with the client, (iv) regularly reviewing the docket, (v) preparing and implementing the various bar date motions, (vi) responding to calls and inquiries from creditors, (vii) preparing monthly operating reports, schedules of assets and liabilities, statements of financial affairs, and related financial reports, and (viii) performing any other work of the type generally performed in bankruptcy cases that would have benefitted the Foundations without falling into another category. The Committee submits that this time should be divided equally among all eighteen Debtors since it represents time that is incurred in every bankruptcy case.[14] This results in an allocation of approximately 11.11% of such fees to

---

[14] In fact, certain of the Debtors had already ceased operations and would have required minimal services in the bankruptcy, so these fees could arguably be allocated among fewer Debtors. However, in order to establish a consistent and conservative fee allocation, the Committee has proposed to allocate these fees among all 18 Debtors.

LEGAL02/32708950v4

the Foundations.

Alternatively, as a more conservative minimum allocation, the Committee submits that the market value allocation methodology described above represents a reasonable allocation for these fees. In general, debtors with more assets require greater expenditures of administrative time. This method provides a rough approximation of work done for each Debtor, particularly with respect to financial reporting requirements, which are based in part on asset analysis. This results in an allocation of approximately 9.2% of these fees to the Foundations.

g.  **Fee Applications/Retention** – These entries include time spent preparing retention applications, monthly statements, and interim fee applications; attending related hearings; and, in the case of attorneys, conducting regular internal conflict audits. In the case of McDonald Hopkins, these entries include time spent preparing retention applications for professionals whose work would have benefitted the Foundations. In addition, this category includes work performed by McDonald Hopkins related to the termination of Walter Pishkur as CEO, his retention as a consultant, and payment of severance. With respect to Huron, this category also includes time spent related to the retention of an investment banker for purposes of the Sale. This category excludes ordinary course professional retention, but it does include time spent related to the retention of Baker & Hostetler LLP, Ernst & Young LLP, and Squire, Sanders & Dempsey L.L.P.[15] Since each of the professionals was retained on behalf of all of the Debtors, and since each performed services benefitting all of the Debtors, the Committee submits that this time should be divided equally among all eighteen Debtors (including the Foundations) [2 divided by 18 is approximately 11.11%].

Alternatively, at a minimum, the Committee submits that the Foundations should pay a percentage of these fees equivalent to the Foundations' *pro rata* share of the market value of the Debtors' assets. This method provides a rough approximation of work to be done by each professional, since, as a general rule, cases involving more assets will require more professionals. As demonstrated above, this methodology yields a proportionate share to the Foundations of approximately 9.2%.

h.  **Plan** – These entries include all time related to the plan of reorganization prepared by the Debtors (but never filed) prior to dismissal of the Foundations' cases. Such a plan of reorganization would necessarily have involved resolution of the Bond Obligations, and it would undoubtedly have impacted the Foundations in other ways as well. In addition, this category includes time spent reviewing alternative plans that would have included the

---

[15] Baker & Hostetler LLP was retained to provide services related to, among other things, the Debtors' tax exempt status and interfacing with the Ohio Attorney General. (See Docket No. 714 ¶ 10.) Ernst & Young LLP provided services to the Foundations. (*See* WRHF Docket No. 3 at 11; TMHF Docket No. 3 at 11.) Squires, Sanders & Dempsey L.L.P. provided services related to the Bonds. (*See* Docket No. 793 ¶ 8.) The actual time and expenses incurred by these professionals as part of their bankruptcy-specific retention was not included in this analysis. However, the Foundations should bear a fair and equitable portion of this time. The fact that this analysis does not include such time underscores the Committee's conservative, analytic approach.

-13-

Foundations. The Committee submits that this time should be divided equally among all eighteen Debtors (including the Foundations) since such a plan would have benefited each of them. This results in an allocation of approximately 11.11% of such fees to the Foundations.

Alternatively, however, since those assets sold as part of the Sale and the Foundations' unrestricted cash would have emerged as part of any plan of reorganization, the market value methodology described above provides a reasonable and conservative minimum allocation amount. This results in an allocation of approximately 9.2% of such fees to the Foundations.

i.  **Sale** – These entries include all time related to issues affecting or related to the Sale of substantially all of the Debtors' assets. Although none of the Foundations' assets were included in the Sale, the proceeds of the Sale were used to satisfy the Bond Obligations on which the Foundations were jointly and severally liable with the other Obligated Debtors. Accordingly, the Committee submits it would be reasonable to divide these costs among each of the Obligated Debtors. However, since certain of the non-Obligated Debtors' assets were included in the Sale, and some of the non-Obligated Debtors may receive some of the proceeds, out of an abundance of caution the Committee proposes to split these costs among all of the Debtors. This results in an allocation of approximately 11.11% of such fees to the Foundations.

For the reasons stated with respect to General Administrative (Obligor Group) fees, the Committee submits that the use of the market value methodology describes above represents a reasonable minimum allocation for these fees. This results in an allocation of approximately 9.2% of such fees to the Foundations.

Pension/PBGC

j.  **Pension Plan** – These entries include all time related to the Forum Health Pension Plan (the "Pension Plan"). Both of the Foundations contributed to the Pension Plan as employers. (WRHF Docket No. 3 at 14; TMHF Docket No. 3 at 14.) According to the Debtors' Statements of Financial Affairs, only nine of the other Debtors contributed to the Pension Plan as employers within the six years prior to the Petition Date.[16] Accordingly, the Committee submits that this time should be divided evenly among the eleven participating Debtors (including the Foundations). This results in an allocation of approximately 18.18% of such fees to the Foundations [2 divided by 11].

Alternatively, at a minimum, the Committee submits that these costs should be allocated evenly among all of the Debtors. This results in an allocation of approximately 11.11% of such fees to the Foundations [2 divided by 18].

---

[16] Those Debtors are Forum Health (Docket No. 215 at 14), Forum Health Enterprises Co. (Case No. 09-40798, Docket No. 3 at 14), Forum Health Pharmacy Services Co. (Case No. 09-40802, Docket No. 3 at 14), Forum Health Rehabilitative Services Co. (Case No. 09-40796, Docket No. 3 at 14), Forum Health Services Co. (Case No. 09-40803, Docket No. 2 at 15), Forum Health Ventures Co. (Case No. 09-40801, Docket No. 3 at 14), PrideCare Inc. (Case No. 09-40811, Docket No. 3 at 14), Trumbull Memorial Hospital (Case No. 09-40808, Docket No. 3 at 14), and Western Reserve Care System (Case No. 09-40804, Docket No. 3 at 16).

-14-

k. **PBGC** – These entries include time spent researching issues related to the PBGC's claims against all of the Debtors (including the Foundations), preparing for and attending meetings with or regarding the PBGC, and related to the PBGC Settlement. The PBGC asserted its claims against all of the Debtors (including the Foundations). In addition, the PBGC Settlement specifically included a provision whereby the PBGC released any claims against the Foundations and agreed not to oppose dismissal of the Foundations' cases. Since the PBGC's claim is ultimately based on termination of the Pension Plan, the Committee submits that allocating these fees using the same methodology as fees related to the Pension Plan is reasonable.

30. McDonald Hopkins incurred fees totaling $6,914,657 through April 30, 2011. The Debtors (including the Foundations) were collectively authorized and directed to pay the fees and expenses incurred by McDonald Hopkins in the orders granting its six interim fee applications. (Docket No. 431 ¶ 4; Docket No. 596 ¶ 4; Docket No. 752 ¶ 4; Docket No. 1108 ¶ 4; Docket No. 1299 ¶ 4; Docket No. 1548 ¶ 4.) Based on the Methodology, the Committee identified entries totaling $3,391,324 at least part of which should be allocated to the Foundations. Based on the Methodology, the Committee submits that the Foundations' fair and equitable share of this amount is between $502,005 and $648,819.[17]

31. Huron incurred fees totaling $6,047,528 through May 31, 2011. The Debtors (including the Foundations) were collectively authorized and directed to pay the fees and expenses incurred by Huron in the orders granting its six interim fee applications. (Docket No. 440 ¶ 4; Docket No. 595 ¶ 4; Docket No. 757 ¶ 4; Docket No. 1107 ¶ 4; Docket No. 1300 ¶ 4; Docket No. 1546 ¶ 4.) Based on the Methodology, the Committee identified entries totaling $2,432,893 at least part of which should be allocated to the Foundations. Based on the

---

[17] A similar analysis of expenses is extremely difficult due to the necessary vagaries of certain expense summaries, and, accordingly, the Committee has not included any of the McDonald Hopkins's expenses in its estimate of the Foundations' fair and equitable share of professional fees and expenses. However, applying a similar percentage allocation to expenses as to fees yields an allocable range of $25,457 and $32,903. The Committee submits that this is a reasonable range of allocation of such expenses if the Court chooses to allocate expenses to the Foundations.

-15-

Methodology, the Committee submits that the Foundations' fair and equitable share of this amount is between $299,054 and $469,745.[18]

32.     Nadler incurred fees totaling $409,212 through May 31, 2011.  The Debtors (including the Foundations) were collectively authorized and directed to pay the fees and expenses incurred by Nadler in the orders granting its five interim fee applications.  (Docket No. 434 at 2; Docket No. 597 at 2; Docket No. 750 at 2; Docket No. 1104 at 2; Docket No. 1296 at 2.)  Based on the Methodology, the Committee identified entries totaling $165,003 from which the Foundations derived at least some benefit.  Based on the Methodology, the Committee submits that the Foundations' fair and equitable share of this amount is between $41,085 and $45,792.[19]

33.     Houlihan was retained to market and sell the Debtors' assets, a process which culminated in the Sale.  Their monthly fees were incurred in furtherance of the Sale, and their Transaction Fee was incurred as a result of the Sale.  Houlihan was paid $7,108,606 in fees (consisting of $2,250,000 in monthly fees plus a $4,858,606 "Transaction Fee") and reimbursed expenses totaling $186,169.86.  The Debtors (including the Foundations) were collectively authorized and directed to pay the fees and expenses incurred by Houlihan in the order granting its final fee application.  (Docket No. 1378 ¶ 4.)  Applying the Methodology applicable to Sale fees for other professionals to Houlihan's fees and expenses yields a fair and equitable share

---

[18] A similar analysis of expenses is extremely difficult due to the necessary vagaries of certain expense summaries, and, accordingly, the Committee has not included any of the Huron's expenses in its estimate of the Foundations' fair and equitable share of professional fees and expenses.  However, applying a similar percentage allocation to expenses as to fees yields an allocable range of $41,720 and $65,533.  The Committee submits that this is a reasonable range of allocation of such expenses if the Court chooses to allocate expenses to the Foundations.

[19] A similar analysis of expenses is extremely difficult due to the necessary vagaries of certain expense summaries, and, accordingly, the Committee has not included any of the Nadler's expenses in its estimate of the Foundations' fair and equitable share of professional fees and expenses.  However, applying a similar percentage allocation to expenses as to fees yields an allocable range of $4,177 and $4,655.  The Committee submits that this is a reasonable range of allocation of such expenses if the Court chooses to allocate expenses to the Foundations.

LEGAL02/32708950v4

allocable to the Foundations between $668,376 and $810,531. Since the Bond Obligations were satisfied by the proceeds of the Sale, the Foundations (along with the other Obligated Debtors) were the primary Debtor-beneficiaries of the Sale. Indeed, since the Foundations were released from the Bond Obligations without having to contribute any assets toward the Sale, they greatly benefitted from the Sale (perhaps more than any of the other Obligated Debtors).

34. Thompson Hine was retained to examine certain Debtors' unrestricted and restricted cash. Thompson Hine reviewed restricted and unrestricted funds totaling approximately $23.9 million, and the Committee understands that the Foundations held approximately $19.6 million of these funds. Accordingly, approximately 82% of the funds examined by Thompson Hine were held by the Foundations, and thus approximately 82% of the related fees should be allocated to the Foundations. Thompson Hine's first interim fee application sought $261,071 in fees and expenses, thus the Foundations' fair and equitable share of this amount is approximately $214,191.40. The Debtors (including the Foundations) were collectively authorized and directed to pay the fees and expenses incurred by Thompson Hine in the order granting its interim fee application. (Docket No. 1306 ¶ 4.)

35. The Cash Collateral Orders directed all of the Debtors (including the Foundations) to pay for the Consent Parties' professional fees and expenses. (*E.g.,* Docket No. 165 ¶ 4(d).) However, the Consent Parties only had prepetition secured claims against the Obligated Debtors (including the Foundations). Specifically, all of the Foundations' unrestricted cash was pledged to secure the Bond Obligations owed to the Consent Parties, and the Foundations' unrestricted cash was subject to the Cash Collateral Orders. These Bond Obligations were ultimately satisfied by the proceeds of the Sale, releasing the Foundations from their primary obligations. Indeed, each of the Foundations has stated that it "filed for chapter 11

-17-

protection **only** because of its liability under the Bond Obligations." (Dismissal Mots. ¶ 4 (emphasis added).) The Consent Parties submitted invoices requesting payment of their professionals' (and certain other) fees and expenses totaling $11,219,173. These costs arise from the Bond Obligations on which the Foundations and the other Obligated Debtors were jointly and severally liable, and the Debtors (including the Foundations) were collectively ordered to pay them by the Cash Collateral Orders. But for the bankruptcy filings by all of the Obligated Debtors (including the Foundations), these costs would not have been incurred, and these costs were related to the resolution of the Bond Obligations, from which resolution the Foundations benefited greatly. Thus, these professional (and certain other) fees and expenses are costs generally related to the Debtors' General Administration (Obligor Group) costs. Based on the General Administration (Obligor Group) Methodology, the Committee submits that the Foundations' fair and equitable share of this amount is between $1,027,945 and $2,493,150.[20]

36. Accordingly, the Committee submits that the Foundations' fair and equitable share of the restructuring costs in these cases is between $2,752,656 and $4,682,228.[21] This far exceeds the (less than) $1 million settlement amount proposed by the Foundations, and thus the settlement cannot be approved and the Plan cannot be confirmed. The Foundations enjoyed the benefits of chapter 11 protection for nearly two years, and benefitted greatly from the chapter 11 process by virtue of the satisfaction of their Bond Obligations from the proceeds of the Sale.

---

[20] These costs could also be attributed generally to the Bonds or to the Cash Collateral Orders, and these allocation methodologies yield the same allocation of fees to the Foundations.

[21] The Committee notes that these figures do not include an allocation of expenses from McDonald Hopkins, Huron, or Nadler. Out of an abundance of caution, the figures also do not include any fees or expenses incurred by the Committee's professionals, which are allocable to all of the Debtors, including the Foundations. Moreover, as explained more fully below, the proposed settlement includes a broad, general release of all claims against the Foundations, even claims that could be asserted by non-Debtor third parties. Since the proposed settlement does not even begin to satisfy the Foundations' fair and equitable share of professional costs, it cannot support these additional releases either.

-18-

They should not be allowed to shirk this responsibility with a lowball settlement completely unsupported by any evidence or analysis.

37. Nor can this extremely low settlement amount be justified as a discount for the vagaries of litigation. There can be no reasonable dispute that the Foundations should pay for their fair and equitable share of the professional costs incurred in connection with their bankruptcy cases. These bankruptcy cases resulted in resolution of the Bond Obligations, which the Foundations claim was the only reason that they filed for bankruptcy protection. Indeed, given the current posture of these cases – that the Foundations' bankruptcy cases have been dismissed, leaving them with more than $12 million in unrestricted cash subject only to claims incurred in these bankruptcy cases – the Foundations have arguably benefitted from bankruptcy far more than any of the other Debtors, who will cease to exist at the close of these cases and whose assets have been liquidated to satisfy the claims of their creditors. Thus, there is no conceivable rationale for allowing the Foundations to pay (less than) $1 million to settle claims totaling at least $2,752,656. (The settlement is even more untenable considering that this figure is probably closer to $4,682,228 and does not even include all of the costs that could reasonably be allocated to the Foundations.)

38. The proposed settlement is exactly the type of sweetheart deal that is made when parties are related and do not negotiate at arm's length. It appears to the Committee that both the Foundations and the non-Foundation Debtors continued to be represented by the same counsel during the "negotiations" that led to this proposed settlement. This is troubling to say the least.[22]

---

[22] Indeed, the Committee wonders whether said counsel will be representing the Foundations' or the non-Foundation Debtors' interests at the confirmation hearing. In light of the Committee's analysis, the Committee wonders how a true advocate for the non-Foundation Debtors' best interests could continue to support the proposed settlement.

LEGAL02/32708950v4

How could the settlement have been negotiated at arm's length when both sides were represented by the same counsel?[23]

> **B.** **The Broad Releases and Other Protections in Favor of the Foundations and the Debtors' (Including the Foundations') Current and Former Officers, Directors, and Trustees Are Impermissible.**

39.     The Plan contains broad releases in favor of the Foundations and all of the Debtors' (including the Foundations') current and former officers, directors, and trustees.  (*See* Plan § 8.6.2; Plan Ex. A at 9.)   The Plan proposes to enjoin taking any actions against the Foundations and all of the Debtors' (including the Foundations') current and former officers, directors, and trustees.  (*See* Plan § 8.6.3; Plan Ex. A at 9.)  In addition to the releases and the injunction, the Plan also proposes to exculpate the Foundations and the Debtors' (including the Foundations') officers, directors, and trustees "for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases and the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan."  (*See* Plan § 8.6.4; Plan Ex. A at 6.)  These releases, the injunction, and the exculpation in favor of the Foundations and the Debtors' (including the Foundation's) current and former officers, directors, and trustees (together, the "Protections") are impermissible.[24] Under Sixth Circuit precedent, the non-consensual third-party Protections in favor of the Foundations cannot be approved as a part of the Debtors' Plan of liquidation, and the same is true with respect to the non-consensual Protections in favor of the Debtors' (including the

---

[23] The non-Foundation Debtors' agreement to indemnify the Foundations for all costs of "further litigation related to these matters" is further evidence that this settlement was not negotiated at arm's length.  (*See* Plan § 3.3.)  In theory, this could result in a net payment from the non-Foundation Debtors to the Foundations, and it seems highly unlikely that a party represented by non-conflicted counsel would agree to such a provision under the circumstances here, where the Foundations' liability for at least some of the restructuring costs of these cases is beyond reasonable dispute.  The Committee objects to this indemnification.

[24] The release and the injunction apply to the Debtors' (including the Foundations') "current and former" officers, directors, and trustees.  (*See* Plan §§ 8.6.2, 8.6.3; Plan Ex. A at 9.)  The exculpation applies to the Debtors' (including the Foundations') officers, directors, and trustees, but it does not specify whether this includes "current and former" officers, directors, and trustees.  (*See* Plan § 8.6.4; Plan Ex. A at 6.)

LEGAL02/32708950v4

Foundations') officers, directors, and trustees. Moreover, the Foundations have not provided any consideration to support even the non-Foundation Debtors' releases of them, and there is no indication that the Debtors' (including the Foundations') officers, directors, and trustees have provided any consideration for their Protections either.

40. Although some courts have found that the Bankruptcy Code does not permit enjoining a non-consenting creditor's claims against a non-debtor, the Sixth Circuit has permitted such relief where all seven of the following factors are satisfied:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
>
> (4) The impacted class, or classes, has overwhelmingly voted to accept the plan;
>
> (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
>
> (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; [*sic*]
>
> (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *see also In re SL Liquidating*, 428 B.R. 799, 802 (Bankr. S.D. Ohio 2010) (holding that in applying this test "all of the factors must be present and all the factors are important").

41. Notably for the purposes of this case, the third factor of the Sixth's Circuit's test is that the non-consensual third-party Protections must be "essential to **reorganization**, namely, the **reorganization** hinges on the debtor being free from indirect suits against parties who would

-21-

LEGAL02/32708950v4

09-40795-kw    Doc 1686    FILED 07/05/11    ENTERED 07/05/11 15:43:37    Page 25 of 32

have indemnity or contribution claims against the debtor." *In re Dow Corning*, 208 F.3d at 658 (emphasis added). Furthermore, the second factor requires that the "non-debtor has contributed substantial assets to the **reorganization**." *Id.* (emphasis added). That is, non-consensual, non-debtor third-party Protections can only be approved in reorganizations; they cannot be approved in liquidation cases like this one. *See In re SL Liquidating*, 428 B.R. at 803. The Bankruptcy Court for the Southern District of Ohio explained the rationale for this rule as follows:

> This is because a reorganizing debtor, as opposed to a liquidating debtor, needs to be protected from suits that may deplete its assets so that it can, in fact, reorganize. . . . To hold otherwise may be to encourage the filing of liquidating chapter 11 cases where the driving purpose is to obtain non-consensual third-party releases.

*Id.* (internal citations omitted). Accordingly, since the Plan is a liquidating plan, the non-consensual, non-debtor third-party Protections cannot be approved.

42. Several other critical factors are not satisfied either. First, the Foundations have not provided any consideration to justify Protections because they have not provided sufficient consideration to satisfy even their fair and equitable share of the restructuring costs of these bankruptcy cases. Indeed, the $1 million is reduced by any costs of further litigation, and therefore is even more inadequate as consideration for the Protections. (In theory, the non-Foundation Debtors' agreement to indemnify the Foundations for all "costs of further litigation related to these matters" could result in a net payment to the Foundations.) In addition, the Plan provides no mechanism for satisfying the claims of non-consenting creditors in full. In fact, the general unsecured creditors are estimated to recover only 5.49% to 8.43% on the allowed amount of their claims. (Docket No. 1643 at 5.)

43. In addition, the Foundations have failed to provide any consideration to justify granting the Foundations general releases by the non-Foundation Debtors. Although debtors are permitted to release non-debtors as part of the plan, the non-debtor must still provide

-22-

consideration to justify such a release. *See, e.g.*, *Whispering Pine Estates, Inc. v. Flash Island, Inc.*, 370 B.R. 452, 460 (B.A.P. 1st Cir. 2007) (holding that, while a release of the debtor's claim against a non-debtor is appropriate, the plan proponent must still satisfy its burden of justifying the release at the confirmation hearing); *In re Washington Mutual, Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) (applying multi-factor test similar to *In re Dow Corning* and holding that consideration must be provided to justify a release by a debtor of a non-debtor); *cf. In re Dow Corning*, 208 F.3d at 658 (requiring consideration for non-debtor third-party releases). Since the Foundations have not provided any consideration for these broad releases, they cannot be approved. The Foundations' and the other Debtors' current and former directors, officers, and trustees have not provided any consideration for the general releases by the non-Foundation Debtors either. Thus these broad releases in favor of them, and the related Protections, cannot be approved.

44. As explained above, the Foundations have not even offered to pay an amount sufficient to satisfy their costs related to retained professionals in these cases. They certainly have not provided any consideration warranting a general release from the non-Foundation Debtors or the other Protections, and the Foundations' and non-Foundation Debtors' current and former officers, directors, and trustees have not provided any consideration for the Protections. Accordingly, the Protections in favor of the Foundations and all of the Debtors' (including the Foundations') current and former officers, directors, and trustees contained in the Plan are impermissible, and the Plan cannot be confirmed.

        C.     <u>The Plan Cannot Be Confirmed Because It Has Not Been Proposed in Good Faith.</u>

45. A plan may only be confirmed if it has been proposed in good faith. 11 U.S.C. § 1129(a)(3). In evaluating good faith, the court must examine the totality of circumstances. *See*

-23-

*In re Future Energy Corp.*, 83 B.R. 470, 486 (Bankr. S.D. Ohio 1988). Since the Bankruptcy Code imposes a fiduciary duty on a debtor to maximize the value of its estate for the benefit of creditors, *see, e.g.*, *CFTC v. Weintraub*, 471 U.S. 343, 352 (1985), a plan that does not maximize value for the estate's creditors is not proposed in good faith and cannot be confirmed, *cf. In re Future Energy Corp.*, 83 B.R. at 487 ("Clearly, an attempt by a debtor-in-possession to give favorable treatment to an insider is violative of § 1129(a)(3)'s good faith requirement.").

46.     As described above, the proposed settlement is woefully inadequate to justify the Protections contained in the Plan. Indeed, the (less than) $1 million settlement payment offered by the Foundations does not even satisfy their fair and equitable share of the restructuring costs of the bankruptcy cases. Rather than filing a separate motion to approve the settlement, the Debtors have chosen to make the settlement part of their Plan. The Committee submits that this settlement is improper and essentially amounts to a sweetheart deal with the Foundations, who are represented by the same counsel as the non-Foundation Debtors. This improper, related-party deal could not have been proposed in good faith. Since the settlement is a part of the Plan, this lack of good faith contaminates the rest of the Plan, and it cannot be confirmed.

47.     Moreover, since the settlement plainly fails to maximize value for the estates by abandoning all claims against the Foundations for far less than their worth, the Plan has not been proposed in good faith and cannot be confirmed.

> D.     The Plan Cannot Be Confirmed Because Unsecured Creditors Would Receive More in a Chapter 7 Liquidation.

48.     In order to be confirmed, the Plan must either (i) be accepted by each holder of a claim in an affected class or (ii) ensure that such holders will "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were

-24-

liquidated under chapter 7." 11 U.S.C. § 1129(a)(7). This is known as the best interests test because it requires a plan to be in the best interests of creditors before it can be confirmed. *See In re Future Energy Corp.*, 83 B.R. at 489.

49. General unsecured creditors' claims are impaired under the Plan. (*See* Plan § 2.2.3.) The Committee understands that not all unsecured creditors have accepted the Plan.

50. Under chapter 7 of the Bankruptcy Code, an independent trustee would be appointed or elected. *See* 11 U.S.C. §§ 701, 702. This trustee would have a fiduciary duty, *inter alia*, to collect assets in order to maximize value for the Debtors' estates. *See* 11 U.S.C. § 704(a)(1).

51. The Committee submits that this chapter 7 trustee would pursue collection of at least the Foundations' fair and equitable share of the professional fees and expenses expended in connection with their bankruptcy cases. That is, the chapter 7 trustee would attempt to collect between $2,752,656 and $4,682,228 from the Foundations, if not more.[25] The Committee submits that the chapter 7 trustee would not face significant difficulties in collecting this amount since the trustee would be vested with all of the non-Foundation Debtors' assets and powers. *Cf.* 11 U.S.C. § 541 (vesting the estate with all of the debtor's property wherever located). This would include the sole membership interests in the Foundations held by Debtors Trumbull Memorial Hospital ("TMH") and Western Reserve Care System ("WRCS" and together with TMH, the "Hospitals"). (*See* WRHF Arts. Art. V; WRHF Regs. Art. II § 2; TMHF Arts. Art. V; TMHF Regs. Art. II § 2.)[26] Furthermore, the Hospitals have the ability to control the

---

[25] The Committee maintains that the Debtors have other claims against the Foundations that should be pursued, but, since these claims are currently subject to the Appeal, they are not discussed herein.

[26] The term "WRHF Articles" refers to the Amended and Restated Articles of Incorporation of Western Reserve Health Foundation. The term "WRHF Regulations" refers to the Western Reserve Foundation Code of Regulations. The term "TMHF Articles" refers to the Articles of Incorporation of Trumbull Memorial Hospital Foundation. The term "TMHF Regulations" refers to the Amended and Restated Code of Regulations of Trumbull Memorial Hospital

-25-

Foundations. *See* 26 U.S.C. § 509(a)(3)(B)(i) (Type I supporting organizations like the Foundations are "operated, supervised, or controlled by" their supporting organizations, *i.e.* the Hospitals). The Hospitals elect a super-majority of the Foundations' Boards of Trustees and may remove the Trustees they elect at will. (WRHF Regs. Art. IV; TMHF Regs. Art. III § 1; *id.* Art. IV §§ 2, 4, 5.) The Hospitals appoint the Foundations' Presidents and other paid officers, determine the salary of such paid officers, and may replace such paid officers at will. (WRHF Regs. Art V §§ 3, 5, 8; TMHF Regs. Art. V §§ 3, 5, 8.) WRCS may even dissolve Western Foundation and distribute its assets. (WRHF Arts. Art. IV.) The trustee in a chapter 7 case would therefore have the ability to control the Foundations and cause them to distribute their fair and equitable share of the costs of these bankruptcy cases to the trustee for distribution to the Debtors' general unsecured creditors.[27]

52. Since unsecured creditors would receive more under a chapter 7 liquidation than they would under the Debtors' proposed Plan – and not all unsecured creditors have voted to accept the Plan – the Plan cannot be confirmed because it is not in the best interests of unsecured creditors.

> E. The Plan Impermissibly Dissolves the Committee.

53. Perfection of an appeal confers jurisdiction over the issues on appeal and divests the lower court of its control over those aspects of the case involved in the appeal. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). Accordingly, the lower court generally cannot take any action that would impact the appeal or take any other action that could alter the case's status before the court of appeals. *See In re Padilla*, 222 F.3d 1184, 1189-90 (9th

---

Foundation. These documents have previously been filed on the docket (*see* Docket No. 1383 Exs. A, B, F, G) and will be made available at the confirmation hearing, if necessary.

[27] Similarly, the Committee submits that the chapter 7 would further use its ability to control the Foundations to cause the Foundations to distribute all of their unrestricted cash to the Hospitals, consistent with the Foundations' charitable purposes.

LEGAL02/32708950v4

Cir. 2000); *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1064 (5th Cir. 1990).

54. An order confirming a chapter 11 plan is a final, appealable order. *E.g.*, *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 93 (D. Del. 2006). Pursuant to 28 U.S.C. § 158(a), a party may appeal as of right any final order of a bankruptcy court. *See, e.g.*, *In re Salem*, 465 F.3d 767, 773 (7th Cir. 2006) (finding that an order dismissing the case and denying confirmation of a chapter 13 plan "triggered Salem's right to appeal to the district court under 28 U.S.C. § 158(a)"); *In re Sun Valley Foods Co.*, 801 F.2d 186, 190 (6th Cir. 1986) (holding that 28 U.S.C. § 158 required the district court to hear an appeal from a final order of the bankruptcy court); *In re Ionosphere Clubs, Inc.*, 139 B.R. 772, 777 (S.D.N.Y. 1992) ("Under 28 U.S.C. § 158(a), the parties to a proceeding in bankruptcy may appeal as of right from final judgments, orders and decrees . . . .").

55. Section 10.4 of the Plan provides that the Committee automatically dissolves on the Effective Date of the Plan. Assuming that this Court confirms the Plan and the District Court has not yet entered its decision on the Committee's pending Appeal, this would impermissibly affect the Committee's right to prosecute the pending Appeal. Moreover, the Committee has filed this objection to confirmation of the Plan. If the Committee is dissolved automatically on the Effective Date, it would not be able to appeal any order confirming the Plan (or to continue to prosecute such an appeal), which violates 28 U.S.C. § 158(a). Accordingly, this provision of the Plan is impermissible, and the Plan cannot be confirmed because it would affect the Committee's ability to prosecute its pending Appeal in violation of federal common law and because it would deny the Committee its right to prosecute an appeal of a confirmation order.

LEGAL02/32708950v4

56.    In addition, the Committee should continue to exist after the Effective Date in order to raise and be heard on objections to final fee applications, if any.

WHEREFORE, for all of the foregoing reasons, the Committee respectfully requests that the Court sustain the objections set forth herein, deny confirmation of the Plan, and grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: July 5, 2011
       New York, New York

**ALSTON & BIRD LLP**

By: _____/s/ Craig E. Freeman_____
    Craig E. Freeman
    Martin G. Bunin
    90 Park Avenue
    New York, NY 10016
    (212) 210-9400
    *Counsel to the Official Committee*
    *of Unsecured Creditors*

LEGAL02/32708950v4